**CONNELL FOLEY LLP**
**85 Livingston Avenue**
**Roseland, NJ 07068**
**Telephone: (973) 535-0500**
**Telecopy: (973) 535-9217**
**Stephen V. Falanga**
**Peter J. Pizzi**
*Counsel for Debtor, Bayonne Medical Center and Allen J. Wilen, in his Capacity as*
*Liquidating Trustee And Estate Representative for the Estate of Debtor, Bayonne Medical*
*Center*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>**BAYONNE MEDICAL CENTER,**<br><br><br>Debtor. | **Bankr. Case No. 07-15195 (MS)**<br><br><br><br>**Chapter 11** |
| **BAYONNE MEDICAL CENTER, Debtor and Debtor-in-Possession; and ALLEN J. WILEN, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor, Bayonne Medical Center,**<br><br>Plaintiffs,<br><br>v.<br><br>**BAYONNE/OMNI DEVELOPMENT, L.L.C., a New Jersey limited liability company; BAYONNE HEALTHCARE DEVELOPMENT, L.L.C., an unregistered entity; OMNI ASSET MANAGEMENT, L.L.C. a New Jersey limited liability company; ATE CONSULTING COMPANY, a New Jersey corporation; AVERY EISENREICH, individually and trading as Bayonne Healthcare Development, L.L.C.; JOHN and JANE DOES 1 through 10; and ABC CORPS. 1 through 10,**<br><br>Defendants. | **Adv. Proc. No. 09-0_____(MS)**<br><br><br><br><br><br><br><br><br>**COMPLAINT TO AVOID AND RECOVER PREFERENTIAL AND FRAUDULENT TRANSFERS, TO COLLECT AMOUNTS DUE AND FOR OTHER RELIEF** |

Plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession ("Debtor" or the "Hospital") and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor (hereinafter collectively "Plaintiffs"), by and through their attorneys, Connell Foley LLP, as and for their Complaint against Defendants, Bayonne/Omni Development, L.L.C.; Bayonne Healthcare Development, L.L.C.; Omni Asset Management, L.L.C.; Avery Eisenreich; John and Jane Does 1 Through 10; and ABC Corps. 1 through 10, (collectively "Defendants"), states the following:

## INTRODUCTION AND NATURE OF CLAIMS

1.      The claims asserted by Plaintiffs in this action arise out of the Hospital's years-long effort prior to filing for bankruptcy to establish a skilled nursing facility ("SNF"), or nursing home, at or near the Hospital as a means to increase the Hospital census and capitalize on changing market trends in the City, including a growing and aging population.

2.      The Debtor began studying the feasibility of constructing a SNF as early 2004.

3.      Ultimately, in early 2006, the Hospital selected Defendant, Omni Asset Management, L.L.C., an entity owned and controlled by Defendant, Avery Eisenreich, as its partner to construct a SNF facility on Hospital-owned land adjacent to the main Hospital buildings.

4.      In connection with the selection of Omni Asset Management, L.L.C., Mr. Eisenreich made an unconditional unrestricted pledge of $5 million to the Hospital from two separate entities owned and controlled by him, Defendants, Bayonne Healthcare Development, L.L.C. and Omni Asset Management, L.L.C.  The pledges, however, have not been fulfilled.

5.      Additionally, another entity controlled by Eisenreich, Defendant, ATE Consulting, Corp. purportedly made a $1 million loan to the Hospital in June 2006 that was

2

never authorized by the Debtor's Board of Trustees.  In actuality, the $1 million the Hospital received from Eisenreich in June 2006 coincides with the due date of the first installment of the $5 million pledge and Plaintiffs, therefore, contend the $1 million received by the Debtor was not intended as a loan but was, instead, Eisenreich honoring his pledge commitment.  That the purported "loan" was not genuine is further evidenced by the fact that the Promissory Note documenting this "loan" contains the forged signature of Herman Brockman ("Brockman"), who at the time was the Chairman of the Debtor's Board of Trustees.

6.    Notwithstanding the "loan" was unauthorized and the Promissory Note was forged, Mr. Brockman, without knowledge of the Board of Trustees, and in dereliction and breach of his duties, authorized the repayment of the purported "loan" as a credit against the $2 million purchase price which Defendant, Bayonne/Omni Development, L.L.C. was to pay the Hospital to acquire its land to construct the SNF.

7.    Lastly, the Debtor's former President and Chief Executive Officer, Robert Evans, without knowledge or authority of the Board of Trustees, and in dereliction and breach of his duties, entered into a contract in August 2006 to sell the Hospital land to Defendant, Bayonne/Omni Development, L.L.C. for a total purchase price of $2 million, which was substantially less than the fair market value of the property.  In particular, the land was appraised by the Hospital in October, 2005 for $5.3 million.  After allowing for the repayment of the fraudulent $1 million "loan" and other credits, the Hospital netted a mere $185,000 from the sale.

8.    By way of this action, Plaintiffs seek to recover for the benefit of creditors: 1) the $5 million pledge that has not been fulfilled; 2) the unlawful repayment of the $1 million "loan" premised upon the forged Promissory Note; and 3) the actual real property or true value of the

3

real property transferred to Defendant, Bayonne/Omni Development, L.L.C. for less than adequate consideration.

## **PARTIES**

9.      On April 16, 2007 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

10.     On May 3, 2007, the Office of the United States Trustee for the District of New Jersey appointed an official committee of unsecured creditors pursuant to section 1102(a)(1) of the Bankruptcy Code.

11.     On February 23, 2009, the Debtor and the Committee filed a First Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code (the "Plan"), which provides, among other things, for the creation of a liquidating trust pursuant to a Liquidating Trust Agreement[1] (the "Liquidating Trust") and the appointment of a liquidating trustee (the "Liquidating Trustee") at or prior to confirmation of the Plan.  Pursuant to the Plan, the Liquidating Trustee is authorized to prosecute any and all claims and causes of action of the Debtor, including but not limited to, Avoidance Actions assigned to the Liquidating Trust.

12.     In addition, the Plan provides for the appointment of an Estate Representative, pursuant to the Bankruptcy Code, who is authorized to prosecute any and all claims and causes of action of the Debtor not assigned to the Liquidating Trust (the "Estate Representative").

13.     The Plan was confirmed by Order of the Court entered on April 7, 2009 ("Confirmation Order") and pursuant to Confirmation Order, Allen J. Wilen was appointed the Liquidating Trustee and the Estate Representative and has standing to prosecute the within action.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

14.     Defendant, Bayonne/Omni Development, L.L.C. ("Bayonne/Omni") is a New Jersey limited liability company with an address of 26 Journal Square, Suite 16, Jersey City, New Jersey 07306.

15.     Defendant, Bayonne Healthcare Development, L.L.C. ("BHD") is upon information and belief an entity that was never formed and  is not registered as a limited liability company but was used by Defendant, Avery Eisenreich for business purposes.

16.     Defendant, Omni Asset Management, LLC ("OAM") is a New Jersey limited liability company with an address of 26 Journal Square, Suite 16, Jersey City, New Jersey 07306.

17.     Defendant ATE Consulting Company ("ATE") is a New Jersey corporation with an address of 26 Journal Square, Suite 16, Jersey City, New Jersey 07306.

18.     Defendant, Avery Eisenreich ("Eisenreich") is, upon information and belief, the Chief Executive Officer and owner of OAM, owner of ATE, a member/interest holder of Bayonne/Omni and a promoter of BHD.

19.     Defendants Bayonne/Omni, BHD, ATE and OAM are collectively referred to herein as the "Omni Entities."

20.     Defendants, John and Jane Does 1 through 10 and ABC Corp. 1 through 10 are individuals and/or entities who may be liable to Plaintiffs on account of the claims asserted herein.  The true names and capacities, whether individual, corporate or otherwise, are unknown to Plaintiffs at this time and Plaintiffs, therefore, sue said Defendants by such fictitious names. Plaintiffs will amend their Complaint to allege the true names and capacities of the fictitious names if and when ascertained.

2116017-01

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

22.     This action is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A)(F)(H)(O).

23.     Venue of this action is proper in this district pursuant to 28 U.S.C. § 1409(a).

## ALLEGATIONS COMMON TO ALL COUNTS

24.     At all relevant times, the Debtor was a tax-exempt, non-profit corporation licensed by the State of New Jersey to operate a 278 acute care bed hospital at its campus in Bayonne, New Jersey.

*The Skilled Nursing Facility*

25.     Beginning as early as December 2004, the Debtor began to explore the possibility of constructing a SNF on or near its main campus in order to capitalize on changing market trends in the City including a growing and aging population.

26.     In this regard, the Debtor engaged Aon Life Sciences to examine the feasibility of constructing and operating a 120-bed nursing home.

27.     The Debtor's then President and Chief Executive Officer, Robert Evans ("Evans"), was the one of the main proponents of establishing a SNF and lead the efforts to explore its feasibility early on.

28.     By way of background, Evans was hired as President and CEO of the Hospital in 2000 and served in that capacity until his resignation in or about November 2006.

29.     From its inception in 2004, the SNF concept included the consideration of constructing the SNF on the property owned by the Hospital at the time, located at 636-644

6

Broadway in Bayonne and designated as Lots 1-4 of Block 164 on the Official Tax Map of the City of Bayonne (hereinafter the "Bell Building Property"). The property was commonly known as the Bell Building because a building on one of the parcels once housed telephone company operations.

30.     Throughout 2005, a strategic planning committee comprised of the Hospital's management team including Evans met periodically to address a timeline for implementation of a plan to construct and operate the SNF.

31.     In addition, throughout 2005, a finance subcommittee comprised of the Hospital's management team including Evans also met periodically to explore financing alternatives for construction of the SNF and retained Cain Brothers to assist in this regard.

32.     In the Spring of 2005, the Hospital's management began meeting with potential financial partners who were interested in assisting the Hospital with the operation of the SNF.

33.     As early as May, 2, 2005, the Hospital's senior management met with Eisenreich to discuss the Omni Entities' possible involvement with the project.

34.     At this time, Omni was aware that it was one of several possible financial partners under consideration by the Hospital.

35.     Sometime in 2005, Evans informed the Hospital's Board of Trustees (the "Board" or the "Trustees") about the concept of constructing the SNF and explained that it would involve the Debtor partnering with an established operator of skilled nursing home facilities to investigate, design, plan, construct and operate the SNF near the Hospital and most likely at the Bell Building Property.

36.     Evans further advised the Board that establishing a nursing home near the Hospital was perceived to be something that would benefit the Hospital in terms of increasing its census and the services it could provide to the aged population that would reside there.

37.     Throughout the second half of 2005, Evans and Eisenreich had discussions and negotiations regarding a proposal for Eisenreich, through one of his Omni companies, ultimately Bayonne/Omni, to be the entity selected by the Hospital to design, plan, construct and operate the nursing home on the Bell Building Property.

*The $ 5 million Pledges*

38.     In connection with his efforts to have OMA selected as the Hospital's SNF partner (and presumably to endear himself to Evans), Eisenreich agreed to make an unconditional unrestricted pledge of $5 million to the Hospital to be paid in five annual installments over five years.

39.     Two Confidential Pledge Forms were actually made at Eisenreich's direction.

40.     First, on or about October 14, 2005, Defendant BHD executed a Confidential Pledge Form pledging an unrestricted, unconditional gift of $5 million to the Hospital which was to be paid in annual installments of $1 million for five years with the first installment being due in July, 2008 (the "BHD Pledge").

41.     Eisenreich claims that the BHD Pledge was voided and that BHD was never formed as a legal entity.

42.     The second Confidential Pledge Form was executed by OAM on or about October 21, 2005 under which OAM made an unrestricted, unconditional gift of $5 million to the Hospital which was to be paid in annual installments of $1 million for five years with the first installment being due in July, 2006 (the "OAM Pledge").

8

43.    Eisenreich claims that the OAM Pledge is not legally binding and relies upon a letter, dated October 21, 2005, address to Eisenreich c/o OAM from Evans which provides:

> "While Bayonne Medical Center regards a pledge as a promise, it is not legally binding.  Bayonne Medical Center is dependent on the generosity and ability of its constituents to financially assist the Medical Center in bringing forth projects; however, you are under no obligation to fulfill your pledge if your own personal financial circumstances change.  While we hope that you will not experience any financial difficulties Bayonne Medical Center will work with you to accommodate unforeseen personal situations."

44.    However, Evans was not authorized to write such a letter to Eisenreich and, in any event,  Evans' statements are contrary to New Jersey law.

45.    In addition, upon information and belief, Eisenreich was also made aware that, by obtaining the $5,000,000 pledge to the Hospital in October of 2005, Evans and Heather Aaron, then Chief Financial Officer of the Hospital ("Aaron"), were able to qualify for compensation bonuses because the pledge enabled the Hospital to show an approximate profit of $500,000 for the fiscal year 2005, instead of a $4.5 million loss.

46.    Accordingly, accepting Eisenreich's contention that he authorized the OAM Pledge but immediately sought a letter from Evans alleging the Pledge was not legally binding suggests that Eisenreich was complicit in an apparent deception by Evans and Aaron to claim bonus compensation for which they were not entitled.

47.    Further, even accepting Evans' statements on their face, Eisenreich could not claim that the OAM Pledge was not binding unless he could demonstrate a change in his own personal financial circumstances, an event which certainly has not occurred.

48.    In any event, Eisenreich clearly did not rely upon Evans' October 21, 2005 Letter because he subsequently confirmed the validity of the OAM Pledge in response to a letter dated February 6, 2006, from Aaron to Eisenreich at OAM.

49.     The February 6, 2006 Letter requested that Eisenreich confirm for purposes of the Hospital's 2005 Audit the accuracy of his $5 million pledge.  Eisenreich countersigned the February 6, 2006 Letter, confirming that OAM had pledged $5 million as an unrestricted pledge payable in five installments commencing in June 2006.

50.     Eisenreich could have listed exceptions to the confirmation such as an alleged belief that that the OAM Pledge was conditional, but he did not do so.

51.     The OAM Pledge is valid, binding, unconditional and unrestricted and remains due and owing.

*Evans' Selection of Bayonne/Omni as the Hospital's SNF Partner*

52.     With the $5 million OAM Pledge apparently firming up the deal, in or about November 2005, Evans apparently made the decision to select OAM as the Hospital's SNF partner.

53.     On or about November 30, 2005, Evans sent Eisenreich c/o OAM a Letter of Intent ("LOI") that outlined the understandings between Evans and Eisenreich.

54.     As originally structured, the deal called for the Hospital to convey by either sale or lease the Bell Building Property to an affiliate of OAM which would construct a 6-story, 100,000 sq. foot building to house the SNF.  As part of the agreement, the Hospital would lease two floors of the new building on terms to be agreed-upon.  The Hospital was also to receive a membership interest in the OAM affiliate reflective of the value of the Bell Building Property.

55.     Eisenreich countersigned the LOI and on December 13, 2005, wrote a supplemental letter to Evans to clarify certain terms of the LOI and requesting that team meetings begin to start the planning process.

56.     In Eisenreich's letter of December 13, 2005, Eisenreich states that Omni had ordered an appraisal of the Bell Building Property on December 12, 2005.  Eisenreich also requested a copy of the appraisal the Hospital had ordered on the Bell Building Property three months earlier in October 2005.

57.     The appraisal, which was ordered on behalf of the Hospital before Evans had reached any understanding with Eisenreich, indicated that the Bell Building Property had a fair market value of $5.3 million as of October 17, 2005.  Incredibly, Eisenreich's appraisal, which was obtained in January 2006 after OAM's selection, contended the Bell Building Property was only worth $1.2 million.

58.     Evans then began to set up meetings with Eisenreich's team and certain Hospital management starting in January 2006.

59.     Significantly, Evans never advised the Trustees of his apparent decision to move forward with OAM until almost four months after executing the LOI.

60.     Indeed, it was not until the Board Meeting on April 6, 2006, that the concept of SNF and negotiations with Eisenreich and OAM were first discussed.

61.     During that meeting, Aaron advised the Board that the SNF due diligence process had included close review of three separate firms, including OAM, and that this review indicated that OAM appeared to be the best partner for the SNF project.

62.     Aaron also gave the Board some general details of the proposed project noting that the Hospital would receive 49% of the revenue (estimated at $8 million yearly) and would negotiate market value rent for the Bell Building Property which would be a land lease.

2116017-01

63.     Neither Aaron nor Evans informed the Board that Evans had signed a binding LOI in January 2006 awarding the project to OAM or that Eisenreich had authoized the $5 million pledge that enabled them to claim their bonuses for that year.

64.     Based upon Aaron's report, the Board adopted a Resolution on the recommendation of the Finance Committee that approved and authorized management to proceed with a contractual agreement with OAM.

*Revisions to the Original Deal-Structure
and Execution of the Purchase and Sale Agreement*

65.     Sometime between the Board's April 6th Meeting and its subsequent meeting on June 8, 2006, the terms of the initial deal changed.

66.     During the June 8, 2006 Board Meeting, Herman Brockman, the then Chairman of the Board of Trustees, reported to the Board that the initial structure of the SNF project as a land lease arrangement with OAM would not work because of the Hospital's not-for-profit status.

67.     Instead, Brockman advised the Board that in order to move forward with the SNF project and to proceed with an anticipated bond refinancing that was being pursued, it might be necessary to sell the Bell Building Property at the "current market rate."

68.     According to the Minutes of the Board of Trustees Meeting on June 8, 2006, Brockman only advised the Board that certain discussions had been ongoing with Eisenreich, including information regarding the general structure of the proposed deal.

69.     Brockman further assured the Board that, in connection with any sale, all necessary covenants would be included to protect the best interests of the Hospital. This assurance was important because the location of the Bell Building Property was adjacent to the main Hospital buildings and access from the Bell Building Property would continue to be needed

by the Hospital for ingress and egress and also for air rights.  In addition, the Hospital's main sewer line was located under the Bell Building Property.

70.     Based upon Brockman's recommendation and proposed resolution, the Board adopted a Resolution at the June 2006 Meeting which authorized the Hospital's administration to proceed and, if deemed necessary, arrange for the sale of the Bell Building Property "at market value."

71.     The Hospital's strategic planning committee continued to meet thereafter to discuss and finalize the OAM transaction, and Evans decided to devote a significant potion of his time to expediting the development of the SNF.

72.     According to the Minutes of the Board of Trustees Meeting on August 10, 2006, Evans reported to the Board that the SNF and bond refinancing initiatives continued to move forward. Evans advised the Board that the SNF would help to build back volume and groundbreaking was anticipated in early 2007.

73.     Up to this point, however, Evans did not advise the Board that he had negotiated any firm agreement with Eisenreich or OAM for the sale of the Bell Building Property nor what the details of the proposed agreement would be, such as the purported market value of the Bell Building Property.

74.     Despite Evans' failure to disclose this clearly material information, only two weeks after the Meeting, Evans signed a document titled "Purchase and Sale Agreement," dated August 24, 2006 ("Purchase and Sale Agreement") which provided that the Hospital would sell Bayonne/Omni the Bell Building Property to Bayonne/Omni for a price of only $2 million.  In addition, as part of the agreement, the Hospital was required to assign to Bayonne/Omni for no additional consideration the Hospital's existing license to operate nine (9) long term acute beds.

Further, the Hospital was required under the Purchase and Sale Agreement to fund the costs of environmental cleanup on the Bell Building Property for the lesser of costs or $500,000.

75.    The Purchase and Sale Agreement also required, *inter alia*, the Debtor to rent approximately 20,000 sq. ft. of space at the nursing home for a substantial amount of rent and in connection therewith, Evans executed a written lease, also dated August 24, 2006, for the space conditioned upon Bayonne/Omni obtaining all necessary approvals for the SNF.

76.    In short, a deal which initially called for the Hospital to garner up to $8 million in additional income plus substantial rental income from a land-lease had devolved to the point where the Hospital would receive only a fraction of what it was originally promised and upon which the Hospital had reasonably relied.

*Events Occurring After Evans' Resignation in November 2006*

77.    Within a few short months, Evans resigned (in or about November 2006), the existing management at the Hospital was unsettled, and a series of interim appointments were made to place executive management in position to oversee the Hospital's operations.

78.    As a result, during this period, Brockman apparently chose to take on a greater role in overseeing the operational affairs of the Hospital and became particularly involved with the OAM transaction.

79.    By way of background, Brockman had begun serving as a Trustee on the Board in or around 1979 and became Chairman of the Board in or around 1992, serving in that position for approximately 15 years until his resignation in August 2007 after the Debtor filed for bankruptcy.

80.    As part of his duties serving as Trustee and Chairman of the Board, Brockman served on the search committee that was responsible for the hiring of Evans.

14

81.    Sometime in late November or early December 2006, Eisenreich approached Brockman at the Hospital and advised him that Evans had executed a signed contract for the sale of the Bell Building Property prior to his resignation and demanded to close on the sale.

82.    During this meeting, Eisenreich produced a copy of the Purchase and Sale Agreement.

83.    Until December 2006, neither Brockman nor anyone else on the Board for that matter knew the details of an agreement between the Hospital and Bayonne/Omni let alone that a signed contract had even existed.

84.    Up until this point in time, the Board was only aware that discussions between Hospital management had taken place with Eisenreich and his entities and that the only authority given by the Board was for the Hospital's administration to proceed and, if deemed necessary, arrange for the sale of the Bell Building Property "at market value."  The minutes of the Board meeting do not indicate that the Board, at this time, authorized the finalization of the material terms for the sale or the execution of a final purchase and sale agreement.

85.    During Brockman's meeting with Eisenreich in December 2006, in consideration of the perilous financial condition of the Hospital at that time, Brockman advised Eisenreich that the Hospital did not have any need for a lease of the two floors of the SNF and that the Hospital would not go through with the agreement.

86.    In response, Eisenreich contacted Brockman days later and advised him the provisions requiring the Hospital to lease the two floors of space in the SNF would be eliminated and that the closing needed to be scheduled immediately.

87.    The reason for Eisenreich's sense of urgency is clear.

88.    During this time, Eisenreich was aware that the Hospital was experiencing significant financial difficulties as well as a declining census and there was a risk that the Hospital might file for bankruptcy, which would derail the purported transaction with OAM.

89.    In fact, Eisenreich instructed his attorney, Fred Gruen, to send a letter dated December 1, 2006 to the Hospital to the attention of Carrie Evans advising that "This will constitute notice that we hereby set time of the essence for the closing of title to the premises referred to above for December 11, 2006."

*The Forged Promissory Note and Alleged $1 million Loan*

90.    During the same conversation referenced above, Eisenreich also advised Brockman for the first time that he had lent the Hospital $1 million through Evans.

91.    When Brockman denied any knowledge of this purported loan, Eisenreich produced a document titled "Promissory Note" dated June 22, 2006, purporting to validate a loan for $1,000,000 made by ATE to the Hospital (hereinafter the "Alleged Note").

92.    The Alleged Note was purportedly signed on behalf of the Hospital by Evans as President and by Brockman as Chairman of the Board.

93.    Brockman, however, denies that he signed the Alleged Note and claims his signature is a forgery.

94.    The Alleged Note was purportedly notarized by a notary named Daisy Acevedo, who was an employee of the Hospital in the medical records department.

95.    Ms. Acevedo has acknowledged that Brockman did not sign the Alleged Note in her presence and that the Alleged Note may not have contained Brockman's signature at the time she placed her notary acknowledgement on the document.

2116017-01

96.    In addition to the forged Alleged Note, Brockman's name was also forged on a document titled "Corporate Resolution" and also dated June 22, 2006, which purported to be a resolution of the Hospital authorizing the Hospital to borrow $1,000,000 from ATE (the "Alleged Corporate Resolution").

97.    The Alleged Corporate Resolution was also signed by Evans as President of the Hospital.

98.    The forged Alleged Note was never authorized by the Board and no such loan is even mentioned in the Minutes of the Board of Trustee's Meeting of June 8, 2006, which would have preceded the signing of the Alleged Note and Alleged Corporate Resolution, and which would have indicated that the Board at least considered the substance of the Alleged Note and/or the Alleged Corporate Resolution.

99.    Similarly, according to the Minutes of the Board of Trustee's Meeting of August 10, 2006, the Alleged Note and Alleged Corporate Resolution were never disclosed to the Board at the August 10, 2006 Meeting.

100.    After being advised of the existence of the Alleged Note, Brockman asked the Hospital's current administration to investigate the matter.  Administrators spoke with the notary who confirmed that Brockman was not present when the document was notarized and that his signature had been forged.

101.    Hospital administration advised Brockman that the Hospital received a $1 million wire on June 23, 2006 with a notation of "ATE Consulting Corporation" which was reconciled on the Hospital's General Ledger with a notation "Wire Transfers – Omni Nursing Home."

102.    In actuality, the $1 million the Hospital received from Eisenreich in June 2006 coincides with the due date of the first installment of the $5 million OAM Pledge.

103.    Upon information and belief, the $1 million received by the Debtor was not intended as a loan but, instead, was Eisenreich honoring his pledge commitment in accordance with the OAM Pledge.

104.    Remarkably, despite the existence of the forgery, in dereliction and breach of his duties, and with knowledge of the Hospital's deteriorating financial condition, Brockman never discussed the forgery with the Board or the acting president and chief operating officer of the Hospital and continued to press forward with scheduling an emergent closing on the sale of the Bell Building Property to Omni that very week.

*The Sale of the Bell Building Property to Omni*
*and Repayment of the Fraudulent Promissory Note*

105.    According to the Minutes of the Board of Trustees' Meeting on December 7, 2006, Brockman apparently reported to the Board for the first time that a closing on the sale of the Bell Building Property to Bayonne/Omni was scheduled to occur the next day, December 8, 2006.

106.    This was the first time the Board was made aware that an actual agreement had even been entered into.

107.    As alleged above, in June of 2006, when the Board adopted the action item to sell the property at market value, the Bell Building Property had a market value as of October 17, 2005 in the amount of approximately $5.3 million based upon an appraisal that the Hospital ordered.

108.    There is only a reference in the Minutes that Brockman advised the Board that he had been successful in renegotiating and releasing the Hospital from being obligated to lease back a portion of the space at the new building.  Apparently, Brockman never disclosed to the Board the details or material terms of the transaction, including the purchase price.

109.    Further, although the Minutes suggest that "aspects surrounding a promissory note were related," Brockman, in an incredible dereliction and breach of his duties, never advised the Board that his signature on the Promissory Note had been forged and that issues existed concerning whether an actual loan to the Hospital from OAM had been properly authorized, thereby depriving the Board of the opportunity to act.

110.    According to the Minutes, instead of making such disclosures, Brockman apparently commented to the Board that the SNF was "an important project for the community that we must move forward with."

111.    At this time, Brockman was also aware of the $5 million OAM Pledge but yet again never disclosed to the Board that the pledge existed, that the first installment of the Pledge was due in June 2006, and that there was a question as to whether the funds received by the Hospital in June 2006 were on account of the Pledge or the Alleged Note.

112.    Brockman also never advised the Board that the Hospital had been pressured to close on the Bell Building Property by Eisenreich.

113.    Rather, at the Board meeting, Brockman reported to the Board that further information had come to light and additional factors uncovered that placed the Hospital in a more severe financial position than initially anticipated.

114.    As the documentation to finalize the closing was being prepared, and notwithstanding the Alleged Note was unauthorized and forged, Brockman, without knowledge of authorization by the Board, and in dereliction and breach of his duties, authorized the repayment of the Alleged Note with interest as a credit to Bayonne/Omni at the closing on the sale of the Bell Building Property.

115.    Brockman claims he allowed the Alleged Note to be repaid despite the forgery because he had confirmed that the Hospital received the $1 million loan.  There is no record, however, showing that the amount received in June 2006 was on account of the alleged "loan," as opposed to the first installment of the $5 million OAM Pledge.

116.    In fact, the only record which is not in dispute and which supports receipt of the payment in June 2006 is the $5 million OAM Pledge Eisenreich authorized in October 2005.

117.    It was also clear that Bayonne/Omni struggled with its attempts to characterize the repayment of the Alleged Note to ATE as a proper adjustment to the purchase price obligations of Bayonne/Omni.

118.    Significantly, nowhere in the Purchase and Sale Agreement is there any indication that the Hospital was indebted to Bayonne/Omni.

119.    A initial draft of the HUD-1 Uniform Settlement Statement, dated 12/1/06 referred to the repayment of the Alleged Note as "Forgiveness of Loan, $1,036,430.11[.]" something that clearly did not occur.

120.    The actual HUD-1 Uniform Settlement Statement, dated 12/8/06, ultimately reflected a credit against the purchase price to Bayonne/Omni for "Payment of Loan" in the amount of $1,037,313.23" – even though the loan was not made by Bayonne/Omni.

121.    As alleged above, the rush to close had nothing to do with time being of the essence.  Rather, Eisenreich was aware that the Hospital faced financial difficulties and therefore made it imperative to close on the transaction before a possible bankruptcy filing.

122.    Indeed, the Hospital was not even prepared to vacate the Bell Building Property for another three (3) to four (4) months following the closing because of the time needed to relocate the exiting operations being conducted there.

123.    As a result, at the closing, the parties also entered into a Use and Occupancy Agreement that permitted the Hospital to remain in the building at no charge for an additional six (6) months, or through April 8, 2007.

124.    A Resolution of the Board of Trustees of Bayonne Medical Center, Inc. purporting to have been adopted on June 8, 2006 was apparently created simultaneously with the closing in December (the "June 8th Resolution").   However, the June 8th Resolution contains authorizations that were never approved by the Board at its meeting in June 2006 or at any time thereafter.

125.    Brockman claims that the June 8th Resolution had to have been presented to the Board at the June 8, 2006 meeting but that is impossible since the Resolution contains information that was not available to the Board at that time, including the purchase price and amounts that were set aside for environmental escrows.

126.    In fact, the Purchase and Sale Agreement was not even executed until some time in August of 2006 so there was no contract at the time of the June 2006 meeting.

127.    Nor was there any legitimate reason or logic for the closing to occur quickly because the Hospital needed funds for its operations since, after deducting for escrows, closing costs and other matters, and allowing Bayonne/Omni to receive improper credit for the alleged loan from ATE, the total proceeds to the Hospital from the closing amounted to little more than $184,000.

128.    In January 2009, Brockman personally appeared at the Bayonne Zoning Board hearing to support Bayonne/Omni's application even though, between the closing in December 2006 and when Bayonne/Omni made its application in the Fall of 2008, Brockman claims to have had no contact with Eisenreich.

129.    Upon information and belief, Brockman or his family stand to benefit either directly or indirectly from the Bayonne/Omni transaction and the construction by the Omni Entities of the nursing home on the Bell Building Property.

### COUNT I
### (Claim for Enforcement of Pledge)

130.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

131.    OAM voluntarily made the OAM Pledge to the Hospital in the amount of $5 million.

132.    The OAM Pledge is valid, binding, unconditional and unrestricted and remains due and owing.

133.    BHD voluntarily made the BHD Pledge to the Hospital in the amount of $5 million.

134.    Alternatively, the BHD Pledge is valid, binding, unconditional and unrestricted and remains due and owing.

135.    As owner of OAM and promoter of BHD, Eisenreich is personally liable for fulfillment of either the OAM Pledge or the BHD Pledge.

136.    OAM, BHD and Eisenreich have failed to fulfill their requirements under the Pledges.

137.    The Debtor has been damaged.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne Healthcare Development, L.L.C., Omni Asset Management, L.L.C. and Avery Eisenreich in an amount no less than $5,000,000, plus

continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

## COUNT II
### (Claim for Avoidance of Preferential Transfer as to Repayment of Alleged Promissory Note)

138.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

139.    Because of Eisenreich's and the Omni Entities' close relationship with the Hospital, Eisenreich and the Omni Entities qualify as insiders of the Debtor, subjecting any transactions made between the Debtor of to heavy scrutiny.

140.    The repayment of the Alleged Note was a transfer of property, or an interest in property, of the Debtor.

141.    The repayment of the Alleged Note was made to or for the benefit of ATE, a creditor of the Hospital.

142.    The repayment of the Alleged Note was made for or on account of an antecedent debt owed by the Debtor to ATE before the transfer was made.

143.    The repayment of the Alleged Note was made while the Debtor was insolvent.

144.    The repayment of the Alleged Note was made between ninety days and one year before the Petition Date to or for the benefit of ATE, an insider of the Debtor.

145.    The repayment of the Alleged Note enabled ATE to receive more than ATE would have received if: (a) the repayment of the Alleged Note had not been made; (b) the Debtor's chapter 11 case was a case under chapter 7 of the Bankruptcy Code; and (c) the ATE had received payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

2116017-01

146.    Bayonne/Omni, ATE, OAM and/or Eisenreich were (i) the initial transferee of the repayment Alleged Note (ii) the immediate or mediate transferee of the repayment Alleged Note, or (iii) the entities for whose benefit of the repayment Alleged Note Transfer(s) was made.

147.    The repayment of the Alleged Note is avoidable pursuant to 11 U.S.C. § 547 and the amount paid, plus interest, of the Alleged Note is recoverable from Bayonne/Omni, ATE, OAM and/or Eisenreich pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich for avoidance of the transfer and judgment in an amount no less than $1,037,313.23, plus continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

<u>COUNT III</u>
**(Claim for Fraudulent Transfer as to Repayment
of Alleged Promissory Note - Actual Fraud)**

148.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

149.    The Alleged Note purporting to document a loan from ATE to the Hospital in June 2006 is fraudulent and forged and the loan was never authorized by the Board.

150.    Upon information and belief, the $1 million wire the Hospital received on June 23, 2006 was not intended as a loan but was, instead, Eisenreich honoring his pledge commitment in accordance with the OAM Pledge.

24

151.    The Debtor permitted the repayment of Alleged Note to or for the benefit of Eisenreich and the Omni Entities with the actual intent to hinder, delay or defraud present and/or future creditors of the Hospital.

152.    Bayonne/Omni, ATE, OAM and/or Eisenreich were (i) the initial transferee of the repayment Alleged Note (ii) the immediate or mediate transferee of the repayment Alleged Note, or (iii) the entities for whose benefit of the repayment Alleged Note Transfer(s) was made.

153.    The repayment of the Alleged Note is avoidable pursuant to Section 548(a) of the Bankruptcy Code and the amount paid, plus interest, of the Alleged Note is recoverable from Bayonne/Omni, ATE, OAM and/or Eisenreich pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich for avoidance of the transfer and judgment in an amount no less than $1,037,313.23, plus continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

### *COUNT IV*
### (Claim for Fraudulent Transfer as to Repayment
### of Alleged Promissory Note – Constructive Fraud)

154.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

155.    The Alleged Note purporting to document a loan from ATE to the Hospital in June 2006 is fraudulent and forged and the loan was never authorized by the Board.

156.    Upon information and belief,  the $1 million wire the Hospital received on June 23, 2006 was not intended as a loan but was, instead, Eisenreich honoring his pledge commitment in accordance with the OAM Pledge.

157.    The Debtor received less than reasonably equivalent value in exchange for repaying the Alleged Note.

158.    The Debtor was insolvent on the date that it repaid the Alleged Note or became insolvent as a result of the transfer.

159.    Bayonne/Omni, ATE, OAM and/or Eisenreich were (i) the initial transferee of the repayment Alleged Note (ii) the immediate or mediate transferee of the repayment Alleged Note, or (iii) the entities for whose benefit of the repayment Alleged Note Transfer(s) was made.

160.    Repayment of the Alleged Note is avoidable pursuant to Section 548(a) of the Bankruptcy Code and the amount paid, plus interest, of the Alleged Note is recoverable from Bayonne/Omni, ATE, OAM and/or Eisenreich pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich for avoidance of the transfer and judgment in an amount no less than $1,037,313.23, plus continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

### *COUNT V*
**(Claim for Fraudulent Transfer as to Repayment
of Alleged Promissory Note – N.J.S.A. 25:2-25)**

161.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

2116017-01

162.     The Alleged Note purporting to document a loan from ATE to the Hospital in June 2006 is fraudulent and forged and the loan was never authorized by the Board.

163.     Upon information and belief,  the $1 million wire the Hospital received on June 23, 2006 was not intended as a loan but was, instead, Eisenreich honoring his pledge commitment in accordance with the OAM Pledge.

164.     The repayment of the Alleged Note was made to an insider.

165.     The Debtor was insolvent or became insolvent shortly after the transfer was made.

166.     The Debtor repaid the Alleged Note with actual intent to hinder, delay, or defraud the Hospital's present and future creditors, including Plaintiffs.

167.     The Debtor repaid the Alleged Note without receiving a reasonably equivalent value in exchange for the transfer and the Hospital 1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the Hospital were unreasonably small in relation to the business or transaction; or 2) intended to incur, or believed or reasonably should have believed that the Hospital would incur, debts beyond the Hospital's ability to pay as they became due.

168.     The Debtor repaid the Alleged Note without receiving reasonably equivalent value in exchange for the transfer and the Hospital was insolvent at the time of the transfer or became insolvent as a result of the transfer.

169.     Bayonne/Omni, ATE, OAM and/or Eisenreich were (i) the first transferee of the repayment of the Alleged Note or (ii) the subsequent transferee of the repayment of the Alleged Note.

2116017-01

170.    Repayment of the Alleged Note is avoidable pursuant to N.J.S.A. 25:2-25 and the amount paid, plus interest, of the Alleged Note is recoverable from Bayonne/Omni, ATE OAM and/or Eisenreich pursuant to N.J.S.A. 25:2-29 & 30 and Section 550 of the Bankruptcy Code.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich for avoidance of the transfer and judgment in an amount no less than $1,037,313.23, plus continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

### _COUNT VI_
**(Claim for Fraudulent Transfer as to Repayment
of Alleged Promissory Note – N.J.S.A. 25:2-27)**

171.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

172.    The Alleged Note purporting to document a loan from ATE to the Hospital in June 2006 is fraudulent and forged and the loan was never authorized by the Board.

173.    Upon information and belief,  the $1 million wire the Hospital received on June 23, 2006 was not intended as a loan but was, instead, Eisenreich honoring his pledge commitment in accordance with the OAM Pledge.

174.    The repayment of the Alleged Note was made to an insider.

175.    The Debtor repaid the Alleged Note without receiving reasonably equivalent value in exchange for the transfer and the Hospital was insolvent at the time of the transfer or became insolvent as a result of the transfer.

28

176.    The Debtor repaid the Alleged Note to an insider for an antecedent debt and the Hospital was insolvent at the time and the insider had reasonable cause to believe that the Debtor was insolvent.

177.    The repayment of the Alleged Note was fraudulent as to present creditors of the Hospital, including Plaintiffs.

178.    Bayonne/Omni, ATE, OAM and/or Eisenreich were (i) the first transferee of the repayment Alleged Note or (ii) the subsequent transferee of the repayment Alleged Note.

179.    Repayment of the Alleged Note is avoidable pursuant to N.J.S.A. 25:2-27 and the amount paid, plus interest, of the Alleged Note is recoverable from Bayonne/Omni, ATE OAM and/or Eisenreich pursuant to N.J.S.A. 25:2-29 & 30 and Section 550 of the Bankruptcy Code.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich for avoidance of the transfer and judgment in an amount no less than $1,037,313.23, plus continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

### *COUNT VII*
**(Declaratory Judgment of Invalidity
and/or Unenforceability as to Alleged Promissory Note)**

180.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

181.    The Alleged Promissory Note purporting to document a loan from ATE to the Hospital in June 2006 is fraudulent and forged and the loan was never authorized by the Board.

182.    Upon information and belief,  the $1 million wire the Hospital received on June 23, 2006 was not intended as a loan but was, instead, Eisenreich honoring his pledge commitment in accordance with the OAM Pledge.

183.    The Alleged Promissory Note lacked any consideration or lacked any adequate consideration.

184.    The Alleged Promissory Note at a minimum contemplated but did not, or intend to, effectuate a loan.

185.    The Alleged Promissory Note was purportedly an agreement entered into on behalf of the Hospital, which did not give or otherwise provide any actual or implied, express, implicit or incidental, authority to enter into such an agreement.

186.    Evans and Brockman lacked any authority, actual or implied, express, implicit or incidental, to bind the Hospital or the Board to the terms or conditions of the Alleged Promissory Note.

187.    As a result, the Hospital cannot be held bound to the terms of the Alleged Promissory Note, and the Alleged Promissory Note is void or voidable and must be deemed invalid and/or unenforceable.

188.    A declaratory judgment as to the rights and other legal relations of the parties is necessary to the resolution of this dispute.

189.    Plaintiffs accordingly seek a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the Alleged Promissory Note is invalid and unenforceable.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand the entry of an order declaring the Alleged Promissory Note null and void and

30

2116017-01

entering judgment against Defendants, Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich in an amount no less than $1,037,313.23, plus continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

### COUNT VIII
**(Claim for Unjust Enrichment as to Alleged Promissory Note)**

190.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

191.    The Alleged Promissory Note purporting to document a loan from ATE to the Hospital in June 2006 is fraudulent and forged and the loan was never authorized by the Board.

192.    Upon information and belief,  the $1 million wire the Hospital received on June 23, 2006 was not intended as a loan but was, instead, Eisenreich honoring his pledge commitment in accordance with the OAM Pledge.

193.    The Alleged Promissory Note lacked any consideration or lacked any adequate consideration.

194.    The Alleged Promissory Note at a minimum contemplated but did not effectuate or intend to issue a loan.

195.    The Alleged Promissory Note was purportedly an agreement entered into on behalf of the Hospital, which did not give or otherwise provide any actual or implied, express, implicit or incidental, authority to enter into such an agreement.

196.    The Alleged Promissory Note is invalid and unenforceable.

197.    Defendants received a monetary benefit from the repayment of the Alleged Promissory Note by the Hospital.

31

198.    As a result, Defendants have been unjustly enriched at the expense of and to the detriment of Plaintiffs.

199.    Plaintiffs have been substantially injured as a result thereof.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich in an amount no less than $1,037,313.23, plus continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

### COUNT IX
**(Claim for Fraudulent Transfer as to Sale of Bell Building – Constructive Fraud)**

200.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

201.    The Debtor received less than reasonably equivalent value in exchange for the transfer of the Bell Building Property to Bayonne/Omni.

202.    The Debtor was insolvent on the date that it transferred the Bell Building Property to Bayonne/Omni or became insolvent as a result of the transfer.

203.    Bayonne/Omni, ATE, OAM and/or Eisenreich were (i) the initial transferee of the transfer of the Bell Building Property to Bayonne/Omni. (ii) the immediate or mediate transferee transfer of the Bell Building Property to Bayonne/Omni or (iii) the entities for whose benefit of transfer of the Bell Building Property to Bayonne/Omni was made.

204.    The transfer of the Bell Building Property is avoidable pursuant to Section 548(a) of the Bankruptcy Code and the transfer should be set aside or the actual value of the property

should be awarded Plaintiffs and is recoverable from Bayonne/Omni and/or the Omni Entities pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne Healthcare Development, L.L.C., Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich for:

a)      Avoidance of the transfer of the Bell Building Property pursuant to Section 548 and 550 of the Bankruptcy Code;

b)      An attachment or other provision remedy against the Bell Building Property pursuant to Section 105 of the Bankruptcy Code;

c)      An injunction against further disposition by the Defendants, or any of them, of the Bell Building Property pursuant to Section 105 and/or 362 of the Bankruptcy Code;

d)      Recovery of judgment for the value of the Bell Building Property; and

e)      For such other relief as this Court may deem just and proper.

### *COUNT X*
**(Claim for Fraudulent Transfer as to Sale of Bell Building– N.J.S.A. 25:2-25)**

205.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if

206.    The transfer of the Bell Building Property was made to an insider.

207.    The Debtor was insolvent or became insolvent shortly after the transfer was made.

208.    The Debtor transferred the Bell Building Property without receiving a reasonably equivalent value in exchange for the transfer and the Hospital 1) was engaged or was about to

engage in a business or a transaction for which the remaining assets of the Hospital were unreasonably small in relation to the business or transaction; or 2) intended to incur, or believed or reasonably should have believed that the Hospital would incur, debts beyond the Hospital's ability to pay as they became due.

209.    The Debtor transferred the Bell Building Property without receiving reasonably equivalent value in exchange for the transfer and the Hospital was insolvent at the time of the transfer or became insolvent as a result of the transfer.

210.    Bayonne/Omni, ATE, OAM and/or Eisenreich were (i) the first transferee of the Bell Building Property or (ii) the subsequent transferee of the Bell Building Property.

211.    The transfer of the Bell Building Property  is avoidable pursuant to N.J.S.A. 25:2-25 and the transfer should be set aside or the actual value of the property should be awarded Plaintiffs and is recoverable from Bayonne/Omni and/or the Omni Entities pursuant to N.J.S.A. 25:2-29 & 30 and Section 550 of the Bankruptcy Code.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne Healthcare Development, L.L.C., Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich for:

a)    Avoidance of the transfer of the Bell Building Property pursuant to N.J.S.A. 25:2-29(1);

b)    An attachment or other provision remedy against the Bell Building Property pursuant to N.J.S.A. 25:2-29(2);

c)    An injunction against further disposition by the Defendants, or any of them, of the Bell Building Property pursuant to  N.J.S.A. 25:2-29(3);

d)      Recovery of judgment for the value of the Bell Building Property pursuant to N.J.S.A. 25:2-30; and

e)      For such other relief as this Court may deem just and proper.

### *COUNT XI*
**(Claim for Fraudulent Transfer as to Sale of Bell Building –N.J.S.A. 25:2-27)**

212.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

213.    The transfer of the Bell Building Property was made to an insider.

214.    The Debtor transferred the Bell Building Property without receiving reasonably equivalent value in exchange for the transfer and the Hospital was insolvent at the time of the transfer or became insolvent as a result of the transfer.

215.    The Debtor transferred the Bell Building Property to an insider in part for an antecedent debt and the Hospital was insolvent at the time and the insider had reasonable cause to believe that the Debtor was insolvent.

216.    The transfer of the Bell Building Property was fraudulent as to present creditors of the Hospital, including Plaintiffs.

217.    Bayonne/Omni, ATE, OAM and/or Eisenreich were (i) the first transferee of the Bell Building Property or (ii) the subsequent transferee of the Bell Building Property.

218.    The transfer of the Bell Building Property is avoidable pursuant to N.J.S.A. 25:2-27 and the transfer should be set aside or the actual value of the property should be awarded Plaintiffs and is recoverable from Bayonne/Omni and/or the Omni Entities pursuant to N.J.S.A. 25:2-29 and Section 550 of the Bankruptcy Code.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne Healthcare Development, L.L.C., Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich for:

a)    Avoidance of the transfer of the Bell Building Property pursuant to N.J.S.A. 25:2-29(1);

b)    An attachment or other provision remedy against the Bell Building Property pursuant to N.J.S.A. 25:2-29(2);

c)    An injunction against further disposition by the Defendants, or any of them, of the Bell Building Property pursuant to  N.J.S.A. 25:2-29(3);

d)    Recovery of judgment for the value of the Bell Building Property pursuant to N.J.S.A. 25:2-30; and

e)    For such other relief as this Court may deem just and proper.

## *COUNT XII*
**(Declaratory Judgment of Invalidity and/or Unenforceability as to Transfer of Bell Building Property)**

219.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

220.    Neither Evans nor Brockman had authority, actual or implied, express, implicit or incidental, to bind the Hospital to the Purchase and Sale Agreement relating to the Bell Building Property.  Brockman and Evans were never authorized by the Board to enter into the Purchase and Sale Agreement relating to the Bell Building Property.

221.    The Hospital lacked any knowledge, actual or constructive, (1) as to the material terms of the Purchase and Sale Agreement prior to its execution or (2) that Evans and/or

Brockman had acted, without authority, to bind the Hospital by executing the Purchase and Sale Agreement.

222.    As a result, the Hospital cannot be held bound to the terms of the Purchase and Sale Agreement relating to the Bell Building Property, and the Purchase and Sale Agreement is invalid and/or unenforceable.

223.    A declaratory judgment as to the rights and other legal relations of the parties is necessary to the resolution of this dispute.

224.    Plaintiffs accordingly seek a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the Purchase and Sale Agreement relating to the Bell Building Property is invalid and unenforceable.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne Healthcare Development, L.L.C., Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich declaring that the transfer of the Bell Building Property to Bayonne/Omni is null and void and/or awarding such other relief as the Court deems just and proper.

### *COUNT XIII*
**(Claim for Unjust Enrichment as to Transfer of Bell Building Property)**

225.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

226.    The Debtor received less than reasonably equivalent value in exchange for the transfer of the Bell Building Property to Bayonne/Omni.

227.    Neither Evans nor Brockman had authority, actual or implied, express, implicit or incidental, to bind the Hospital to the Purchase and Sale Agreement relating to the Bell Building

Property.  Brockman and Evans were never authorized by the Board to enter into the Purchase and Sale Agreement relating to the Bell Building Property.

228.    The Hospital lacked any knowledge, actual or constructive, (1) as to the material terms of the Purchase and Sale Agreement prior to its execution or (2) that Evans and/or Brockman had acted, without authority, to bind the Hospital by executing the Purchase and Sale Agreement.

229.    As a result, the Hospital  cannot be held bound to the terms of the Purchase and Sale Agreement relating to the Bell Building Property, and the Purchase and Sale Agreement is invalid and unenforceable.

230.    Defendants received monetary and other benefits by paying the Debtor less than reasonably equivalent value in exchange for the unauthorized, and there invalid and unenforceable, transfer of the Bell Building Property to Bayonne/Omni.

231.    As a result, Defendants have been unjustly enriched at the expense of and to the detriment of Plaintiffs.

232.    Plaintiffs have been substantially injured as a result thereof.

WHEREFORE, plaintiffs, Bayonne Medical Center, debtor and debtor-in-possession and Allen J. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor demand judgment against Defendants, Bayonne Healthcare Development, L.L.C., Bayonne/Omni Development, L.L.C., ATE Consulting Corp., Omni Asset Management, L.L.C. and Avery Eisenreich awarding a judgment in favor of Plaintiffs in an amount no less than the difference between the consideration paid and the actual value of the property transferred, plus continued accrued interest, attorney's fees and costs and for such further and other relief as the Court deems just and proper.

2116017-01

## *COUNT XIV*
### (Attorneys' Fees and Costs)

233. Plaintiffs repeat and reallege each and every one of the foregoing allegations as if fully set forth at length herein.

234. By reason of the foregoing and pursuant to Fed. R. Bankr. P. 7008(b), Plaintiff is entitled to recover their reasonable costs and legal fees incurred in connection with this proceeding.

CONNELL FOLEY LLP
*Counsel for Debtor, Bayonne Medical Center and Allen J. Wilen, in his Capacity as Liquidating Trustee And Estate Representative for the Estate of Debtor, Bayonne Medical Center*


By:   */s/ Stephen Falanga*
      Stephen V. Falanga
      Peter J. Pizzi

85 Livingston Avenue
Roseland, NJ 07068
Telephone:  (973) 535-0500
Telecopy:  (973) 535-9217

Dated: April 15, 2009

2116017-01