# EXHIBIT

# #1

June 21, 2005

Mr. John Grywalski, Jr.
Senior Vice President
Aon Consulting
270 Davidson Avenue
Somerset, NJ 08873

EXHIBIT
P-69
7-22-10

Dear Mr. Grywalski,

It was a pleasure meeting with both you and Mr. Evans last week. Below please find a
brief outline of how I envision a transaction between Bayonne Medical Center and Omni
Health Systems of New Jersey.

**PROJECT:**

Sub-divide approximately 20,000 square foot site from the current Medical Center site
on Broadway frontage for the purpose of building a 120 bed skilled nursing facility,
( parking to be discussed) , and 18,000 square feet of medical diagnostic space to be
leased to Bayonne Medical Center. I believe that Omni Asset Management would be the
best suited partner for Bayonne Medical Center, due to Omni already having over 1,000
patients  daily within its' healthcare system.

**FINANCIAL ARRANGEMENT:**

Omni Asset Management will deliver to the project a Certificate of Need with 120 beds,
with all necessary financing for development. Additionally, Omni Health Systems of
New Jersey will operate the facility on an ongoing basis.

**OPTION 1:**   Omni will ground lease the land from the Medical Center for 99
years with a 99 year extension for $60,000 annually, valuing the land at $500,000.

**OPTION 2:**    The Medical Center will partner with Omni Asset on the Real
Estate Holding Company which will lease space to the various tenants, i.e. Bayonne
Medical Center and the new nursing home entity. Omni's contribution to the company
will be all capital required to construct the project. Bayonne Medical Centers contribution
will be the land and other ancillary costs it has accumulated to create the possibility for
this project. The medical center will retain an 8% interest in the real estate holding
company and Omni will maintain the 92% balance.

**TIME FRAME:**

Assuming this proposal is acceptable, we would then work on a LOI (30 days). Planning and construction will be completed in approximately 30 months. It is Omni's understanding that the Medical Center will close its current Transitional Care Unit as the nursing home beds become available.

Together, I believe with diligent effort we can develop a facility that will transform the Medical Center into a Healthcare Campus, which will be a leader in providing quality healthcare to Hudson County for years to come.

Please call me to further discuss. I can be reached in my office at 201-216-9500 or on my e-mail at AveryE@OMNIHSNJ.com.


Yours truly,


Avery Eisenreich

# EXHIBIT

## #2



EXHIBIT 19
CARRIE EVANS-1
5-6-10

# EISENREICH
# BAYONNE MEDICAL CENTER

## DEPOSITION
## CARRIE EVANS

### MAY 6, 2010

### EXHIBITS 1 THRU 19

### ONE OF TWO

Fred R. Gruen, Esq.
GRUEN & GOLDSTEIN
1150 W. Chestnut Street
Union, New Jersey  07083
(908) 687-2030

# Exhibit
# Carrie Evans

# #1

November 30, 2005

Mr. Avery Eisenreich
Omni Asset Management, LLC
26 Journal Square – 16th Floor
Jersey City, N.J. 07306

     Re:   Development of Nursing Home/Medical Office Building

Dear Mr. Eisenreich:

The purpose of this Letter of Intent (this "Letter") is to set forth certain non-binding understandings and certain binding agreements between Bayonne Medical Center ("Bayonne") and Omni Asset Management, LLC ("Omni") with respect to the development of a mixed use Nursing Home and Medical Office Building on property located at 636—644 Broadway, Bayonne, New Jersey.

## INTRODUCTION

Bayonne is the owner of certain land containing a vacant building located at 636—644 Broadway, Bayonne, New Jersey (the "Premises"). Bayonne desires to convey by sale or lease, the Premises to an affiliate of Omni ("Omni Affiliate"). The Omni Affiliate desires to construct a six-story, 100,000 square foot building on the Premises. Bayonne will lease (or sub-lease, as the case may be) (hereinafter referred to as a "Lease") two floors from the Omni Affiliate, not to exceed 40,000 square feet, upon such terms as the parties agree. The Omni Affiliate will use three (3) of the remaining four floors to operate a 120-bed nursing home and provide a floor for physician office space and other medical/clinical/support function uses. As part of the purchase or lease transaction, Bayonne shall receive an interest in the Omni Affiliate which is reflective of, among other factors, the agreed-upon value of the land being sold or leased.

## NON-BINDING PROVISIONS

The following numbered paragraphs reflect our understanding of the matters described in them, but are not intended to constitute an exhaustive statement of, or a legally binding or enforceable agreement or commitment on the part of Bayonne or Omni with respect to, the matters described therein or to impose on Bayonne or Omni an enforceable duty or obligation to negotiate towards or conclude any such agreement or commitment. This Letter is intended to form the basis for a separate, subsequently binding, and definitive agreements satisfactory in all respects to each of the parties in their sole and absolute discretion. This Letter merely sets forth a preliminary outline of a transaction for the purpose of aiding the parties in connection with negotiations.

1.    Purchase Price.  The purchase or lease price shall be agreed upon by the parties based upon appraisals obtained by or on behalf of the parties.

2.    Construction.  The Omni Affiliate will construct a six-story, 100,000 square foot building on the Premises.  The parties understand that zoning board approval is required for a variance in the case of buildings over five stories.  All applications to the zoning board shall be at the Omni Affiliate's sole expense.  This transaction is contingent on Bayonne receiving adequate parking for the facility.  The Omni Affiliate agrees to build a facility to maintain adequate space for 120 beds. Omni expects construction to be completed within 24 months, or the end of 2007, if the definitive agreements are executed by the end of 2005.  The Omni Affiliate shall provide Bayonne with a construction schedule.  The schedule will include time prior to the Commencement Date for Tenant to install its system furniture, telephone, and computer systems.

3.    Demised Premises.  The Omni Affiliate, will lease, and Bayonne will rent, space on two floors, not to exceed 40,000 square feet.

4.    Primary Term.  A term for not less than twenty-five years, to commence upon completion of Bayonne's improvements.

5.    Rental Rate.  The base rent will be $35 per square foot for the first five years of the lease term.  The rate for subsequent terms, adjustments, and any extensions shall be negotiated.

6.    Utilities / Taxes / Maintenance.   Electric and water will be sub-metered. Bayonne shall be responsible for its own heat.  Bayonne shall be responsible for its proportionate share of the real estate taxes and sewer charges.  Bayonne shall be responsible for its maintenance and housekeeping.

7.    Base Year.  The base year shall be the year in which Bayonne takes occupancy of the Demised Premises.  Bayonne will pay its proportionate share of operating expense increases over the base year based on 100% building occupancy.

8.    Building Improvements.  Bayonne shall not pay a proportionate share of any capital repairs or improvements undertaken by the Omni Affiliate to the building. Bayonne shall only pay its proportionate share of any common area maintenance repairs.

9.    Bayonne Improvements.  The Omni Affiliate shall provide $30.00 per square foot pursuant to a work letter.

10.   Bayonne Construction.  Bayonne shall be responsible for constructing access from the Demised Premises to its hospital located at 29 East 29th Street pending review of the architectural plans. Bayonne is estimated to commence construction when feasible according to the architectural plans.

11.   Non-Compete.  Bayonne shall close its Transitional Care Unit (TCU) upon availability of service of the Omni Affiliate's nursing home beds.  Concurrently, Bayonne will provide the Omni Affiliate with a non-compete agreement on a term for years and mileage agreeable to both parties.

12.   Permits/Approvals.   Completion of this transaction shall be subject to Omni receiving all permits and approvals necessary to proceed with construction and operation of a nursing home on the Premises.  The facility shall include adequate parking as determined by the Bayonne zoning and planning board.

13.   LTACH Beds.  Bayonne will discuss the transition of its current allocation of LTACH beds to Omni Health System's project in Jersey City on the old Franciscan site, subject to approval by the appropriate parties and agreement on the terms of such transition.

14.   Access to Demised Premises.  Bayonne shall have access to the building 24 hours a day, 7 days per week.

15.   Non-Disturbance.  If the Omni Affiliate, or any subsequent Owner of the Demised Premises, including any holder of a mortgage or deed of trust that affects the Demised Premises at any time, sells the Demised Premises, Bayonne will attorn to any subsequent Owner, provided subsequent Owner assumes liabilities and obligations under the lease and the Omni Affiliate obtains a non-disturbance agreement from subsequent Owner.

16.   Assignment.  Any consent required for assignment or subletting shall not be unreasonably withheld nor delayed by the Omni Affiliate.  Bayonne will provide a corporate guarantee in the event it wishes the lease to be with an affiliate.  Six months rent reserve will be required from the affiliate.

17.   Signs.  The Omni Affiliate shall provide building directory signage.

18.   Due Diligence.  Omni will have a 60 day due diligence period.  During that period, Omni will obtain a Preliminary Assessment Report (Phase I) and will conduct any testing recommended. If the results are not satisfactory, Omni may terminate.  Omni will have the option to extend the diligence period by 90 days, if required for further testing.

19.   Environmental Responsibilities.  Bayonne shall be responsible for all environmental clean up required to obtain approval for use of the site as contemplated by this Letter, provided the cost for such cleanup shall not exceed $50,000.00  Bayonne shall not be obligated to perform a cleanup to direct contact residential standards, but shall be permitted to obtain such approval through the use of engineering controls and deed restrictions, including, without limitation, for the presence of historic fill, which do not unreasonably interfere with the proposed use of the property.  The parties expressly acknowledge that all or a portion of the building may serve as the engineering control

required to encapsulate contamination on the site. Bayonne and Omni will enter into a Memorandum of Agreement with the New Jersey Department of Environmental Protection, but Bayonne shall be solely responsible to to obtain approval for use of the site as contemplated by this Letter. Omni will accept an engineering control (i.e., capping) and Deed Notice as to any contamination, including, without limitation, historic fill. Omni will also accept a Classification Exception as to any groundwater contamination. Bayonne will use its best efforts to cooperate with Omni to obtain a Brownfields Redevelopment Agreement so that Omni is eligible for reimbursement of added costs of building construction related to any contamination on the site.

## BINDING PROVISIONS

Upon execution of counterparts of this Letter by you, the following numbered paragraphs will constitute the legally binding and enforceable agreement of Bayonne and Omni (in recognition of the significant costs to be borne by the parties in pursuing this transaction and further in consideration of their mutual undertakings, as to the matters described therein, including preparation of any definitive agreements). The Binding Paragraphs shall survive the execution, delivery, termination and expiration hereof. The Binding Paragraphs shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. The rights and obligations of any party to this Letter under the Binding Paragraphs may not be assigned by any party without the prior written consent of the other party.

1.     **The Omni Affiliate.**   Omni represents that it has full authority to negotiate on behalf of and represent the Omni Affiliate as to the terms and conditions of this transaction and is authorized to sign on behalf of the Omni Affiliate.

2.     **Confidentiality.**   Bayonne, Omni, and the Omni Affiliate mutually agree that (except as required by law) they will not disclose or use, and they will cause their respective officers, directors, employees, representatives, agents, and advisors not to disclose or use, any Confidential Information (as herein defined) with respect to information furnished, or to be furnished, by one party to the other in connection with this proposed transaction at any time or in any manner and will not use such information other than in connection with their respective evaluation of the proposed transaction. For purposes of this paragraph, "Confidential Information" means any information supplied by one party to the other and identified as such in writing. If the transaction is not consummated, each party will promptly return to the other all documents, financial information, contracts, or records supplied to it as part of this proposed transaction. The provisions of this paragraph shall survive the termination of this Letter.

3.     **Governing Law.**   This Letter shall be governed by and construed under the laws of the State of New Jersey in the United States of America without giving effect to the principles of conflicts of law.

4.      **Counterparts and Telecopier Signatures.** This Letter may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or telecopier versions of manual signatures of the Letter shall be considered manual signatures.

Please sign and date this Letter in the spaces provided below on one or more counterpart copies to confirm our mutual intentions, understandings and agreements as set forth in this Letter and return signed copies to the undersigned.

Very truly yours,

Robert H. Evans, President and CEO

Acknowledged and Agreed to:

OMNI ASSET MANAGEMENT, LLC

By: _____

# EXHIBIT
## #3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :

                    Debtor,      :          **ORIGINAL**

BAYONNE MEDICAL CENTER,          :
Debtor and
Debtor-in-Possession; and        :
ALLEN D. WILEN, in his
capacity as Liquidating          :    DEPOSITION OF:
Trustee and Estate
Representative for the Estate    :    MARVIN APSEL
of Debtor, Bayonne Medical
Center,                          :

                    Plaintiff,   :

              -vs-               :

BAYONNE/OMNI DEVELOPMENT,         :
L.L.C., a New Jersey limited
liability company; et al.,       :

                    Defendants.  :
----------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

THURSDAY, OCTOBER 14, 2010, commencing at 10:05

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880     Fax (973) 353-9445
www.depolinklegal.com

1   earlier 2005?

2          A.      I can't recall specifically when in

3   2005, but yes, Rob Evans shared his vision for a

4   skilled nursing facility sometime in 2005.

5          Q.      And you said there were some studies

6   done, I guess, and somebody asked you if there was a

7   feasibility study done.  Do you recall when you ever

8   saw a feasibility study?

9          A.      I don't recall the specific time when

10  I saw that study.

11         Q.      Did you, in fact, see one?

12         A.      I saw information pertaining to

13  demographics and the numbers of nursing homes and

14  the bed capacity of those nursing homes, I saw

15  information like that.

16         Q.      Did you hear that there were other

17  potential partners in addition to Mr. Eisenreich and

18  Omni who were being considered for the skilled

19  nursing facility project?

20         A.      Yes.  At the request of Rob Evans, we

21  were asked to identify two other entities, one being

22  CareOne and one being Cole.

23         Q.      How do you spell Cole?

24         A.      I believe it was C-o-l-e.

25         Q.      And did you participate in any

1   meetings with anyone associated with those entities?

2          A.      Yes, we invited people from both

3   those entities to come in and talk to us.

4          Q.      Did you first hear from Mr. Evans,

5   Robert Evans that it was his view that it should be

6   Omni to develop the project?

7          A.      I'm not sure I understand the

8   question.

9          Q.      Let's try this.  Did you participate

10  in discussions about the relative strengths and

11  weaknesses of each of these potential participants,

12  Omni, CareOne and Cole?

13         A.      What came out of our meetings with

14  CareOne and Cole was that they did not have the

15  ability to provide the sufficient number of licensed

16  beds for the project to be viable.  And it became a

17  fait accompli that Omni could provide those licensed

18  beds, and he was selected.

19         Q.      Take a look at Exhibit P-58.

20         A.      Is that this (indicating)?

21                 MR. BERNSTEIN:  This right here, I

22  would imagine.

23         Q.      P-58 is a compilation of board

24  minutes, and I'm go to ask you --

25         A.      I'm sorry, what section?

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

                    Debtor,         :          **ORIGINAL**

BAYONNE MEDICAL CENTER,            :
Debtor and
Debtor-in-Possession; and          :
ALLEN D. WILEN, in his                 DEPOSITION OF:
capacity as Liquidating             :
Trustee and Estate                     ROBERT H. EVANS
Representative for the Estate      :
of Debtor, Bayonne Medical               VOLUME I
Center,                            :    (Pages 1-236)

                    Plaintiff,      :

                    -vs-            :

BAYONNE/OMNI DEVELOPMENT,          :
L.L.C., a New Jersey limited
liability company; et al.,         :

                    Defendants.     :
----------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GREENBAUM, ROWE, SMITH &

DAVIS, L.L.P., 75 Livingston Avenue, Roseland, New

Jersey, on MONDAY, JUNE 21, 2010, commencing at 9:19

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1    or am I confusing that with the senior team?

2          A.    I think those are synonymous, the

3    senior team and the leadership team.

4          Q.    Do you know what a Certificate of

5    Need is?

6          A.    I do.

7          Q.    Of the four prospective entities that

8    you've described, how many of them held Certificates

9    of Need that would have enabled them to develop and

10   operate a long-term care facility on the Bell Street

11   building?

12         A.    Only one.

13               MR. FALANGA:   Object to the form.

14         Q.    Which one was that?

15         A.    Omni.

16         Q.    When the senior team or the strategic

17   planning group learned that Omni alone held a C.N.,

18   did that narrow your search for an entity to build

19   the nursing facility?

20               MR. FALANGA:   Object to the form.

21         A.    It certainly did.  It certainly did

22   refocus our efforts, such that we came to realize

23   that Omni was most likely to be able to build a

24   nursing home.

25         Q.    Well, help me with that.  As you

1   analyzed it at the time, how could any of these

2   prospects other than Omni have built a SNF on the

3   Bell Street building and operated it?

4        A.     We actually asked that question,

5   because we tried to have as many options as we

6   could, if for nothing else, for negotiation

7   purposes, and we actually put that question to

8   CareOne, who told us that they would have to buy the

9   beds from Omni, which did not make a lot of sense to

10  us.

11       Q.     In the course of your investigation

12  of which of the four prospective prospects to

13  choose, did you research the availability through

14  the Department of Health of a new C.N. or a new

15  Certificate of Need, the availability of a new

16  Certificate of Need for Hudson County?

17       A.     In fact we did.  And probably the

18  clarification that you talk of about the four

19  entities and gravitating towards Omni came from the

20  vice chairman of our board, John Grywalski, who was

21  a former Deloitte & Touche partner and a CPA.  And

22  he also was the head of another one of our board

23  committees, where most of the board activities

24  actually took place in the conversations and the

25  decisions.  He was the vice chairman of the board

1   and also the head of a joint conference committee,

2   JCC, which was a subcommittee of the board of

3   directors.

4        And at a July meeting of either that meeting

5   or the board of trustees, I can't be exactly

6   certain, although I actually remember the date,

7   because I had to miss something important to go to

8   that meeting, Mr. Grywalski laid out the criteria as

9   he saw them as the situation was evolving.  And what

10  Mr. Grywalski said specifically was, number one, and

11  remember that he as a former Deloitte & Touche

12  partner and that he is very knowledgeable in

13  healthcare affairs, he said there is a moratorium on

14  beds.  It would be difficult, if not impossible to

15  get the state to open up a call, and it would take

16  years, not months.

17       He said the second component that he had

18  come to realize was that if we were going to get

19  this nursing home built, Omni was going to do it.

20  And at this point in time Omni had essentially all

21  of the leverage in negotiation, since they held the

22  licenses for the only beds in Hudson County.

23       And the third thing he said which is worth

24  noting, because I think it comes into play later, is

25  Mr. Grywalski said, and it is on the record

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

               Debtor,          :          **ORIGINAL**

BAYONNE MEDICAL CENTER,                 :
Debtor and
Debtor-in-Possession; and               :
ALLEN D. WILEN, in his
capacity as Liquidating                 :    DEPOSITION OF:
Trustee and Estate
Representative for the Estate           :    JOHN GRYWALSKI
of Debtor, Bayonne Medical
Center,                                 :

          Plaintiff,          :

      -vs-                              :

BAYONNE/OMNI DEVELOPMENT,               :
L.L.C., a New Jersey limited
liability company; et al.,              :

         Defendants.          :
----------------------------------

B E F O R E:

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

WEDNESDAY, SEPTEMBER 8, 2010, commencing at 10:05

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880      Fax (973) 353-9445
www.depolinklegal.com

1          A.          Yes.

2          Q.          In connection with the hospital's

3    interest in a nursing home, did you have occasion to

4    meet Avery Eisenreich?

5          A.          Yes.

6          Q.          Do you remember when that was?

7          A.          I don't recall the specific date, but

8    it was sometime before I resigned from the board.

9          Q.          Was Dr. Dedousis in any way involved

10    in getting you and Mr. Eisenreich together?

11          A.          Dr. Dedousis was.  It wasn't a

12    meeting personally between Avery and myself, it was

13    with a group of a subcommittee of the board dealing

14    with the issue of a nursing home.

15          Q.          And what was the purpose of meeting

16    with Mr. Eisenreich?

17          A.          The purpose was to hear about his

18    interest in a nursing home at Bayonne Hospital, and

19    also to hear about his organization and

20    qualifications to build and operate such a facility.

21          Q.          And it was the joint conference

22    committee that had this meeting with Mr. Eisenreich

23    or --

24                    MR. GRUEN:  Object to the form.

25          Q.          -- or some other entity?

1        A.        It was not the joint conference

2    committee.  It was a subcommittee of the board that

3    was established to take a look at whether or not it

4    was a good idea to put a nursing home up.

5        Q.        Who were the members of that

6    subcommittee?

7        A.        Myself, Rob Evans, Stephanie Giblin,

8    who was the chief nursing officer at the time, and I

9    believe, although I'm not certain who the board

10   members were, there were one or two other board

11   members on it, but I don't recall specifically who

12   they were.

13       Q.        Were there other candidates that the

14   subcommittee interviewed?

15       A.        Yes.  We talked to CareOne and a

16   healthcare REIT out of Los Angeles, a representative

17   for a health care REIT out of Los Angeles.  We

18   actually talked to three organizations, two others

19   and Omni.

20       Q.        What can you recall, if anything, of

21   the meeting with Mr. Eisenreich?

22       A.        I don't recall the specifics of the

23   meeting.

24       Q.        And after the subcommittee met, and

25   you'll correct me if I'm wrong, I take it that the

1    same subcommittee met with the three candidates for

2    this project; is that correct?

3        A.    Met with two.  The representative for

4    the REIT out of Los Angeles told us that they were

5    not interested.  It was a project too small for

6    them.  But this subcommittee met with the owner

7    operators of CareOne, as well as Omni.

8        Q.    And by the time you had left in July

9    of '05, what progress, if any, had been made on

10   either the selection of either Omni, CareOne or the

11   California outfit in connection with this project?

12       A.    Up to that point no selection had

13   been made.  However, there were discussions about

14   the qualification of the two firms, both CareOne and

15   Omni, and what advantages one had over the other.

16       Q.    Can you recall those discussions?

17       A.    Yes.  Omni and Avery Eisenreich was

18   the only organization that had a C.N. for licensed

19   nursing home beds in Hudson County.  And there was a

20   moratorium placed on additional nursing home beds by

21   the State of New Jersey.  So any operator, in order

22   to build, develop a nursing home at Bayonne Hospital

23   would have to have some sort of an arrangement with

24   Avery, either buy the beds or do some sort of a

25   joint venture with him, since he clearly was the

1   only, of the three that we looked at, that had

2   licensed beds.

3        Q.      Anything else you recall of those

4   discussions?

5        A.      During the last meeting that I was

6   at, I talked about the fact that Mr. Eisenreich

7   clearly had a position over the other company

8   because of the licensed beds; that this provided

9   very little leverage for Bayonne in terms of

10  negotiating with him, if they wanted to do the

11  project.  And suggested that a real estate valuation

12  be done of the property, the Bell building, to get a

13  good idea of what the property was worth, and also

14  to exercise due diligence in terms of negotiating a

15  transaction.

16        Q.      And by the time you left, had that

17  process gotten any legs?

18        A.      Not to my knowledge.

19        Q.      And before you left, then, was there

20  any further discussion of valuation?

21        A.      No.

22        Q.      Was there further discussion of

23  obtaining appraisals of valuation?

24        A.      No.

25        Q.      There was only one meeting with Avery



UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

**ORIGINAL**

In re BAYONNE MEDICAL CENTER,    :

               Debtor,    :

ALLEN D. WILEN,    :

            Plaintiff,    :    DEPOSITION OF:

            -vs-    :    HERMAN BROCKMAN

BAYONNE/OMNI DEVELOPMENT,    :
LLC, et al.,
                :

           Defendants.    :
-----------------------------------

B E F O R E:

     SHARON B. STOPPIELLO, a Certified Court
Reporter and Notary Public of the State of New
Jersey, at the offices of EDWARDS, ANGELL, PALMER &
DODGE, L.L.P., One Giralda Farms, Madison, New
Jersey, on MONDAY, MARCH 29, 2010, commencing at
12:28 p.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1   person, with the principal responsibility of

2   shepherding this project through?

3            MR. PIZZI:   Objection, foundation.

4   A      I don't know of anybody that was.

5       Q      Was there a person who was charged

6   with the principal responsibility of shepherding

7   this project through?

8   A      I don't know for sure, but Mr. Evans was the

9   one that was working on the project.

10      Q      At some point in time, is it correct,

11  the BMC, through the strategic planning committee,

12  commenced negotiations with Mr. Eisenreich in

13  connection with the skilled nursing facility idea;

14  is that correct?

15           MR. PIZZI:   Objection.

16  A      I believe Mr. Evans did.

17      Q      Did BMC also consider other

18  candidates for development of the skilled nursing

19  facility on the Bell building aside from Mr.

20  Eisenreich?

21  A      Yes, I was told there were three

22  participants.

23      Q      And did there come a time that the

24  hospital decided that of the candidates that they

25  were considering, that Eisenreich was the one that

1    they chose to go through with?

2    A      Yes, Mr. Evans brought to the board that

3    that was the company they were going for.

4         Q      Do you know recall that he said why

5    it was that that was the company they were going

6    with?

7    A      I believe he said something like they

8    already had the licensed beds.

9         Q      Did you understand what that meant?

10   A      That meant you didn't have to apply to the

11   state for the process of getting licensed beds,

12   which could take a substantial amount of time.

13   That's the way it was explained.

14        Q      And did Evans explain that the

15   candidates that were being considered for

16   development of the skilled nursing facility, that

17   Eisenreich or his company was the only one who held

18   such a license?

19   A      I believe that's what he said.

20        Q      At some point in time somebody then

21   began negotiations with Mr. Eisenreich with a view

22   towards implementing this idea.

23             MR. PIZZI:  Objection, no foundation.

24        Q      Is that correct?

25   A      I believe so.

## Board of Trustees Meeting
### December 1, 2005

**MEMBERS PRESENT:**   Messrs. Brockman, Garelick, Campbell, Mill, Evans, Finnerty, Ward, Ms. Dugan, Drs. McGeehan, Williams, Levine, Wozniak, Istvan

**GUESTS:**   Messrs. Apsel, Lombardo, Greenan, Mmes. Aaron, Giblin

**CALL TO ORDER:**   Mr. Brockman called the meeting to order at 5:05 P.M.

**MINUTES OF THE PREVIOUS MEETING:**

**FOR ACTION:**   Minutes of the November 3, 2005 meeting were previously circulated and were presented for approval.  Upon a motion duly made, seconded and unanimously carried, the minutes of November 3, 2005 were approved.

**COMMUNICATIONS:**   Mr. Mill noted an acknowledgement of expression of sympathy received from the family of Bernard Monaco, Mr. Garelick's uncle, who had recently passed away at the Medical Center.

**REPORT OF THE PRESIDENT OF THE MEDICAL STAFF:**   Dr. Levine reported that the Medical Staff is preparing and receiving education in anticipation of the first quarter 2006 Joint Commission survey.

**REPORT OF THE BAYONNE MEDICAL CENTER FOUNDATION:**   Mr. Lombardo discussed the following items:

• The November 19th Annual Charity Ball was a huge success with over 420 people in attendance.  Mr. Lombardo extended his thanks and gratitude to the event chairs, the committee, trustees, Mr. Evans and Senior Staff for their support and efforts in this regard.  He also thanked Mr. Garelick for volunteering once again to serve as official photographer at the event.
• The Annual "Lights of Love" ceremony will take place on Tuesday, December 6th, at 5:00 P.M. in the main lobby.  Entertainment will be provided by students from Robinson School.
• Solicitations for the year end appeal have been mailed and include information on tax saving incentives when considering charitable contributions to the Bayonne Medical Center Foundation.

**REPORT OF THE PRESIDENT & CEO**   Mr. Evans referred to his written report for specifics and mentioned the positive impact of receiving the recent designation as a Stroke Center.  This will bring a different level of reimbursement and potentially allow for additional state-funded monies supporting this initiative.

WILEN_DB00012311

**TREASURER'S REPORT:**     It was reported that the financial statements show a positive line and efforts continue at containing costs and satisfying expenses. We remain optimistic that the year will end at break even.

At this juncture, Mr. Brockman introduced Ms. Aaron who would present a brief financial summary followed by presentation of the 2006 Operating Budget.

It was noted that the Finance Committee has reviewed, discussed and approved the items being presented today. Ms. Aaron proceeded with the following points being highlighted:

• Through the support and efforts of staff, physicians and Board members, BMC was able to work through a difficult financial year and remains in bond compliance.
• Reductions in volume were due in part to 2005 changes in Medicare regulations that were enacted allowing Skilled Nursing Facilities to deliver IV antibiotics and the fact that this was one of the healthiest years in recent history. Further decreases in admissions were experienced due to changes in several physician practices, physician retirement, etc.
• A prime focus this year was to built revenue, reduce expenses and move forward with strategic initiatives.
• Our 2006 "bridge to the future" will target physician development, elective angioplasty, expanding vascular center, women's center, wound care and SNF project.
• Ms. Aaron related further budget specifics and mentioned that the 2006 budget calls for break even and includes union increases and an anticipated rise in pharmacy and supply costs.

With no further questions, the following resolution was presented:

**FOR ACTION:**     The Board of Trustees of Bayonne Medical Center approves the 2006 Operating Budget as presented and discussed.

Upon a motion duly made, seconded and unanimously carried, the budget was approved.

**COMMITTEE REPORTS:**

*Audit & Compliance Committee* – Minutes of the October 28, 2005 meeting were previously distributed with the meeting packets. Minutes of the November 15, 2006 meeting were handed out at the start of today's meeting.

Mr. Finnerty reported that the November 15th, 2005 meeting was held via a conference call to solely address the issue of selection of an external auditor. Following review of proposal and in-depth discussion, the committee agreed and recommends approval of the firm Withum Smith & Brown.

WILEN_DB00012312

**FOR ACTION:**      The Board of Trustees of Bayonne Medical Center approves retaining the firm of Withum Smith & Brown to serve as external auditors.

Upon a motion duly made, seconded and unanimously carried, the aforementioned resolution was approved.

*Joint Conference Committee* – Minutes of the November 17, meeting were previously circulated with the meeting packets.  Mr. Garelick advised that the Medical Staff recommendations being presented have been reviewed and approved by the Credentials Committee and the Medical Executive Committee.

The following Medical Staff recommendations were then presented:

**FOR ACTION:**      Approval of the following new appointments:

Lawrence Gorzelnik, D.M.D. – Oral/Maxillofacial Surgery
Lavanya Jitendranath, M.D. – Internal Medicine/Infectious Disease

**FOR ACTION:**      Approval of request for additional privileges:

Michael Bessette, M.D. – privileges in Moderate Sedation

Upon a motion duly made, seconded and unanimously carried, the new appointments and request for additional privileges were approved.

*Human Resources Committee* – Mr. Garelick advised that the November 14, 2005 meeting minutes were previously circulated and referred the Board to those minutes for specifics.

Mr. Evans advised that he has learned from HPAE representatives that staffing ratios will be a focus of the 2006 negotiations.

*Employee Savings & Investment Committee* - Minutes of the November 21, 2005 meeting were distributed with the meeting materials.

Mr. Mill mentioned that the Plan is at approximately $64 million and the funds are being efficiently managed and fees competitive.  He then related recent developments pertaining to the fund custodian, State Street.

*School of Nursing Advisory Committee* – Dr. McGeehan advised that an Open House would take place at the school the following week for any interested students.

*Finance Committee* – Ms. Aaron then presented an update on the proposed Skilled Nursing Facility.

3

WILEN_DB00012313

She reported that the due diligence process has been on-going with three separate companies. Two of these firms are not in a position to acquire the beds and, therefore, discussions have now been limited to the firm of Omni Asset Management LLC, who already own sufficient numbers of beds.

In order to take discussions with Omni to the next level, Ms. Aaron requested the Board's approval to proceed with a non-binding Letter of Intent. It was emphasized that this would allow for proposals to be developed and is not a commitment of either funds or resources.

The follow resolution was then presented:

**FOR ACTION:**    The Board of Trustees of Bayonne Medical Center approves developing a non-binding Letter of Intent with Omni Asset Management LLC relative to the development of a Skilled Nursing Facility.

Upon a motion duly made, seconded and unanimously carried, the aforementioned resolution was approved.

**NEW BUSINESS:**    Prior to calling for adjournment, Mr. Brockman commended the Board on their participation at the Charity Ball. He stated that this participation clearly evidences the Board's support and commitment to this institution.

**ADJOURNMENT:**

There being no further business to discuss, the meeting adjourned at 5:50 P.M.

Attest,

*Robert C. Mill*

Robert C. Mill
Secretary

4

WILEN_DB00012314

# EXHIBIT
# #3A



EISENREICH

BAYONNE MEDICAL CENTER

DEPOSITION

CARRIE EVANS

MAY 6, 2010

EXHIBITS 20 THRU 39

TWO OF TWO

Fred R. Gruen, Esq.

GRUEN & GOLDSTEIN

1150 W. Chestnut Street

Union, New Jersey 07083

(908) 687-2030

# Exhibit
# Carrie Evans

# #21

Bayonne Medical Center
Case 09-31689-MS    Doc 47-2    Filed 05/06/11    Entered 05/06/11 10:02:44    Desc
Exhibit #1 - #3A    Page 35 of 35

29th Street at Avenue E
Bayonne, New Jersey 07002



October 21, 2005

Mr. Avery Eisenreich
OMNI Asset Management, LLC
26 Journal Square
Jersey City, New Jersey 07306

Dear Mr. Eisenreich:

While Bayonne Medical Center regards a pledge as a promise, it is not legally binding. Bayonne Medical Center is dependent on the generosity and ability of its constituents to financially assist the Medical Center in bringing forth projects and programs; however, you are under no obligation to fulfill your pledge if your own personal financial circumstances change.   While we hope that you will not experience any financial difficulties Bayonne Medical Center will work with you to accommodate unforeseen personal situations.

Thank you,

Robert H. Evans
President & CEO