# EXHIBIT
# #3B

THE

*Institute*

FOR THE

AT BAYONNE MEDICAL CENTER

BMC036508

# FREQUENTLY ASKED QUESTIONS AND ANSWERS

**Doesn't Bayonne Medical Center already have a cardiac treatment program that does cardiac catheterization, cardiac rehabilitation, and pacemaker implantation?**

Yes, Bayonne Medical Center currently offers treatment for patients suffering from coronary heart disease.

**Why do you need a Vascular Institute?** Vascular diseases different, affecting not only the heart, but also the circulatory system. Many people who have heart disease may also have vascular disease and vascular patients are at greater risk to suffer heart attacks. The new Vascular Institute at Bayonne Medical Center will be a natural extension of our cardiac treatment program, providing an integrated approach to managing cardiac and vascular health.

**What is the cost of the new Vascular Institute at Bayonne Medical Center?** The estimated cost of the new Vascular Institute is close to $5 million including construction and the purchase of the most advanced, diagnostic equipment and state-of-the-art technology used for treatment.

**How much am I expected to give?** Charitable giving is a very personal decision. We ask that you consider our financial commitment in terms of what this project means to you, your family and the Bayonne community. Bayonne Medical Center is seeking support from many different constituents; Bayonne residents, Bayonne Medical Center Board of Trustees, Bayonne Medical Center Foundation Board members, physicians, local businesses, corporations, foundations and staff. Each constituent will be approached in a personal a way as possible. This campaign is a unique opportunity for you to make a difference in the lives of current patient and to be a part of a legacy to future generations of patients.

**How long will I have to meet my pledge?** We are asking constituents to fulfill their pledges over a three or five year period. Doing so allows you to be recognized for a generous donation while managing the financial commitment over a designated period of time.

**Is my gift tax deductible?** Yes. The amount contributed is deductible to the full extent provided by law. Bayonne Medical Center is dependent on the generosity

**What if I am unable to complete my pledge?** A pledge is a promise; it is not legally binding. Bayonne Medical Center will rely upon your pledge if your own personal financial and ability of its constituents to financially support this project, but you are under no obligation. Bayonne Medical Center Foundation will work with you to circumstances change. While we hope that you will not experience any financial difficulties, accommodate unforeseen personal situations.

**What if I have further questions?** Feel free to contact Vincent Lombardo at Bayonne Medical Center Foundation Office, 201.858.6500

BMC036523

# EXHIBIT
## #4

Mr. Campbell called the Finance Committee meeting to order at 5:00 pm.

## REVIEW AND APPROVAL OF MINUTES OF APRIL 27, 2005

A motion was made, seconded and unanimously approved to accept the minutes of the April 27, 2005 Finance Committee meeting.

Mr. Grywalski opened the meeting with a presentation on hospital performances over the past twenty years. He indicated that financial indicators have been trending downward and hospitals are now concentrating on their basic core businesses.

## REVIEW OF FINANCIAL STATEMENTS

The April 2005 Financial Statements were reviewed by Ms. Aaron and she presented a report on financial ratios and cash flow analysis. Discussion followed on the various ratio formulas and benchmarks.

The cash flow analysis indicated a $5,000,000 cash shortfall for 2005 due to declining admissions and below budget investment income. After discussion a motion was unanimously passed increasing the Medical Center's line of credit by $5,000,000.

Ms. Giblin reported on overtime and agency costs showing that the hospital has been proactive reacting to volume changes during 2005.

There being no further business, the meeting was adjourned at 6:30 pm.

WILEN_DB00012599

# EXHIBIT
# #5

## Board of Trustees
### December 1, 2006

**MEMBERS PRESENT:**    Messrs. Brockman, Garelick, Campbell, Mill, Finnerty, Ward, Ms. Dugan, Drs. Istvan, Villalona, Dedousis, McGeehan

**GUESTS:**    Messrs. Apsel, Greenan, Lombardo, Mohrle, Mmes. Giblin, Dobin, Petrosino

**CALL TO ORDER:**    Mr. Brockman called the meeting to order at 5:00 P.M.

**CHAIRMAN'S REPORT:**    Pertaining to St. Vincent's, Mr. Brockman discussed the details of yesterday's State Healthcare Project Review Committee meeting in Albany at which time the committee approved our application for the acquisition of St. Vincent's. This is very good news and the next step in the process calls for a full committee review/vote to take place on December 7th, 2006.

Mr. Brockman reported that discussions had been underway with Ms. Dawn Gideon for her to provide interim leadership, however, St. Vincent's parent corporation perceived this as a conflict of interest and has filed in court to restrict this. The process of identifying interim leadership continues and meetings are being set up with several potential candidates, including Roger Hiser of Plexus Group.

**FINANCIAL REPORT:**    Mr. Brockman proceeded to relate BMC's serious financial standing and detailed certain problematic financial practices that had recently been uncovered. He noted that a preliminary assessment indicates that there is the potential that these practices could result in an approximate year-end deficit nearing $30 million which would include the $5 million dollar pledge by Omni write off.

At this conjuncture, Mr. Brockman excused all staff present and entered into closed Executive Session.

Attest,

_Robert C. Mill_

Robert C. Mill

BMC001125

# EXHIBIT
# #5A

| From: | Auriemma, Robert |
| Sent: | Wednesday, November 29, 2006 10:59 AM |
| To: | Mohrle, Paul |
| Subject: | FW: DRAFT October, 2006 Financial Statements - first revision |
| Attachments: | OCT 2006 - AUDIT 2005.xls |

Paul,
As discussed this morning, 3 September journal entries have been reversed in October as indicated below.

Also reversed in October was the Omni Asset Management pledge receivable that was booked last year in October, 2005. The negative P & L effect on Other Operating Revenue is $4,717,300. The $1 million cash payment that was received from Omni Asset Management in July, 2006 has been set up as a liability in October under accrued expenses.
Bob

-----Original Message-----
**From:** Auriemma, Robert
**Sent:** Monday, November 27, 2006 3:39 PM
**To:** Mohrle, Paul
**Subject:** October, 2006 Financial Statements:- September adjustments not reversed in October

Except as noted below, since I have no supporting documentation I cannot determine if these adjusting entries should be reversed.

For your review, the following month end adjusting entries were booked in September:
(000's omitted)

SVSI Receivable      6,877
  Salaries                    2,750
  Fringe Benefits            660
  Other Expenses        3,467
 - SVSI Allocation for September

SVSI Receivable      5,709
  Accrued A/P              4,666
  Accrued Salaries        1,043
- Reversal of July, 2006 general journal entry #9 & #10

NPSR                      3,165
  Patient A/R              3,165
- To adjust NPSR to agree with patient cash received in September.          **(REVERSED in October)**


Patient A/R            6,000
  NPSR                      6,000
- To adjust NPSR for September.                                              **(REVERSED in October)**

Estimated Third Party Settlements (Receivable)          6,000
  Patient Receivables                                          6,000      **(REVERSED in October)**

Estimated Third Party Settlements (Short Term Liability)  3,603
  Estimated Third Party Settlements (Receivable)                3,603
- Balance Sheet reclassification in order to net the third party receivable and liability.

**Just FYI,** the following negative adjustments were booked in September and should not be reversed:
 $3.5 million debit to NPSR -- 2004 Medicare Settlement (booked the liability)

BMC041763

# EXHIBIT
# #6


**Board of Trustees Meeting**
December 7, 2006

*Minutes*

**MEMBERS PRESENT:**   Messrs. Brockman, Garelick, Campbell, Mill, Finnerty, Ward, Ms. Dugan, Drs. Dedousis, Istvan, McGeehan, Villalona, Williams

**GUESTS:**   Messrs. Apsel, Mohrle, Greenan, Lombardo, Mmes. Petrosino, Dobin

**CALL TO ORDER:**   Mr. Brockman called the meeting to order at 5:00 P.M.

**MINUTES OF THE PREVIOUS MEETING:**

**FOR ACTION:**   Minutes of the November 9, 2006 meeting were previously circulated and were presented for approval. Upon a motion duly made, seconded and unanimously carried, the minutes of November 9, 2006 were approved.

**CHAIRMAN'S REPORT:**

***Skilled Nursing Facility -*** Mr. Brockman reported that the closing with Omni Asset Management for the on-site Skilled Nursing Facility is scheduled to take place tomorrow. He was successful in renegotiating and releasing BMC from being obligated to lease back 20,000 square feet. Aspects surrounding a promissory note were related and it was commented that this is an important project for the community that we must move forward with.

***Financial Update -*** Mr. Brockman advised that further information has come to light and additional factors uncovered that place BMC in a more severe financial position than initially anticipated. Our short term debt, in the form of Accounts Payable, lines of credit, advances, etc., total approximately $40 million. He noted that given this extent of a deficit, there is no possibility of our proposed bond refinancing going through. The state along with the assistance of Mayor Doria has been approached with a request to receive the remainder of our allocated Charity Care funding and we are awaiting a response from them.

Mr. Brockman went on to advise that Ms. Giblin has been working on a Turnaround Plan to bring the approximate $1.2 million monthly shortfall in line and identify a restructuring and downsizing plan. Speaking frankly, he stated that even with a successful turnaround plan, other operational issues and major expenditures coming due in 2007 (i.e., monthly debt service, repayment of lines of credit, anticipation funding, and Accounts Payable) will all serve to have a draconian budgetary impact from which we may not be able to recover. As an immediate step, a buyer for the parking garage is being sought, the sale of which could yield $5-7 million, however, it was noted that this action could take several months to finalize. Also, a meeting is being set up with the Hudson County Improvement Authority to discuss a possible sale/leaseback arrangement.

Summarizing, Mr. Brockman advised that, at this point, we should consider notifying the Bonding Authority and our bond insurers, Financial Security Assurance (FSA). He then opened the floor to discussion. The group discussed aspects surrounding the current financial standing and in particular the sequence and timing of the notification process.

**REPORT OF THE PRESIDENT OF THE MEDICAL STAFF:**    Dr. Dedousis advised that physician members of the Coalition to Save Bayonne Medical Center had made a request at the Medical Executive Committee meeting to have representation on this Board. The potential for this was discussed at length from varying perspectives.

At the conclusion of this discussion, Dr. Dedousis introduced the following resolution:

**FOR ACTION:**    The Board of Trustees of Bayonne Medical Center approve and authorize the submission of a list of proposed candidates (together with their CVs) from the Coalition to Save Bayonne Medical Center to be presented to the Board Governance Committee for their review and recommendation of two candidates to fill two seats on the Board of Trustees.

Upon a motion duly made, seconded and unanimously carried, the aforementioned resolution was approved.

**REPORT OF THE BAYONNE MEDICAL CENTER FOUNDATION:**    Mr. Lombardo reported on the following items:

• The December 2nd Charity Ball was a very successful event and Mr. Lombardo thanked all for their support.
• The Lights of Love ceremony was held on Tuesday and once again the choir of the Robinson School provided excellent entertainment.

**REPORT OF THE ACTING COO/EVP:**    Mr. Apsel referred the Board to his written report that was contained with the meeting packets for specifics.

**TREASURER'S REPORT:**    It was reported that October, 2006 will show a loss of approximately $16 million with additional items furthering the loss anticipated by year end. Group discussion ensued relating to contributing factors, what is included in the loss, etc.

**COMMITTEE REPORTS:**

***Audit & Compliance Committee*** - Mr. Finnerty advised that the December 1, 2006 meeting minutes were distributed at the start of today's meeting.

Mr. Finnerty reported that to comply with the Deficit Reduction Act of 2005, the committee developed a policy codifying federal and state regulations relating to liability for false claims, protection against reprisal or retaliation for those who report wrongdoing and to detect and prevent fraud, waste and abuse.

**FOR ACTION:**    On the recommendation of the Audit & Compliance Committee made at their meeting of December 1, 2006, the Board of Trustees approves the addition of a new policy to the Organizational Policy Manual entitled, "False Claim Liability, Anti-Retaliation Protections, and Detecting and Responding to Fraud Education" as presented and discussed today/

Upon a motion duly made seconded and unanimously carried, the aforementioned policy was approved.

2.

*Joint Conference Committee* – Minutes of the November 16, 2006 meeting were distributed with the meeting materials. Mr. Garelick advised that the Medical Staff recommendations being presented have been reviewed and approved by the Credentials Committee and the Medical Executive Committee.

The following Medical Staff recommendations were then presented:

**FOR ACTION:**    Approval of New Appointments:

Michael Baruch, M.D. – Plastic Surgery
Michael Moretti, M.D. – OB/GYN

**FOR ACTION:**    Approval of Changes in Privilege Status:

Dr. Carmelita Malalis was recommended for transfer to the Emeritus Staff in accordance with her request.

Upon a motion duly made, seconded and unanimously carried, the new appointments and request for privilege changes were approved.

*Employee Savings & Investment Committee* – Mr. Mill referred the members to the November 20, 2006 meeting minutes that were circulated with the meeting packets.

*School of Nursing Advisory Committee* – Dr. McGeehan advised that the committee had met today and meeting minutes will be provided next month.

Mr. Brockman then called for an executive session and excused the staff members.

**NEW BUSINESS:**    While in executive session, discussion occurred regarding Pamrapo Bank's willingness to extend the repayment date relating to its $1,939,000 line of credit on the condition that the bank would receive a mortgage on certain BMC properties unsecured by FSA.

On motion of Mr. Finnerty, seconded by Mr. Mill, the attached resolution was adopted with note that William Campbell, Theodore Garelick, Herman Brockman and John Dedousis, M.D. abstained from vote.

**APPOINTMENT OF INTERIM PRES. & CEO:**    Mr. Brockman stated that it is necessary to appoint an Interim President & CEO to oversee the daily operations of the Medical Center. After discussion of various candidates, the following resolution was presented:

**FOR ACTION:**    The Board of Trustees of Bayonne Medical Center approve the appointment of Eugene Greenan to serve in the role and assume the duties of Interim President & CEO until such time as a replacement and/or permanent candidate is identified.

Upon a duly motion duly made, seconded and unanimously carried, the aforementioned resolution was approved.

3.

## ADJOURNMENT:

There being no further business to discuss, the meeting adjourned at 6:20 P.M.

Attest,

*Robert C. Mill*

Robert C. Mill
Secretary

# BAYONNE MEDICAL CENTER

## CERTIFIED COPY OF RESOLUTION

I, the undersigned, Robert C. Mill, Secretary of the Board of Trustees of Bayonne Medical Center, a not-for-profit corporation incorporated under the laws of the State of New Jersey, do hereby certify that the following is a true and accurate copy of the resolution adopted at a meeting of the Board of Trustees of Bayonne Medical Center on December 7, 2006 at 5:00 P.M. I further certify that this resolution is in effect and that a quorum was present.

BE IT RESOLVED, that the Board of Trustees of Bayonne Medical Center approve and authorize the execution of a mortgage in connection with the agreement of Pamrapo Bank to postpone the date for repayment of a certain loan in the approximate amount of $1,939,000.00. This loan extension is secured by mortgage on the following parcels of land owned by Bayonne Medical Center: Lot 49, 14 East 29th Street, Bayonne, New Jersey and Lots 14 & 15, 423 & 425 Avenue E, Bayonne, New Jersey.

IN WITNESS WHEREOF, I have executed this Certificate as Secretary and duly affix hereon the seal of the corporation this the seventh day of December 2006.

_Robert C. Mill_
Robert C. Mill, Secretary

(seal)

# EXHIBIT
# #7

*Bayonne Medical Center Financial Review*

In reviewing the internal 2006 financial statements and discussing with management, it was noted that BMC reported an unfavorable adjustment of $5.1 million related to prior years' cost reports. This is contrary to the prior trend where most years reported a smaller and favorable settlement. Also, in 2006, BMC wrote off a pledge receivable of $4.7 million which was recorded as revenue in 2005. Apparently, the write-off was associated with the renegotiation of the long-term agreement with a potential developer. As of the date of this report, and after a few attempts, we have not been able to meet with BMC's independent auditors to discuss the prior year's accounting treatment of the pledge and other financial statement matters. 

Considering these relevant facts, we thought it would be informative to recast the years 2001-2005 to adjust for the above revenues which are not likely to recur in 2006 and beyond. This is not to suggest that the financial statements were incorrect. It is merely an analytical tool to help make a determination as to whether the losses of 2006 are an anomaly or whether they flow naturally from recent operations.



The conclusion that can be drawn from the above presentation is that the 2006 losses are reasonably consistent with recent results. For example, the 2005 data points suggest that BMC was positioned to begin 2006 at an approximate annual loss rate of $12.1 million. This further assumes that the patient accounts receivable, which were stated at $26.3 million as of December 31, 2005, were reasonably valued. This level was $6.7 million higher than the previous year. We requested an analysis of subsequent cash receipts to confirm this valuation, but did not receive the analysis in time for this report.

WSB-008359

# EXHIBIT
# #8

Page 1

                    UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEW JERSEY
                    CASE NO. 07-14195(MS)
                    CHAPTER 11
---------------------------
IN RE:                          DEPOSITION UPON
                                ORAL EXAMINATION
BAYONNE MEDICAL CENTER,              OF
                                JAMES P. LAWLER
     Debtor,


BAYONNE MEDICAL CENTER,
Debtor and Debtor-in-
Possession, and ALLEN                **ORIGINAL**
D. WILEN, in his
capacity as Liquidating
Trustee and Estate
Representative for the
Estate of Debtor,
Bayonne Medical Center,

     Plaintiff,

     -vs-

BAYONNE/OMNI
DEVELOPMENT, LLC,
a New Jersey limited
liability company,
et als,

     Defendants.

---------------------------




                         DepoLink
        Court Reporting & Litigation Support Services
         Phone (973) 353-9880  Fax (973) 353-9445
                 www.depolinklegal.com

```
 1          Q          Had you --

 2          A          And usually with, just for

 3   clarification, a lot of hospitals report or issue

 4   a financial report to the hospital associations

 5   periodically and other interested parties, so the

 6   information sort of gets around.

 7          Q          But at that point in time, prior

 8   to when you were retained or contacted in

 9   December 2006, had you ever reviewed books and

10   records or financial statements of Bayonne?

11          A          No, I did not.

12          Q          Had you, at any point in time,

13   heard of OMNI or Avery Eisenreich or when was the

14   first time you heard that name?

15          A          First time I heard that name was

16   when I was engaged in a review.

17          Q          Sometime after 2006, December?

18          A          Yes.

19          Q          How did that come up?

20          A          I believe that came up with my

21   interview with Mr. Brockman, and he mentioned the

22   fact that there was an arrangement for the

23   building of a skilled nursing facility on site

24   through OMNI.

25          Q          Was this before or after there
```

1    was a closing on the sale of the Bell property?

2                    MR. FALANGA:  Object to the

3    form.

4           A        I don't know.

5           Q        Can you, tell us in as close you

6    can, what he said to you about OMNI and

7    Eisenreich?

8                    MR. FALANGA:  Object to the

9    form.

10          A        One of the things I had noticed

11   in my review of the financial statements is that

12   there had been a receivable on the books at one

13   time, a pledge receivable and then there was an

14   adjustment to remove that pledge in the

15   subsequent year, and I was discussing that with

16   Mr. Brockman and he mentioned that it was in

17   conjunction with the skilled nursing facility

18   developer, and he indicated that apparently there

19   was an agreement at one time, and then the

20   agreement was renegotiated, and as part of the

21   renegotiation, the pledge was no longer part of

22   the arrangement.

23          Q        This is what Brockman told you?

24                   MR. FALANGA:  Object to the form

25   of the question.

1   closing, you are talking about February 1, 2008?

2              MR. CIENKI:  Yes, and the

3   current operations of the hospital.

4              MR. COPLON:  Well, I am not sure

5   I agree with that, but that's your instruction.

6              MR. CIENKI:  That's my

7   instruction, and I understand your disagreement

8   and we can cross that bridge later.

9              MR. FALANGA:  I guess I could go

10  on the record, and if I may, I need to put on the

11  -- I may not agree with that direction either to

12  the extent the witness is being advised not to

13  answer questions about conversations he may have

14  had with Mr. Eisenreich at any time.

15       Q       So between the time you first

16  got contacted with Bayonne Hospital through the

17  closing, February 2008, you had no contact with

18  OMNI or its representatives or agents or Mr.

19  Eisenreich.  Is that a fair statement?

20              MR. FALANGA:  Object to the

21  form.

22       A       I don't recall.

23       Q       Now, going back to the document,

24  the next sentence which I would like to read

25  says, "Apparently, the write-off was associated

1    with the renegotiation of the long term agreement

2    with a potential developer.  Can you tell me the

3    source of information for that sentence?

4                     MR. FALANGA:  Object to the

5    form.

6         A        That's Mr. Brockman.

7         Q        And can you be specific as to

8    what Mr. Brockman said to you to cause you to

9    write that sentences?

10                    MR. FALANGA:  Object to the

11   form.

12        A        That's pretty much what Mr.

13   Brockman said which is why I wrote the sentence

14   the way I wrote it.

15        Q        Did he by any chance tell you

16   that there had been a lease agreement between the

17   hospital and OMNI?

18                    MR. FALANGA:  Object to the

19   form, asked and answered.

20        A        I don't recall specifically, a

21   lease agreement.  I know there was a long term

22   agreement which is the words I used here, I don't

23   recall exactly what the form of that agreement

24   was.

25        Q        Did he give any indication about

```
 1    why this long term agreement had been

 2    renegotiated?

 3                    MR. FALANGA:  Object to the

 4    form.

 5        A        Not that I recall.

 6        Q        He didn't state why?

 7        A        He didn't state why as I recall.

 8        Q        And did he tell you what the

 9    renegotiation entailed, going from -- when there

10    is a renegotiation, you usually start with one

11    position and end with a second?

12                    MR. FALANGA:  Object to the

13    form.

14        A        No, I don't recall.

15        Q        When you use the word

16    renegotiation, you don't know what they were

17    renegotiating over or about?

18                    MR. FALANGA:  Object to the

19    form.

20        A        Renegotiation was his term that

21    he used.

22        Q        When it says with a potential

23    developer, did you have an understanding of who

24    that potential developer was?

25        A        I believe he mentioned it was
```

1    OMNI.

2          Q          Now, final sentences of that

3    paragraph in your report on WSB 8359 says, "As of

4    the date of this report and after a few attempts,

5    we have not been able to meet with BMC's

6    independent auditors to discuss the prior year's

7    accounting treatment of the pledge and other

8    financial matters."  Do you see that sentence?

9          A          Yes, I do.

10         Q          Now, when you say a few

11   attempts, what attempts are you referring to?

12         A          I tried to place a call to the

13   individual's name that I was given at the time

14   representing the auditors two or three times.

15         Q          Do you recall the name or the

16   auditor's name or the individuals?

17         A          I do not recall the individual,

18   the firm was Smith, the previous auditor.

19         Q          You tried two or three times?

20         A          Yes.

21         Q          No one returned your call?

22         A          No.

23         Q          Was that a substantial issue in

24   terms of what you were trying to accomplish with

25   this report?

# EXHIBIT
# #8A

Page 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

CASE NO. 07-15195(MS)

CHAPTER 11


------------------------------------------X

In re:  Bayonne Medical Center,


         Debtor.


------------------------------------------X



DEPOSITION OF JAMES J. HANNAN

TUESDAY, APRIL 14, 2009




DEPOLINK

Court Reporting & Litigation Support Services

Phone (973) 353-9880      Fax (973) 353-9445

www.depolinklegal.com

Page 174

1    Q.   Now, in the second page, in the middle

2    it says, "In planning the audit, analytical

3    procedures were performed with an objective of

4    identifying the existence of unusual transactions,

5    events, amounts, ratios, or trends."

6    Do you see that.

7    A.   Yes.

8    Q.   Why is that an objective of the audit?

9    A.   I don't think it's an objective of the

10   audit.  I think it's an objective to understand

11   interaction between accounts, abnormalities from

12   previous years compared to this year, any unusual

13   items that would pop out in connection with

14   planning the audit.  And, again, this was

15   memorialized at the inception of the audit.

16   Q.   You're concerned about unusual

17   transactions because that could lead to fraud.

18   Correct?

19   A.   Yes.

20   Q.   Was a standalone pledge to the hospital,

21   not the foundation, in the amount of $5 million an

22   unusual transaction in your view?

23   A.   It would be at Bayonne, given the

24   historical levels of donor support that they've

25   received in the past.

Page 175

1      Q.   It was far greater than the historical

2    level of donor support.   Correct?

3      A.   Yes.

4      Q.   Let's turn to the third page of this

5    document.

6      A.   1189?

7      Q.   Yes, 1189.   Thank you.   "Risk of

8    fraudulent financial reporting.   The auditor

9    considered the following conditions which could

10   provide incentives for fraudulent financial

11   reporting."   The second one is, "The company has

12   lost a significant source of funding."

13      Do you see that?

14      A.   Yes.

15      Q.   What does that refer to?

16      A.   I'm not sure.   Again, from a historical

17   perspective, this was our first year on the

18   engagement.   And it could be that the State at the

19   time was reducing charity care subsidies, not only

20   to Bayonne, but other hospitals within the state

21   of New Jersey.   There could have been cutbacks on

22   certain contracts or contractual reimbursements

23   from third parties, but ...

24      Q.   Well, sitting here today, do you know of

25   a significant source of funding that had been

# EXHIBIT #8B

## Board of Trustees Meeting
### September 1, 2005

**MEMBERS PRESENT:**    Messrs. Brockman, Campbell, Garelick, Mill, Evans, Ward, Drs. Villalona, Williams, Levine, Istvan

**GUESTS:**    Messrs. Apsel, Lombardo, Mohrle, Mmes. Giblin, Fleishell

**CALL TO ORDER:**    Mr. Brockman called the meeting to order at 5:00 P.M.

**MINUTES OF THE PREVIOUS MEETING:**

**FOR ACTION:**    Minutes of the August 4, 2005 meeting were previously circulated and were presented for approval. Upon a motion duly made, seconded and unanimously carried, the minutes of August 4, 2005 were approved.

**ANNOUNCEMENTS:**    Mr. Brockman extended the Board's deepest condolences to the Carroll family on the recent loss of their daughter, Mary Sue. He announced that a memorial service would take place on Saturday, September 10th, at 10:00 A.M. at St. Andrew's.

Mr. Brockman reminded the members that this year's annual Simpson Baber Foundation Humanitarian Awards dinner, honoring among others, Ted and Phyllis Garelick, would be held on Friday evening, September 9th, at the Liberty House. He asked for the Board's participation as a show of our appreciation for all that the Garelick's do for Bayonne Medical Center and the entire Bayonne community.

**COMMUNICATIONS:**    Mr. Garelick read a letter received from Mr. John Grywalski resigning his position as Vice Chairman and Trustee on the Board. Mr. Brockman related Mr. Grywalski's new executive position with a competing healthcare system and the conflict of interest this had created. He acknowledged Mr. Grywalski's service and contributions and stated that with the Board's acceptance, his resignation would take effect. It was noted that a letter expressing the Board's gratitude is being prepared and will be sent to Mr. Grywalski.

**FOR ACTION:**    Upon a motion duly made, seconded and unanimously carried, the resignation of John Grywalski was accepted.

**REPORT OF THE PRESIDENT OF THE MEDICAL STAFF:**    Dr. Levine reported that the medical staff continues to address LOS issues and working toward improving the number of outstanding medical records.

**REPORT OF THE BAYONNE MEDICAL CENTER FOUNDATION:**    Mr. Lombardo discussed the following items:

• The Foundation has received a $25,000 gift from the membership of the 33rd Street Club.
• Another gift of $10,000 was made in honor of former Trustee Charles Grodberg who had recently passed away. This gift is through the generosity of Mr. Grodberg's sister

WILEN_DB00012497

Betty and her husband, Dr. Milton Hollander, who are both former Bayonne residents and loyal supporters.
• Mr. Lombardo extended thanks and gratitude to Mr. Campbell and Pamrapo Bank for volunteering to be the lead sponsor of this year's Charity Ball.

**REPORT OF THE PRESIDENT & CEO**      Mr. Evans referenced his written report that was contained with the meeting materials and added the following comments:

• As part of BMC's emergency preparedness process, a full presentation drill was recently held. All disaster procedures and processes went well. Mr. Evans thanked the physicians and staff for their commitment and on-going participation in the important task of disaster preparedness.
• Referring to the state's annual report containing measures on how well hospitals perform in treating patients with heart failure, heart attack and pneumonia, Mr. Evans stated that this year's report will show significant improvement for BMC over last year.
• In response to a question raised, Mr. Evans advised that the state is expected to release its decision on angioplasty in either late October or early November noting that we remain optimistic.
• As an update, Mr. Evans discussed plans for the proposed Skilled Nursing Facility (SNF), the internal committee in place and anticipation of being able to present two proposals for partnering and financing options to Strategic Planning and on to the Board by the end of the year.

**TREASURER'S REPORT:**      It was reported that there was a slight loss from operations in July of approximately $51,000.   The Medical Center is moving in the right direction and it is anticipated that with the conclusion of summer, further improvements will be realized.

During the ensuing discussion, it was noted that the Wound Care Center, which is slated to open in late fall, and the Vascular Center will complement each other and generate further revenue.

**COMMITTEE REPORTS:**

*Governance Committee* – Mr. Ward advised that with the resignation of Mr. Grywalski, the Governance Committee had been convened to discuss and make a recommendation for a person to fill the vacant position of Vice Chairman.

The committee had met the previous day (meeting minutes were distributed at the start of today's meeting) and following in-depth discussion, recommend that Mr. Theodore Garelick be appointed to the Vice Chairmanship.

Mr. Garelick's experience, qualifications and involvement in BMC and the community were highlighted. Mr. Ward then presented the following resolution.

**FOR ACTION:**      On the recommendation of the Governance Committee made at their meeting of August 31, 2005, the Board of Trustees of Bayonne Medical Center approves the appointment of Theodore Garelick to the position of Vice Chairman for the remainder of the current term of office.

WILEN_DB00012498

Upon a motion duly made, seconded and unanimously carried, Mr. Garelick's appointment as Vice Chairman was approved.

Mr. Ward further commented that in the likelihood that the Board would approve Mr. Garelick's appointment as Vice Chair, the committee felt it would be prudent to discuss and form a recommendation for an individual to step into the position of Secretary that Mr. Garelick would be vacating.

In consideration of his many years of valued service, knowledge and participation, Mr. Ward stated that the committee recommends Mr. Robert Mill be appointed to the position of Secretary.

**FOR ACTION:**    On the recommendation of the Governance Committee made at their meeting of August 31, 2005, the Board of Trustees of Bayonne Medical Center approves the appointment of Robert Mill to the position of Secretary for the remainder of the current term of office.

Upon a motion duly made, seconded and unanimously carried, Mr. Mill's appointment as Secretary was approved.

***School of Nursing Advisory Committee*** – Ms. Giblin reported that the vacant Director position has been filled by Ms. Caroline Zall who had been an instructor at the school. A fall meeting of the Advisory Committee will be scheduled.

***Finance Committee*** – Previously covered.

**NEW BUSINESS:**    The issue of identifying space within the Medical Center that could be converted into a state-of-the-art conference center was raised and discussed. All agreed that in order to sponsor physician and community related functions, a more appropriate space is required. The potential for achieving this through the development of the SNF project was mentioned. Discussion continued on this matter and other potential moves within BMC.

**ADJOURNMENT:**

There being no further business to discuss, the meeting was adjourned at 5:50 P.M.

Attest,

*Robert C. Mill*

Robert C. Mill

3

WILEN_DB00012499

# EXHIBIT
# #9

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

           Debtor,      :

BAYONNE MEDICAL CENTER,            :
Debtor and
Debtor-in-Possesssion; and         :
ALLEN D. WILEN, in his                   DEPOSITION OF:
capacity as Liquidating             :
Trustee and Estate                       CAROLINE EVANS
Representative for the Estate      :
of Debtor, Bayonne Medical               VOLUME I
Center,                            :     (Pages 1-229)

         Plaintiff,      :

        -vs-           :

BAYONNE/OMNI DEVELOPMENT,          :
L.L.C., a New Jersey limited
liability company; et al.,         :

       Defendants.      :
------------------------------------

B E F O R E:

      SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 8

1        A.       That is correct.

2        Q.       What kind of consulting did you do?

3        A.       Healthcare finance, revenue cycle

4    management.

5        Q.       What does revenue cycle management

6    mean, to those of us who don't understand it?

7        A.       It's basically all of the elements

8    and the areas wherein a healthcare institution that

9    regulates the billing and/or reimbursement from the

10   particular carriers that the entities would have.

11       Q.       And you consulted with BMC for how

12   long?

13       A.       About a year.

14       Q.       And that takes us to what, 2002?

15       A.       About June of 2002, when I was hired

16   as a permanent employee.

17       Q.       Who hired you?

18       A.       Kris Keissling.

19       Q.       And did you have a job title?

20       A.       I did, I was the V.P. of revenue

21   cycle management.

22       Q.       And did you retain that same title

23   for your entire tenure at BMC?

24       A.       I did.

25       Q.       And when did your tenure at BMC end?

1          A.        December '06.

2          Q.        And did you perform the same

3      functions for BMC during the period 2002 through

4      2006?

5          A.        Yes, I was the V.P. of revenue cycle

6      management, other administrative issues, you know.

7          Q.        And when you say there were other

8      administrative issues, can you be more precise?

9          A.        Yeah.  I was part of the senior team,

10     so I would then be involved in senior team

11     management meetings, revenue cycle meetings,

12     crosswalk meetings, a lot of other, you know,

13     various committee meetings.  Sometimes strategic

14     planning meetings.  I could go on and on.  The St.

15     Vincent's-related meetings, information technology

16     transition, revenue cycle transition, all of those

17     types of things.

18         Q.        You mentioned the "senior team."

19     What was the senior team?

20         A.        The senior team was made up of the

21     V.P.'s and A.V.P.'s of the medical center.

22         Q.        And what was the function of the

23     senior team, as you understood it?

24         A.        A lot of what I just explained,

25     obviously each vice president had their own category

1    and responsibilities as it related to the operations

2    of the medical center.  We had a V.P. of operations,

3    a vice president and an assistant vice president of

4    nursing and clinical services, me, a V.P. of

5    finance, which is really the FO, those types of

6    things.

7          Q.     Did the senior team have a charter of

8    any type?

9          A.     I'm not sure I understand.

10         Q.     Did it have bylaws, rules,

11   regulations, charter, any piece of paper that

12   described what its composition was or what it was

13   supposed to be doing?

14         A.     I don't know anything about that.  I

15   would say no, not to my knowledge, I didn't know

16   that one existed.

17         Q.     Was the senior team a decision-making

18   body or was it a recommending body?

19         A.     It was both in a lot of ways.  For

20   example, I wouldn't be making any decisions as it

21   related to clinical services.  You know what I mean?

22   That would be something that Stephanie and/or Cheryl

23   would have done, and vice-versa.  They would come to

24   me with a new service line saying, This is the

25   service line we'd like to implement.  Take a look

1    and see what it means to us in terms of

2    reimbursement and services based on our current

3    volume, things like that.  It was extremely

4    collaborative I would say.

5            Q.      So in some areas you say the senior

6    team made decisions and in other areas it made

7    recommendations?

8            A.      Absolutely.

9            Q.      And in the areas where it made

10   recommendations, to whom did it make

11   recommendations?

12           A.      It depended on what we were talking

13   about.  For instance, if it was strategic planning,

14   there was a strategic planning committee of the

15   board.  So the recommendation would go there.  If it

16   was space planning, there was a space planning

17   committee that the V.P. of op.'s was the last word

18   on.  If it was clinical integration, well, that was

19   Stephanie.  So if it was something

20   organization-wide, it would be the CEO that we made

21   the recommendation to.  So it definitely would be

22   situational.

23           Q.      And the strategic planning committee,

24   have I got those words right, what was its function?

25           A.      It had a lot of functions.  It was