# EXHIBIT
# #10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,   :

          Debtor,   :

BAYONNE MEDICAL CENTER,   :
Debtor and
Debtor-in-Possesssion; and   :
ALLEN D. WILEN, in his          DEPOSITION OF:
capacity as Liquidating   :
Trustee and Estate          CAROLINE EVANS
Representative for the Estate   :
of Debtor, Bayonne Medical      VOLUME I
Center,   :     (Pages 1-229)

        Plaintiff,   :

        -vs-   :

BAYONNE/OMNI DEVELOPMENT,   :
L.L.C., a New Jersey limited
liability company; et al.,   :

        Defendants.   :
------------------------------------

B E F O R E:

     SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880   Fax (973) 353-9445
www.depolinklegal.com

1          Q.      What did he tell you about the

2    selection of Omni, if anything?

3          A.      He didn't tell me anything about it.

4    He just said it was, yeah, that's kind of the way it

5    went.

6          Q.      He didn't tell you why the decision

7    was made for Omni, as opposed to the competitor?

8          A.      It was not Marvin, but it was Heather

9    who told me Avery had the beds.

10         Q.      For the record, that's Heather Aaron?

11         A.      Uh-huh.

12         Q.      When Heather told you that "Avery had

13   the beds," I presume that means that Avery was going

14   to be the chosen developer for the SNF?

15         A.      Yeah.  At the time the state was not

16   issuing new licenses for beds.  And even before the

17   SNF initiative, Heather was trying to get beds.

18         Q.      So now when you say the state wasn't

19   issuing new licenses for beds, how did that play, if

20   at all, into the selection of Omni as the developer

21   of the SNF?

22         A.      Well, he had beds and we needed beds

23   in order to have a SNF.

24         Q.      When you say "he had beds," you mean

25   he had licenses for beds?

Page 19

```
 1         A.      Correct, his company had all the

 2    licenses.

 3         Q.      And you say the state wasn't issuing

 4    licenses for beds?

 5         A.      We couldn't get anymore.

 6         Q.      And the competitor for the position

 7    of developer of the SNF did not have any licenses

 8    for beds for this area?

 9         A.      I don't know the answer to that.  I

10    wasn't told that they didn't, I was just told that

11    he did.

12         Q.      You didn't discuss with anyone

13    whether the competitor did or didn't have licenses

14    for beds?

15         A.      Uh-uh.

16         Q.      And what was the next thing, if any,

17    that came to your attention about the SNF project

18    after Heather told you that Omni had been chosen?

19         A.      That we were going to build a nursing

20    home.

21         Q.      Was she the exclusive source of your

22    information about the proposed development project

23    with Omni for the SNF at the Bell Street building?

24         A.      No, she wasn't.  Marvin, you know,

25    talked about it.  This went on for a while, I mean
```

# EXHIBIT
# #11

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,   :

          Debtor,   :

BAYONNE MEDICAL CENTER,   :
Debtor and
Debtor-in-Possesssion; and   :
ALLEN D. WILEN, in his       DEPOSITION OF:
capacity as Liquidating   :
Trustee and Estate       CAROLINE EVANS
Representative for the Estate   :
of Debtor, Bayonne Medical       VOLUME I
Center,   :      (Pages 1-229)

       Plaintiff,   :

     -vs-   :

BAYONNE/OMNI DEVELOPMENT,   :
L.L.C., a New Jersey limited
liability company; et al.,   :

      Defendants.   :
------------------------------------

B E F O R E:

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880   Fax (973) 353-9445
www.depolinklegal.com

1        Q.      If you remembered exactly when, you'd

2   be a hero.  So it was sometime in this time frame

3   that --

4        A.      In this time period where we were

5   building a nursing home and we were going to lease

6   back space to take it out of the original footprint

7   and into this new space.

8        Q.      And who introduced you to Avery?

9        A.      I don't remember if it was Marvin or

10  Heather or they gave me his phone number.  I don't

11  remember, actually.

12       Q.      This is sometime after he had been

13  selected by BMC?

14       A.      Yes.

15       Q.      Did whoever introduce you to Avery,

16  tell you or did you learn from some other source

17  what your role was to be with Avery?

18       A.      I remember exactly, actually.  Marvin

19  came into my office because they were going to ask

20  Avery for a donation.  And Heather and Marvin wanted

21  me to join in the endeavor of asking Avery for a

22  pledge.

23       Q.      That was the foundation, no pun

24  intended, that was the foundation, then, or the

25  springboard for --

# EXHIBIT
# #12

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

               Debtor,      :

BAYONNE MEDICAL CENTER,      :
Debtor and
Debtor-in-Possesssion; and      :
ALLEN D. WILEN, in his                 DEPOSITION OF:
capacity as Liquidating      :
Trustee and Estate                     CAROLINE EVANS
Representative for the Estate  :
of Debtor, Bayonne Medical             VOLUME I
Center,                        :       (Pages 1-229)

          Plaintiff,      :

        -vs-      :

BAYONNE/OMNI DEVELOPMENT,      :
L.L.C., a New Jersey limited
liability company; et al.,      :

         Defendants.      :
----------------------------------

B E F O R E :

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880      Fax (973) 353-9445
www.depolinklegal.com

Page 106

```
 1   why it is that the first payment date changed from

 2   July 2008 to June 2006?

 3         A.     No, I don't.

 4         Q.     Did you discuss with Avery at any

 5   time the first payment date on the October 14th

 6   form?

 7         A.     I don't recall that.

 8         Q.     Do you recall discussing with him the

 9   first payment date on the October 21 form?

10         A.     I don't recall that I did, no.

11         Q.     And at some point, whether it was

12   because Avery signed it in front of you or because

13   you got it back after he signed it outside of your

14   presence, you did receive this document back signed

15   by Avery; is that correct?

16         A.     Yes.

17         Q.     What did you do with it then?

18         A.     I didn't give it to Heather because

19   she wasn't in, I gave it to Marvin.

20         Q.     What did you say to Marvin, if

21   anything, and what did he say to you?

22         A.     I didn't say anything but "Here's the

23   resigned form."

24         Q.     Did anyone tell you that this pledge

25   was necessary in order for the SNF deal to be
```

1    awarded to Avery?

2           A.    No, they did not tell me that.

3           Q.    As far as you know, was this pledge

4    an essential for Avery to have been awarded the SNF

5    deal?

6           A.    No, not as far as I knew.

7           Q.    Did you ever talk to Herman Brockman

8    about this pledge?

9           A.    Not personally, but he was actually

10   in pretty close to when they got it and he was

11   actually in the hospital, and he was there when they

12   were discussing it.  It was Marvin, Rob, me, I came

13   out into the hallway, Steph was there, Stephanie was

14   there.  He was there, Herman was there, they told

15   him, yep.

16          Q.    So now you mentioned earlier that you

17   didn't tell Avery the first time you talked to him

18   about the pledge that it would be unenforceable, but

19   if I'm remembering your testimony correctly, at some

20   point later you did tell him that it would not be

21   binding; is that correct?

22          A.    Yes.

23                MR. FALANGA:  Object to the form.

24          Q.    When was it that you first told him

25   that it would not be binding?

# EXHIBIT
# #13

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

               Debtor,      :

BAYONNE MEDICAL CENTER,      :
Debtor and
Debtor-in-Possesssion; and      :
ALLEN D. WILEN, in his
capacity as Liquidating      :
Trustee and Estate
Representative for the Estate      :
of Debtor, Bayonne Medical
Center,      :

          Plaintiff,      :

       -vs-      :

BAYONNE/OMNI DEVELOPMENT,      :
L.L.C., a New Jersey limited
liability company; et al.,      :

        Defendants.      :

------------------------------------

DEPOSITION OF:

CAROLINE EVANS

VOLUME I
(Pages 1-229)

B E F O R E:

     SHARON B. STOPPIELLO, a Certified Court
Reporter and Notary Public of the State of New
Jersey, at the offices of CONNELL FOLEY, L.L.P., 85
Livingston Avenue, Roseland, New Jersey, on
THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,
pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880     Fax (973) 353-9445
www.depolinklegal.com

1          A.        Rob was not a part of the vascular

2    campaign, foundation, whatever that was.

3          Q.        All right.

4          A.        And it became evident that, at least

5    with these consultants, that Vinny wasn't going to

6    be able to do this.  So we all began asking vendors.

7    I asked Marvin's vendors, I asked Stephanie's

8    vendors, Stephanie asked her own vendors.  And

9    Marvin had trouble doing that, sitting down to a

10   lunch and expressing the mission of this vascular

11   center and conveying what it is we were trying to do

12   with this vascular center.  I didn't have a problem

13   doing that.  So I actually did a lot of fundraising

14   in that regard.

15         Q.        This is '03, '04?

16         A.        '03, '04, this was the vascular

17   campaign.  I asked Turner Construction for money.  I

18   asked Self Pay Solutions for money.  I asked Phoenix

19   Nursing.  So, you know, whenever somebody needed

20   help asking or putting that together, I would have

21   helped.  So that was why I think Heather and Marvin

22   were in my office that day.

23         Q.        In connection with your efforts in

24   the vascular campaign, did it ever come to your

25   attention that Rotolo, the consultant for the

DEPOLINK COURT REPORTING & LITIGATION SERVICES (973) 353-9880

1   vascular campaign, recommended that in pursuing

2   pledges, you tell the prospective pledgor that the

3   pledges were not enforceable?

4          A.     Yes.

5                 MR. FALANGA:  Object to the form.

6                 THE WITNESS:  I'm sorry.

7          Q.     And more specifically, do you recall

8   what it was that you learned about Rotolo having

9   given that advice?

10         A.     I actually heard that from Vince

11  Lombardo, he was very specific.  Because I said,

12  "Vinny, you've got us out there asking for money,

13  and these people are asking questions.  What are we

14  supposed to say?"  And that's when he gave me a very

15  specific example and said that we can't hold them to

16  it.  Actually, I'll tell you exactly what he said,

17  "They weren't binding."

18         Q.     And did he tell you that you were to

19  tell that to prospective pledgors?

20         A.     If they got nervous and said, Well,

21  what am I supposed to do?  What if I lose my

22  business?  And I was supposed to say, "They're not

23  going to hold you to it.  They're not going to go

24  after you for it."

25         Q.     And is that what Rotolo had

# EXHIBIT
# #14

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

         Debtor,      :


BAYONNE MEDICAL CENTER,      :
Debtor and
Debtor-in-Possesssion; and      :
ALLEN D. WILEN, in his                   DEPOSITION OF:
capacity as Liquidating      :
Trustee and Estate                       CAROLINE EVANS
Representative for the Estate      :
of Debtor, Bayonne Medical                  VOLUME I
Center,      :                           (Pages 1-229)

        Plaintiff,      :


      -vs-      :


BAYONNE/OMNI DEVELOPMENT,      :
L.L.C., a New Jersey limited
liability company; et al.,      :

        Defendants.      :
_____

B E F O R E :

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.


DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880      Fax (973) 353-9445
www.depolinklegal.com

1           MR. FALANGA:  Objection.

2      A.    I don't remember that.

3      Q.    Was it before the October 14th pledge

4  form?

5      A.    It could have been, sure.

6      Q.    Were there others present when you

7  told him that the pledge would not be binding?

8      A.    I don't remember that.

9      Q.    So far as you know, were others at

10  BMC aware of the fact that you were telling Avery

11  that the pledge was not binding?

12           MR. FALANGA:  Object to the form.

13      A.    Yes, and we all told, that was part

14  of the Rotolo spiel.

15      Q.    What does that mean?  I know what it

16  means, but the record doesn't.

17      A.    That means it was part of the

18  Elements for Effective Fundraising, that was the

19  name of the document.

20      Q.    What was that element?

21      A.    It was phrased like you had to put

22  the donor at ease and not make them feel like it was

23  a debt, that was the document verbiage.

24      Q.    So it was your understanding that

25  that meant that you had to tell the pledgor that the

# EXHIBIT
# #15

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

            Debtor,      :

BAYONNE MEDICAL CENTER,      :
Debtor and
Debtor-in-Possesssion; and      :
ALLEN D. WILEN, in his           DEPOSITION OF:
capacity as Liquidating      :
Trustee and Estate           CAROLINE EVANS
Representative for the Estate      :
of Debtor, Bayonne Medical          VOLUME I
Center,      :      (Pages 1-229)

          Plaintiff,      :

         -vs-      :

BAYONNE/OMNI DEVELOPMENT,      :
L.L.C., a New Jersey limited
liability company; et al.,      :

         Defendants.      :
----------------------------------

B E F O R E :

     SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880      Fax (973) 353-9445
www.depolinklegal.com

Page 28

1  vascular campaign, recommended that in pursuing

2  pledges, you tell the prospective pledgor that the

3  pledges were not enforceable?

4        A.     Yes.

5               MR. FALANGA:  Object to the form.

6               THE WITNESS:  I'm sorry.

7        Q.     And more specifically, do you recall

8  what it was that you learned about Rotolo having

9  given that advice?

10       A.     I actually heard that from Vince

11 Lombardo, he was very specific.  Because I said,

12 "Vinny, you've got us out there asking for money,

13 and these people are asking questions.  What are we

14 supposed to say?"  And that's when he gave me a very

15 specific example and said that we can't hold them to

16 it.  Actually, I'll tell you exactly what he said,

17 "They weren't binding."

18       Q.     And did he tell you that you were to

19 tell that to prospective pledgors?

20       A.     If they got nervous and said, Well,

21 what am I supposed to do?  What if I lose my

22 business?  And I was supposed to say, "They're not

23 going to hold you to it.  They're not going to go

24 after you for it."

25       Q.     And is that what Rotolo had

# EXHIBIT
# #16

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

                    Debtor,             :

BAYONNE MEDICAL CENTER,                 :
Debtor and
Debtor-in-Possesssion; and             :
ALLEN D. WILEN, in his                      DEPOSITION OF:
capacity as Liquidating                 :
Trustee and Estate                          CAROLINE EVANS
Representative for the Estate           :
of Debtor, Bayonne Medical                  VOLUME I
Center,                                 :   (Pages 1-229)

                    Plaintiff,          :

                    -vs-                :

BAYONNE/OMNI DEVELOPMENT,               :
L.L.C., a New Jersey limited
liability company; et al.,              :

                    Defendants.         :
-------------------------------------

B E F O R E :

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1             MR. FALANGA:  Objection.

2        A.    He was the only person who said it to

3   me.

4        Q.    Do you know whether others beside you

5   understood that to be the rule?

6        A.    Yes, sir.

7             MR. FALANGA:  Objection to form.

8        Q.    And how do you know that others

9   beside you knew that to be the rule or the protocol

10  for solicitation of pledges?

11       A.    Because I heard Stephanie repeat it.

12  Stephanie said it to me about Phoenix, about Phoenix

13  Nursing.

14       Q.    Anybody else involved in that issue?

15       A.    Not that I remember.

16            MR. FALANGA:  Objection.

17       Q.    Do you know Dr. Wozniak?

18       A.    Deborah, yes.

19       Q.    Did Dr. Wozniak make a pledge to

20  either the foundation or the hospital?

21       A.    She made a pledge, yes, she did.

22       Q.    Was her pledge honored or dishonored?

23            MR. FALANGA:  Object to the form.

24            MR. SAMSON:  Do you understand the

25  question?

1                    THE WITNESS:  I do.

2                    MR. SAMSON:  I mean to the extent

3    "honored."

4                    THE WITNESS:  Uh-huh.

5        A.      The only information that I have

6    about Debbie Wozniak's pledge is what Vinny told me.

7        Q.      And what did he tell you?

8                    MR. FALANGA:  Objection to form.

9        A.      She didn't pay it.

10       Q.      Do you know whether any action was

11   ever taken to enforce the pledge against her?

12       A.      I don't know the answer to that.

13       Q.      Do you know whether any legal action

14   was ever taken by BMC or the foundation to enforce a

15   pledge?

16       A.      Not that I know of.

17       Q.      Do you recall ever discussing with

18   anyone the issue of pursuing legally a pledgor to

19   make a pledge binding and enforceable?

20       A.      That I discussed with someone?

21       Q.      Yes.

22       A.      No, I don't remember that.

23       Q.      So we have you back now at this

24   meeting with Marvin.  And at some point after that

25   meeting you had your first face to face with Avery?

# EXHIBIT
# #16A

*To: Gary*
*From: Bob.*

**Auriemma, Robert**

| | |
|---|---|
| **From:** | Auriemma, Robert |
| **Sent:** | Monday, October 09, 2006 5:13 PM |
| **To:** | Vigliano, Alfred |
| **Cc:** | Eimo, Angelo |
| **Subject:** | Wipfli Open Item Listing: Reference: Kim Other Rec-0.2 The confidential pledge form indicates the original receivable was for $1,000,000 payable in 4 annual install starting 11/05. |

**Summary of 2005 Activity:**
The Foundation recorded a $1 million Pledge Receivable from a private donor and *credited* income.

The Foundation subsequently recorded an inter-company liability (Due to BMC) and *debited* Net Assets.
BMC simultaneously recorded an Inter-company receivable (Due from Foundation) and credited Other Operating Revenue.

Foundation Net Assets netted to $0.
The revenue resides only on BMC's books.  There is no duplication of this receivable.

The Inter-company BMC Receivable and Foundation Liability were appropriately eliminated on the Audited 2005 Consolidating Balance Sheet.
Since Revenue was included only on BMC's books, no elimination entries were required on the Audited 2005 Consolidating Statement of Operations.

**Collection Status:**
To date, only $100,000 has been received from the donor and the remaining balance of the Pledge Receivable on the Foundations books is $900,000.
The Foundation has not yet remitted this money to BMC and further collections from the donor are doubtful.
Bob

*This email pertains only to
GJ #20 of Group #2 regarding
the $1 million Pledge. The Receivable
was written-off in 2006. (BMC &
Foundation)*

*The entry for $962,595.14 (GJ#20/Group #3)
has no backup or explanation & was
reversed in 2006.  (BMC & Foundation)*

BMC036160

10/11/2006

*2005 Year-end*
*BMC ~~____~~   J.E.*

```
RUN DATE: 01/23/06
RUN TIME: 1447
V USER: MAGNL
```

Bayonne Medical Center GL   **LIVE**
GL BATCH LIST

PAGE 1

12/31/05 GENERAL #20 (POSTED)

```
COMMENT:
POST TO: DEC 2005
CONTROL AMOUNT:
CONTROL COUNT:
CREATED:      MAGNL
LAST EDITED: MAGNL
POSTED:       MAGNL
```

```
DATABASE:
CONTROL HASH:
ACTUAL HASH: 2914394585
On  Jan 23, 2006 @ 2:41pm
On  Jan 23, 2006 @ 2:46pm
On  Jan 23, 2006 @ 2:46pm
```

| | COUNT | DEBITS AMOUNT | COUNT | CREDITS AMOUNT |
|---|---|---|---|---|
| NORMAL | 11 | 6,610,468.72 | 9 | 6,610,468.72 |
| REVERSING | 0 | 0.00 | 0 | 0.00 |
| | 11 | 6,610,468.72 | 9 | 6,610,468.72 |

| ENTRY GROUP | DESCRIPTION | ENT | GL ACCOUNT | DEBIT | CREDIT | ACCOUNT DESCRIPTION |
|---|---|---|---|---|---|---|
| 1 | GJ#20 TO RECLASSIFY SCH OF X-RAY TO NURSING | | | | | |
| | | 1 | 01.8021.0720 | | | BAY SCHOOL OF NURSING PURCH MAINT EQUIP |
| | | 2 | 01.8022.0720 | 77.16 | | BAY SCHOOL OF RADIOLOGY PURCH MAINT EQUIP |
| | | 3 | 01.8021.0760 | | 77.16 | BAY SCHOOL OF NURSING TELEPHONE |
| | | 4 | 01.8022.0760 | 45.76 | | BAY SCHOOL OF RADIOLOGY TELEPHONE |
| | | 5 | 01.8021.0870 | | 45.76 | BAY SCHOOL OF NURSING LEASE PAYMENT |
| | | 6 | 01.8022.0870 | 110.66 | | BAY SCHOOL OF RADIOLOGY LEASE PAYMENT |
| | Totals For Group # 1 | | | 233.58 | 110.66 | |
| | | | | 233.58 | | |
| | GJ#20 TO RECORD RELEASE OF FUNDS FOR OPERATIONS | | | | | |
| | | 1 | 01.1080.5400 | 100,000.00 | | BAY PLEDGE RECEIVABLE - CURRENT |
| | | 2 | 01.1080.0800 | 900,000.00 | | BAY BH DUE FROM FOUNDATION |
| | | 3 | 01.5000.5475 | | 1,000,000.00 | BAY OTHER OPERATING REV FOUNDATION REIUMBURS |
| | Totals For Group # 2 | | | | 1,000,000.00 | |
| | | | | 1,000,000.00 | | |
| | GJ#20 TO RECORD RELEASE OF FUNDS FOR CAPITAL | | | | | |
| | | 1 | 01.1080.0800 | 962,535.14 | | BAY BH DUE FROM FOUNDATION |
| | | 2 | 01.2290.2910 | | 962,535.14 | BAY OPERATING FUND BALANCE |
| | Totals For Group # 3 | | | 962,535.14 | 962,535.14 | |
| | GJ#20 TO RECORD AMOUNT DUE FR 3RD PARTY PAYOR | | | | | |
| | | 1 | 01.1073.0500 | | | BAY EST. THIRD PARTY RECEIVABLE |
| | | 2 | 01.2071.2200 | 2,000,000.00 | | BAY EST 3RD PARTY S/T MCR-MEDICARE |
| | | 3 | 01.2071.2205 | 100,000.00 | | BAY EST 3RD PARTY S/T MCR-MEDICAID |
| | | 4 | 01.5500.6000 | 100,000.00 | | BAY SERVICE CHARGE ALLOW FHC MEDICARE |
| | | 5 | 01.5500.6010 | | 2,100,000.00 | BAY SERVICE CHARGE ALLOW FHC MEDICAID |
| | Totals For Group # 4 | | | | 100,000.00 | |
| | | | | 2,200,000.00 | 2,200,000.00 | |
| | GJ#20 TO REVERE PRIOR ADJUSTMENTS | | | | | |
| | | 1 | 01.5500.6000 | | 2,200,000.00 | BAY SERVICE CHARGE ALLOW FHC MEDICARE |
| | | 2 | 01.1060.0640 | 2,200,000.00 | | BAY BILLED A/R ALLOW |
| | Totals For Group # 5 | | | | 2,200,000.00 | |
| | | | | 2,200,000.00 | | |
| | GJ#20 TO CORRECT MISPOSTING OF C/R FOUNDATION | | | | | |
| | | 1 | 01.5000.5470 | | | BAY OTHER OPERATING REV BH FOUNDATION GRANT |
| | | 2 | 01.5000.5475 | 247,700.00 | | BAY OTHER OPERATING REV FOUNDATION REIUMBURS |
| | | | | | 247,700.00 | |

# Bayonne Hospital
## Journal Entry

*This is a Foundation Journal Entry*

Month Ending _____ December-05 _____
Journal Entry # _____ 1205-17 _____
Reversing Date _____

| Account Name | Account Number | Debit | Credit |
|---|---|---|---|
| | 20000 | 1,249.05 | |
| | 88500 | | 1,249.05 |
| | | | |
| Net Asset released from operations | 99000 | 900,000.00 | |
| Net Asset released Capital | 99500 | 962,535.14 | |
| A/P BMC | 20000 | | 900,000.00 |
| A/P BMC | 20000 | | 962,535.14 |
| | | | |
| | 90000 | 100,000.00 | |
| | 99000 | 247,700.00 | |
| | 31800 | | 100,000.00 |
| | 31575 | | 50,000.00 |
| | 31361 | | 197,700.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | 2,211,484.19 | 2,211,484.19 |

To adjust to/from BMC
To record Transfer to BMC
To record transfer to BMC

BMC036162

# EXHIBIT
# #17

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :

              Debtor,             :

BAYONNE MEDICAL CENTER,          :
Debtor and
Debtor-in-Possesssion; and       :
ALLEN D. WILEN, in his                    DEPOSITION OF:
capacity as Liquidating          :
Trustee and Estate                       .CAROLINE EVANS
Representative for the Estate    :
of Debtor, Bayonne Medical                  VOLUME I
Center,                          :       (Pages 1-229)

              Plaintiff,         :

              -vs-               :

BAYONNE/OMNI DEVELOPMENT,        :
L.L.C., a New Jersey limited
liability company; et al.,       :

              Defendants.        :
----------------------------------

B E F O R E :

       SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1          A.      He asked me to talk to Avery about

2    the pledge.

3          Q.      And before talking about the Avery

4    pledge, you say what was happening was that a group

5    was reaching out to those who had relationships with

6    the hospital?

7          A.      Uh-huh.

8                  MR. FALANGA:  Object to the form.

9          Q.      And was it those who had long-term

10   relationships with the hospital?

11         A.      Some and some new vendors, it was a

12   mix.

13         Q.      At the time that you were asked to

14   reach out to Avery for the pledge, did you

15   understand, from whatever source, that it was

16   anticipated there would be a relationship between

17   the hospital and Avery?

18         A.      Yes, I did.

19         Q.      Was it your understanding that it

20   would be a long-term relationship?

21         A.      Yes, I did.  He was building a

22   nursing home on the corner.

23         Q.      And which the hospital was going to

24   be a lessee?

25         A.      That we were going to lease space

1    back, yes.

2              Q.      For long term?

3              A.      Yes.

4              Q.      Twenty years?

5              A.      Sure, yes.

6              MR. FALANGA:  Object to the form.

7              Q.      So then there came a time that you

8    did solicit Avery?

9              A.      Yes.

10             Q.      Where were you and where was he,

11   where did it happen?

12             A.      I don't remember.  It might have been

13   in the hospital in my office.  I don't remember

14   exactly where it took place, but I did have the

15   conversation with him.

16             Q.      Had you met him before?

17             A.      I think I did meet him before.  Yes,

18   I did.  I think we had a phone conversation and then

19   we met in my office where we didn't talk about the

20   pledge.  As I discussed before, we kind of talked

21   about business and our families and things like

22   that.

23             Q.      Did you invite him to the hospital

24   that day?

25             A.      I think I did.  Yes, I did.

# EXHIBIT
# #18

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,        :

              Debtor,        :

BAYONNE MEDICAL CENTER,              :
Debtor and
Debtor-in-Possesssion; and           :
ALLEN D. WILEN, in his                        DEPOSITION OF:
capacity as Liquidating               :
Trustee and Estate                            CAROLINE EVANS
Representative for the Estate        :
of Debtor, Bayonne Medical                    VOLUME I
Center,                              :        (Pages 1-229)

        Plaintiff,        :

      -vs-              :

BAYONNE/OMNI DEVELOPMENT,            :
L.L.C., a New Jersey limited
liability company; et al.,           :

       Defendants.        :
------------------------------------

B E F O R E:

     SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880      Fax (973) 353-9445
www.depolinklegal.com

Page 87

1          A.      He asked me to talk to Avery about

2    the pledge.

3          Q.      And before talking about the Avery

4    pledge, you say what was happening was that a group

5    was reaching out to those who had relationships with

6    the hospital?

7          A.      Uh-huh.

8          MR. FALANGA:  Object to the form.

9          Q.      And was it those who had long-term

10   relationships with the hospital?

11         A.      Some and some new vendors, it was a

12   mix.

13         Q.      At the time that you were asked to

14   reach out to Avery for the pledge, did you

15   understand, from whatever source, that it was

16   anticipated there would be a relationship between

17   the hospital and Avery?

18         A.      Yes, I did.

19         Q.      Was it your understanding that it

20   would be a long-term relationship?

21         A.      Yes, I did.  He was building a

22   nursing home on the corner.

23         Q.      And which the hospital was going to

24   be a lessee?

25         A.      That we were going to lease space

1  back, yes.

2        Q.    For long term?

3        A.    Yes.

4        Q.    Twenty years?

5        A.    Sure, yes.

6        MR. FALANGA:  Object to the form.

7        Q.    So then there came a time that you

8  did solicit Avery?

9        A.    Yes.

10       Q.    Where were you and where was he,

11 where did it happen?

12       A.    I don't remember.  It might have been

13 in the hospital in my office.  I don't remember

14 exactly where it took place, but I did have the

15 conversation with him.

16       Q.    Had you met him before?

17       A.    I think I did meet him before.  Yes,

18 I did.  I think we had a phone conversation and then

19 we met in my office where we didn't talk about the

20 pledge.  As I discussed before, we kind of talked

21 about business and our families and things like

22 that.

23       Q.    Did you invite him to the hospital

24 that day?

25       A.    I think I did.  Yes, I did.

1          Q.     Did you tell him why you were

2    inviting him?

3          A.     No, I said for coffee.

4          Q.     Sneaky.  Was it just the two of you

5    that day --

6          A.     In the office, yes, it was.

7          Q.     No one else was around?

8          A.     Uh-uh.

9          Q.     Tell me as best you can recall how

10   the conversation went.

11         A.     The first conversation I had with

12   him?

13         Q.     The first conversation.

14         A.     We talked about my ex-husband being

15   Jewish, we talked about --

16         Q.     I'm sorry, I mean --

17         A.     You just said.

18         Q.     You're right.  The substantive

19   conversation about the pledge, let's start with

20   that.

21         A.     I don't know that that was the day.

22   I think it was the subsequent -- I don't know that I

23   took that opportunity.

24         Q.     Then take me to the next time or

25   whatever time it was when you first talked to him

1    about the pledge.

2          A.    I talked about him being a long-term

3    partner.  I talked about how it was going to be

4    great to have a nursing home on the corner, about

5    how the admissions were going to be great, from my

6    perspective, how the length of stay was going to be

7    positively affected.  I talked about the partnership

8    with St. Vincent's, that that was another market

9    that he could pull from.  We talked about a lot of

10   things like that.  I also talked about how much it

11   costs to run a hospital, and he kind of went down

12   that road, and asked him for a pledge.  I don't know

13   the specific information.

14          Q.    When you asked him for a pledge, did

15   you ask him for a specific amount?

16          A.    Yes.

17          Q.    And what was that amount?

18          A.    $5,000,000.

19          Q.    Where did that number come from?

20          A.    That number came from Heather Aaron

21   and Marv Apsel.  That's what they told me they were

22   going to have that conversation for.

23          Q.    Did they tell you why that number?

24          MR. FALANGA:  Object to the form.

25          A.    No.

DEPOLINK COURT REPORTING & LITIGATION SERVICES  (973) 353-9880