# EXHIBIT
# #62

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,,       :

    Debtor,                          :

        v.                       :

                      :

BAYONNE MEDICAL CENTER, Debtor       :
and Debtor-in-Possession; and
ALLEN D. WILEN, in his capacity as:
Liquidating Trustee and Estate       :
Representative for the Estate of     :
Debtor, Bayonne Medical Center,      :

    Plaintiff,                       :

        v.                       :

                      :

BAYONNE/OMNI DEVELOPTMENT,           :
L.L.C., a New Jersey limited
liability company; et al.,           :

    Defendants.                      :

DEPOSITION OF

PAUL MOHRLE

**ORIGINAL**

_____

      T R A N S C R I P T of Deposition Proceedings

in the above-entitled matter, as taken by and before MARIA

F. PIOTROWSKI, Certified Court Reporter and Notary Public of

the State of New Jersey, at the offices of SAIBER ATTORNEYS

AT LAW, 18 COLUMBIA AVENUE, FLORHAM PARK, NEW JERSEY, on

WEDNESDAY, SEPTEMBER 15th, 2010 commencing at 10:12 a.m..

      DepoLink Court Reporting & Litigation Support Services
      Phone (973) 353-9880        Fax (973) 353-9445
              www.depolinklegal.com

1      Q.      And was this conversation that you had with

2  Herman Brockman in the fall of '06 the only conversation

3  that you recall having had with him about the pledge?

4      A.      I don't recall.

5              MR. FALANGA:  Objection to the form.

6      Q.      Excuse me?

7      A.      I don't remember.

8      Q.      Do you recall any conversations with Herman

9  Brockman about the pledge other than the one that took place

10 in or about October or November or I should say in the fall

11 of 2006?

12             MR. GROHS:  Object to the form.

13     A.      I don't remember.

14     Q.      Tell me what you can recall about the

15 conversation about the pledge that you had with Herman

16 Brockman in the fall of 2006.

17             MR. FALANGA:  Object to the form.

18             MR. GROHS:  Object to the form.  You can

19 answer.

20     A.      I don't remember any specifics.

21     Q.      What was the subject matter?

22     A.      It was probably when I was writing it off the

23 books or fully reserving it.  Not writing it off the books,

24 but setting up a reserve.

25     Q.      So --

```
 1        A.        And that was a significant item because that

 2   reduced the -- increased the loss of the hospital when that

 3   was written off the books.

 4        Q.        So your best recollection is that it was at

 5   the time that you were writing off the pledge that you

 6   discussed something about the pledge with Herman Brockman;

 7   is that correct?

 8                  MR. FALANGA:  Object to the form.

 9                  MR. GROHS:  Object to the form.

10        Q.        You can answer.

11        A.        Yeah.

12        Q.        What was it, as best you can recall, that you

13   discussed with him?

14        A.        Just that we were reserving it against the

15   pledge.

16        Q.        Did you tell him why you were making a

17   reserve against the pledge?

18        A.        Yeah, because it wasn't deemed to be

19   collectable.

20        Q.        Did you tell him why -- who deemed it not to

21   be collectable?

22                  MR. FALANGA:  Object to the form.

23                  MR. GROHS:  I join.  You can answer.

24        A.        I don't remember.

25        Q.        Who told you that they deemed it not --
```

1          MR. GROHS:  Objection.

2          MR. FALANGA:  Objection.

3     A.     I don't remember.

4     Q.     Was it your independent judgment that it was

5  not collectable or did that conclusion come from something

6  that somebody told you?

7          MR. FALANGA:  Object to the form.

8          MR. GROHS:  Object to the form.

9     A.     It wasn't my independent.  Information came

10  that this, you know, this pledge we weren't going to -- I

11  don't remember specifically what was said, but based on the

12  information that was given to me, then I said, you know,

13  we'll have to reserve for the pledge.

14     Q.     Okay.  Do you know who it was that gave you

15  the information that the pledge was uncollectible?

16     A.     I can't remember.

17     Q.     Was it one person or more than one person?

18          MR. GROHS:  Object to the form.

19     A.     I can't remember.

20     Q.     Was it in writing or oral?

21     A.     It was oral.

22     Q.     Was it in the context of a formal meeting of

23  a committee or not?

24     A.     No, it wasn't a formal committee.

25     Q.     Did you do anything to determine the accuracy

1    of the advice you were getting that the pledge was

2    uncollectible?

3                    MR. GROHS:  Object to the form.

4                    MR. FALANGA:  Join the objection.

5         A.        No.

6         Q.        Did you tell anybody at the time that someone

7    told you that the pledge was uncollectible, did you tell

8    somebody else the pledge was uncollectible?

9                    MR. GROHS:  Object to the form.

10                   MR. FALANGA:  Object to the form.

11        Q.        You can answer.

12        A.        I had to tell the Accounting Department so

13   they could prepare the appropriate journal entry on the

14   books.

15        Q.        Do you know why the pledge was uncollectible?

16                   MR. GROHS:  Object to the form.

17                   MR. FALANGA:  Object to the form.

18        Q.        You can answer.

19        A.        No.

20        Q.        Were you ever told why the pledge was

21   uncollectible?

22                   MR. GROHS:  Object to the form.

23                   MR. FALANGA:  Object to the form.

24        A.        No, not that I can recall.

25        Q.        So you made a judgment, if I'm understanding

1    you correctly, to establish a reserve and to write off the

2    pledge based upon what somebody told you and without their

3    telling you the reason for you to do it; is that correct?

4                    MR. FALANGA:  Object to the form.

5                    MR. GROHS:  Object to the form.

6         Q.       You can answer the question.

7         A.       I don't remember the specifics.

8         Q.       Do you remember learning at any time from any

9    source why it was that the Eisenreich pledge had been

10   determined to be uncollectible?

11                   MR. GROHS:  Object to the form and I believe

12   it's been asked and answered.

13                   MR. FALANGA:  Join in the objection.

14        A.       No, I don't remember.

15        Q.       And do you recall any of the specifics of

16   your conversation with Herman Brockman at that time when I

17   gather what you're saying is that you were discussing with

18   him was reserve or write off?

19                   MR. GROHS:  Object to form.

20                   MR. FALANGA:  Object to the form.

21        A.       I don't remember any specifics.

22        Q.       Do you remember his saying anything at that

23   time?

24                   MR. FALANGA:  Object to the form.

25                   MR. GROHS:  Object to the form.

# EXHIBIT
# #63

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11


IN RE BAYONNE MEDICAL CENTER,          :

    Debtor,                            :     DEPOSITION OF

       v.                             :     VINCENT LOMBARDO

                                                :

ALLEN D. WILEN,                        :

    Plaintiff,                         :

       v.                             :

BAYONNE/OMNI DEVELOPMENT, LLC.,        :
et al,                                 :

    Defendants.                        :

_____:

       T R A N S C R I P T of Deposition Proceedings

in the above-entitled matter, as taken by and before MARIA

F. PIOTROWSKI, Certified Court Reporter and Notary Public of

the State of New Jersey, at the offices of CONNELL FOLEY,

LLP, 2510 PLAZA 5, HARBORSIDE FINANCIAL CENTER, JERSEY CITY,

NEW JERSEY, on TUESDAY, MARCH 16th, 2010 commencing at 3:10

p.m..


    DepoLink Court Reporting & Litigation Support Services
    Phone (973) 353-9880          Fax (973) 353-9445
             www.depolinklegal.com

Page 14

1    times to get that pledge.

2         Q.      And sometimes the pledge was not honored?

3                 MR. PIZZI:  Object to the form.  No

4    foundation.

5         A.      Yes.

6         Q.      And you know what I mean been when I say the

7    pledge was not honored?

8         A.      Yes.

9         Q.      Do you have any way, as you sit here today

10   and without your records, to estimate for me the percentage

11   as a fraction of the totality of pledges made during the

12   period of your service that were dishonored?

13        A.      Not to my recollection.

14        Q.      Would it have been -- can you estimate it for

15   me?

16                MR. PIZZI:  It's the same question.  Asked

17   and answered.

18        Q.      You can answer the question.

19        A.      No, I -- not with any absolute.

20        Q.      Let me try it this way.  Would you say that

21   more than 50 percent of the pledges were dishonored?

22                MR. PIZZI:  Object to the form.

23        A.      No.

24        Q.      Would you say that more than 40 percent of

25   the pledges were dishonored?

Page 15

1          A.          Can't recall.  Don't know.

2          Q.          Would you say more than 20 percent, more than

3     20 percent of the pledges were dishonored?

4                      MR. PIZZI:  Object to the form.

5          A.          I can't.  I can't with any accuracy and I

6     don't want to guess.

7          Q.          I don't want you to guess.  Without telling

8     me the percentage of pledges that were dishonored because

9     you're not able to do that at this moment, can you tell me

10    if there are records kept by the foundation for that period

11    that would reflect the pledges that were recorded and the

12    honoring or dishonoring of those pledges?

13         A.          When I left in 2007 there were records that

14    I'm sure would indicate that and also the Bayonne Medical

15    Center's accounting office also kept records.

16         Q.          Who was in charge then of the BMC accounting

17    department?

18         A.          Heather Aaron was the CFO.

19         Q.          Can you tell me in the course of your service

20    from '99 through 12/31/05 any lawsuits were brought against

21    pledgors to collect upon dishonored pledges?

22         A.          No.

23         Q.          No you can't tell me or none were brought?

24         A.          None that I know of.

25         Q.          Was there a policy at the foundation in the

1    period '99 through 12/31/05 with respect to whether or not

2    dishonored pledges were to be the subject of collection

3    suits?

4         A.    Not to my knowledge.

5         Q.    Was there a policy at the foundation in that

6    same period with respect to the pursuit or not pursuing

7    dishonored pledges?

8              MR. PIZZI:  Objection.  No foundation.  If

9    you know.

10        A.    Not sure.  I don't know.

11        Q.    Who at the foundation, if any person or

12   persons would fill this bill, had the primary responsibility

13   for pursuing collection of dishonored pledges?

14             MR. PIZZI:  Object to the form.

15        A.    The situation never or the conversation never

16   took place how to handle dishonored pledges, to the best of

17   my knowledge.

18        Q.    Okay.  So when a -- in the period of your

19   tenure and ending 12/31/05 in the event of a pledge that was

20   dishonored, who made the decision of what to do about it?

21        A.    Well, majority of the pledges occurred, I

22   believe, in 2002 or 2003 and the hope was that the people

23   would ultimately satisfy their pledge.

24        Q.    Right.  So let me reconstruct this then.

25             In the period before 12/31/05 and during your

1    tenure, I understand you to say there were dishonored

2    pledges, you can't estimate for me the number or the amount;

3    is that correct?

4                 MR. PIZZI:  Objection to form.

5        A.      By dishonored pledges were they formally

6    dishonored?

7        Q.      No, by dishonored pledges I mean, and if you

8    have misunderstood me, my apologies, by dishonored I mean

9    someone promised to pay X dollars on X date and didn't do

10   it.

11       A.      Yes.

12       Q.      Did you understand that to be what I meant

13   when I referred to dishonored pledges?

14       A.      Yes.

15       Q.      Then back to the current question.  In that

16   period '99 through 12/31/05, I understand you to say there

17   were dishonored pledges but you can't estimate the number or

18   amount; is that correct?

19       A.      Right.

20       Q.      In that period when pledges were dishonored,

21   who made the decision, if there was such a person to make a

22   decision, about what to do about it?

23       A.      To the best of my knowledge nothing was done.

24   It was just a number of letters to the donor reminding them

25   and to ask them to fulfill their promise.

1      Q.      And in the instances when those letters did

2   not produce the desired result, who decided what to do next,

3   if anything?

4      A.      I don't believe anything was done.

5      Q.      Is that another way of saying, I want to be

6   sure I'm understanding you correctly, that in those

7   instances lawsuits were not brought against the dishonored

8   pledges?

9              MR. PIZZI:  Object to the form.

10     A.      Best of my recollection, yes.

11     Q.      Yes there were no --

12     A.      There were no lawsuits.

13     Q.      There were no lawsuits.  And you think that

14   the records that were kept by the foundation and/or Heather

15   Aaron in the accounting department would reflect the pledges

16   made in the period '99 through 12/31/05, those that were

17   dishonored and collection actions taken, if any; is that

18   correct?

19     A.      Please repeat.

20     Q.      You believe that the records at the

21   foundation and/or with the accounting department, at least

22   during the period that Heather Aaron was in charge, would

23   reflect the pledges recorded, the pledges dishonored and the

24   actions taken with respect to dishonored pledges, if any?

25     A.      I believe so.

# EXHIBIT
# #64

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,   :

                 Debtor,        :

ALLEN D. WILEN,                 :

                                     DEPOSITION OF:
             Plaintiff,         :
                                     HEATHER J. AARON
             -vs-               :

BAYONNE/OMNI DEVELOPMENT,       :
LLC, et al.,
                                :

             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

B E F O R E:

       SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of DRINKER, BIDDLE & REATH,

L.L.P., 500 Campus Drive, Florham Park, New Jersey,

on MONDAY, APRIL 12, 2010, commencing at 11:11 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1          A.       Meaning that if the board had made a

2    decision to go forth with building a nursing home,

3    in order to go ahead and do that, you have to find

4    someone to build it.   So you would send out, you

5    know, around the area there are companies that do

6    this type of work, and offering whether or not they

7    would want to do this at Bayonne.

8          Q.       And did I understand you correctly to

9    say that the solicitation of the pledge from Omni or

10   Eisenreich was related to this bidding process?

11         A.       As my understanding was, that based

12   on the fact that we were going to be having a

13   long-term relationship with Omni, that they were

14   willing to invest in the facility and basically be a

15   partner with us, support, be a philanthropy with the

16   hospital, because they were going to be doing

17   business with us in the future, so it made sense

18   that they would support the facility.

19         Q.       And who told you this?

20         A.       Mr. Evans.

21         Q.       Ms. Evans?

22         A.       Mr. Evans.

23         Q.       Mr. Evans.  And more specifically, if

24   you can be more specific, what did he tell you about

25   that?

# EXHIBIT
# #65

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,       :

          Debtor,                   :

ALLEN D. WILEN,                     :
                                          DEPOSITION OF:
          Plaintiff,                :
                                      HEATHER J. AARON
          -vs-                      :

BAYONNE/OMNI DEVELOPMENT,           :
LLC, et al.,

                                    :

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of DRINKER, BIDDLE & REATH,

L.L.P., 500 Campus Drive, Florham Park, New Jersey,

on MONDAY, APRIL 12, 2010, commencing at 11:11 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1                    THE WITNESS:  No.

2          Q.     Was there a policy of either the

3    foundation or the hospital while you were there with

4    respect to enforcing pledges?

5          A.     A policy?

6          Q.     Yes.

7          A.     There are general accounting

8    principles that relate to pledges.  And if a pledge

9    is due and not received, then it has to be removed

10   from your books.  That's the only enforcement that I

11   know of.

12         Q.     So then, so far as you know, no

13   action was taken against any dishonored pledges

14   while you were with the hospital to sue to enforce

15   them?

16                 MR. PIZZI:  Object to the form of the

17   question.

18         Q.     Is that correct?

19                 MR. FROST:  Again, this is if you

20   know.

21         A.     Not to my knowledge.

22         Q.     Do you know whether during your

23   tenure there were, in fact, dishonored pledges that

24   had been made to BMC or the foundation?

25         A.     I don't recall.

# EXHIBIT
# #66

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

**ORIGINAL**

In re BAYONNE MEDICAL CENTER,    :

            Debtor,              :

ALLEN D. WILEN,                  :

                                    DEPOSITION OF:
            Plaintiff,           :
                                    HEATHER J. AARON
            -vs-                 :

BAYONNE/OMNI DEVELOPMENT,        :
LLC, et al.,
                                 :
            Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - -


B E F O R E :

      SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of DRINKER, BIDDLE & REATH,

L.L.P., 500 Campus Drive, Florham Park, New Jersey,

on MONDAY, APRIL 12, 2010, commencing at 11:11 a.m.,

pursuant to Notice.


DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1        Q.       And you did that in connection with

2    the 2005 audit?

3        A.       Yes, it would be done every year with

4    every audit.

5        Q.       Now, specifically the entries that

6    are made in this letter, from "Date made" through

7    "Payable in the following installments," where did

8    this information come from when you prepared this

9    letter?  Let's take "Date made."  Who, if anyone,

10   told you that the date that the Omni Asset

11   Management pledge was made was October 21, '05?

12       A.       This information would come from Mr.

13   Evans.

14       Q.       And it was also he who told you the

15   amount of the pledge?

16       A.       Yes.

17       Q.       And it was he who told you that there

18   were no restrictions on the period or manner of use?

19       A.       The pledge received was an

20   unrestricted pledge.  You have pledges that are

21   restricted and unrestricted.

22       Q.       What does that mean?

23       A.       Unrestricted means that the facility

24   can use the funds for whatever they deem fit.

25   Restricted means that the donor said you must bill

1    this particular unit or this particular unit and my

2    name must be here.

3         Q.    So, again, it was Mr. Evans who told

4    you that this was an unrestricted pledge, using your

5    terms?

6         A.    Yes.

7         Q.    Was it also he who told you what the

8    installment dates were as shown in this letter?

9         A.    As far as I recall, our understanding

10   was that the 5,000,000 was going to be given out

11   each year.  In order for us to book this amount for

12   the year ending, based on general accounting

13   procedures, we had to receive it within a period of

14   time.  So the dates here are when we needed to

15   receive it in order for it to be valid on the books.

16              MR. FROST:  Heather, I'm going to

17   instruct you to listen to his questions and answer

18   the question he's asking and only the question he's

19   asking.  If you could please ask your question

20   again.

21         Q.    Again, my question is whether Robert

22   Evans was the source of the information that's set

23   forth on the letter under the heading, "Payable in

24   the following installments"?

25              MR. FROST:  Do you understand the

# EXHIBIT
# #67

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,     :

          Debtor,          :          **ORIGINAL**

BAYONNE MEDICAL CENTER,           :
Debtor and
Debtor-in-Possession; and         :
ALLEN D. WILEN, in his
capacity as Liquidating            :   DEPOSITION OF:
Trustee and Estate
Representative for the Estate     :   MARVIN APSEL
of Debtor, Bayonne Medical
Center,                            :

          Plaintiff,        :

          -vs-              :

BAYONNE/OMNI DEVELOPMENT,          :
L.L.C., a New Jersey limited
liability company; et al.,         :

          Defendants.       :
----------------------------------

B E F O R E :

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

THURSDAY, OCTOBER 14, 2010, commencing at 10:05

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1              MR. GRUEN:  I'm ready to move to a

2    different topic.  I don't know what everybody wants

3    to do about lunch.

4              (A discussion is held off the record.)

5         Q.     At any time in 2005 do you recall

6    discussion with other BMC people about approaching

7    Avery Eisenreich for a monetary pledge?

8         A.     Yes.

9         Q.     When, if you can place it in time,

10   did that subject first come up, or to your attention

11   I should say?

12        A.     Rob Evans asked me to come to his

13   office around about the week of October 10th, and

14   requested that I meet with Avery Eisenreich for the

15   purpose of asking him for a pledge.  Rob Evans

16   discussed the amount, he discussed possible talking

17   points, and asked me to do that for him.

18        Q.     He discussed the amount.  What amount

19   did he discuss?

20        A.     He requested that I ask for a pledge

21   of $5,000,000.

22        Q.     Did he tell you how he arrived at

23   that number?

24        A.     No.

25        Q.     Did you have any discussion with him

# EXHIBIT
# #68

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :

                    Debtor,      :                **ORIGINAL**

BAYONNE MEDICAL CENTER,          :
Debtor and
Debtor-in-Possession; and        :
ALLEN D. WILEN, in his
capacity as Liquidating          :    DEPOSITION OF:
Trustee and Estate
Representative for the Estate    :    MARVIN APSEL
of Debtor, Bayonne Medical
Center,                          :

                    Plaintiff,   :

                    -vs-         :

BAYONNE/OMNI DEVELOPMENT,        :
L.L.C., a New Jersey limited
liability company; et al.,       :

                    Defendants.  :
-----------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

THURSDAY, OCTOBER 14, 2010, commencing at 10:05

a.m., pursuant to Notice.


                    DepoLink
        Court Reporting & Litigation Support Services
            Phone (973) 353-9880    Fax (973) 353-9445
                www.depolinklegal.com

1    with Avery?

2            A.      Yes.

3            Q.      And the meeting took place at the

4    hospital?

5            A.      Yes.

6            Q.      And you met with Avery that day?

7            A.      Yes.

8            Q.      Did you meet alone or was anyone else

9    with you?

10           A.      Alone.

11           Q.      Where was it?

12           A.      On the second floor conference room.

13           Q.      Did anybody know that you were having

14   that meeting with Avery that day?

15           A.      Yes, Vincent Lombardo of the Bayonne

16   Medical Center Foundation.

17           Q.      How did he know?

18           A.      Because the day before I had gone

19   into Vincent Lombardo's office, which is on the same

20   floor, just several offices away from my office, and

21   requested a pledge form from him.

22           Q.      And did you tell him why you wanted a

23   pledge form?

24           A.      Yes, I told him I was going to be

25   meeting with Avery Eisenreich the next day for the

1    purpose of asking for a pledge.

2         Q.    Did you have any other discussion

3    with him?

4         A.    We had general discussion.  Not a

5    long discussion, but a general discussion about

6    pledges.  And I asked him about the nature of a

7    pledge.  He told me essentially that it was a

8    promise made.  I believe that I picked up a brochure

9    or something that he had in his office relating to

10   pledges, and we discussed that.

11        Q.    Anything else you remember of that

12   conversation with Vincent Lombardo?

13        A.    There was some discussion about the

14   binding nature of a pledge that is made by an

15   individual.

16        Q.    Do you recall that conversation?

17        A.    Briefly.

18        Q.    Could you tell us about it?

19        A.    I basically said, What happens to an

20   individual who cannot make that pledge?  And Vincent

21   basically responded, Well, you can't get blood out

22   of rock, or something to that extent.  And I think

23   that was it.

24        Q.    Did you discuss with him anything

25   else about whether a pledge was binding or not

# EXHIBIT
# #69

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

                  Debtor,           :              **ORIGINAL**

BAYONNE MEDICAL CENTER,             :
Debtor and
Debtor-in-Possession; and          :
ALLEN D. WILEN, in his
capacity as Liquidating            :   DEPOSITION OF:
Trustee and Estate
Representative for the Estate      :   MARVIN APSEL
of Debtor, Bayonne Medical
Center,                            :

                  Plaintiff,        :

             -vs-                    :

BAYONNE/OMNI DEVELOPMENT,           :
L.L.C., a New Jersey limited
liability company; et al.,         :

                  Defendants.       :
----------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

THURSDAY, OCTOBER 14, 2010, commencing at 10:05

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1    for a question about that in this time frame, 2005.

2                    MR. GRUEN:  I'll rephrase it.

3         Let me have the witness' answer read back.

4                    (The Reporter reads from Page 103,

5         Lines 9-23.)

6         Q.    That's my question, and the objection

7    has been registered.

8         A.    There's no specific mention of

9    leasebacks or particulars of the project.  It was

10   the overall project.

11        Q.    At that point in time, did you

12   understand the overall project included leasing back

13   by the hospital?

14                   MR. PIZZI:  Object to the form.  No

15   foundation.

16        Q.    Go ahead.

17        A.    Yes, I believe I had an understanding

18   of the overall project.

19        Q.    Anything else that you remember from

20   those 15 minutes other than what you've told us so

21   far?

22        A.    Yes.  Avery had a concern, and he had

23   a concern regarding the, I'll use the binding nature

24   of a pledge to the hospital.  He asked me if it was

25   binding.  I said I don't know.  I recently had a

1   conversation in which I casually talked about

2   pledges with the foundation person, but I was not

3   absolutely sure.

4         He then basically said, I want a letter from

5   Rob Evans stating that the pledge that I am making

6   is essentially nonbinding.  He went into concerns

7   with what if my business gets disrupted or I can't

8   make a pledge.  I don't want to be in that position

9   of not being able to meet my obligations.

10        Q.      What else, if anything, did he say?

11        A.      Who?

12        Q.    · Avery, he's the "he."  You're the

13   "you" and he's the "he"?

14        A.      Thank you very much for that

15   clarification.

16        Q.      If anything.

17        A.      I don't believe there was anything of

18   substance beyond that.

19        Q.      What, if anything, did you say in

20   response to that declaration of his?

21        A.      I said, "I will communicate that to

22   Rob Evans immediately, and we will get the issue

23   resolved."

24        Q.      And did you communicate that to Rob

25   Evans?