# EXHIBIT
# #85

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :

                Debtor,          :          COPY

BAYONNE MEDICAL CENTER,          :
Debtor and
Debtor-in-Possession; and        :
ALLEN D. WILEN, in his                    DEPOSITION OF:
capacity as Liquidating          :
Trustee and Estate                        AVERY EISENREICH
Representative for the Estate    :
of Debtor, Bayonne Medical                 VOLUME II
Center,                          :        (Pages 188-271)

                Plaintiff,       :

              -vs-               :

BAYONNE/OMNI DEVELOPMENT,         :
L.L.C., a New Jersey limited
liability company; et al.,       :

                Defendants.      :
-----------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

WEDNESDAY, JULY 28, 2010, commencing at 10:03 a.m.,

pursuant to Notice.

                DepoLink
Court Reporting & Litigation Support Services
    Phone (973) 353-9880    Fax (973) 353-9445
            www.depolinklegal.com

Page 251

1    A.    Correct.

2    Q.    Do you recall getting it?

3    A.    Not specifically.

4    Q.    And in the second sentence of the

5    bottom e-mail it says, "Last night Avery Eisenreich

6    called me.  Avery Eisenreich called Herman Brockman

7    at his drugstore and spoke to him directly.  Herman

8    Brockman then called me."  And then she goes on to

9    say, "This is the go-forward directive."  My

10   question is, do you recall speaking to Connie Evans

11   by phone and speaking to Herman Brockman by phone on

12   or about November 30, 2006?

13   A.    You mean Carrie Evans?

14   Q.    I'm sorry, Carrie Evans, yes.

15   A.    I remember speaking to Carrie

16   approximately a week before we closed, give or take.

17   She was in and out, then, I think she was just

18   returning.  She told me speak to Herman.  I called

19   up Herman, and that's it.  So I did speak with

20   Herman.

21   Q.    All right.  Was that the first time

22   you had spoken to Herman Brockman?

23   A.    Yes.

24   Q.    So you spoke to him first by phone?

25   A.    Yes.

Page 252

1        Q.        Did you then meet him in person?

2        A.        At closing.

3        Q.        At closing.   So tell us everything

4    you recall about the conversation with Herman

5    Brockman which was by telephone?

6        A.        It went something to the effect of I

7    have a contract with Bayonne Medical Center.   He

8    says, "Yes."   I said, "I want to get the closing

9    ready."   He said, "Okay.   Are all the issues taken

10   care of?"   There were easement issues, there were

11   environmental issues.   I said, "Yes, everything has

12   been taken care of."   I said, "My million dollars is

13   going to be credited at closing?"   He says, "Yes, a

14   hundred percent."

15       And he said the lease is getting canceled,

16   too.   And I said, "Not so fast.   Then it has to be a

17   credit against the purchase price."   Because I

18   believe that the purchase price was too high without

19   the lease.   To which I said to him, "I'll think

20   about it."   I don't remember if I called him back

21   that night or I called him back the next day or

22   somewhere around there, and I said, "I'm fine, I'll

23   close."

24       Q.        And that's all you recall that came

25   up in that conversation?

1           A.      I said, "I'm calling you because

2    Carrie sent me to you."  And that's when he told me

3    I think, "I fired Rob."  And I'm handling these type

4    of issues day-to-day.  I don't remember the exact

5    verbiage he said.

6           Q.      Have you told us everything else you

7    recall about that conversation?

8           A.      Those are the highlights.

9           Q.      And that was around November 30,

10   2006?

11          A.      Within a week before we closed.   I

12   don't remember exact dates.

13          Q.      The record will show the closing was

14   December 8, 2006.

15          A.      Okay.

16          Q.      So this is a week before?  I'm just

17   asking you, is that consistent with your

18   recollection?

19          A.      Approximately, yes.

20          Q.      So you called him why?  Did Carrie

21   tell you to call him?

22          A.      Yes.

23          Q.      What did she say that said now you

24   have to call Herman Brockman?

25          A.      He's the one who has to make

Page 254

1  decisions.

2        Q.      Because Rob Evans was gone?

3        A.      Correct.  I don't think she told me

4  that.  She said, "I just came back," blah, blah,

5  blah, "You have to call him.  He's the one making

6  decisions now.  Things have changed."

7        Q.      So you call and you say I have a

8  contract, words to that effect?

9        A.      You know who I am, blah, blah, blah,

10  I have a contract, and he said yes.

11        Q.      He said yes.  He sounded to you like

12  he already knew about this contract?

13        A.      Correct.

14        Q.      And you said I want to close already,

15  and he said, Are all the issues taken care of, words

16  to that effect?

17        A.      Correct.

18        Q.      And you raised that I want $1,000,000

19  credited at closing; is that right?

20        A.      I want my loan repaid with interest

21  at closing.

22        Q.      And you're saying he knew about what

23  you were talking, from your testimony; is that

24  right?

25        A.      A hundred percent.

Page 255

1          Q.      So the loan was not a surprise to

2     him, as far as you could discern from that

3     conversation?

4          A.      Not at all.

5          Q.      And then he raised the subject of the

6     lease?

7          A.      He said the lease has to be canceled.

8          Q.      And the lease was to run from you or

9     your entity to Bayonne Medical Center?

10         A.      Correct.

11         Q.      For the two floors?

12         A.      Correct.

13         Q.      And he said the lease is getting

14    canceled?

15         A.      Correct.

16         Q.      What did you say?

17         A.      Why?  I said, "I've got a couple of

18    issues with that.  Number one, why, what's going on?

19    Number two, the purchase price is reflective of the

20    lease income."  The lease value, really.

21         Q.      Did you and he talk about the

22    purchase price?

23         A.      Did I specifically say the purchase

24    price was $2,000,000?

25         Q.      Right.

Page 256

1          A.      I don't remember.

2          Q.      Did the number $2,000,000 come up?

3          A.      I have no idea.

4          Q.      So you said why, and you said the

5    purchase price reflects the lease, right?

6          A.      Correct.

7          Q.      What did you mean by that?

8          A.      That the purchase price is too high.

9    The lease has value and I'm losing that value.   I

10   want the purchase price lower.

11         Q.      Why was the purchase price too high

12   without the lease?

13         A.      Because the lease had value.   It had

14   income associated with that lease and I'm losing

15   that.

16         Q.      So how was it left with regard to the

17   lease in the conversation with Herman Brockman?

18         A.      I told him I'll think about it.

19   Either I called him back that night or I called him

20   back the next day.

21         Q.      So it was left open?

22         A.      Until I called him back.

23         Q.      I'm just trying to get the

24   conversation finished that you first had with Herman

25   Brockman.  We've gone over everything that you

Page 257

1    recall in the November 30 conversation, the first

2    conversation you had on or about November 30 with

3    Mr. Brockman?

4            A.       That comes to mind, yes.

5            Q.       Then what did you do after that to

6    determine what position you would take with regard

7    to his desire to cancel the lease?

8            A.       I thought about my options, I thought

9    about what I would be willing to pay $2,000,000 for

10   the land without the lease, figured out how much I

11   was into it at that point in soft costs, and made a

12   decision to close without the lease.

13           Q.       You went through that in your head,

14   and then did you communicate that to Mr. Brockman?

15           A.       I called him back that night or the

16   next morning.  I don't know.  I called him back

17   either that night or the next day to tell him I

18   would close.  I'm content with them canceling the

19   lease.

20                    MR. GRUEN:  Did you get that, "with

21   them canceling the lease"?  That was kind of

22   mumbled.

23                    THE WITNESS:  I'm sorry, with them

24   canceling.

25           Q.       So you were going to relent on the

DEPOLINK COURT REPORTING & LITIGATION SERVICES  (973) 353-9880

# EXHIBIT
# #86

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

              Debtor,          :

BAYONNE MEDICAL CENTER,                :
Debtor and
Debtor-in-Possession; and             :
ALLEN D. WILEN, in his
capacity as Liquidating                :
Trustee and Estate
Representative for the Estate          :
of Debtor, Bayonne Medical
Center,                                :

          Plaintiff,          :

        -vs-                         :

BAYONNE/OMNI DEVELOPMENT,              :
L.L.C., a New Jersey limited
liability company; et al.,             :

        Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - -

COPY

DEPOSITION OF:

FRED R. GRUEN

B E F O R E:

     SHARON B. STOPPIELLO, a Certified Court
Reporter and Notary Public of the State of New
Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,
1150 West Chestnut Street, Union, New Jersey, on
FRIDAY, JULY 30, 2010, commencing at 10:06 a.m.,
pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880     Fax (973) 353-9445
www.depolinklegal.com

Page 82

1    note may have been forged is when you read Mr.

2    Brockman's examination.

3          A.     That's my best recollection now.

4          Q.     Right.  And I'm trying to probe that

5    recollection, because prior to Mr. Brockman being

6    deposed, there was a subpoena served on your client

7    for documents relating to these issues.  That's why

8    I'm probing to see if that jogs your memory if you

9    learned about it sooner than that.  If you didn't

10   learn about it in connection with the closing, I

11   understand your testimony.

12         A.     For sure I didn't learn about it

13   until this litigation.  And my best recollection

14   continues to be that the first time I remember

15   hearing about that or learning about it is when I

16   read the 2004 transcript.  I could be wrong, but

17   that's the way I remember it now.

18         Q.     Prior to the litigation, did Avery

19   ever confide in you that he was concerned that the

20   promissory note had been forged?

21         A.     No.

22         Q.     Or that it was not appropriately

23   obtained by Ms. Evans?

24         A.     No.

25         Q.     You're familiar with the $5,000,000

Page 83

1    pledge, correct?

2          A.      Yes.   Familiar with it to the extent

3    that I'm litigation counsel and I've heard a lot

4    about it in the course of this case.

5          Q.      Therein lies my area of inquiry.

6    When did you first learn about the existence of the

7    $5,000,000 pledge?

8          A.      At the closing.

9          Q.      At the closing?

10         A.      Correct.

11         Q.      In December of 2006?

12         A.      Yes.

13         Q.      Who did you learn that from?

14         A.      Avery.

15         Q.      And what did he tell you?

16         A.      Avery is to my right, Herman Brockman

17   I believe is across the table from me.  Avery said,

18   "Now that the lease is dead," this is in words or

19   substance, "the pledge doesn't exist anymore."  And

20   I said, "What did you say"?

21         Q.      Who did he say that to?

22         A.      To Herman.  I said, "What are you

23   talking about?"  And he told me that he had made a

24   pledge.  I can't say that I remember what the amount

25   was.  I do remember he said, "Yeah, I made a pledge,

# EXHIBIT
# #87

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

                Debtor,            :

BAYONNE MEDICAL CENTER,            :
Debtor and
Debtor-in-Possesssion; and         :
ALLEN D. WILEN, in his               DEPOSITION OF:
capacity as Liquidating            :
Trustee and Estate                   CAROLINE EVANS
Representative for the Estate      :
of Debtor, Bayonne Medical           VOLUME I
Center,                            :  (Pages 1-229)

                Plaintiff,         :

          -vs-                     :

BAYONNE/OMNI DEVELOPMENT,          :
L.L.C., a New Jersey limited
liability company; et al.,         :

                Defendants.        :
------------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 63

1    what I mean?  I borrow this money from you and I

2    know I have to pay it back.

3           Q.    That's what you had in mind when you

4    talked about the "loan guarantee docs"?

5           A.    Yes.

6           Q.    I'm up to Number 5, which does not

7    have a Bates number on it, so I'm sorry, I can't

8    help, but it's entitled "Board of Trustees Meeting,

9    June 8, 2006 Minutes."

10                MR. FALANGA:  It does have an

11   exhibit, D-4.

12                MR. GRUEN:  It has an exhibit tab

13   from an earlier deposition on it, it's hard to read,

14   but it does say D-4.

15                MR. FALANGA:  February 27th, '09.

16                MR. SAMSON:  There's several minutes,

17   too.

18                MR. GRUEN:  I'm just asking her to

19   look at the June meetings.

20                MR. SAMSON:  Well, which one?

21                MR. GRUEN:  June 8, 2006.

22          Q.    Did you attend board of trustees

23   meetings?

24          A.    As guests we did.

25          Q.    Were you a guest at this meeting?

Page 56

1      That's ridiculous," is what I said.  "You're going

2      to get the benefit of our patient population.  It's

3      true, we'll get other benefits other than leasing

4      back space from you."  I remember the argument,

5      because I thought it was too high.

6              Q.      That meeting that you're talking

7      about --

8              A.      That was one of the space planning

9      meetings.

10             Q.      Was that before or after this e-mail?

11             A.      I think it was before that, because

12     we were still haggling about who was going to occupy

13     what space, what entities were going to be moved in.

14             Q.      Did you have further conversations

15     with Avery after June 12 about this $35 price, which

16     you say was just in the discussion phase at that

17     point?

18             A.      I'm sure that I did.  I can't recall

19     what, but I'm sure that I did.  It was not something

20     that I thought was going to fit into budgetary

21     constraints.

22             Q.      "We build out the space from the

23     framework.  We close TCU."  What does that mean?

24             A.      Oh, the transitional care unit.

25     There was actually a subacute unit already open in

Page 57

1    the hospital that was just not doing well at all.

2    It was a subacute unit.  So if an acute patient was

3    okay to leave an acute floor, but not quite okay to

4    go home, they would go to this subacute unit.  And

5    we would close -- that was part of the agreement.

6    Why would we have a nursing home floor adjacent to a

7    nursing home building.

8         Q.    Meaning you would have a subacute

9    floor?

10        A.    Correct.  Why would we?

11        Q.    So part of what you would be leasing

12   as you understood it was a subacute facility in the

13   new building?

14        A.    No, that's not what I meant.

15             MR. FALANGA:  Object to the form.

16        Q.    Explain to me what you mean.

17        A.    They were going to close the floor

18   they were using in the original footprint of the

19   hospital as a subacute unit and turn it into acute

20   beds, which made a lot more sense, or cardiac beds,

21   which made a lot more sense.  Why would we need

22   subacute beds inside our building if there was a

23   nursing center right next door who we could use

24   those beds for subacute patients?  The profit margin

25   on the cardiac/acute beds was much better, and the

Page 58

1   nursing staff could be utilized for that.

2        Q.   And "We build out the space," what

3   did that mean?

4        A.   I'm assuming that it meant, and it is

5   an assumption, because I don't really know about

6   build out, I'm assuming it meant we put in our

7   walls.  I know I had to put in the IT, because we

8   had already discussed that.

9        Q.   So "build out the space" meant what

10  to you?

11       A.   It meant that we put in our lines,

12  our TCIP lines, telecom, the information technology

13  setup, boards, all of that kind of stuff.

14       Q.   You mentioned walls, floor?

15       A.   Well, we'd need a wall.

16       Q.   Ceilings?

17       A.   Yes.  That was my understanding of

18  "build out."

19       Q.   And what did, "Nine latchkey beds

20  back to you" mean?

21       A.   I don't know.  I don't remember that.

22       Q.   Look at the next exhibit, if you

23  will, Number 7.

24       A.   Okay.

25       Q.   Have you had a chance to read it?

Page 177

1          A.      I wasn't.

2          Q.      Actually, it does say you were.  Is

3    that you, Madams Evans and Giblin?

4          A.      Oh, it is.  So I guess I was there.

5          Q.      So you were there?

6          A.      Uh-huh.

7          Q.      So let's review the minutes, then, of

8    the board of trustees meeting where you were

9    present.  If we go to Page 4, under the title "For

10   Action," do you see that in the middle of the page?

11         A.      Yes.

12         Q.      There's a discussion of increasing a

13   loan from Pamrapo Savings Bank.  Then there's a

14   discussion of the St. Vincent's Hospital

15   transaction.  You were involved in the St.

16   Vicinity's, as well, you testified to that.

17         A.      Uh-huh.

18         Q.      Were you the key person involved?

19         A.      Oh, no.

20         Q.      Who was the key person?

21         A.      You have to understand, the

22   transition meetings, there were about three a week,

23   and everybody had their section.  So I was involved

24   in IT, huge, and the revenue cycle part.  Steph had

25   all the clinicals.  The key person for the

Page 178

1   transaction in the beginning was Heather Aaron.

2         Q.    And then Mr. Brockman is advising the

3   board that there's a stalking horse, there's a

4   deadline in July to submit bids, right?  And there's

5   an issue with St. Vincent's trying to withhold The

6   Heart Institute from the deal.  Do you have any

7   recollection of any of those issues?  Wasn't The

8   Heart Institute a vital part of the St. Vincent's

9   acquisition, if you recall?

10        A.    I knew about The Heart Institute, I

11  knew about it, but I wasn't really quite sure the

12  players, you know, the whole playing thing.

13        Q.    Okay.  So then Mr. Brockman gives the

14  report of the skilled nursing facility.  And it

15  says, "By way of background, Mr. Brockman advised

16  that initially we were seeking to structure the

17  skilled nursing facility project as a land lease

18  arrangement with Omni Asset Management.  It has

19  recently come to light that this will not be an

20  acceptable arraignment, given Bayonne Medical

21  Center's not-for-profit status."

22        So it goes on to say, "In order for Raymond

23  James to proceed with the bond financing and to move

24  forward with the skilled nursing facility project,

25  Mr. Brockman stated it may be necessary to sell the

Page 179

1    land at the current market rate.  He explained

2    further details of this proposal, and added that all

3    necessary covenants will be included to protect and

4    ensure the best interests of Bayonne Medical

5    Center."  Do you remember Mr. Brockman giving that

6    report at the meeting?

7         A.    I do not, but I understand what he

8    meant by the covenants, because they were the tested

9    ones, they were the tested covenants.

10        Q.    You were familiar with the bond

11   covenants, correct?

12        A.    I was familiar with the ones that

13   Paul was testing, yes.

14        Q.    And what were those that he was

15   testing?

16        A.    That you had to clear a

17   nonoperational assets of some kind.  Like was it

18   being used for operations, and if it was there was

19   this applied, and if it wasn't this applied, that

20   kind of thing.

21        Q.    The next page, if you could turn, it

22   says, "With no further questions, Mr. Brockman

23   presented the following resolution.  For Action:

24   The Board of Trustees of Bayonne Medical Center

25   approves and authorizes administration to proceed in

1    this matter, and, if deems necessary, arrange for

2    the sale of the land at market value.  Upon a motion

3    duly made, seconded and unanimously carried, this

4    resolution approved."

5         A.    Okay.

6         Q.    Do you have a recollection of being

7    present when that resolution was presented by Mr.

8    Brockman?

9         A.    Do you want to know something?  I

10   didn't even remember being at this meeting, guys.

11   It was four years ago.  I don't dispute that that's

12   what he did.

13               MR. SAMSON:  Do you remember it, yes

14   or no.

15               THE WITNESS:  No, I don't remember

16   it.

17         Q.    So you have no recollection of a

18   discussion about the purchase price for what Omni

19   was going to pay being discussed at this meeting;

20   isn't that true?

21               MR. GRUEN:  Objection to form.

22         A.    Do I remember at this meeting

23   somebody saying Omni is purchasing the nursing home

24   for $2,000,000?  The answer is no, I have no

25   recollection of that being said.

1      Q.      And, in fact, there's no discussion

2   of that in Mr. Brockman's report, we can agree as to

3   that, correct?

4      A.      That's correct.

5      Q.      Let's turn to Exhibit 6 of Carrie

6   Evans-1.  It's the e-mail you testified to earlier,

7   it's dated June 12th, 2006.  It says, "A brief

8   summary of what we discussed."  And, again, in this

9   e-mail there's a discussion of a $2,000,000 sale

10  price, correct?

11     A.      Yes.

12     Q.      So between the meeting on June 8th

13  and June 12th, the sale price still hadn't been

14  confirmed; isn't that true?

15     A.      No, that's not true.  The sale price

16  was discussed way before June 8th.  That was one of

17  the elements of this discussion.  I think I said

18  this before.  There was discussion before June 8th

19  about how much the sale price was going to be.

20  There was discussion before June 8th on the

21  remediation issues.  There was discussion before

22  June 8th about the size of the leaseback.  All of

23  those things were definitely discussed before

24  June 8th.

25     Q.      Between you and Mr. Eisenreich?

Page 182

```
 1          A.      And Mr. Mohrle and Marv Apsel and

 2    Rob, and Rob Evans.

 3          Q.      But the resolution that Mr. Brockman

 4    proposed at the meeting that you attended, even

 5    though I recognize you don't recall it, didn't say

 6    that the hospital authorized administration to sell

 7    the building for $2,000,000, correct?

 8          A.      I don't remember that being --

 9          MR. SAMSON:  The document speaks for

10    itself.  She doesn't have any recollection.

11          Q.      It said "fair market value;" isn't

12    that true?

13          A.      Uh-huh, it did say that.

14          Q.      Did you understand $2,000,000 to be

15    the fair market value of the premises that was being

16    sold?

17          MR. GRUEN:  Objection.

18          MR. SAMSON:  Objection.

19          A.      Based on what?  On three appraisals

20    that all these other people had examined three weeks

21    from Sunday?  These documents were in the possession

22    of these people before June 8th and they had the

23    ability to discuss them, I didn't.

24          MR. SAMSON:  Just answer the

25    question, do you have any knowledge about what the
```

Page 183

1    property was worth?  Do you have any expertise on

2    that?

3                  THE WITNESS:  No, I don't.

4                  MR. SAMSON:  That's all you have to

5    say.

6          Q.    Now, Exhibit 10 in the binder, I

7    believe you looked at this earlier, it's the

8    purchase and sale agreement.

9          A.    I think I looked at the lease, sir.

10         Q.    So take a moment to review that.

11         A.    Okay.

12         Q.    Have you ever seen that before?

13         A.    I think I may have, I'm not sure,

14   though, Steve, I'm not sure.

15         Q.    Do you recall when you might have?

16   You said you may.

17         A.    Yeah, I may have.

18         Q.    Do you know what the document is?

19         A.    It's a purchase and sale agreement

20   (indicating).

21         Q.    For what?

22         A.    For the Bell building.

23         Q.    What's it's dated?

24         A.    It's dated August 24th, 2006.

25         Q.    Do you know why the agreement was

# EXHIBIT
# #88



EISENREICH
BAYONNE MEDICAL CENTER

DEPOSITION
CARRIE EVANS

MAY 6, 2010

EXHIBITS 1 THRU 19

ONE OF TWO

Fred R. Gruen, Esq.
GRUEN & GOLDSTEIN
1150 W. Chestnut Street
Union, New Jersey  07083
(908) 687-2030

# Exhibit
# Carrie Evans

## #7

| | |
|---|---|
| From: | Evans, Carrie [CEvans@bayonnemedicalcenter.org] |
| Sent: | Tuesday, June 13, 2006 2:09 PM |
| To: | Avery Eisenreich |
| Subject: | RE: |

DB just left with the terms for the land sale.
He will call and email Fred on the way back to his office.
I already have board resolution and we have tested the bond covenants to make sure we can transfer a non operating asset. It is fine.

As for loan agreement, I will speak to DB separately

That stays between us - not for public consumption.
What will suffice as loan "guarantee" docs? I will get them together with the loan agreement.

-----Original Message-----
From: Avery Eisenreich [mailto:averye@omnihsnj.com]
Sent: Tuesday, June 13, 2006 12:26 PM
  : Evans, Carrie
Subject: Re:

Get all info to fred gruen ie.have D.B send loan docs with corporate gauraty with ownership structure ,also have them start tiltle work please send fred a copy of the terms of deal so they both can get it done asap lastly do you need any releases to sell the property? Let me know when you get the above moving and I will call fred to push it

-----Original Message-----
From: Evans, Carrie <CEvans@bayonnemedicalcenter.org>
To: Avery Eisenreich <averye@omnihsnj.com>
Sent: Tue Jun 13 12:22:18 2006
Subject:

ok on the 8% - can you send me the million ?
Can you wire it in so I can rock and roll ?
I am losing valuable time ---PLEEESSEE.

:-)


*****************************************************************
This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager.
  his footnote also confirms that this email message has been swept by MIMEsweeper for the presence of computer viruses.
www.clearswift.com
*****************************************************************

BMC v Omni
0050

1

# EXHIBIT
# #89

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

              Debtor,                   :


BAYONNE MEDICAL CENTER,                 :
Debtor and
Debtor-in-Possesssion; and             :
ALLEN D. WILEN, in his                      DEPOSITION OF:
capacity as Liquidating                 :
Trustee and Estate                          CAROLINE EVANS
Representative for the Estate           :
of Debtor, Bayonne Medical                  VOLUME I
Center,                                 :   (Pages 1-229)

              Plaintiff,                :

              -vs-                      :

BAYONNE/OMNI DEVELOPMENT,               :
L.L.C., a New Jersey limited
liability company; et al.,              :

              Defendants.               :

------------------------------------

B E F O R E:

       SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 184

1    entered into in August of 2006?

2         A.    No.

3               MR. SAMSON:  As opposed to another

4    date?

5         A.    Yeah, right, as opposed to another

6    date?

7         Q.    No.

8         A.    No.

9         Q.    If the deal you said was locked down

10   in June of --

11        A.    That's not what I said, sir.  I said

12   the resolution was put to paper is what I said.

13        Q.    So it's your testimony that there

14   were still aspects of the deal that had yet to be

15   decided in June of 2006, when the resolution was

16   adopted?

17        A.    That's not my testimony.  I said I

18   don't know why it said August 24th.  That's what I'm

19   saying, I don't know why.

20        Q.    So it's your testimony that there

21   were no additional deal points that needed to be

22   worked out after June of 2006?

23              MR. GRUEN:  Object to the form of the

24   question.

25              MR. SAMSON:  Objection.

1    IT and transition stuff?  He was on some of the

2    calls, he heard the IT and transition problems.

3        Q.    No.  How about talking to your

4    husband about how the hospital has no money?

5        A.    Steve, are you ready for this?  We're

6    newly married, we've got five kids between us, we're

7    trying to integrate two families, two ex's, if you

8    will, and all the problems that go along with that.

9    I actually wanted to stay married.  So I didn't

10   bring this trauma home to my house.  So I would

11   never have sat across the table from a man who was

12   already under a tremendous amount of pressure to

13   close a transaction with St. Vincent's, deal with a

14   board of directors, deal with what was clearly and

15   publicly a hostile community, because they didn't

16   want the merger.  I'm now going to sit across his

17   dining room table and say, How much money does the

18   hospital have?

19       Q.    What about conversations with your

20   husband at the hospital during work hours?

21       A.    He was there, and he knew.  Paul and

22   I had conversations that we had to build this out.

23            MR. SAMSON:  Did you have

24   conversations with your husband at work, is that

25   what you're asking?

1          MR. FALANGA:  That's what I asked.

2          MR. SAMSON:  Just answer the

3    question.

4          A.     Yes, I had conversations with him at

5    work, yes.

6          Q.     And did you discuss borrowing money

7    from Mr. Eisenreich with your husband?

8          A.     A loan?  Me and Rob in a room,

9    saying, Oh, my gosh, we have to borrow money from

10   Mr. Eisenreich, because, as you heard, it's going to

11   cost more than a million dollars for the buildout,

12   is that what your question is?

13         Q.     No.  My question was:  Did you

14   discuss with your husband borrowing money from Mr.

15   Eisenreich at the hospital?

16         A.     Period.  Yes, I did.

17         Q.     And what did your husband tell you to

18   do?

19         A.     He didn't tell me to do anything.

20   Paul and I had already had this discussion.  Paul

21   and I discussed timelines.  Because I said to Paul,

22   "When, when will we have any piece of this buildout

23   cash?"  And he said, "We're not going to have any

24   piece of this buildout cash until after the

25   transaction is complete."  I said, "Paul, I can't

Page 230

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

                    Debtor,             :

BAYONNE MEDICAL CENTER,                :
Debtor and
Debtor-in-Possession; and             :
ALLEN D. WILEN, in his                          DEPOSITION OF:
capacity as Liquidating               :
Trustee and Estate                              CAROLINE EVANS
Representative for the Estate         :
of Debtor, Bayonne Medical                         VOLUME II
Center,                               :         (Pages 230-412)

                    Plaintiff,         :

                    -vs-               :

BAYONNE/OMNI DEVELOPMENT,             :
L.L.C., a New Jersey limited
liability company; et al.,           :

                    Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - -

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on TUESDAY,

JUNE 1, 2010, commencing at 9:27 a.m., pursuant to

Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 256

1    an Eisenreich entity in or about July 2006?

2                    MR. FALANGA:  Object to the form.

3         A.      As I remember them, it does.

4         Q.      The next document is 31, on

5    June 20th, Carrie Evans to Avery Eisenreich, the

6    caption is "Loan documents for your approval." Do

7    you know what document that referred to?

8         A.      I do not.

9         Q.      Might that have referred to

10   Exhibit 30a that we just looked at.

11                   MR. SAMSON:  Objection to form.

12        A.      You know, I don't remember if it

13   does, quite frankly.

14        Q.      And the second page of this

15   Exhibit 31, do you know whether that document, Bates

16   0056, was included within your e-mail of June 20th

17   referring to the "Loan documents for your approval"?

18        A.      I don't know if it was.

19                   MR. FALANGA:  Object to the form.

20   Just for the record, this is BMC v Omni 056.

21        Q.      And the next document, 32, can you

22   identify that?

23        A.      This is an e-mail from me to Avery

24   dated June 13th that I sent to him.

25        Q.      And when you say, "Okay on the 8

Page 257

1   percent," what were you referring to?

2          A.      The term of the interest.

3          Q.      Had that been approved by Paul

4   Mohrle?

5          A.      Yes.

6                  MR. FALANGA:  Object to the form.

7          Q.      And Exhibit 34, the second paragraph,

8   "As for loan agreement, I will speak to D.B.

9   separately," this is on June 13, 2006.  You

10  identified this is an e-mail that you sent to Avery

11  Eisenreich?

12         A.      Yes.

13         Q.      And the "D.B." is D.B. Ross at the

14  Lindabury firm?

15         A.      Correct.

16         Q.      Do you know what it is you were going

17  to be speaking to him about?

18                 MR. FALANGA:  Object to the form.  It

19  also calls for possible divulging of the

20  attorney/client privilege, which, for the record, we

21  discussed at the last deposition.

22                 MR. GRUEN:  So when I asked her

23  whether she knows what she intended to be speaking

24  to D.B. about, you think you're asserting the

25  privilege?