# EXHIBIT
# #90

**From:**         Evans, Carrie
**Sent:**         Wednesday, June 21, 2006 8:59 AM
**To:**         Mohrle, Paul
**Subject:**       FW: Cash Forecast for 06/21/06
**Attachments:**   cashmodel3.xls

I just spoke to Avery – if we get signatures today – we will have the money by Friday

-----Original Message-----
**From:** Elmo, Angelo
**Sent:** Wednesday, June 21, 2006 8:46 AM
**To:** Mohrle, Paul; Evans, Carrie; Vigliano, Alfred; Auriemma, Robert
**Subject:** Cash Forecast for 06/21/06

Paul, we could have a problem paying taxes this week, based on present numbers, also this will be 3rd straight day we are negative in BOA.

Angelo

BMC040374

# EXHIBIT
# #91

# SILBERBERG & KIRSCHNER LLP

### ATTORNEYS AT LAW
### 55 OLD NYACK TURNPIKE, SUITE 210
### NANUET, NEW YORK 10954
### TEL: (845)623-3011
### FAX: (845)623-5291

July 6, 2010

<u>VIA FEDERAL EXPRESS</u>
Peter J. Pizzi, Esq.
Connell Foley LLP
85 Livingston Street
Roseland, New Jersey 07068-3702

Re:    <u>Bayonne Medical Center</u>

Dear Mr. Pizzi:

It has come to my attention that in addition to the loan documents forwarded to you on May 17, 2010, there was a UCC-1 Financing Statement prepared by our office in connection with the loan.  I am enclosing a CD containing the document with its metadata preserved.

Very truly yours,

*Michael Silberberg*

Michael Silberberg

MS:cf
enclosure

cc: Fred Gruen, Esq.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :          **COPY**

         Debtor,          :

BAYONNE MEDICAL CENTER,                :
Debtor and
Debtor-in-Possesssion; and             ::
ALLEN D. WILEN, in his
capacity as Liquidating                :          DEPOSITION OF:
Trustee and Estate
Representative for the Estate          ::          MICHAEL
of Debtor, Bayonne Medical                       SILBERBERG
Center,                                :

        Plaintiff,          :

        -vs-          :

BAYONNE/OMNI DEVELOPMENT,              :
L.L.C., a New Jersey limited
liability company; et al.,             :

        Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - -

B E F O R E:

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on MONDAY,

MAY 3, 2010, commencing at 10:22 a.m., pursuant to

Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880     Fax (973) 353-9445
www.depolinklegal.com

Page 2

```
 1     A P P E A R A N C E S:

 2

 3          CONNELL FOLEY, L.L.P.
                85 Livingston Avenue
 4              Roseland, New Jersey   07068
                P (973) 535-0500
 5              F (973) 535-9217
          BY:  PETER J. PIZZI, ESQ.
 6             NEIL V. SHAH, ESQ.
               Counsel for the Plaintiff

 7

 8

          GRUEN & GOLDSTEIN, ESQS.
 9              1150 West Chestnut Street
                Union, New Jersey   07083
10              P (908) 687-2030
                F (908) 687-5391
11        BY:  FRED R. GRUEN, ESQ.
               Counsel for the Defendant,
12             Bayonne/Omni Development, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2   WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

3   MICHAEL SILBERGERG

4     BY MR. PIZZI              4

5

6

7                     E X H I B I T S

8   NO.                  DESCRIPTION              I.D.

9   P-27   Subpoena in an adversary proceeding for
           Michael Silberberg dated 4/21/10 with
10         attached Schedule A                      4

11  P-28   Subpoena in an adversary proceeding for
           Silberberg & Kirschner dated 4/21/10
12         with attached Schedule A                 4

13

14

15

16

17

    REQUESTED INFORMATION:
18
    Page 16 - E-mail in Mr. Silberberg's files from Mr.
19            Eisenreich to Mr. Silberberg

20  Page 26 - Invoice to Mr. Eisenreich for preparing
              Exhibits A and B to the subpoena
21
    Page 29 - Promissory note and Corporate Resolution
22            as it exists on Mr. Silberberg's server

23

24

25

1          (Two subpoenas in an adversary

2     proceeding, both dated 4/21/10, one for

3     Michael Silberberg and one for Silberberg &

4     Kirschner are received and marked P-27 and

5     P-28 for identification by the Reporter.)

6   M I C H A E L    S I L B E R B E R G, 55 Old Nyack

7     Turnpike, Suite 210, Nanuet, New York,

8     is sworn.

9   DIRECT EXAMINATION BY MR. PIZZI:

10        Q.    Can you state your full name for the

11  record, sir?

12        A.    Michael Silberberg,

13  S-i-l-b-e-r-b-e-r-g.

14        Q.    And your residence address?

15        A.    14 Orchard Hill Drive, Monsey,

16  M-o-n-s-e-y, New York, 10952.

17        Q.    My name is Peter Pizzi and I

18  represent the Plaintiff in this action, Bayonne

19  Medical Center and Allen Wilen, in his capacity as

20  liquidating trustee and estate representative of the

21  Debtor, Bayonne Medical Center.

22        We're here to take your deposition in

23  connection with this case.  First of all, do I

24  understand that you're a practicing lawyer?

25        A.    A limited practicing attorney.

1          Q.       Are you someone who has experience in

2     litigation?

3          A.       No.

4          Q.       Well, then I'll act as if you have no

5     experience in litigation and, therefore, give you a

6     couple of basic rules.  This is a deposition, where

7     we get the opportunity to ask questions and obtain

8     information from people who have knowledge of the

9     facts.  The reporter is going to take everything

10    down in booklet format.  And the reporter has also

11    administered to you the oath, that would be the same

12    as if we were in a court of law with a judge and

13    jury present.

14          Just make sure that you understand the

15    question.  If you don't understand the question,

16    don't answer it, tell us you don't understand it.

17    If you do answer the question, we're going to assume

18    that you understood it.  All your answers have to be

19    verbal, as opposed to a nod, because the reporter

20    can only take down what is said.

21          So those are basic ground rules.  Do you

22    understand what I've just communicated to you?

23          A.       I do.

24          Q.       Now, you were served with a subpoena,

25    I believe, in this case, right?

1        A.      Yes.

2        Q.      Are Exhibits P-27 and P-28 the

3   subpoenas that were served upon you?

4        A.      Are they different?

5        Q.      One is to you individually, P-27, and

6   then P-28 is to a law firm called Silberberg &

7   Kirschner.

8        A.      Okay.  It's possible I received two.

9   It went to my office in Manhattan and I'm never

10  there.  They did send this to me, and I believe I

11  received one and looked at one.  But it's been a

12  while.  Well, not that long.  But I have seen this.

13  I have seen this.  Are they pretty much identical?

14       Q.      They're identical, except for the

15  recipient.  In other words, one is to the law firm

16  and one is to you in name.

17       A.      Okay.

18       Q.      Before we get into those in detail,

19  let me ask you, I understand you are licensed to

20  practice law?

21       A.      I am.

22       Q.      And when did you become admitted to

23  the bar?

24       A.      Either 1990 or 1991.

25       Q.      And where did you attend law school?

Page 7

1        A.      Fordham Law School.

2        Q.      Did you attend law school out of

3    college?

4        A.      Yes.

5        Q.      Where did you go to college?

6        A.      Baruch College.

7        Q.      Tell us the path your legal career

8    took after law school.

9        A.      I went to work for a law firm by the

10   name of Frenkel, F-r-e-n-k-e-l, & Hershkowitz,

11   H-e-r-s-h-k-o-w-i-t-z in Manhattan for about three

12   years.  And I guess in 1993 or 1994 I opened my own

13   practice.  I did that for about 12 years or so.  And

14   three, four, five years ago I started moving out of

15   the practice of law and was more involved in

16   business.

17       Q.      And when you worked for Frenkel, your

18   main office was in Manhattan?

19       A.      Yes, 34th Street.

20       Q.      When you opened your own practice,

21   which I gather you operated for roughly 12 years,

22   where was that located?

23       A.      First in Lower Manhattan, 26

24   Broadway, and later on in Midtown Manhattan, at

25   various locations on Third Avenue.

DEPOLINK COURT REPORTING & LITIGATION SERVICES (973) 353-9880

1           Q.       What areas did you practice in during

2     that 12-year period?

3           A.       Transactional real estate.

4           Q.       Are you currently affiliated with

5     something called Silberberg & Kirschner?

6           A.       Yes.

7           Q.       What is that?

8           A.       That's a law firm.

9           Q.       Where is it located?

10          A.       360 Lexington Avenue.

11          Q.       What is your affiliation with that

12    entity?  Are you a partner?

13          A.       A partner.

14          Q.       And do you practice law with that

15    entity?

16          A.       Yes.

17          Q.       When you practiced law over that

18    12-year period, what was the name of the law firm?

19          A.       I believe it probably started as

20    Michael Silberberg, P.C., I don't recall.  And

21    shortly after I started that practice, I hired my

22    now partner, Uri Kirschner, out of law school, and

23    probably seven or eight years into that relationship

24    he became a partner, and we formed Silberberg &

25    Kirschner and we've had that ever since.

1          Q.      What's the first name of Mr.

2    Kirschner?

3          A.      Uri, U-r-i.

4          Q.      What area does Silberberg & Kirschner

5    practice in?

6          A.      Transactional real estate.

7          Q.      And in terms of the business

8    activities you have engaged in for roughly the past

9    five years or so, can you describe those to us?

10          A.      That's real estate, as well.

11          Q.      Any particular kind of real estate?

12          A.      Income producing, residential

13    property, retail, some office space.  Anything that

14    we think we can make a couple of dollars in.

15          Q.      Do you have partners in those

16    endeavors?

17          A.      I do.

18          Q.      Do you have many?  Do you have

19    consistent partners?

20          A.      I have a partner in my business, and

21    then on a case-by-case, deal-by-deal basis, I may or

22    may not have investors or partners in the deals.

23          Q.      Are you acquainted with someone

24    called Avery Eisenreich?

25          A.      I'm sure I'm acquainted with him.

1          Q.      How long have you known Mr.

2   Eisenreich?

3          A.      I've known Mr. Eisenreich for a long

4   time.  Maybe close to 15 years, maybe a little less.

5          Q.      And how did you come to be acquainted

6   with him?

7          A.      He was a client of mine for many

8   years.

9          Q.      When did he cease to be a client?

10         A.      I don't know if he ever formally

11  ceased to be a client.  But as I scale down my

12  activities as an attorney, I think he probably

13  stopped using my firm.  I think he on occasion may

14  use the services of my partner, but he has

15  associations with many attorneys.  So I wasn't his

16  exclusive attorney, but I did a fair amount of work

17  for him over the years.

18         Q.      Before you went into your business

19  focused endeavor?

20         A.      Correct.

21         Q.      And have you engaged in real estate

22  transactions with Mr. Eisenreich?

23         A.      Over the years we've done some things

24  together.

25         Q.      Can you describe them?

1      A.      We often will -- not "often," but we

2   have at times invested with other people, not

3   necessarily in my deals, but we have mutual

4   acquaintances who at times syndicate real estate

5   deals, and we will often participate together in

6   investing in some of those deals.  That's basically

7   it.

8      Q.      Have you done real estate deals with

9   Mr. Eisenreich in the State of New Jersey?

10     A.      Many years ago I believe we bought a

11  mortgage on a property in New Jersey together,

12  myself, Mr. Eisenreich and a couple of other

13  individuals.  This dates back a number of years.

14     Q.      Do you remember the location?

15     A.      I don't.

16     Q.      Are there any current real estate

17  projects or real estate endeavors in which you are

18  involved that Mr. Eisenreich is also involved?

19     A.      Several.

20     Q.      What are those?

21     A.      I don't know that I want to go into

22  the specifics without talking to him, but several

23  office properties in major cities throughout the

24  country.

25     Q.      Do you have any involvement in a real

Page 12

1    estate project in Bayonne with Mr. Eisenreich?

2         A.    No.

3         Q.    By the way, have you ever taken

4    depositions, conducted depositions in any manner as

5    a lawyer?

6         A.    On the receiving end?

7         Q.    As a lawyer.

8         A.    To depose someone?

9         Q.    Correct.

10        A.    No.

11        Q.    You were served with a subpoena,

12   which called for the production of documents.  Do

13   you have any documents responsive to the subpoena?

14        A.    I don't.

15        Q.    Let's look at, if you would, Schedule

16   A.  You have to go one page earlier.  You're looking

17   at Schedule A to Exhibit P-27, right?  Are we on the

18   same page?

19        A.    Yes.

20        Q.    Item 1 calls for documents between

21   2002 and the present that involve Bayonne Medical

22   Center and any of the people listed as (a) through

23   (q), okay?

24        A.    Correct.

25        Q.    And you're telling us you have no

Page 13

1    documents responsive to that request?

2         A.    That is correct.

3         Q.    And Item 2 calls for the production

4    of any documents relating to the creation of the

5    document called Exhibit A.

6         A.    Correct.

7         Q.    Which is styled as a promissory note.

8    And Item 3 calls for production of any documents

9    relating to Exhibit B, which is styled as a

10   corporate resolution.

11        A.    Correct.

12        Q.    You're telling us you have no

13   documents whatsoever responsive to Items 2 and 3 in

14   the subpoena, right?

15        A.    Correct.

16        Q.    What efforts did you make to locate

17   responsive documents?

18        A.    I checked my files in my office in

19   Nanuet, asked my secretary in Manhattan to check

20   that office, and I checked a storage facility near

21   my office in Nanuet to see if I had a file on this

22   matter.  I also checked my e-mails to see if I had

23   any e-mails at all regarding this matter and found

24   none.

25        Q.    How far back do you have e-mails?

Page 14

1          A.        I don't know how far back.

2          Q.        What's the e-mail address that you

3   use today?

4          A.        The e-mail address I use today, I use

5   two, I use Ms@skllp.com and Ms@Berkleyllc.com.

6          Q.        And it's B-e-r-k?

7          A.        L-e-y l-l-c.com.

8          Q.        What is Berkley, L.L.C.?

9          A.        That's my real estate business.

10         Q.        Where is it located?

11         A.        In Nanuet is our office.

12         Q.        And how many people are employed

13   there, approximately?

14         A.        One.

15         Q.        Yourself?

16         A.        No.

17         Q.        One other person?  Who is that, a

18   secretary?

19         A.        A secretary/bookkeeper, yes.

20         Q.        So you looked in your e-mail mailbox

21   for Ms@skllp.com and Ms@Berkleyllc.com and found

22   nothing relating to Bayonne Medical Center?

23         A.        Correct.  Oh, I want to correct that.

24         Q.        Yes.

25         A.        I had an e-mail shortly before I

1   received this from Mr. Eisenreich telling me that I

2   probably will be served with a subpoena, and he

3   apologizes, since he knows I'm busy and don't

4   normally have time.  But he was letting me know that

5   I would be getting a subpoena and I would be asked

6   to testify.

7                MR. GRUEN:  I'm going to, I guess,

8   make a statement for the record.  We're all

9   sensitive to the attorney/client privilege.  You've

10  begun to reveal communications between you and Mr.

11  Eisenreich, which you don't have the right to do,

12  unless and until I waive the privilege on behalf of

13  Mr. Eisenreich.  I haven't waived the privilege yet.

14  I am considering a limited waiver.  But until I tell

15  you otherwise, please do not discuss communications

16  between Mr. Eisenreich.

17               THE WITNESS:  All right.

18      Q.       First of all, that e-mail would be

19  responsive to the subpoena, would it not?

20      A.       I didn't view it as such.  I guess it

21  could be.  I didn't view it as such.  It was

22  basically a courtesy.

23               THE WITNESS:  Is it okay if I

24  respond?

25               MR. GRUEN:  You've done it already,

1    so you can complete this limited narrative.

2         A.    I think it was a courtesy from him.

3    I think he felt he owed me that courtesy to tell me

4    I'm going to be getting a subpoena, and he

5    apologizes for any time that it may take out of my

6    schedule.

7         Q.    Whether it's a courtesy or not, it's

8    a communication about Bayonne Medical Center after

9    the date of May 2002 from Avery Eisenreich.  So to

10   me it looks like it's directly responsive to Item 1;

11   therefore, I have to ask it to be produced.  Is it

12   possible someone can fax it today?

13         MR. GRUEN:  It's going to be sent

14   through me, and I'm going to determine whether I

15   assert the privilege or not.

16         MR. PIZZI:  No matter what, Mr.

17   Gruen, Mr. Silberberg, there's such a thing as a

18   privilege log.  If it's privileged and you want to

19   assert a privilege, you put it down on a log which

20   says we contend this is privileged.  One way or

21   another, I have to see something about the document,

22   date, time, who was cc'd, what have you.  So I can't

23   complete the deposition until I have that document.

24   We can do it however you want to do it, but I can't

25   complete the deposition without all the responsive

1   documents. We're going to ask you to produce it,

2   whether a privilege is asserted or not, we'll deal

3   with it.

4          Q.     Now, did Mr. Eisenreich ask you to

5   perform any legal services relating to Bayonne

6   Medical Center?

7                MR. GRUEN:  I am going to agree to a

8   limited waiver of the privilege, limited to

9   communications relating to the loan from the Omni

10  entity to Bayonne Medical Center.  As we go along, I

11  may determine to expand the limited waiver, but at

12  this point that is the extent of the limited waiver.

13               MR. PIZZI:  Well, a limited waiver

14  obviously requires consent in some way.  And all I'm

15  saying is I'm not taking a position one way or

16  another about whether there is such a thing as a

17  limited waiver.  You're allowing him to testify in

18  response to certain questions, that's fine, we'll

19  take it at a step at a time.

20         Q.     But at the time you received the

21  e-mail from Mr. Eisenreich, had you been engaged to

22  render legal services on his behalf relating to

23  Bayonne Medical Center?

24               MR. GRUEN:  Was that question at the

25  time or as of the time?

Page 18

1       Q.      At the time received the e-mail

2    that you didn't bring with you today, had you been

3    engaged by Mr. Eisenreich to render legal services

4    on his behalf relating to Bayonne Medical Center?

5       A.      Are you referring back to the date of

6    this, 2006?

7       Q.      Let's start again.  You told us you

8    got an e-mail from Mr. Eisenreich about this

9    litigation, right?

10      A.      Yes.

11      Q.      And that was sometime after this

12   litigation was filed, right?

13      A.      I assume so.  When was this

14   litigation filed?

15      Q.      You were subpoenaed in April of 2010,

16   right?  Yes?

17      A.      Yes.

18      Q.      And was it before or after you got

19   the subpoena that you heard from Mr. Eisenreich by

20   e-mail?

21      A.      I would have to check.

22      Q.      Was it in 2010 that you received this

23   e-mail from Mr. Eisenreich?

24      A.      Yes.

25      Q.      So at that time, when you got this

1    communication from Mr. Eisenreich, had you been

2    engaged by him to render legal services relating to

3    Bayonne Medical Center?

4              MR. GRUEN:  I'm going to object to

5    the form of the question only because I think it's

6    confusing, and I sense that it's confusing to the

7    witness.  And I'm not trying to lead him in any

8    direction.  But I interpret the question as meaning

9    at that very point in time did you have any

10   outstanding engagement from Eisenreich to render

11   legal services.  If that's what you mean and with

12   that clarification, I would permit the witness to

13   answer the question.

14             A.    Is that your question?  Because it

15   was kind of confusing.

16             Q.    I couldn't imagine a simpler

17   question.  I'm going to rephrase it.

18             A.    Please.

19             Q.    When you got the e-mail from Mr.

20   Eisenreich, had you been engaged to do legal work

21   for him about Bayonne Medical Center?

22             A.    At the present or prior to that year

23   or two back?

24             Q.    At the present time, at the time you

25   got the e-mail --

1          A.     No.

2          Q.     Did he, after you got this e-mail,

3    ask you to do any legal work for him about Bayonne

4    Medical Center?

5          A.     No.

6          Q.     So when you got the e-mail, he wasn't

7    asking you to be his lawyer about this matter, was

8    he?

9          A.     No.

10          Q.     So to me that's not a privileged

11    communication.  Again, I'd like to see the document.

12          Now, did there come a point in time before

13    you got this e-mail from Mr. Eisenreich that he

14    asked you to do anything about Bayonne Medical

15    Center?

16          A.     I believe so.

17          Q.     When was that?

18          A.     I don't recall, but from the date of

19    this note, I assume sometime in 2006, roughly the

20    date of this note.

21          MR. PIZZI:  Just read that answer

22    back for me, please.

23          (The last answer is read by the

24    Reporter.)

25          Q.     When you say "this note," you're

1      referring to Exhibit A to the subpoena, which is a

2      promissory note?

3            A.      Correct.

4            Q.      Did you prepare Exhibit A to the

5      subpoena?

6            A.      I believe I did.

7            Q.      Did you prepare Exhibit B?

8            A.      It looks like it would have been

9      prepared by my office, yes.

10           Q.      And what tells you it would have been

11     prepared by your office?

12           A.      Just the style, the format.

13           Q.      Who actually did that work?

14           A.      It could have been a number of

15     secretaries that work in the office.

16           Q.      Who told them what to write?

17           A.      I did.

18           Q.      Before you told the secretaries to

19     write these documents that are attached as Exhibits

20     A and B to Exhibit P-27, I take it you heard

21     something from Mr. Eisenreich?

22           A.      Correct.

23           Q.      What was the nature of that

24     communication; was it phone, was it fax, was it

25     e-mail?

1          A.      I believe it was a phone call from

2     him.

3          Q.      And what did he say?

4          A.      I believe, I don't recall, obviously,

5     the particulars of the conversation in detail, but I

6     recall that he said that he was making a loan to the

7     hospital, or something like that, and he needed the

8     loan documents quickly, a note, and I should please

9     prepare it and get it over to him.

10         Q.      Is that all he told you?

11         A.      Yes, that I recall.

12         Q.      Well, did he tell you who the

13    hospital was?

14         A.      Well, he obviously told me who the

15    borrower was, so I'm sure he did give me that

16    information, yes.

17         Q.      Did he tell you the amount?

18         A.      Yes.

19         Q.      Do you recall it?

20         A.      No.

21         Q.      Do you recall him talking to you

22    about anything else, the term, anything?

23         A.      As I sit here today, without looking

24    at the note, I don't recall the particulars of the

25    transaction, other than he said he was making a loan

1      A.    I believe it was a phone call from

2  him.

3      Q.    And what did he say?

4      A.    I believe, I don't recall, obviously,

5  the particulars of the conversation in detail, but I

6  recall that he said that he was making a loan to the

7  hospital, or something like that, and he needed the

8  loan documents quickly, a note, and I should please

9  prepare it and get it over to him.

10      Q.    Is that all he told you?

11      A.    Yes, that I recall.

12      Q.    Well, did he tell you who the

13  hospital was?

14      A.    Well, he obviously told me who the

15  borrower was, so I'm sure he did give me that

16  information, yes.

17      Q.    Did he tell you the amount?

18      A.    Yes.

19      Q.    Do you recall it?

20      A.    No.

21      Q.    Do you recall him talking to you

22  about anything else, the term, anything?

23      A.    As I sit here today, without looking

24  at the note, I don't recall the particulars of the

25  transaction, other than he said he was making a loan

1   location where you keep track of invoices, whether

2   they've been paid or not?

3        A.    The attorney, either myself or my

4   partner, now more so my partner, when we close a

5   transaction, we present an invoice. We usually get

6   paid. And if for some reason we don't get paid, the

7   attorney handling that matter will keep his own

8   records. If there's an open invoice out there, he's

9   got to be on top of it. There's no central, like,

10  bookkeeping department or anything like that.

11       Q.    Well, I do believe that an invoice,

12  if any exists, would be responsive to the subpoena.

13  So I have to ask you to do a search. And I can't

14  complete the deposition until I know if there is an

15  invoice or not.

16       A.    I'd be glad to.

17       Q.    The form of the promissory note, did

18  you give any thought to using any particular form

19  for this transaction?

20       A.    It's my standard form.

21       Q.    It's standard for what kind of loan?

22       A.    For any loan. It would be modified

23  if there were particulars. Maybe if it was secured

24  by a pledge of an interest, it would be in there; if

25  it was secured by a real estate mortgage, that may

1   be added.  Obviously, the particulars of a

2   transaction would modify the note, but the form

3   itself is my standard form that I use.

4          Q.     And this note indicates it's due in

5   the year end, December 31, 2006?

6          A.     It does.

7          Q.     Do you know where that date came

8   from?

9          A.     I don't.

10          Q.     You presume you got it from Mr.

11   Eisenreich?

12          A.     Correct.

13          Q.     Did you talk to anyone at Bayonne

14   Medical Center relating to this note?

15          A.     No.

16          Q.     Exhibit B to the subpoena is titled

17   "Corporate Resolution."  This is a document you

18   prepared, as well?

19          A.     I believe so.

20          Q.     And who told you to prepare a

21   corporate resolution?

22          A.     I believe it was Mr. Eisenreich who

23   told me he needed a note and a resolution.

24          Q.     He told you he needed a note, as well

25   as a resolution?

Page 28

1      A.      I don't recall the conversation with

2   great detail.  I don't know if he said to me, I need

3   a note and a corporate resolution, or he said to me,

4   I need a note, and I said to him, And you need a

5   corporate resolution.  I'd be wrong if I told you I

6   remember the specifics of who said what to who in

7   terms of the corporate resolution.

8      Q.      Why was a corporate resolution

9   needed?

10     A.      It's a corporate loan and we wanted

11  to make sure it's authorized.

12     Q.      What did you think needed to happen

13  in order for this loan to be authorized?

14     A.      That the board of directors and

15  officers approve the loan.

16     Q.      How did you send this promissory note

17  and corporate resolution to Mr. Eisenreich?

18     A.      I don't recall.

19     Q.      So you don't recall if it was

20  e-mailed or anything like that?

21     A.      I don't.

22     Q.      Now, let me ask you, was this

23  document done on a word processor?

24     A.      As opposed to?

25     Q.      A typewriter.

# EXHIBIT
# #92

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

                    Debtor,            :

BAYONNE MEDICAL CENTER,                :
Debtor and
Debtor-in-Possesssion; and            :
ALLEN D. WILEN, in his                      DEPOSITION OF:
capacity as Liquidating               :
Trustee and Estate                         CAROLINE EVANS
Representative for the Estate         :
of Debtor, Bayonne Medical                   VOLUME I
Center,                               :    (Pages 1-229)

                    Plaintiff,        :

          -vs-                        :

BAYONNE/OMNI DEVELOPMENT,             :
L.L.C., a New Jersey limited
liability company; et al.,            :

                    Defendants.       :
------------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 186

1          THE WITNESS:  It says --

2          MR. GRUEN:  Excuse me.  There's no

3  question.

4      Q.    We can agree that you're still

5  discussing parts of the deal on June 12th, 2006?

6          MR. SAMSON:  Hold on a second.

7          MR. GRUEN:  Objection to form of the

8  question.

9          MR. SAMSON:  How do you define the

10  "deal"?  Because there's an asset and purchase

11  agreement, there's also a lease.  There's different

12  components of the deal.  So if you could just be a

13  little more precise.  I think you're talking about

14  one thing, perhaps, and she's talking about another.

15      Q.    Do you consider the lease separate

16  and apart from the sale of the building?

17      A.    My conversations with him were

18  separate and apart from that.  We had separate lease

19  conversations, yeah.

20      Q.    Did the board ever authorize

21  administration to enter into a long-term lease of

22  space with the skilled nursing facility, to your

23  knowledge?

24      A.    I don't know how to answer that

25  question.

DEPOLINK COURT REPORTING & LITIGATION SERVICES (973) 353-9880

Page 187

1         Q.      It wasn't discussed at the June

2    meeting, to your knowledge, correct?

3         A.      No.

4         Q.      So then am I understanding your

5    testimony that there were issues with respect to the

6    lease that still needed to be resolved after June 8,

7    2006?

8                 MR. GRUEN:  Objection to form.

9                 MR. SAMSON:  Objection, form.  Do you

10   understand the question?

11                THE WITNESS:  I'm really not

12   understanding.  Ask me a direct question and I'll

13   give you a direct answer, I promise.

14        Q.      I'm trying the best I can.

15        A.      All right.

16        Q.      June 8th, 2006, your understanding

17   was, correct me if I'm wrong, the deal is done.

18                MR. GRUEN:  Objection to form.

19        A.      No.  My understanding was that the

20   board passed the resolution to purchase the nursing

21   home.

22        Q.      To purchase or --

23        A.      I'm sorry, for Omni to purchase the

24   Bell building.  I beg your pardon.

25        Q.      And what is your understanding of