GRUEN & GOLDSTEIN
1150 West Chestnut Street
Union, New Jersey 07083
(908) 687-2030
Fred R. Gruen, Esq.

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP
One Gateway Center
Newark, New Jersey 07102-5386
(973) 621-9020
Richard B. Honig, Esq.
*Attorneys for Defendants: Bayonne/Omni Development, L.L.C.,
Bayonne Healthcare Development, L.L.C., Omni Asset Management,
L.L.C., ATE Consulting Company and Avery Eisenreich*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ------------------------------------x | Case No. 07-15195 (MS) |
| In re: | |
| | Chapter 11 Proceeding |
| BAYONNE MEDICAL CENTER, | Hon. Morris Stern |
| | |
| Debtor. | |
| ------------------------------------x | Adversary No. 09-1689 (MS) |
| BAYONNE MEDICAL CENTER, Debtor and | |
| DIP; and ALLEN D. WILEN, in his | |
| Capacity as Liquidating Trustee and | |
| Estate Representative for the Estate | Hearing Date: June 8, 2011 |
| of Debtor, Bayonne Medical Center, | at 10:00 a.m. |
| | |
| Plaintiffs, | |
| v. | |
| | |
| BAYONNE/OMNI DEVELOPMENT, L.L.C., a | |
| NJ limited liability company, et al., | |
| | |
| Defendants. | |
| ------------------------------------x | |

BRIEF OF DEFENDANTS IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I, II
AND WITH RESPECT TO CERTAIN CLAIMS UNDER COUNTS IV - VI

On the Brief:
    Fred R. Gruen, Esq.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT   . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . 5

LEGAL ARGUMENT

    POINT I.   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
               JUDGMENT ON COUNT I (PLEDGE)
               SHOULD BE DENIED. . . . . . . . . . . . . . . 53

    POINT II.  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
               JUDGMENT ON COUNT II (REPLACEMENT OF
               LOAN AS VOIDABLE PREFERENCE TO "INSIDER")
               SHOULD BE DENIED BECAUSE AVERY EISENREICH
               AND OMNI ENTITIES ARE NOT "INSIDERS"
               AND THEREFORE ONE YEAR LOOK BOOK
               PERIOD DOES NOT APPLY . . . . . . . . . . . 64

          1.   EISENREICH AND OMNI ENTITIES WERE
                   NOT "GENERAL PARTNERS OF THE DEBTOR"
                   UNDER 11 USC §101 (31) . . . . . . . 64

          2.   EISENREICH AND OMNI WERE NOT "NON-
                   STATUTORY INSIDERS" TO THE DEBTOR. . . 69

              a)  NO "CLOSE RELATIONSHIP" WITH
                   DEBTOR AND ITS PRINCIPALS. . . . . 73

              b)  DEBTOR TRANSACTIONS WITH OMNI
                   ENTITIES WERE ARM'S LENGTH . . . . 85

    POINT III. THE LOAN REPAYMENT CLAIM UNDER COUNTS
               IV, V AND VI FAILS AND PLAINTIFFS' MOTION
               FOR SUMMARY JUDGMENT SHOULD BE DENIED,
               SINCE DEBTOR RECEIVED REASONABLY
               EQUIVALENT VALUE IN EXCHANGE FOR
               REPAYMENT OF THE PROMISSORY NOTE AND
               THE TRANSFER WAS NOT CONSTRUCTIVELY
               FRAUDULENT. . . . . . . . . . . . . . . . 98

CONCLUSION    . . . . . . . . . . . . . . . . . . . . . 104

## TABLE OF AUTHORITIES

**CASES**                                                                 **Page (s)**

Abbott v. Eviciti Corp.,
    2005 U.S. Dist. LEXIS 15464, at ** 22-24
    (S.D. Ind. June 29, 2005) . . . . . . . . . . . . . . . . 97

Aequus Techs. LLC v. qh, LLC,
    2009 U.S.Dist. LEXIS 72933 at **8-16
    (D.N.J. Aug 17, 2009) . . . . . . . . . . . . . . . . . 67

American Fire & Cas. Ins. Co. v. Manzo,
    347 N.J.Super. 100 (App. Div. 2002) . . . . . . . . 66, 67

Building Materials Corp. of America v. Certainteed Corp.,
    273 F.Supp 2d 552 (D.N.J. 2002) . . . . . . . . . . . 56

In re Belle Isle Farm,
    76 B.R. 85 (Bankr. ED Va. 1987) . . . . . . . . . . . 67

In re Friedman,
    126 B.R. 63 (9th Cir. BAP 1991) . . . . . . . . . 85, 86

In re Holloway,
    953 F 2d 1008 (5th Cir. 1992) . . . . . . . . . . . 74

In re Morris Communications NC, Inc.,
    914 F.2d 458 (4th Cir. 1990) . . . . . . . . . . . 101

In re U.S. Med.,
    531 F.3d 1272 (10th Cir. 2008) . . . . . . . . . 68, 86

In re Winstar Commc'n, Inc.,
    No. 01-01430, 2003 WL 21356090, *9
    (Bankr. D.Del. May 29, 2003) . . . . . . . 68, 82, 85, 86

In re Woodmere Academy v. Steinberg,
    41 NY 2d 746 (1977) . . . . . . . . . . . . . . . . 56

Jewish Federation of Central New Jersey v. Gerson Baronders,
    234 N.J. Super. 526 (Law Div. 1989) . . . . . . . 53, 57

Matter of Falk,
    2 B.R. 609 (Bktcy. NJ 1980) . . . . . . . . . . . . 56

Mellon Bank, N.A. v. Metro Commc'ns, Inc.,
    945 F.2d 635 (3d Cir. 1991) . . . . . . . . . . . 99, 102

Mellon Bank, N.A. v. Official Comm. of
    Unsecured Creditors of R.M.L. (In re R.M.L.),
       92 F.3d 139 (3d Cir. Pa. 1996) . . . . . . . . . 101

Milligan v. Mueller (In re Estate of Schmidt),
    2006 Iowa App. LEXIS 1056 . . . . . . . . . . . . . 55

More Game Birds in America, Inc. v. Boettger,
    125 N.J.L. 97 (1940) . . . . . . . . . . . . . 53, 55-57

Nissho Iwai American Corp. v. United States,
    786 F.Supp. 1002 (Ct. Of Intn'l Trade 1992) . . . . . . 68

P.H.C.C.C. Inc. v. Johnston,
    340 NW 2d 774 (Iowa 1983) . . . . . . . . . . . . . 55

Pamrapo II,
    429 B.R. 152 (Bankr. D.N.J. 2010) . . . . . . . . . *passim*

Salisbury v. Northwestern Bell Tel. Co.,
    221 NW 2d 609 (Iowa 1974) . . . . . . . . . . . . . 56

Shaw v. Delta Airlines, Inc.,
    798 F.Supp. 1453 (D.Nev. 1992) . . . . . . . . . . . 67

Shubert v. Lucent Technologies, Inc.
    (In re Winstar Communication Inc.,
    554 F.3d 382 (3d Cir. 2009) . . . . . . . . . . . . 69

U.S. ex rel. Goodstein v. McClaren Regional Medical,
    202 F.Supp.2d 671 (E.D.Mich. 2002) . . . . . . . . . 94

U.S. v. Clementon Sewerage Authority,
    365 F2d 609 (3rd Cir. (NJ) 1996) . . . . . . . . . 56

United States v. Freeman,
    1993 U.S.Dist. LEXIS 3570 (D.N.J. March 3, 1993) . . . . 69

## STATUTES AND RULES

11 U.S.C. § 101(31) . . . . . . . . . . . . . . . . . . . . . . 68

11 U.S.C. § 101(31)(B)(iii) . . . . . . . . . . . . . . . . . . 69

11 U.S.C. §101 (31)(B)(2011) . . . . . . . . . . . . . . 64

11 U.S.C. § 548(d)(2)(A) . . . . . . . . . . . . . . . . . 98

N.J.S.A. 25:2-24(a) . . . . . . . . . . . . . . . . . . . . . 98

N.J.S.A. 42:1-1-49 . . . . . . . . . . . . . . . . . . . . . 66

N.J.S.A. 42:1-6 . . . . . . . . . . . . . . . . . . . . . . 66

## PRELIMINARY STATEMENT

Omni Asset Management, LLC ("OAM") and its attorney
negotiated a skilled nursing facility ("SNF") project with BMC
and its attorneys over a period of 14 months (June 2005 OAM
initial proposal through November 2005 LOI through June 2006 BMC
conversion of partnership structure to straight land sale to
August 2006 contract of sale and BMC leaseback of space in the
proposed SNF project).  They were assisted by appraisers and
other professionals in pricing and crafting the ultimate land
sale at fair market value.  The sale was closed in accordance
with the sale contract after Bayonne/Omni Development LLC
("Bayonne/Omni", OAM's designee) issued a time of essence letter,
which it issued since by contract the closing date was set for
two months earlier.

The negotiations and agreement and closing were monitored by
BMC's Board of Trustees.

In June 2006, after the Board had authorized BMC's entering
into the sale contract and leaseback, BMC solicited Avery and for
Avery made a $1 million dollar loan or advance against the land
sale purchase price to assist BMC in connection with planned
acquisition of St. Vincent's Hospital, with the understanding the
loan would be credited or offset against the land sale purchase

price at closing or repaid not later than December 31, 2006 if
the land sale closing failed or had not occurred before then.
Repayment of the loan by the purchase price credit was made at
the land sale closing as approved by the Board and specifically
executed by its Chairman.

BMC solicited Avery to make a $5 million dollar pledge.  The
purpose of the pledge was to afford rent relief and fund fit up
costs for BMC's anticipated leaseback, but since the lease had
yet to be executed and the lease rent commencement date was to be
several years beyond the pledge payment installment dates
selected by BMC, Avery asked for and received contemporaneously
with the conditional pledge the written promise of BMC that the
pledge was "nonbinding" Bayonne/Omni's selection by BMC as the
SNF developer was preordained, as only Avery held an unused
nursing home bed license (Certificate of Need) for Hudson County.

The pledge was voidable if the leaseback condition was not
met, and when BMC cancelled the leaseback at the time of the
closing, and recognizing the leaseback condition to the pledge,
it wrote off the pledge.

Before writing off the conditional, nonbinding pledge, BMC
impermissibly recorded it on its financial statement as revenue.

2

The recording was effected by the CFO and the CEO, both of whom knew of the pledge's conditional and nonbinding features which disqualified it for said recording.  The CEO and CFO received bonuses as a result of the improper recording of the conditional, nonbinding pledge as revenue.  Plaintiffs say the CEO and CFO also issued the tainted financial statement to demonstrate satisfaction of BMC bond covenants.  Had the financial statement not impermissibly recorded the conditional, nonbinding pledge as revenue, that revenue could not and would not have been relied upon for bonuses and bond compliance.

The million dollar June 2006 loan was originally entered on BMC's books as a deposit against the land sale, but then incorrectly changed to reflect the same as payment against the first pledge installment due.  When the pledge was written off because of BMC's cancellation of the leaseback, the $1,000,000 payment was re-characterized on BMC's books as it had originally been, as a liability (deposit, or loan).

The repayment of the loan at the land sale closing was not to an "insider", as Avery and his Omni entities were, ultimately, not general partners with BMC in a partnership to develop the SNF project (statutory insider), and Avery and his Omni entities and BMC did not have a "closeness" and their transactions were not

out of the ordinary course of business/in bad faith/influenced by Avery or his Omni entities to compromise BMC's interests/or otherwise not at arm's length (non-statutory insider).

Accordingly, the one year look back period for voidable preference does not apply.

**STATEMENT OF FACTS**

The facts on Plaintiffs' motion are set forth in Defendants' Reply to Plaintiffs' Statement of Undisputed Material Facts[1]:

1. – 7.   Agree, based on documents supplied by Plaintiffs, that BMC is a non-profit entity, that it filed a voluntary petition April 16, 2007, that Plaintiff Allen Wilen was appointed liquidating trustee, that BMC was governed by a Board of Trustees whose Chairman was Herman Brockman, and that Avery Eisenreich is owner and chief executive officer of Omni Asset Management, LLC.

8.   Denied.   Connie Tauber is not knowledgeable respecting the assets of Omni Asset Management, LLC ("OAM" or "Omni"). Avery Eisenreich ("Avery") has testified OAM has and in 2005-2006 had assets and rendered consulting services for nursing homes. (Exhibit #1 to Certification of Fred G. Gruen, Esq. in Support of Defendants' Reply to Plaintiffs' Statement of Undisputed Material Facts (hereinafter "RSUMF": Avery deposition pages 14, 4 to 17, 25; 198, 11, 2 to 23; 195, 5-196, 3).

---

[1]   They are also set forth in Defendants' Statement of Undisputed Material Facts in support of Defendants' motion for summary judgment previously submitted to the Court.

9.   Exhibit #3 does not say Avery owns these facilities; it says he is "involved in them".   Exhibit #3 does not say each facility is owned by a single member limited liability company. Exhibit #3 says nothing of the number of members of each ownership entity.

The nursing home industry knows this group of facilities as "Omni".   (Exhibit #2 to RSUMF:   Avery deposition pages 45, 2 to 9; and 199, 19 – 200, 3.)

10.   Admit that Avery is the owner of Bayonne/Omni Healthcare Development LLC ("Bayonne/Omni").

11.   Avery believed in October 2005 that Bayonne Healthcare Development LLC was a legally formed entity; it was not (Plaintiffs' Exhibit #3).   Plaintiffs' claim that this name was used by Avery "in certain dealings with the Hospital" is not supported by Plaintiffs' Exhibit #3, which exhibit merely affirms that Avery believed in October 2005 that this entity was formed, and it was not.

12.   Avery is the owner of ATE Management Consulting LLC which does business as ATE Consulting LLC or ATE Consulting Company ("ATE").   (See Plaintiffs' Exhibit #4.)

13. The cited references at Plaintiffs' Exhibits #2, #3 and #5 do not support the allegation that Avery "largely ignores the corporate form of the various defendant entities" and "treats the entities interchangeably". Rather, the cited exhibits say only that lender ATE and Bayonne/Omni, the land purchaser that received loan repayment as a credit against the purchase price, are solely owned by Avery and interchangeable, which Defendants concede.

14. Based on the documents that have been made available to Defendants, who would otherwise have no knowledge with respect thereto, these allegations are admitted.

15. Based on the documents that have been made available to Defendants, who would otherwise have no knowledge with respect thereto, these allegations are admitted.

16. Based on the documents that have been made available to Defendants, who would otherwise have no knowledge with respect thereto, these allegations are admitted.

17. Denied that BMC management had meetings with parties which expressed an interest in partnering with BMC to operate a SNF (skilled nursing facility). Nothing in the supporting

citations of Plaintiffs' Exhibits #7, #6, #10, #11, #12 and #85
suggests that BMC and/or its prospective partners contemplated
that BMC was to partner in operation of the SNF, as opposed to
partner in ownership of the real estate, which letter is
admitted.  Plaintiffs' Exhibit #7 says only that as respects
Omni, Omni was interested in building a SNF and was interviewed
for that purpose, which is admitted.

18.  Admitted that Avery first met with CEO Evans, Dr.
Dedousis and Trustee Grywalski with respect to the prospective
development of the SNF, but apparently the meeting took place in
June 2005, not May 2005 (Plaintiffs' Exhibit #14).

Admitted that Avery was aware BMC was interviewing others
for the SNF development, although Avery and BMC's management all
knew and agreed that only Omni qualified for selection, as only
Omni possessed the necessary Certificate of Need ("CN") in Hudson
County for the project (see Defendants' Motion Brief and exhibits
cited therein, at page 5, footnote 3).

19.  Admitted that after the meeting with CEO Evans, Dr.
Dedousis and Trustee Grywalski, Avery made the June 21, 2005
proposal to develop BMC's Bell Street Building site for 120 bed
SNF together with additional office space, and which proposal set

8

forth two options:   (1) Omni to ground lease the Bell Street
Building land from BMC for 99 years, with an annual rent based on
land valuation of $500,000; or (2) Omni to partner with BMC in
ownership of the real estate, which partnership was to leaseback
space in the new building to Avery's SNF and to various other
tenants, including BMC itself - BMC to have an 8% interest in the
real estate and Omni the 92% balance.   With either option, BMC
was to close its current sub-acute bed unit.


     20.   Plaintiffs have failed to report accurately the
contents of the June 21, 2005 Avery offer letter, as it does not
propose as the first option, purchase of the Bell Street Building
property; and it does not propose as a second option, a
partnership by which BMC and Omni would _operate_ the SNF (the
partnership was to own the land together and lease to Avery's
SNF, BMC and other tenants - see #19 above).


     21.   Admit that BMC came to understand that Omni, and only
Omni, could be considered for the SNF project, since Omni, and
only Omni, held the necessary CN, and the State was not issuing
new CNs. (See #18 above).


     22.   Admitted that Marvin Apsel and/or Carrie Evans
solicited Avery for a pledge in October 2005.


                              9

23.   Denied.   There is nothing in the cited exhibits that
says or suggests that BMC withheld entering into an agreement
with Omni for the SNF project pending outcome of its request of
Avery for a pledge.   Exhibit #20 says only that the next step to
be taken with Omni, after June 2005, was entering into an LOI,
and that all recognized Omni was the only potential developer
because of its exclusive ownership of the CN.

The pledge clearly was not needed to secure Omni's position
as developer of the SNF project with BMC.   The cited Heather
Aaron and CEO Robert Evans deposition excerpts similarly do not
say a pledge was required of Omni in exchange for its selection
for the SNF project.   Rather, here Aaron says that she understood
Omni would pledge by virtue of the long-term relationship that
was contemplated (partnership and BMC leaseback), and in the
cited CEO Evans deposition he, too, does not say that the award
of the SNF project to Omni was conditional upon a pledge, but
rather observes only that the <u>raison d'etre</u> for the pledge was to
afford rent relief and fit out cost assistance in connection with
the portion of the SNF building to be leased back by BMC.

24.   Denied.   Omni did not agree to make an unconditional,
unrestricted pledge.   See Defendants' Motion Brief and referenced
exhibits, the essential highlights of which are that the pledge

was sought and given for the purpose of leaseback relief to BMC,
and was in exchange for the leaseback, but since the leaseback
was not yet in place, and would not begin generating rent for
several years, the pledge was accompanied by the CEO's October
21, 2005 letter ("comfort letter") <u>unambiguously assuring Avery
that the pledge was non-binding</u>.  And the pledge installment
amounts and dates were selected and filled in by CFO Heather
Aaron.  Her selected dates, according to Aaron, were to render
the pledge recordable as revenue on BMC's 2005 financial
statement.  The balance of the details respecting the pledge and
its solicitation and inducement and linkage to the leaseback and
CEO comfort letter appear in Defendants' Motion Brief at pages 4
through 33.

See also Apsel's deposition at page 104, 19-106, 23, omitted
from Plaintiffs' Exhibit #10 and included as Exhibit #69 and #70
in Defendants' Motion Declaration:  He addressed with CEO Evans
and CFO Aaron at the time of Avery's signing of the pledge,
Avery's requirement that the pledge be non-binding and that he
receive a CEO letter confirming the same.

With respect to the contention here that the pledge was "a
critical factor in the ultimate selection of Omni for the SNF
project", citing Heather Aaron's deposition, Plaintiff has failed

11

to detail the unanimous testimony of all the other management
personnel who were deposed and the Chairman of the Board, to the
effect that the pledge was not a factor, given Omni's unique
qualification for the assignment (holder of CN). And even in
this Aaron excerpt, she was unable to identify anyone at BMC who
allegedly claimed that the pledge was required for Omni's
selection. (See #23 above and Aaron deposition, page 82, annexed
as Exhibit #3 to RSUMF.)

25. Admitted that Avery signed the October 14, 2005 pledge
form for Bayonne Healthcare Development LLC. None of the details
in respect to installments or dates or amount were penned by him
when he signed it. (See Avery deposition, page 62, annexed to
RSUMF; and see letter from Alfred I. Bernstein, Esq., April 4,
2011, amending the deposition testimony of Marvin Apsel annexed
as Exhibit #4 to RSUMF.)

"Gentlemen

I am writing to advise you that Mr. Apsel
whishes (sic) to correct an error in his
testimony at the time of his deposition on
October 14, 2010. His testimony was
conflicting as to weather Mr. Eisenreich had
filled in the pledge form in his presence or
that Mr. Eisenreich signed it in blank.

After much thought during the weeks and
months since his deposition Mr. Apsel has
come to the conclusion that the correct
sequence of events was that Mr. Eisenreich

signed the pledge form in blank saying to Mr.
Apsel that "you guys can fill out the rest."
Furthermore, upon Mr. Eisenreich leaving the
meeting with Mr. Apsel he requested that Mr.
Apsel secure him the letter from Robert Evans
with regard to the pledge not being legally
binding upon him.

Mr. Apsel further recollects that he gave the
signed pledge form to Robert Evans who then,
with Mr. Apsel following along, took the
pledge form to Heather Aaron. Mr. Apsel
recalls that Ms. Aaron then filled out the
pledge form.

Given the separation of time from the taking
of Apsel's deposition, he now believes that
the above information is the accurate account
of what transpired.

On behalf of Mr. Apsel I ask that you accept
his apology for an inconvenience he may have
caused.

Very truly yours,   Alfred I. Bernstein"


Avery believed Bayonne Healthcare Development LLC was a

filed entity at the time; it was not.   (See #11 above and see

Avery deposition testimony pages 84, 22-85, 25 annexed as Exhibit

#5 to RSUMF.)


26.   Admitted.   CFO Aaron was dissatisfied with the timing

of the installments that BMC wrote in to the pledge of October

14, 2005 and provided in the replacement October 21, 2005 pledge

form <u>accelerated installments (she changed the first installment</u>

<u>date from 2008 to 2006) so BMC could enter the pledge as revenue</u>

upon its 2005 financial statement:   "The dates here are when we
needed to receive it in order for it to be valid on the books."
(Exhibit #66 to Gruen's Declaration in Support of Defendants'
Motion).


Aaron testified then Director of Finance Paul Mohrle
repeated this action several months later when preparing a
confirmation letter reporting the pledge installment dates to
BMC's auditors, WS&B:


> "Q.   Did you discuss with Robert Evans before
>       this confirmation letter was sent to
>       Omni the installment payment dates that
>       are shown in this letter?
>
> A.    Yes.
>
> Q.    Did you discuss with anyone other than
>       Robert Evans the installment dates that
>       are set forth in this letter?
>
> A.    Yes, the entire accounting department.
>
> Q.    That's what I wanted to get to.   That
>       would include Mr. Olsen; is that
>       correct?
>
> A.    Mr. Olsen is with Withum, Smith & Brown.
>
> Q.    Oh, when you say the "accounting
>       department" –
>
> A.    I mean Paul Mohrle and his staff.
>
> Q.    I beg your pardon.   So what did you
>       discuss with Paul Mohrle and his
>       accounting staff with respect to the

installment payment dates that are shown in this letter?

A.   The correct accounting procedure necessary to collect these funds and when they would have to be due.  That's what I'm talking about, the $5,000,000 and the dates.

Q.   So what, if anything, did Mohrle say about the dates that had to be shown on here in order to serve your accounting purposes?

A.   These were the dates that needed to be documented for the dollars.  These are the dates that we needed to collect the funds in order to have it correctly booked.

Q.   What does "correctly booked" mean?

A.   May I give an example?  "Correctly booked" means that for 2005 we have a pledge that came in.  In order to book the dollars as a receivable in 2005, the cash must shortly follow, before the end of the preceding year, or else you cannot recognize it on your books.

Q.   By "the cash," you mean the entire pledge or a part of the pledge?

A.   A part of it.  You know, it's over a period of time.

Q.   So the dates that were reflected in this letter resulted from a conversation that you had with Mohrle?

A.   The dates here?

Q.   Yes.

A.   Yes.

Q.   And it was he, then, who told you what
     dates should show on the confirmation
     letter?

A.   He did.  The year-end audit was being
     done, the accounting, Withum, Smith &
     Brown, everybody discussed what should
     be the appropriate collection of these
     dollars.

MR. FROST:  Again, Heather, listen very
carefully to his question.

Q.   So who at WSB did you discuss these
     installment payment dates as reflected
     on this letter?

A.   Mr. Olson.

Q.   Anyone else?

A.   Not that I know of.

MR. PIZZI:  Just to clarify for the record,
the name is Oster.

THE WITNESS:  Oster

MR. PIZZI:  According to Exhibit P-22 to the
Brockman deposition.  We might as well start
using the correct name, if that's it.  The
bottom left-hand corner, William Oster.  You
have it right there.  After signing and
dating Your reply.

THE WITNESS:  Yes.

MR. PIZZI:  Thank you.

MR. FROST:  Just to clarify –

THE WITNESS:  Just to make sure who we're
talking about.

MR. FROST:  -- the person we have been
identifying as "Olson" is Oster.

THE WITNESS:  Yes, O-s-t-e-r.

Q.   So tell me everything you can remember
about your conversation with William
Oster with respect to setting forth
these installment payment dates on this
letter.

A.   We had a conversation where we verified
that this is when we expected the
dollars to come in, and this is what's
being sent out to be verified by Omni.

Q.   Upon what did you base your expectation
that these were the dates that the
payments were going to be coming in?

A.   Based on what's acceptable through the
accounting process.

Q.   And nothing else?

A.   Nothing else.

MR. FROST:  Fred, do you mind if I ask a
quick question here to help?  I think I can
get you what you're looking for.

MR. GRUEN:  Okay.

MR. FROST:  Who actually came up with these
dates?  Where did these particular dates came
(sic) from?

MR. GRUEN:  I think the witness has already
answered that, but if she wants to give an
answer to your question, I have no objection.

THE WITNESS:  In collaboration with my
finance department and what is acceptable.

MR. FROST:  I just wanted to clarify the
record on that point."

(Aaron deposition, p. 41, 3 – 45, 10 annexed as Exhibit #6

to RSUMF.)

27.    In response to his inquiry to Carrie Evans after receiving the replacement pledge form of October 21, 2005 and noticing that the dates of the installments had been accelerated (we now know, by CFO Heather Aaron), dates which no longer coordinated with the anticipated commencement date of the BMC lease back, Carrie Evans told Avery:

> "Q.    And did she explain why?
>
> A.    When I went into it with her, she said, 'It's out interior – It's not your business.' 'You have your letter.' [referring to the October 21, 2005 comfort letter]
>
> Q.    I think you started to say, "it's for our interior'.  Did you mean 'internal'?
>
> A.    I meant internal.
>
> Q.    What, accounting?
>
> A.    No, she didn't use that word.
>
> Q.    Under the word 'our', you meant BMC, right?
>
> A.    Yeah.  It doesn't involve you is what she said.  I don't remember the exact verbiage, but the context.... Her context was that it doesn't involve you, and we need it for our own issues.
>
> Q.    Did you reflect at that time what the internal issues that could require this pledge to have an earlier first payment date might be?
>
> A.    I went into it with her, pressed her on it, asking her what reason would you need the payments to start before the

18

lease would actually start?  To which
she said that the board needs comfort
that the money would be available when
the lease starts.  To which I said, 'The
lease is not going to start, this
building is not going to be up.'  To
which she said, 'You're not going to
make these payments anyway, you have a
letter stating that.'  And that was that
part of the conversation, something to
that effect.

Q.    So she said, 'You're not going to make
the payments anyway'?

A.    Correct, because the lease is not in
place....The [Board] wanted to make sure
that when they sign on a lease, there
would be money to build out the space."

(Avery deposition at pages 78, 19-81, 8 Exhibit #7 to

RSUMF.)


28.    Admitted that October 14, 2005 pledge with nonexistent

Bayonne Healthcare Development LLC was voided and replaced with

the October 21, 2005 pledge form made by OAM.


29.    Denied.  The applicable accounting standards as well as

common sense dictate that it was impermissible to record the

pledge as income on BMC's 2005 financial statement where the

entire management team including the CFO knew of the comfort

letter assuring Avery the pledge was non-binding, and many on the

management team including BMC's CEO Evans knew the pledge was

conditioned upon and in exchange for performance by BMC of the

leaseback and was for the purpose of funding rent and fit-out

relief on the leaseback.  (For accounting standards, see report

of Frank Monti, CPA,  dated April 25, 2011 annexed as Exhibit #8

to  RSUMF.)


30.  BMC's recording of the pledge as unrestricted,

unconditional income in its 2005 financial statement was done

without knowledge or approval or complicity of Avery.  A

recording of the pledge as income is contrary to common sense and

applicable accounting standards.  See #29 above.


31.  Defendants' have no knowledge and had none then of an

impact of the conditional, nonbinding pledge on "the Hospital's

finances", and nothing has been offered to suggest otherwise.

BMC's accounting/creative accounting was not shared with Avery,

and nothing has been offered nor is there any evidence to suggest

otherwise.  Similarly, no suggestion has been made nor is there

any evidence to support the notion that Avery was aware BMC's

management failed to reveal the "positive financial results" of

the October 2005 report were attributable to the pledge (although

we hasten to observe that Chairman of the Board Herman Brockman

testified that he was aware of the pledge when it was made.  See

Brockman deposition, p. 14, 2-15, 15 annexed as Exhibit #9 to

RSUMF.)

32.   See answer to #31 above.   BMC's accounting and reporting, _vel_ _non_, of sources of income was not shared with Avery, and again nothing has been offered nor is there any evidence to suggest otherwise.   Similarly, no suggestion has been made nor is there any evidence to support the notion that Avery was aware of the reporting.

33.   See answer to #31 above.   It appears from Plaintiffs' #31 that since BMC met its 1.25 debt service coverage ratio ("DSCR") "before the pledge", that the pledge was not necessary for BMC to satisfy that bond covenant and instead boosted DSCR to 1.32, well beyond what was required.   All of this was unknown to Avery, and nothing has been offered and there is no evidence to suggest otherwise.

34.   See answer to #31 above.   All this – CEO Evans' bonus – was unknown to Avery and nothing has been offered and there is no evidence to suggest otherwise.

35.   See answer to #31 above.   All this – CFO Aaron's bonus – was unknown to Avery and nothing has been offered and there is no evidence to suggest otherwise.

36.   Plaintiff claims here that CFO Aaron was unaware of the
October 21, 2005 "non-binding" comfort letter from BMC's CEO
Evans.   That is not accurate.   CEO Evans and Apsel both testified
that they discussed the comfort letter with her, and Carrie Evans
also confirmed that senior management knew of it.

(See Defendants' Motion Brief at pages 15-16 and 19-21 and
27-29 and exhibits referred to therein.)


It is not clear whether BMC' auditors, Withum, Smith & Brown
("WS&B"), were aware of the comfort letter when their audit was
undertaken in February 2006.   Carrie Evans told Avery that she
had given a copy to WS&B (Plaintiffs' Exhibit #3, page 139, 8 to
20 and 155, 21- 156,10).   And Avery had attached the comfort
letter to the October 21, 2005 pledge when he returned it signed
to BMC in October 2005 (Declaration of Avery Eisenreich's in
support of Defendants' Motion).   The pledge produced by
Plaintiffs at Chairman Brockman's 2004 examination, which had to
have come from BMC, was joined by the comfort letter and both the
pledge and comfort letter show staple marks at their upper left
corner).   (RSUMF #10A.)   But, BMC never gave the auditors a copy
of the pledge itself (which had the comfort letter attached).
(Deposition of audit chief James Hannan at page 140, annexed as
Exhibit #10 to RSUMF.)   Instead, of the pledge and attached
comfort letter, BMC provided its auditors with a management

representation letter in April, 2006 that promised that the

pledge was <u>not</u> attended by any assurance that it was non-binding,

<u>i.e.</u> was "collectible". (WS&B answers to interrogatory number

20, Plaintiffs' Exhibit #30; and see the management

representation letter at Plaintiffs' Exhibit #28).


Contrary to the Plaintiffs' claims that Aaron and Paul

Mohrle were unaware of the comfort letter, the cited Exhibits

#29, #3 and #19 merely reiterate Avery's demand for and

acceptance of the comfort letter. Those excerpts do not speak to

the issue of awareness Aaron and Mohrle had of the comfort

letter. As to Aaron's awareness, see #36 above.


37. The first, and most prominent sentence in the comfort

letter assured Avery without ambiguity, condition or

qualification that "While Bayonne Medical Center regards a pledge

as a promise, <u>it is not legally binding</u>". (Emphasis added)

(Plaintiffs' Exhibit #28).


When Avery returned to BMC the signed October 21, 2005

pledge, he attached to it a copy of the October 21, 2005

"nonbinding comfort letter" (Avery's Declaration on Defendants'

motion). At Chairman Brockman's Rule 2004 Examination he was

presented with BMC's copy of the October 21, 2005 pledge which

had the October 21, 2005 comfort letter attached – staple marks on the pledge and comfort letter appear at upper left hand corner of both documents.   (See Exhibit D-19 marked at the 2004 Rule Examination annexed as Exhibit #10A to RSUMF.)

Avery most decidedly did NOT "stipulate in this case that his personal financial circumstances did not change".   The stipulation at Plaintiffs' Exhibit #3 was that other than the BMC cancellation of the leaseback, Avery's personal financial circumstances did not change after October 21, 2005.

> "We will stipulate other than the ipso facto loss of the lease, as that impacts financial circumstances, we will make no claim in this case that Mr. Eisenreich's personal financial circumstances changed."

The leaseback was the quid pro quo for the pledge.   It was cancelled unilaterally by BMC's Chairman of the Board on or about November 29, 2006.   (See Defendants' Motion Brief, pages 23; 25).

38.   The confirmation was given in the context of the presumption the auditors had seen a copy of the comfort letter (because attached to the pledge, probably attached to the confirmation, and according to Carrie Evans had been supplied by her to WS&B); or were otherwise aware of BMC policy not to

enforce pledges, and it was given against the backdrop of Carrie
Evans' March 8, 2006 and March 15, 2006 e-mail solicitations of
the confirmation, referring to the same as "non-binding pledge
confirmation". (Defendants' Motion Brief at pages 7- 8; 13-15;
16-17; 19-21; 26-27; 30-32 and exhibits cited therein; Avery's
Declaration on Defendants' Motion Brief; and #39 below).


Connie Tauber, Avery's assistant, despite Plaintiffs'
contention to the contrary, did refer to herself from time to
time as his "CFO". (Connie Tauber deposition, p. 10-11, annexed
as Exhibit #11 to RSUMF).


39. Avery sent the confirmation, he believes, <u>to BMC</u>, not
WS&B, with comfort letter attached (just as he had attached it to
the October 21, 2005 pledge itself). BMC sent a copy of the
confirmation letter with Avery's signature forged to WS&B, and
that is the confirmation letter in WS&B's file which WS&B says
did not include the comfort letter (no pledge, no comfort letter
says WS&B). Avery had attached a copy of the comfort letter to
the October 21, 2005 pledge when he delivered it to BMC, but BMC
did not give WS&B a copy of the pledge document. And Carrie
assured Avery she had given a copy of the comfort letter to WS&B,
and solicited the confirmation by e-mails referring to the same
as "non-binding pledge confirmation". (Avery's Declaration on

Defendants' Motion; Defendants' Motion Brief, pages 13-32 and

exhibits referred to therein; James Hannan (WS&B) deposition,

page 140 annexed as Exhibit #10 to RSUMF; and see #38 above.)


40.   See response to #39 above.


41.   Avery had no knowledge - and there is no proof to the

contrary - that CEO Evans, CFO Aaron and Director of Finance

Mohrle all knowingly represented to BMC's auditors in their April

2006 management representation (actually dated February 2006)

letter that Omni's pledge was "collectible", _i.e._, did not inform

them therein of the comfort letter or leaseback linkage.


CEO Evans has testified he signed the management

representation letter because Aaron and Mohrle told him he

should, and that he assumed WS&B knew that pledges are non-

binding, even though he characterized the Avery pledge therein as

"collectible". (Robert Evans deposition, p. 89, 14-90, 9; and 98,

12-100,13, annexed as Exhibit #12 to RSUMF.)


42.   The $1,000,000 wire transfer to BMC from Avery's entity

ATE Consulting Co. was a loan, which was solicited by Carrie

Evans to assist BMC funding of infrastructure costs in connection

with its acquisition of the St. Vincent's Hospital, as

established by loan documents, BMC attorneys' preparation of loan

agreement and e-mails.  (See Defendants' Motion Brief, pages 33 –

40 and exhibits referred to therein.)


43.  Despite Plaintiffs' contention to the contrary, then

CFO Mohrle testified he did not know who told him June 2006 to

record the $1 million as a payment against the pledge, that

Carrie Evans told him in June, July or August 2006 it was <u>not</u> a

pledge payment but rather a deposit against the land sale; BMC's

June 2006 accounting entry shows the payment as "Deposit – Omni

Nursing Home" and the June 2006 bank reconciliation also does not

show the payment as a pledge.  Apparently, at some point

thereafter, unknown to Avery, internal BMC accounting reflected

the payment as a pledge payment, but it was <u>reversed to loan</u>

<u>liability November 29, 2006 at the same time the pledge was</u>

<u>reversed and written off, the date Avery and Chairman of the</u>

<u>Board Brockman discussed Brockman's unilateral cancellation of</u>

<u>the leaseback quid pro quo for the pledge.  Two days later,</u>

<u>December 1, 2006, Brockman reported the write off to the Board of</u>

<u>Trustees and in January 2007 told James Lawler the pledge was</u>

<u>written off due to the lease cancellation ("renegotiation of long</u>

<u>term agreement with potential developer").  Brockman instructed</u>

<u>Mohrle to effect the write off</u>.  (Defendants' Motion Brief, pages

23-26 and 39-40 and exhibits referred to therein.)

44. The claim here that the pledge was essential to Omni's selection for the SNF project is denied by top management CEO Evans, COO Apsel, Vice President Carrie Evans, and by Chairman of the Board Brockman. See #23 and #24 above. Omni was selected because it was the only viable candidate, since only Omni possessed the necessary CN. (Defendants' Motion Brief, page 5, footnote #3; and Robert Evans deposition at pages 167-168, annexed as Exhibit #13 to RSUMF; Herman Brockman deposition at pages 36-37, annexed as Exhibit #14 to RSUMF; Marvin Apsel deposition at page 96, annexed as Exhibit #15 to RSUMF.)

45. Agree with characterization of the November-December 2005 LOI. Note <u>the leaseback was a part of the SNF transaction from the start</u>.

46. Agree the November-December 2005 LOI contemplated a partnership in the 100,000+ square foot building Omni was to build on the Bell Street land that would lease to Omni's SNF and two floors to BMC.

47. Agree Avery and BMC each commissioned an appraisal of the Bell Street land.

48.   Agree that BMC's October 17, 2005 appraisal by Adolph Walter purported to value the existing Bell Street building and land at $5.3 million.   CEO Evans testified that Walter was pushed to give a high appraisal, refused to sign off on the appraisal, wouldn't stand behind it, until Apsel twisted his arm.   CEO Evans, Carrie Evans and BMC attorney Robert S. Burney, Esq. all felt the Walter appraisal was "ridiculous" or "crazy" or "plainly wrong".   BMC's appraiser Cushman & Wakefield in November 2006 (Paul Korch) also felt the Walter appraisal was fatally flawed.

Burney and Korch and BMC all agreed valuation should be of vacant land, since the antiquated existing buildings would have to be demolished for the SNF project.   (Carrie Evans deposition, pages 36-37; CEO Evans deposition, pages 39-43; Burney deposition, Volume II, pages 97; 104; 107-110, annexed as Exhibit #16 to RSUMF.)

Cushman & Wakefield (Korch) issued an appraisal report November 22, 2006 valuing the vacant land at $2,000,000, the BMC-Omni contract of sale price.   (Exhibit #17 annexed to RSUMF.)

BMC appraiser Walter agreed the highest and best use for the land was as vacant to be developed for the contemplated SNF building (Walter deposition, pages 44-47, annexed as Exhibit #18

to RSUMF), but BMC chose to have him appraise value based on the existing buildings instead because such an appraisal would cost less. (Walter deposition, pages 12-21, annexed as Exhibit #19 to RSUMF.) Cushman & Wakefield and BMC attorney Burney agreed the appraisal should be of vacant land: the existing buildings had to be demolished, an added expense to purchaser; they were old, useless buildings). (Burney deposition, Volume II, pages 65-69; Korch deposition at p. 23, 8-24, 24 Exhibit #20 annexed to RSUMF.) Walter's appraisal by its terms conceded his valuation based on the replacement cost approach for an 80-90 year old building was very speculative and unreliable. He had done nothing in the report to verify the comparables be used for his capitalized income analysis. And he conceded the appraisal was useless if the existing buildings were to be demolished, as necessary for the SNF project. (Walter deposition pages 12-21; 51-54; 66-71; 100-105; 115, annexed as Exhibit #21 to RSUMF.)

BMC and its attorneys commissioned Cushman & Wakefield to value the Bell Street land before the closing. C&W opined to $2,000,000 value. (Burney deposition, Volume II, pages 53-59, annexed as Exhibit #22 to RSUMF.)

49. The April 6, 2006 Board Minutes reflect authority to enter into a contract with Omni for the SNF project.

The Minutes do <u>not</u> say BMC was to receive any part or percentage of SNF operating revenues, and nowhere else in any document does the 49% figure appear, and the same was never discussed with Avery, with whom as reflected by the LOI the BMC real estate sharing was to be 8%, not 49% (LOI, Exhibit #2 to Defendants' Motion Declaration).

50.   Agree the Board Resolution authorized management to enter contract with Omni.

51.   Agree Aaron resigned as CFO May 2006 and Mohrle replaced her.

52.   On June 8, 2006 Brockman reported to the Board the <u>partnership</u> structure for the SNF project could not work because of the for profit-not for profit mix and had transformed to land sale.  (Defendants' Motion Brief, pages 24-25 and exhibits referred to therein; Exhibit #52 to Defendants' Motion Declaration).

53.   On the same date the Board resolved to sell the Bell Street land at "market value", and by a separate resolution determined to sell to Omni for $2,000,000 with a $500,000 environmental escrow.  (Exhibit #52 to Defendants' Motion

Declaration).  That resolution was prepared by BMC attorney
Robert S. Burney, Esq. and certified by its secretary, Robert
Mill.  It was presented to Avery and his attorney and title
insurance company attached to an affidavit of title at the
December 8, 2006 land sale closing, which Chairman of the Board
Brockman attended.  Brockman signed the Affidavit of Title and
took no exception to it and the attached June 8, 2006 Board
resolution.  (Burney deposition, Volume III, p. 121, 23-123, 24;
and 138, 4-139, 21 annexed as Exhibit #23 to RSUMF.)  And see
September 5, 2006 report of Strategic Planning Committee (of
which Board trustees are members) that Board of Trustees has
authorized the August 24, 2006 contract of sale and August 24,
2006 leaseback.  (Exhibit #24 annexed to RSUMF.)  See also Board
Minutes of August 10, 2006 (SNF deal "moving forward"); and June
12, 2006 Carrie Evans e-mails to BMC attorney Burney outlining
elements of sale and leaseback transaction.  (Exhibit #25 annexed
to RSUMF.)  And see #86 below: Brockman and all Board members
were aware of the $2 million sale price and believed it to be
fair market value.

54.  Denied.  BMC and Omni did not "carry on as partners"
after it was reported by Chairman Brockman June 8, 2006 that they
could not be partners.  Although BMC and Omni continued to share
the goal of Omni's development - alone - of the SNF building, and

32