# EXHIBIT
# #1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

                    Debtor,            :          COPY

BAYONNE MEDICAL CENTER,                :
Debtor and
Debtor-in-Possession; and             :
ALLEN D. WILEN, in his                     DEPOSITION OF:
capacity as Liquidating                :
Trustee and Estate                         AVERY EISENREICH
Representative for the Estate          :
of Debtor, Bayonne Medical                 VOLUME I
Center,                                :   (Pages 1-187)

                    Plaintiff,         :

                    -vs-               :

BAYONNE/OMNI DEVELOPMENT,              :
L.L.C., a New Jersey limited
liability company; et al.,             :

                    Defendants.        :
------------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

MONDAY, JULY 26, 2010, commencing at 11:08 a.m.,

pursuant to Notice.


                    DepoLink
     Court Reporting & Litigation Support Services
        Phone (973) 353-9880     Fax (973) 353-9445
               www.depolinklegal.com

Page 14

1    Q.    And over that 10-year period, did it
2  ever own any real estate?
3    A.    It could have, I don't remember.
4    Q.    Does it have any assets?
5    A.    Yes.
6    Q.    What assets does it have today?
7    MR. GRUEN: I'm going to object and
8  I'm going to object for the following reason. This
9  sounds to me, I can't think of any other rationale
10  for it, as pre-judgment asset discovery, to which of
11  course you're not entitled. As far as I know, and
12  you'll correct me if I'm wrong, no claim has been
13  made in this case against Avery Eisenreich based
14  upon the notion that Omni Asset Management was a de
15  facto agent of his, justifying piercing of the
16  corporate veil. So unless I'm missing something,
17  I'm going to instruct the witness not to answer the
18  question.
19    MR. PIZZI: I do not want to engage
20  in colloquy in the presence of the witness.
21    MR. GRUEN: I can excuse him from the
22  room if you'd like.
23    MR. PIZZI: That's fine. You can
24  step out briefly.
25    (Mr. Eisenreich leaves the deposition

Page 15

1  room.)
2    MR. PIZZI: I have testimony already
3  on the record that the entity is a shell
4  corporation, and I'm entitled to pursue that,
5  because it goes to the circumstances of fraud,
6  dishonesty relating to instruments signed by this
7  person, among other things. I'm just throwing that
8  out off the top of my head. But based upon the
9  testimony we have already, I am entitled to pursue
10  whether this entity had assets at the time Mr.
11  Eisenreich signed the pledge.
12    MR. GRUEN: So here is why I
13  respectfully disagree with you, and we will be
14  respectful of one another. I would agree with you
15  if there were a claim in this case, and there isn't
16  now, and maybe there will be, but at the moment
17  there isn't a claim in this case that an alter-ego
18  corporation was used to defraud creditors, as a
19  result of which the claimant seeks to pierce the
20  corporate veil. If there were such a claim in the
21  case I would have a different approach to this and a
22  different attitude. But there isn't such a claim in
23  this case now.
24    Since there isn't such a claim in this case
25  now, the inquiry as to Omni Asset Management's

Page 16

1  assets can be nothing other than an effort to
2  determine its ability to satisfy a judgment, when
3  and if a judgement is entered, and that, of course,
4  is not something you're entitled to do now.
5    The fact, and it is a fact, that Connie
6  Tauber testified in answer to your question that
7  Omni Asset Management is a shell and that there's a
8  contradiction here in this testimony where this
9  witness has said that Omni Asset Management has or
10  had assets is irrelevant, because as the case is
11  presently structured, you don't have a claim based
12  upon either thin capitalization or de facto agency
13  under the piercing the veil cases. And, therefore,
14  I just don't see that it comes into the case at this
15  point.
16    MR. PIZZI: I'll just state, not to
17  prolong this, I do not have to bring a claim called
18  "alter ego." There is no such claim to bring, as my
19  understanding of the law is. Piercing is a remedy,
20  it is not a claim. You don't bring a claim to
21  pierce or to alter-ego somebody. So I disagree with
22  you, but I'm going to try it one more time, one
23  other way. But if you're going to instruct him,
24  then we'll move on and we'll make a motion.
25    (Mr. Eisenreich returns to the

Page 17

1  deposition room.)
2    Q.    What real estate, if any, has Omni
3  Asset Management, L.L.C. owned at any time?
4    A.    I wouldn't remember.
5    Q.    Do you know for a fact that it ever
6  owned any real estate?
7    A.    I really don't remember.
8    Q.    So you're not able to remember
9  whether it ever owned real estate, correct?
10    A.    I have many entities. Correct, I
11  don't know what it owned.
12    Q.    I'm asking about this one entity,
13  sir.
14    A.    I don't remember.
15    Q.    Can you tell us if it ever owned
16  anything?
17    A.    It owned things.
18    Q.    Can you tell us anything it ever
19  owned?
20    MR. GRUEN: This is where I'm going
21  to reassert the objection and instruct the witness
22  not to answer.
23    Q.    Can you tell us if Omni Asset
24  Management, L.L.C. has a bank account?
25    A.    Yes.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

            Debtor,      :

BAYONNE MEDICAL CENTER,      :
Debtor and
Debtor-in-Possession; and      :
ALLEN D. WILEN, in his                DEPOSITION OF:
capacity as Liquidating      :
Trustee and Estate                    AVERY EISENREICH
Representative for the Estate  :
of Debtor, Bayonne Medical            VOLUME II
Center,                        :      (Pages 188-271)

           Plaintiff,      :

          -vs-      :

BAYONNE/OMNI DEVELOPMENT,      :
L.L.C., a New Jersey limited
liability company; et al.,      :

          Defendants.      :
_____

B E F O R E :

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

WEDNESDAY, JULY 28, 2010, commencing at 10:03 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880     Fax (973) 353-9445
www.depolinklegal.com

Page 197

1    A.    I don't think so.
2    Q.    And it's not accurate to say that
3  Omni Asset Management, L.L.C. manages real estate;
4  is that true?
5        MR. GRUEN:  That's a little bit
6  contorted.
7    Q.    Okay.  Omni Asset Management, L.L.C.
8  does not manage any real estate, correct?
9    A.    It has.  It consulted on those
10  nursing home contracts.  I think it was Omni, I
11  don't remember which entity.  That's all that comes
12  to mind right now.  I'm sure there are other ones.
13    Q.    You said Omni Asset Management
14  consulted on nursing home contracts.  What are you
15  talking about?  Is this the Pope John situation?
16    A.    Correct.
17    Q.    But you said it might have been Omni
18  II, L.L.C., right?
19    A.    I said it might have been.
20    Q.    What year did that take place?
21    A.    '05, '04.
22    Q.    Do you recall testifying in a
23  deposition in another case in Camden County in 2008?
24    A.    Okay.
25    Q.    I'm asking you if you remember

Page 198

1  testifying in 2008 in a case in Camden County?
2    A.    I might have.
3    Q.    Cassabon, does that sound familiar?
4    A.    I remember the name.
5    Q.    Do you remember saying then that Omni
6  Asset Management, L.L.C. never managed real estate?
7    A.    I might have.
8    Q.    Was that true then?
9    A.    I still didn't say it does.  I don't
10  remember which entity it was.
11    Q.    As of 2008 was it a correct statement
12  that Omni Asset Management, L.L.C. does not have
13  anything?
14    A.    As of 2008 forward?
15    Q.    No.  As of that time, 2008.
16    A.    I don't know.
17    Q.    Do you know if Omni Asset Management,
18  L.L.C. had anything in 2008?
19    A.    Yes.
20    Q.    It did?
21    A.    Yes.
22    Q.    What did it have in 2008?
23    A.    Assets.
24    Q.    What assets?
25    A.    Cash.

Page 199

1        MR. GRUEN:  Objection.  Don't answer
2  the question.
3    Q.    I'm going to ask the same question.
4  Did Omni Asset Management have any assets in 2005?
5        MR. GRUEN:  Same objection.
6    Q.    You can answer.
7        MR. GRUEN:  No, I'm directing the
8  witness not to answer the question.
9        MR. PIZZI:  We're going to have to
10  get this resolved, so I think we should call Judge
11  Stern and have this out, because I'm entitled to
12  know what assets Omni Asset Management had in 2005
13  with which to fulfill the pledge.
14        MR. GRUEN:  I'm available.
15        MR. PIZZI:  I think we should go off
16  the record for a minute.
17        (At this point in the proceedings,
18        a brief recess is taken.)
19    Q.    A few more questions about Omni, Mr.
20  Eisenreich.  Why was Omni Asset Management formed?
21    A.    Omni Asset Management was formed,
22  actually, it's the company that negotiates contracts
23  or just negotiates various business deals with
24  potential sellers.  And it's something that the
25  employees know the facilities, that they belong to a

Page 200

1  system.  They know each facility is a standalone
2  facility, but they just belong to a larger group of
3  facilities if they need help.
4    Q.    You said what Omni does is it
5  negotiates various contracts and deals.  So I
6  understand that's what it does or has done.  But my
7  question is when it was formed, why was it formed?
8  Do I understand the second part of your answer to be
9  it was formed so the employees know they're part of
10  a system?
11    A.    No, first it was the first answer.
12    Q.    So it was formed to negotiate various
13  deals and contracts with sellers; is that right?
14    A.    Right.
15    Q.    And was it also formed so employees
16  know they're part of a system?
17    A.    No, that came years later.
18    Q.    And though it negotiates various
19  contracts and deals with sellers, it has no
20  employees and has never entered into a contract with
21  any seller; is that true?
22    A.    No.
23    Q.    What assets has it ever had?
24        MR. GRUEN:  Object to the question.
25  It's the same question that you put before.  I'm

3 (Pages 193 to 196)

Page 193

1  A.  I think it did.
2  Q.  What did it do and for whom?
3  A.  I don't remember what entity. It
4  might have done some consulting services.
5  Q.  You don't know if it was that entity,
6  is that what you're saying?
7  A.  Correct.
8  Q.  So you don't remember if Omni Asset
9  Management rendered any services at any time?
10  A.  It might have done consulting
11  services at the time I said.
12  Q.  But if it never had any employees,
13  tell us how it rendered consulting services?
14  A.  It might not have been that entity, I
15  don't know.
16  Q.  So did you have an entity that
17  rendered consulting services?
18  A.  Yes.
19  Q.  Is that ATE Consulting?
20  A.  No.
21  Q.  What is the entity that renders
22  consulting services?
23  A.  It might have been a different Omni.
24  Q.  Is it an Omni that has jural
25  existence?

Page 194

1  MR. GRUEN: I think you'll explain to
2  the witness what "jural existence" means. He
3  shouldn't be expected to know that.
4  Q.  I thought you might know. Is it an
5  entity that was formed according to the laws of any
6  state?
7  A.  Yes.
8  Q.  What is the name of the entity that
9  you think may have rendered consulting services that
10  you're referring to?
11  A.  Omni II.
12  Q.  Is it Omni t-o-o or Omni II?
13  A.  II.
14  Q.  Is that an L.L.C.?
15  A.  Yes.
16  Q.  When was it formed?
17  A.  I don't know.
18  Q.  Who are the members?
19  A.  I actually don't know.
20  Q.  Are you a member?
21  A.  Yes.
22  Q.  And I take it it has no
23  parent/subsidiary kind of relationship to Omni Asset
24  Management, L.L.C., it's just a different entity; is
25  that right?

Page 195

1  A.  I don't know.
2  Q.  Omni II is not a d/b/a for Omni Asset
3  Management, L.L.C., is it?
4  A.  I don't know. I don't think so.
5  Q.  So at some point Omni II rendered
6  consulting services to someone?
7  A.  I told you, I don't remember if it
8  was Omni Asset or Omni II.
9  Q.  So you don't know if Omni Asset
10  Management rendered consulting services and you're
11  not sure if Omni II rendered consulting services,
12  but they may have?
13  A.  I don't know which one it was.
14  Q.  What consulting services are you
15  talking about?
16  A.  Consulting services to various
17  nursing homes.
18  Q.  Which nursing homes?
19  A.  Pope John Paul Pavilion and Rahway
20  Healthcare.
21  Q.  And what were the nature of those
22  services?
23  A.  Consulting services.
24  Q.  But what were you doing?
25  A.  They were consulting for the

Page 196

1  ownership of those nursing homes, management
2  services. It wasn't management, but consulting to
3  the boards of those facilities.
4  Q.  Consulting to the boards of those
5  facilities in anticipation or in the hope of getting
6  a management arrangement or something else?
7  MR. GRUEN: Object to the form of the
8  question. You can answer if you understand it.
9  A.  I don't know, something else.
10  Q.  Who was doing the actual consulting?
11  A.  Probably I was.
12  Q.  Now, did Omni II have employees?
13  A.  I don't know.
14  Q.  We know Omni Asset Management never
15  had employees, but you don't know if Omni II had
16  employees?
17  A.  Correct.
18  Q.  So let's leave that aside.
19  Now, I may have asked you this, and if I
20  did, I apologize, but perhaps you can help clarify.
21  Has Omni Asset Management, L.L.C. ever owned real
22  estate?
23  MR. GRUEN: The question was asked
24  and answered, so I will object to the form. But if
25  you want him to answer it again he will.

# EXHIBIT
# #2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :

               Debtor,    :    COPY

BAYONNE MEDICAL CENTER,    :
Debtor and
Debtor-in-Possession; and    :
ALLEN D. WILEN, in his
capacity as Liquidating    :    DEPOSITION OF:
Trustee and Estate
Representative for the Estate    :    AVERY EISENREICH
of Debtor, Bayonne Medical
Center,    :    VOLUME I
            (Pages 1-187)

         Plaintiff,    :

       -vs-    :

BAYONNE/OMNI DEVELOPMENT,    :
L.L.C., a New Jersey limited
liability company; et al.,    :

        Defendants.    :
-------------------------------

B E F O R E :

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

MONDAY, JULY 26, 2010, commencing at 11:08 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 42

1    Q.    Do you remember anything else of what
2    was said at that meeting?
3        A.    That's it.
4        Q.    Now, after the meeting did you send a
5    letter?
6        A.    I would assume that was the letter I
7    sent.
8        Q.    Exhibit P-69?
9        A.    Correct.
10       Q.    Now, the first paragraph of this
11   letter appears to provide a, "Brief outline of how I
12   envision a transaction between Bayonne Medical
13   Center and Omni Health Systems of New Jersey." Is
14   Omni Health Systems of New Jersey an entity?
15       A.    It's a d/b/a.
16       Q.    A d/b/a for?
17       A.    Omni Asset Management.
18       Q.    That first paragraph after the
19   introductory paragraph is headlined "Project," and
20   it talks about subdividing an approximately
21   20,000-square-foot site from the current medical
22   center on Broadway frontage for the purpose of
23   building a 120-bed skilled nursing facility, and
24   18,000 square foot of medical diagnostic space to be
25   leased to Bayonne Medical Center. Could you tell us

Page 43

1    how you arrived at that proposal?
2        A.    Putting pieces together from the
3    conversation. They initially assumed it was all one
4    big site, therefore, the 20,000 square feet needed
5    to be subdivided. And piecing together what they
6    needed, I assume, that's the 18,000 square feet of
7    medical diagnostic space.
8        Q.    What do you mean "they needed"?
9        A.    Piecing together parts of their
10   conversation on what they said needed into the long
11   term on a go-forward basis to service the hospital.
12       Q.    So they needed medical diagnostic
13   space, did they tell you that?
14       A.    Correct.
15       Q.    Why did you need to subdivide a
16   20,000-square-foot site?
17       A.    They thought that the Bell building
18   and the other building, I think they called it the
19   Glass building, and the Bell building were one site
20   as part of the hospital site.
21       Q.    So why would you need to subdivide?
22       A.    In order to accomplish this
23   transaction you would need to subdivide it.
24       Q.    In other words, they thought those
25   two buildings were part of the hospital site?

Page 44

1        A.    Correct.
2        Q.    I see. And that turned out not to be
3    the case?
4        A.    Correct.
5        Q.    How did you arrive at the 120-bed
6    figure?
7        A.    It's what I believed the necessity is
8    in that town, that city.
9        Q.    Then you say, "I believe that Omni
10   Asset Management would be the best suited partner
11   for Bayonne Medical Center due to Omni already
12   having over 1,000 patients daily within its
13   healthcare system." Does Omni Asset Management,
14   L.L.C. have a healthcare system?
15       A.    No.
16       Q.    And did it in June of 2005 have a
17   healthcare system?
18       A.    No.
19       Q.    Omni Asset Management, I presume it
20   was not true at the time, in June of 2005, that Omni
21   Asset Management had 1,000 patients?
22       A.    No, it's what that hospital knew us
23   as.
24       Q.    So you must have told them that Omni,
25   in fact, operates a healthcare system, right?

Page 45

1        A.    No.
2        Q.    You say the hospital knew you as Omni
3    having a healthcare system, right?
4        A.    The hospital made a conclusion that
5    Omni had a healthcare system.
6        Q.    And you told them in this letter that
7    Omni had a healthcare system, didn't you?
8        A.    It's what the industry knows a group
9    of facilities as.
10       Q.    Sir, let's get back to the question.
11   You told Mr. Grywalski that Omni had a 1,000-patient
12   healthcare system, correct?
13       A.    No. It says it services 1,000
14   patients daily.
15       Q.    And it does not.
16       A.    Omni itself, okay.
17       Q.    Correct?
18       A.    Okay.
19       Q.    In 2005 it was not servicing 1,000
20   patients, correct?
21       A.    The facilities that Mr. Grywalski
22   knew as Omni serviced over 1,000 patients.
23       Q.    We're not talking about what's in Mr.
24   Grywalski's head, we're talking about what's in your
25   letter.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

                    Debtor,            :          COPY

BAYONNE MEDICAL CENTER,                :
Debtor and
Debtor-in-Possession; and             :
ALLEN D. WILEN, in his                        DEPOSITION OF:
capacity as Liquidating                :
Trustee and Estate                            AVERY EISENREICH
Representative for the Estate          :
of Debtor, Bayonne Medical                    VOLUME II
Center,                                :      (Pages 188-271)

                    Plaintiff,         :

                    -vs-               :

BAYONNE/OMNI DEVELOPMENT,              :
L.L.C., a New Jersey limited
liability company; et al.,             :

                    Defendants.        :
------------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

WEDNESDAY, JULY 28, 2010, commencing at 10:03 a.m.,

pursuant to Notice.


                    DepoLink
    Court Reporting & Litigation Support Services
      Phone (973) 353-9880     Fax (973) 353-9445
              www.depolinklegal.com

4  (Pages 197 to 200)

Page 197

1    A.  I don't think so.
2    Q.  And it's not accurate to say that
3  Omni Asset Management, L.L.C. manages real estate;
4  is that true?
5        MR. GRUEN: That's a little bit
6  contorted.
7    Q.  Okay. Omni Asset Management, L.L.C.
8  does not manage any real estate, correct?
9    A.  It has. It consulted on those
10  nursing home contracts. I think it was Omni, I
11  don't remember which entity. That's all that comes
12  to mind right now. I'm sure there are other ones.
13    Q.  You said Omni Asset Management
14  consulted on nursing home contracts. What are you
15  talking about? Is this the Pope John situation?
16    A.  Correct.
17    Q.  But you said it might have been Omni
18  II, L.L.C., right?
19    A.  I said it might have been.
20    Q.  What year did that take place?
21    A.  '05, '04.
22    Q.  Do you recall testifying in a
23  deposition in another case in Camden County in 2008?
24    A.  Okay.
25    Q.  I'm asking you if you remember

Page 198

1  testifying in 2008 in a case in Camden County?
2    A.  I might have.
3    Q.  Cassabon, does that sound familiar?
4    A.  I remember the name.
5    Q.  Do you remember saying then that Omni
6  Asset Management, L.L.C. never managed real estate?
7    A.  I might have.
8    Q.  Was that true then?
9    A.  I still didn't say it does. I don't
10  remember which entity it was.
11    Q.  As of 2008 was it a correct statement
12  that Omni Asset Management, L.L.C. does not have
13  anything?
14    A.  As of 2008 forward?
15    Q.  No. As of that time, 2008.
16    A.  I don't know.
17    Q.  Do you know if Omni Asset Management,
18  L.L.C. had anything in 2008?
19    A.  Yes.
20    Q.  It did?
21    A.  Yes.
22    Q.  What did it have in 2008?
23    A.  Assets.
24    Q.  What assets?
25    A.  Cash.

Page 199

1        MR. GRUEN: Objection. Don't answer
2  the question.
3    Q.  I'm going to ask the same question.
4  Did Omni Asset Management have any assets in 2005?
5        MR. GRUEN: Same objection.
6    Q.  You can answer.
7        MR. GRUEN: No, I'm directing the
8  witness not to answer the question.
9        MR. PIZZI: We're going to have to
10  get this resolved, so I think we should call Judge
11  Stern and have this out, because I'm entitled to
12  know what assets Omni Asset Management had in 2005
13  with which to fulfill the pledge.
14        MR. GRUEN: I'm available.
15        MR. PIZZI: I think we should go off
16  the record for a minute.
17        (At this point in the proceedings,
18    a brief recess is taken.)
19    Q.  A few more questions about Omni, Mr.
20  Eisenreich. Why was Omni Asset Management formed?
21    A.  Omni Asset Management was formed,
22  actually, it's the company that negotiates contracts
23  or just negotiates various business deals with
24  potential sellers. And it's something that the
25  employees know the facilities, that they belong to a

Page 200

1  system. They know each facility is a standalone
2  facility, but they just belong to a larger group of
3  facilities if they need help.
4    Q.  You said what Omni does is it
5  negotiates various contracts and deals. So I
6  understand that's what it does or has done. But my
7  question is when it was formed, why was it formed?
8  Do I understand the second part of your answer to be
9  it was formed so the employees know they're part of
10  a system?
11    A.  No, first it was the first answer.
12    Q.  So it was formed to negotiate various
13  deals and contracts with sellers; is that right?
14    A.  Right.
15    Q.  And was it also formed so employees
16  know they're part of a system?
17    A.  No, that came years later.
18    Q.  And though it negotiates various
19  contracts and deals with sellers, it has no
20  employees and has never entered into a contract with
21  any seller; is that true?
22    A.  No.
23    Q.  What assets has it ever had?
24        MR. GRUEN: Object to the question.
25  It's the same question that you put before. I'm

# EXHIBIT
# #3

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

1

```
 1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEW JERSEY
 2                  CASE NO. 07-15195(MS)
                         CHAPTER 11
 3
        In re BAYONNE MEDICAL CENTER,    :
 4
                        Debtor,          :
 5
        ALLEN D. WILEN,                       DEPOSITION OF:
 6
                        Plaintiff,       :   HEATHER J. AARON
 7
                        -vs-             :
 8
        BAYONNE/OMNI DEVELOPMENT,        :
 9      LLC, et al.,                     :
10                      Defendants.
        -----------------------------
11

12

13      B E F O R E:

14          SHARON B. STOPPIELLO, a Certified Court

15      Reporter and Notary Public of the State of New

16      Jersey, at the offices of DRINKER, BIDDLE & REATH,

17      L.L.P., 500 Campus Drive, Florham Park, New Jersey,

18      on MONDAY, APRIL 12, 2010, commencing at 11:11 a.m.,

19      pursuant to Notice.

20

21

22

23                      DepoLink
24      Court Reporting & Litigation Support Services
              Phone (973) 353-9880    Fax (973) 353-9445
25                  www.depolinklegal.com
```

DepoLink Court Reporting & Litigation Support Services (973)

2

```
 1   A P P E A R A N C E S:
```
                         Page 1

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

10      Q.      Did there come a time while you were

11  still there that two vendors were the leading

12  contenders for this skilled nursing facility?

13      A.      I remember Omni being a leading

14  contender.

15      Q.      Did you understand that both Omni and

16  CareOne were solicited to pledge financial

17  contributions to Bayonne Medical Center?

18      A.      Yes.

19      Q.      And you don't know whether CareOne

20  actually came through with a pledge, is that your

21  recollection?

22      A.      I don't recall that.

23      Q.      We know that Omni came through with a

24  pledge, correct?

25      A.      Yes.


DepoLink Court Reporting & Litigation Support Services (973)

353-9880
[]

Heather Aaron - Cross/Pizzi          82

1       Q.      Do you know the fact or the role that

2   played in the decision-making as Omni became the

3   leading contender?

4           MR. GRUEN:  Objection to form, no

5   foundation.

6       A.      Can you explain what you mean?

7       Q.      Sure.  Was the fact that Omni made

8   this pledge a factor in its selection?

9       A.      I believe so, yes.

10      Q.      Did Mr. Evans say that to you in

11  words or substance?

12      A.      No.
                        Page 75

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

13    Q.    But you had that sense while you were

14    there?

15    A.    I think everybody did.

16    Q.    Now I'm going to show you a couple of

17    documents. Mr. Gruen asked you questions about

18    Exhibit Brockman-2, which is a confidential pledge

19    form dated October 14, 2005. Do you see that?

20    A.    Yes.

21    Q.    And the maker of the pledge appears

22    to be something called Bayonne Healthcare

23    Development, L.L.C., right?

24    A.    Yes.

25    Q.    And then he showed you also a

DepoLink Court Reporting & Litigation Support Services (973)

353-9880
☐

Heather Aaron - Cross/Pizzi          83

1    document that's part of Brockman Exhibit 1, and also

2    Lombardo Exhibit 1, which is a confidential pledge

3    form dated October 21, 2005, and the maker is Omni

4    Asset Management, right?

5    A.    Yes.

6    Q.    And neither of these documents in the

7    form in which they appear, signed, et cetera, you

8    saw while you were employed with Bayonne Medical

9    Center; is that true?

10    A.    I don't recall.

11    Q.    You don't recall either way?

12    A.    No.

13    Q.    I think you gave testimony about the

14    process by which D-22 was prepared.

Page 76

# EXHIBIT
## #4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,         :

          Debtor,         :      COPY

BAYONNE MEDICAL CENTER,               :
Debtor and
Debtor-in-Possession; and             :
ALLEN D. WILEN, in his                     DEPOSITION OF:
capacity as Liquidating               :
Trustee and Estate                         AVERY EISENREICH
Representative for the Estate         :
of Debtor, Bayonne Medical                  VOLUME I
Center,                               :     (Pages 1-187)

          Plaintiff,      :

       -vs-                          :

BAYONNE/OMNI DEVELOPMENT,             :
L.L.C., a New Jersey limited
liability company; et al.,            :

         Defendants.       :
------------------------------------

B E F O R E :

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

MONDAY, JULY 26, 2010, commencing at 11:08 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 62

1    A.    I assume I did.  I never really
2  stayed in the hospital for a long period of time.
3    Q.    Now, did she give you any pieces of
4  paper when you had this meeting?
5    A.    She probably gave me this paper.
6    Q.    She probably gave you Exhibit P-70,
7  is that what you're saying?
8    A.    Correct.
9    Q.    Whose handwriting is on the document
10  other than your signature next to the word
11  "Signature"?
12    A.    I assume it's hers or someone from
13  her staff.
14    Q.    So when she gave you P-70 it had some
15  handwriting already in it, right?
16    A.    That's correct.  It's not me.
17    Q.    Was there any conversation between
18  you and Ms. Evans where the number $5,000,000 was
19  discussed?
20    A.    It was really a component of my $35 a
21  square foot for shell space was at the top end of
22  the market.  I had to give them some type of
23  buildout allowance, and I had to give them some type
24  of rent abatement in order to get on their feet.
25  40,000 square feet, my income was about 1.4 million

Page 63

1  for my lease, and that gave them the ability to do
2  it.
3    Q.    You've just told us your explanation
4  for how you get the $5,000,000; is that right?
5    A.    Correct.
6    Q.    Did she say anything to you about the
7  $5,000,000?
8    A.    She said something to the effect that
9  it will cost them at least $100 a square foot to
10  buildout.
11    Q.    So this is something in the meeting
12  that she said to you that you now recall, right?
13    A.    With respect to the buildout and the
14  rent abatement.
15    Q.    So she said it's going to cost $100 a
16  square foot to build out; is that right?
17    A.    Approximately.
18    Q.    How does that connect to the
19  $5,000,000 figure that's on Exhibit P-70?
20    A.    It's $4,000,000, plus the rent
21  abatement.
22    Q.    So 40,000 square feet is two floors
23  of 20,000 square feet?
24    A.    Correct.
25    Q.    And so you say Ms. Evans came up with

Page 64

1  this $100 a square foot?
2    A.    Estimation.
3    Q.    The answer is yes, she did?
4    A.    Oh, yes, it was a $100 estimation.
5    Q.    And did she use the word "rent
6  abatement"?
7    A.    I don't know if she used the word
8  "rent abatement."  She said the hospital is not
9  going to be generating revenue from those floors
10  while building it out.  I think my lease called for
11  rent to start immediately.  And she was telling me
12  something to the effect of once they even build it
13  out, until they start generating some revenue.
14    Q.    You said your lease called for rent
15  to start immediately.  You didn't have a lease
16  drafted as of October 14, 2005, did you?
17    A.    No.  But it's what the conversation
18  was that my lease would require.
19    Q.    What conversation?
20    A.    When I was talking to Marv Apsel or
21  anybody else, I said to them many times that my
22  lease would start immediately.  It's the only way I
23  would be able to cover my debt service on the
24  building.
25    Q.    So she handed you P-70, as you

Page 65

1  recall, during that meeting?
2    A.    I don't remember.
3    Q.    So she may or may not have handed you
4  P-70 during the meeting?
5    A.    She could have.
6    Q.    And you say all this conversation
7  about the cost of building out space, all that took
8  place in the conversation with Carrie Evans on or
9  about October 14, 2005, or preceding October 15th,
10  2005?
11    A.    The same time frame as the pledge, so
12  it's in that area.
13    Q.    Anything else come up in this
14  conversation that you're telling us led to Exhibit
15  P-70?
16    A.    A big part of the conversation was
17  what comfort do I have if the lease doesn't get
18  signed.
19    Q.    And what did she say?
20    A.    To which she said we don't enforce
21  pledges, they're none binding, she carried on about
22  that for a while.  And then I said, "Get me a letter
23  from the hospital that it's unenforceable."
24    Q.    Now, as I understand it, you're
25  saying she wanted this pledge of money so the

**ALFRED I. BERNSTEIN**
*Attorney At Law*
76 South Orange Avenue
Suite 105
South Orange, New Jersey 07079
(973) 761-0300
FAX (973) 761-1424

April 4, 2011

Peter J. Pizzi, Esq.                          Fred R. Gruen, Esq.
Connell Foley                                  Gruen & Gruen
888 Seventh Avenue                     1150 West Chestnut Street
New York, New York 10106           P.O. Box 1553
                                                      Union, New Jersey 07083

Re: Bayonne Medical Center - Eisenreich

Gentlemen

    I am writing to advise you that Mr. Apsel whishes to correct an error in his testimony at the time of his deposition on October 14, 2010.   His testimony was conflicting as to whether Mr. Eisenreich had filled in the pledge form in his presence or that Mr. Eisenreich signed it in blank.

    After much thought during the weeks and months since his deposition Mr. Apsel has come to the conclusion that the correct sequence of events was that Mr. Eisenreich signed the pledge form in blank saying to Mr. Apsel that "you guys can fill out the rest." Furthermore, upon Mr. Eisenreich leaving the meeting with Mr. Apsel he requested that Mr. Apsel secure him the letter from Robert Evans with regard to the pledge not being legally binding upon him.

    Mr. Apsel further recollects that he gave the signed pledge form to Robert Evans, who then, with Mr. Apsel following along, took the pledge form to Heather Arron.  Mr. Apsel recalls that Ms. Arron then filled out the pledge form.

    Given the separation of time from the to the taking of Mr. Apsel's deposition, he now believes that the above information is the accurate account of what transpired.

    On behalf of Mr. Apsel I ask that you accept his apology for any inconvenience he may have caused.

Very truly yours,

Alfred I. Bernstein

cc: Marvin Apsel

# EXHIBIT
## #5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195 (MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,　　　:

　　　　　　　　Debtor,　　　　　　　:　　COPY

BAYONNE MEDICAL CENTER,　　　　　　:
Debtor and
Debtor-in-Possession; and　　　　:
ALLEN D. WILEN, in his　　　　　　　　DEPOSITION OF:
capacity as Liquidating　　　　　　:
Trustee and Estate　　　　　　　　　AVERY EISENREICH
Representative for the Estate　　:
of Debtor, Bayonne Medical　　　　　　VOLUME I
Center,　　　　　　　　　　　　　　:　　(Pages 1-187)

　　　　　　　　Plaintiff,　　　　　:

　　　　　　　　-vs-　　　　　　　　:

BAYONNE/OMNI DEVELOPMENT,　　　　　:
L.L.C., a New Jersey limited
liability company; et al.,　　　　:

　　　　　　　　Defendants.　　　　　:
----------------------------------

B E F O R E:

　　　　SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

MONDAY, JULY 26, 2010, commencing at 11:08 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880     Fax (973) 353-9445
www.depolinklegal.com

Page 82

1    cost and rent abatement for the lease.
2        Q.    Right. And the lease was part of the
3    transaction, right?
4        A.    There was two separate parts of the
5    transaction. There were a couple of components, a
6    couple of deals I was doing with them at the time
7    that ended up evolving, but the lease was one of
8    them, yes.
9        Q.    The pledge was entered into in order
10   to make the lease component fly; is that right?
11       A.    Sure. The pledge component gave the
12   hospital the ability to build out the space, occupy
13   the space, and not lose money on it for the first
14   year or two.
15       Q.    And the lease was part of making the
16   whole transaction fly, right?
17       A.    No.
18       Q.    Didn't you want the hospital to lease
19   space in order for you to recoup the costs of
20   developing the site?
21       A.    It would have been an added benefit.
22   It's not something that I have in other facilities.
23       Q.    So it wasn't a significant part of
24   this transaction?
25       A.    Evidenced by I closed without it, so

Page 83

1    how significant could it have been?
2        Q.    Now, Exhibit P-62 --
3        THE WITNESS:    Do we get a coffee
4    break, by the break, at any time? No pressure, I'm
5    just curious.
6        MR. PIZZI:    I'm willing to do
7    whatever you want in terms of a break.
8        THE WITNESS:    I don't need a break.
9    Just tell me when I could look forward to a coffee.
10       MR. PIZZI:    Off the record.
11       (At this point in the proceedings,
12   a lunch recess is taken, whereupon a letter
13   dated 2/12/09 from Richard B. Honig to
14   Stephen V. Falanga and an e-mail dated
15   2/13/09 from Barbara Johnson on behalf of
16   Richard B. Honig to Avery Eisenreich and
17   Fred Gruen are received and marked P-77 and
18   P-78 for identification by the Reporter.)
19       MR. PIZZI:    It's 1:57, we're back on
20   the record.
21       Q.    You told us that you signed the
22   document marked as P-70 and delivered that back to
23   Ms. Evans, right?
24       A.    Correct.
25       Q.    And that's the October 14th pledge.

Page 84

1    And then afterwards you heard from her that the
2    dates were wrong, right?
3        A.    Correct.
4        Q.    When you signed it and returned it to
5    Ms. Evans, you don't know how you did that, right,
6    you don't recall how that took place?
7        A.    I don't remember.
8        Q.    You don't remember if it was mailed
9    or if it was personally delivered or even delivered
10   the day of its date, October 14, 2005, right?
11       A.    It wasn't done on October 14, 2005.
12   That was probably the day I got it.
13       Q.    It was signed after you got the
14   comfort letter, which we're going to talk about in a
15   minute, Exhibit P-62, right?
16       A.    Correct.
17       Q.    And that document has a date of
18   October 21, 2005. Do you know if you got the
19   comfort letter after or on the date it was dated?
20       A.    I don't remember, but I know I got
21   the letter before I signed the first pledge.
22       Q.    In any event, you signed the first
23   pledge, you gave it to Ms. Evans or got it to her in
24   some way, and you signed it under the name of an
25   entity that did not exist, correct?

Page 85

1        A.    Correct.
2        Q.    And even though you knew the entity
3    did not exist, you still signed it, right?
4        A.    No, I didn't realize it was the wrong
5    entity.
6        Q.    You thought you may have formed an
7    entity called Bayonne Healthcare Development,
8    L.L.C.?
9        A.    No. I actually thought it was the
10   entity that was going to purchase the land from the
11   hospital.
12       Q.    This was the entity that was to be
13   the joint venture between the hospital and you?
14       A.    Correct, or the purchaser of the
15   land, right.
16       Q.    So you thought the entity that was
17   going to be the obligor on this pledge was actually
18   going to be an entity that the hospital would have
19   an interest in, is that what you're telling us?
20       A.    Okay, you can look at it that way,
21   but I wasn't thinking of it that way at all.
22       Q.    Well, back in June of 2005 you talk
23   about an entity holding the real estate in which the
24   hospital would have an interest, right?
25       A.    Correct.

# EXHIBIT
# #6

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

1

```
 1              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF NEW JERSEY
 2                 CASE NO. 07-15195(MS)
                        CHAPTER 11
 3
      In re BAYONNE MEDICAL CENTER,   :
 4
                      Debtor,         :
 5
      ALLEN D. WILEN,                 :
 6                                       DEPOSITION OF:
                      Plaintiff,      :
 7                                       HEATHER J. AARON
                      -vs-            :
 8
      BAYONNE/OMNI DEVELOPMENT,       :
 9    LLC, et al.,
                                      :
10                    Defendants.
      ------------------------------------
11

12

13    B E F O R E:

14        SHARON B. STOPPIELLO, a Certified Court

15    Reporter and Notary Public of the State of New

16    Jersey, at the offices of DRINKER, BIDDLE & REATH,

17    L.L.P., 500 Campus Drive, Florham Park, New Jersey,

18    on MONDAY, APRIL 12, 2010, commencing at 11:11 a.m.,

19    pursuant to Notice.

20

21

22

23                       DepoLink
24      Court Reporting & Litigation Support Services
            Phone (973) 353-9880    Fax (973) 353-9445
25                  www.depolinklegal.com
```

DepoLink Court Reporting & Litigation Support Services (973)

353-9880

2

```
 1    A P P E A R A N C E S:
```

Page 1

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

2        A.      The question is understandable for

3    the 5,000,000 of unrestricted. But you're asking me

4    to give an answer for something that has to be

5    standard. In order for me to book $5,000,000, the

6    million has to come in June 1.

7              MR. FROST: Heather, I'm going to

8    instruct you to listen to his question very

9    carefully and answer the question he's asking. But

10   just let me him reask it and answer the question

11   he's asking.

12       Q.      Maybe I can ask it a different way

13   and it will make you more comfortable.

14       A.      No, I'll answer your question from

15   the best I can remember.

16             MR. FROST: Heather, please stop.

17   There's no question pending. Please don't answer

18   anything that's not pending. Listen to his question

19   and only answer what he asks.

20             THE WITNESS: Okay.

21       Q.      Was Robert Evans also the source of

22   the information for the installment payment dates

23   that are set forth on this document?

24       A.      No.

25       Q.      Did you discuss with Robert Evans the

DepoLink Court Reporting & Litigation Support Services (973)

353-9880
U

Heather Aaron - Direct/Gruen          41

1    payment dates that are set forth on this document?

2        A.      Yes.

3        Q.      Did you discuss with Robert Evans

4    before this confirmation letter was sent to Omni the

Page 37

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

5    installment payment dates that are shown in this

6    letter?

7         A.     Yes.

8         Q.     Did you discuss with anyone other

9    than Robert Evans the installment dates that are set

10   forth in this letter?

11        A.     Yes, the entire accounting

12   department.

13        Q.     That's what I wanted to get to.  That

14   would include Mr. Olson; is that correct?

15        A.     Mr. Olson is with Withum, Smith &

16   Brown.

17        Q.     Oh, when you say the "accounting

18   department" --

19        A.     I mean Paul Mohrle and his staff.

20        Q.     I beg your pardon.

21   So what did you discuss with Paul Mohrle and

22   his accounting staff with respect to the installment

23   payment dates that are shown in this letter?

24        A.     The correct accounting procedure

25   necessary to collect these funds and when they would

DepoLink Court Reporting & Litigation Support Services (973)

353-9880
ᴰ

Heather Aaron - Direct/Gruen        42

1    have to be due.  That's what I'm talking about, the

2    $5,000,000 and the dates.

3         Q.     So what, if anything, did Mohrle say

4    about the dates that had to be shown on here in

5    order to serve your accounting purposes?

6         A.     These were the dates that needed to

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

7   be documented for the dollars.  These are the dates

8   that we needed to collect the funds in order to have

9   it correctly booked.

10          Q.     What does "correctly booked" mean?

11          A.     May I give an example?  "Correctly

12   booked" means that for 2005 we have a pledge that

13   came in.  In order to book the dollars as a

14   receivable in 2005, the cash must shortly follow,

15   before the end of the preceding year, or else you

16   cannot recognize it on your books.

17          Q.     By "the cash," you mean the entire

18   pledge or a part of the pledge?

19          A.     A part of it.  You know, it's over a

20   period of time.

21          Q.     So the dates that were reflected in

22   this letter resulted from a conversation that you

23   had with Mohrle?

24          A.     The dates here?

25          Q.     Yes.


DepoLink Court Reporting & Litigation Support Services (973)

353-9880
[]

Heather Aaron - Direct/Gruen          43


1          A.     Yes.

2          Q.     And it was he, then, who told you

3   what dates should show on the confirmation letter?

4          A.     He did.  The year-end audit was being

5   done, the accounting, Withum, Smith & Brown,

6   everybody discussed what should be the appropriate

7   collection of these dollars.

8                 MR. FROST:  Again, Heather, listen

9   very carefully to his question.

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

10        Q.        So who at WSB did you discuss these

11    installment payment dates as reflected on this

12    letter?

13        A.        Mr. Olson.

14        Q.        Anyone else?

15        A.        Not that I know of.

16                  MR. PIZZI:  Just to clarify for the

17    record, the name is Oster.

18                  THE WITNESS:  Oster.

19                  MR. PIZZI:  According to Exhibit P-22

20    to the Brockman deposition.  We might as well start

21    using the correct name, if that's it.  The bottom

22    left-hand corner, William Oster.  You have it right

23    there.  After signing and dating your reply.

24                  THE WITNESS:  Yes.

25                  MR. PIZZI:  Thank you.


      DepoLink Court Reporting & Litigation Support Services (973)

353-9880

                  Heather Aaron - Direct/Gruen          44

1                   MR. FROST:  Just to clarify --

2                   THE WITNESS:  Just to make sure who

3     we're talking about.

4                   MR. FROST:  -- the person we have

5     been identifying as "Olson" is Oster.

6                   THE WITNESS:  Yes, O-s-t-e-r.

7         Q.        So tell me everything you can

8     remember about your conversations with William Oster

9     with respect to setting forth these installment

10    payment dates on this letter.

11        A.        We had a conversation where we

                        Page 40

Bayonne Medical Center v Omni-Aaron 4-12-10.txt

12    verified that this is when we expected the dollars

13    to come in, and this is what's being sent out to be

14    verified by Omni.

15        Q.    Upon what did you base your

16    expectation that these were the dates that the

17    payments were going to be coming in?

18        A.    Based on what's acceptable through

19    the accounting process.

20        Q.    And nothing else?

21        A.    Nothing else.

22        MR. FROST:  Fred, do you mind if I

23    ask a quick question here to help?  I think I can

24    get you what you're looking for.

25        MR. GRUEN:  Okay.

DepoLink Court Reporting & Litigation Support Services (973)

353-9880

Heather Aaron - Direct/Gruen      45

1        MR. FROST:  Who actually came up with

2    these dates?  Where did these particular dates came

3    from?

4        MR. GRUEN:  I think the witness has

5    already answered that, but if she wants to give an

6    answer to your question, I have no objection.

7        THE WITNESS:  In collaboration with

8    my finance department and what is acceptable.

9        MR. FROST:  I just wanted to clarify

10    the record on that point.

11        Q.    The second page of this letter that

12    we're looking at now, D-22, do you remember seeing

13    this before today?

14        MR. FROST:  Again, I instruct her not

# EXHIBIT
# #7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,   :

          Debtor,   :

BAYONNE MEDICAL CENTER,   :
Debtor and
Debtor-in-Possession; and   :
ALLEN D. WILEN, in his
capacity as Liquidating   :
Trustee and Estate
Representative for the Estate   :
of Debtor, Bayonne Medical
Center,   :

        Plaintiff,   :

      -vs-   :

BAYONNE/OMNI DEVELOPMENT,   :
L.L.C., a New Jersey limited
liability company; et al.,   :

      Defendants.   :
------------------------------

**COPY**

DEPOSITION OF:

AVERY EISENREICH

VOLUME I
(Pages 1-187)

B E F O R E :

    SHARON B. STOPPIELLO, a Certified Court
Reporter and Notary Public of the State of New
Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,
1150 West Chestnut Street, Union, New Jersey, on
MONDAY, JULY 26, 2010, commencing at 11:08 a.m.,
pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880     Fax (973) 353-9445
www.depolinklegal.com

Page 82

1    cost and rent abatement for the lease.
2        Q.    Right. And the lease was part of the
3    transaction, right?
4        A.    There was two separate parts of the
5    transaction. There were a couple of components, a
6    couple of deals I was doing with them at the time
7    that ended up evolving, but the lease was one of
8    them, yes.
9        Q.    The pledge was entered into in order
10    to make the lease component fly; is that right?
11        A.    Sure. The pledge component gave the
12    hospital the ability to build out the space, occupy
13    the space, and not lose money on it for the first
14    year or two.
15        Q.    And the lease was part of making the
16    whole transaction fly, right?
17        A.    No.
18        Q.    Didn't you want the hospital to lease
19    space in order for you to recoup the costs of
20    developing the site?
21        A.    It would have been an added benefit.
22    It's not something that I have in other facilities.
23        Q.    So it wasn't a significant part of
24    this transaction?
25        A.    Evidenced by I closed without it, so

Page 83

1    how significant could it have been?
2        Q.    Now, Exhibit P-62 --
3        THE WITNESS: Do we get a coffee
4    break, by the break, at any time? No pressure, I'm
5    just curious.
6        MR. PIZZI: I'm willing to do
7    whatever you want in terms of a break.
8        THE WITNESS: I don't need a break.
9    Just tell me when I could look forward to a coffee.
10        MR. PIZZI: Off the record.
11        (At this point in the proceedings,
12    a lunch recess is taken, whereupon a letter
13    dated 2/12/09 from Richard B. Honig to
14    Stephen V. Falanga and an e-mail dated
15    2/13/09 from Barbara Johnson on behalf of
16    Richard B. Honig to Avery Eisenreich and
17    Fred Gruen are received and marked P-77 and
18    P-78 for identification by the Reporter.)
19        MR. PIZZI: It's 1:57, we're back on
20    the record.
21        Q.    You told us that you signed the
22    document marked as P-70 and delivered that back to
23    Ms. Evans, right?
24        A.    Correct.
25        Q.    And that's the October 14th pledge.

Page 84

1    And then afterwards you heard from her that the
2    dates were wrong, right?
3        A.    Correct.
4        Q.    When you signed it and returned it to
5    Ms. Evans, you don't know how you did that, right,
6    you don't recall how that took place?
7        A.    I don't remember.
8        Q.    You don't remember if it was mailed
9    or if it was personally delivered or even delivered
10    the day of its date, October 14, 2005, right?
11        A.    It wasn't done on October 14, 2005.
12    That was probably the day I got it.
13        Q.    It was signed after you got the
14    comfort letter, which we're going to talk about in a
15    minute, Exhibit P-62, right?
16        A.    Correct.
17        Q.    And that document has a date of
18    October 21, 2005. Do you know if you got the
19    comfort letter after or on the date it was dated?
20        A.    I don't remember, but I know I got
21    the letter before I signed the first pledge.
22        Q.    In any event, you signed the first
23    pledge, you gave it to Ms. Evans or got it to her in
24    some way, and you signed it under the name of an
25    entity that did not exist, correct?

Page 85

1        A.    Correct.
2        Q.    And even though you knew the entity
3    did not exist, you still signed it, right?
4        A.    No, I didn't realize it was the wrong
5    entity.
6        Q.    You thought you may have formed an
7    entity called Bayonne Healthcare Development,
8    L.L.C.?
9        A.    No. I actually thought it was the
10    entity that was going to purchase the land from the
11    hospital.
12        Q.    This was the entity that was to be
13    the joint venture between the hospital and you?
14        A.    Correct, or the purchaser of the
15    land, right.
16        Q.    So you thought the entity that was
17    going to be the obligor on this pledge was actually
18    going to be an entity that the hospital would have
19    an interest in, is that what you're telling us?
20        A.    Okay, you can look at it that way,
21    but I wasn't thinking of it that way at all.
22        Q.    Well, back in June of 2005 you talk
23    about an entity holding the real estate in which the
24    hospital would have an interest, right?
25        A.    Correct.