# EXHIBIT
# #8

# Expert Report
## of
## Frank A. Monti, CPA, DABFE

## Kahn, Litwin, Renza & Co., Ltd.

## April 25, 2011

Kahn, Litwin, Renza & Co., Ltd.
Providence • Boston • Waltham • Newport

951 North Main Street, Providence, Rhode Island 02904
Phone: 401-274-2001 • Fax: 401-831-4018
Email: TrustedAdvisors@KahnLitwin.com • www.KahnLitwin.com



*Certified Public Accountants*
*and Business Consultants*

## Contents:

**Expert's Retention, Background and Experience and Information Considered**

Expert's Retention ............................................................................................. 1

Background and Experience of Expert .......................................................... 1

Information Considered by Expert ................................................................. 2

**Overview of My Opinion**

Impropriety of Recording the Pledge as Revenue ........................................ 3
Inadequacy of the Audit Process

**Background of the Case**

Bayonne Medical Center (BMC) ................................................................... 4

Background of the $5 Million Pledge ............................................................ 5

**Accounting Analysis**

Relevant Accounting Standards ..................................................................... 11

Discrepancies in the Depositions
Who Solicited the Pledge? .............................................................................. 11
Discrepancy Regarding Signature on the Pledge Audit Confirmation
Form. .................................................................................................................. 12
$1 Million Wire Transfer Received from Omni in June 2006 .................... 12

Conclusion ......................................................................................................... 12
Impropriety of Recording the Pledge as Revenue ...................................... 13
Inadequacy of the Audit Process .................................................................. 17

**Exhibit 1**
Expert's Resume .............................................................................................. 23

**Exhibit 2**
Documents and Other Resources Examined .............................................. 28

*Member of The Leading Edge Alliance*



## Expert's Retention, Background and Experience and Information Considered

### Expert's Retention

I have been retained by Fred Gruen, Esq. (Gruen & Goldstein), counsel for Avery Eisenreich, in regard to litigation involving Bayonne Medical Center ("BMC" or the "Hospital"), and Bayonne/Omni Development LLC, among others to evaluate and opine on the appropriate accounting pursuant to Generally Accepted Accounting Principles ("GAAP") for a pledge of $5 million to BMC.

I have not been retained to perform an audit, review, or compilation of the financial statements or their components that are the subject of the litigation and this report. As such, this report and my opinions herein are specific to the issue identified above.

I currently expect to state the opinions set forth in this expert's report at trial. This report is based on the evidence I have been provided to date. I reserve my right to revise my opinions as additional information becomes available, including any additional expert reports.

Kahn, Litwin, Renza & Co., Ltd. (KLR) is being compensated at a rate of $400 per hour for my services. KLR is also being compensated for the services of its professional staff assisting me at hourly rates ranging from $225 to $400 per hour. In determining KLR fees, actual hours expended are multiplied by each professional's applicable hourly billing rate. KLR fees are not contingent upon the results of this matter.

### Background and Experience of the Expert

I am a Principal (a non-equity partner) at Kahn, Litwin, Renza & Co., Ltd. and a co-director of the firm's not-for-profit specialty group. I received a Bachelor of Science degree with a major in Accounting from Providence College. I am a Certified Public Accountant licensed in the States of Rhode Island and Maryland. I am a Board Certified Forensic Examiner and have been awarded Diplomat status from the American College of Forensic Examiners. I am a past board member of the American College of Forensic Accountants.

I have concentrated my public accounting practice in tax-exempt organizations since 1981. I am on the faculty of the Boston Tax Institute and a past instructor for the American Institute of Certified Public Accountants teaching courses for Certified Public Accountants on subjects specific to not-for-profit accounting and the taxation of tax-exempt organizations. I am a past faculty member of Providence College and Brown University teaching accounting related subjects. I currently teach an online accounting course at Bryant University. I also conduct seminars for the Rhode Island Foundation in their *Initiative for Non-Profit Excellence* program.

1



I have more than 40 years experience in public accounting, including performing audits of a wide variety of tax-exempt organizations, such as colleges, hospitals, associations, membership organizations, charities, social service agencies, health and human service agencies, United Way agencies and professional organizations. I have significant expertise advising organizations and other Certified Public Accountants on accounting and financial reporting issues unique to the not-for-profit industry. A copy of my resume is attached to this report as Exhibit 1.

**Admitted as an Expert Witness in Financial Areas**

Rhode Island Family Court
1995   Justice Bedrosian
1995   Justice Lipsey
1994   Chief Justice Jeremiah

US District Court
1993   Justice Torres

**Information Considered by Expert in
The Preparation of This Report**

In Exhibit 2 to this report, I identify the documents and other resources I have considered in preparing this report. I may revise my opinions as additional documents and information become available. I have examined any and all materials that I deemed appropriate for the development of my opinions, including publicly available materials. In addition, I have researched accounting and financial reporting standards.



## Overview of My Opinion

Based on the work I have performed to date and as more fully described in this report, my findings and opinions include the following:

Impropriety of Recording the Pledge as Revenue:

1. The $5 million pledge received by Bayonne Medical Center (BMC) from Avery Eisenreich on behalf of Omni Asset Management was not properly recorded as revenue when it was initially received during 2005.

Inadequacy of the Audit Process:

2. Circumstances surrounding the transaction should have led the auditors to conduct additional audit procedures and expand their examination of the transaction. Had they done so, it is my opinion that this would have led them to the conclusion that this was not a contribution as defined by Generally Accepted Accounting Principles (GAAP) and the recording error would have been corrected.



## Background of the Case

### A. BAYONNE MEDICAL CENTER (BMC)

During the time period pertinent to this matter (January 1, 2005 through February 22, 2006 – the date of the auditors' report on the BMC financial statements as of and for the year ended December 31, 2005), BMC was a New Jersey not-for-profit corporation that operated a 278-bed, fully accredited, acute-care hospital located in Hudson County.

Due to financial challenges and pressures faced by acute care hospitals in New Jersey over a period of years, BMC faced a liquidity crisis and was unable to generate sufficient cash flow to meet its operating needs. In April 2007, BMC filed for Chapter 11 bankruptcy protection.[1]

Beginning as early as December 2004, BMC management and members of its Board of Directors started to consider building a skilled nursing facility (SNF) at a BMC-owned building adjacent to the Hospital known as the Bell Street building property.[2] Building the SNF near the Hospital was thought to be a means to increase the Hospital's census and capitalize on changing market trends in Bayonne, including a growing and aging population.[3]

In 2005, BMC management reviewed proposals from competing developers of a SNF.[4] By late 2005, BMC management had determined to enter into negotiations with one of the three potential bidders, Omni Asset Management ("Omni"), owned by Avery Eisenreich ("Eisenreich").[5]

---

[1]  Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the First Amended Joint Plan of
Liquidation Under Chapter 11 of the Bankruptcy Code, February 23, 2009, pages 14-15. (As noted in the Expert
Report of William Eisig.).

[2]  Complaint to Avoid and Recover Preferential and Fraudulent Transfers, to Collect Amounts Due and for Other Relief,
dated April 15, 2009 ("Complaint"), pages 6-8 (As noted in the Expert Report of William Eisig.).

[3]  Complaint, pages 6-8

[4]  WILENO0001268-1269 (As noted in the Expert Report of William Eisig)

[5]  WILENO0001268-1269 (As noted in the Expert Report of William Eisig.)

KLR

## B. BACKGROUND ON THE $5 MILLION PLEDGE

According to former CFO Heather Aaron ("Aaron"), "Omni, like all the other companies, [who do business with BMC was] asked to make donations to the [SNF] facility."[6]   Caroline Evans, wife of CEO Robert Evans, and also V.P. of Revenue Cycle Management and a member of the "senior team" at BMC was significantly involved in soliciting a donation from Avery Eisenreich or Omni Development.[7]   At the time she solicited the pledge from Eisenreich it was her understanding that there would be a long-term relationship between BMC and Eisenreich.  His company was building the SNF next to the Hospital and the Hospital was going to lease back space in the new building.[8]

There is some confusion as to who actually solicited the pledge from Eisenreich.  Marvin Apsel, V.P. of Operations, noted that CEO Robert Evans requested *him* to meet with Eisenreich for the purpose of asking for a pledge.  Apsel testified that a meeting between him and Evans occurred "around the week of October 10, 2005".  Apsel indicated that Evans told him the amount of the pledge should be $5 million.[9]

Mr. Evans has indicated that the pledge amount was arrived at in conversations among the senior team relative to the costs that BMC would be incurring in connection with the SNF being built by Omni, especially in regard to the leaseback of office space and that the "pledge would be able to offset some of those [costs]".[10]

In his deposition, Apsel indicates that when he met with Eisenreich, Mr. Eisenreich expressed concern over the binding nature of the pledge.  Apsel indicated to Eisenreich that he was not sure if the pledge was binding but he would speak to Robert Evans about it.  Eisenreich requested written assurance from Evans that the pledge would not be binding.  Apsel indicated he would communicate that to Evans.[11]

On the same day he met with Mr. Eisenreich, Apsel indicates he met with Mr. Evans in Evans' office. Apsel gave Mr. Evans the signed pledge card and informed Mr. Evans of Mr. Eisenreich's concern about the binding nature of the pledge and his request for a letter indicating that it was nonbinding.[12]  Mr. Apsel and Mr. Evans then walked down to the office of CFO Heather Aaron, gave her the pledge card and had a conversation about the nonbinding nature of the pledge and the letter that was requested confirming that fact.[13]  The CEO letter confirming the pledge was non-binding was signed by Mr. Evans on 10/21/05, the same date that Mr. Eisenreich signed the replacement pledge form properly identifying the donor as Omni Asset Management.

---

6   April 12, 2010 deposition of Heather J. Aaron, page 13. (As noted in the Expert Report of William Eisig.).

7   Deposition of Caroline Evans, Exhibit 9, page 9

8   Deposition of Caroline Evans, Exhibit 9, pages 87 - 88

9   Deposition of Marvin Apsel, Exhibit 67, page 95

10   Deposition of Robert H. Evans, Exhibit 38, pages 69 - 70

11   Deposition of Marvin Apsel, Exhibit 69, pages 104 - 105

12   Deposition of Marvin Apsel, Exhibit 70, page 106

13   Deposition of Marvin Apsel, Exhibit 71, page 109



As noted above, there is some confusion among the various depositions as to who actually solicited the pledge. Caroline Evans testified that *she* asked for the $5 million and she was provided the $5 million figure from Heather Aaron and Marvin Apsel.[14]

What is clear in the material I have reviewed is that Mr. Eisenreich was solicited for a $5 million pledge. The potential long-term relationship between Mr. Eisenreich and BMC as a result of the leasing of space by the Hospital in the SNF was the basis for the solicitation, the amount and the granting of the pledge. From the very inception of the pledge, Eisenreich requested written confirmation that the pledge was nonbinding. All of these facts were generally well known among the BMC senior team.[15]

According to Caroline Evans' recollection, a pledge form dated October 14, 2005 was signed by Mr. Eisenreich. Subsequent to that, Heather Aaron told Ms. Evans that there was some discrepancy with the form and Mr. Eisenreich would have to sign another pledge form. Aaron indicated that the difficulties with the pledge form came to light when she was reviewing documents that would eventually be given to the BMC independent auditors during the year-end audit.[16]

Mr. Eisenreich has testified that at some point in his dealings with BMC, Ms. Evans took over for Mr. Apsel in dealing with him relative to the pledge. (This fact is collaborated by all of Ms. Evans testimony which differs from other testimony only in regard to who made the initial solicitation of Mr. Eisenreich.)

At some point, Ms. Evans called Mr. Eisenreich to tell him that the pledge was wrong and she would prepare another one. A new pledge was prepared around October 21, 2005. Mr. Eisenreich asked Ms. Evans why the [payment] date[s] were different [calling for the first payment in June 2006] since the facility would not be built by then. Mr. Eisenreich's deposition indicates that Ms. Evans said "It's not your business, anyway. It's not enforceable and non-binding, and you have a letter from us that it's not enforceable, nor have we ever enforced pledges. This is what I need for my board."[17] This is collaborated by the testimony of CFO Heather Aaron as noted in the following paragraph.

In CFO Heather Aaron's deposition, she testifies that "In order for us to book this amount for the year-end [December 31, 2005], based on general accounting procedures, we had to receive it within a period of time. So the dates are when we needed to receive it in order for it to be valid on the books."[18]

CFO Aaron has indicated that the $5 million pledge played a role in the financial performance of BMC for 2005, enabling the Hospital to generate a positive change in net assets rather than a negative change (or loss).[19] As early as May 25, 2005 Ms. Aaron reported to the BMC Finance

---

[14] Deposition of Caroline Evans, Exhibit 18, page 90
[15] Deposition of Caroline Evans, Exhibit 22, pages 109 - 110
[16] Deposition of Caroline Evans, Exhibit 24, pages 99 - 101
[17] Deposition of Avery Eisenreich, Exhibit 79, pages 68-69, 84-85
[18] Deposition of Heather J. Aaron, Exhibit 66, page 39
[19] April 12, 2010 deposition of Heather J. Aaron, pages 87-93 (As Noted in the Expert Report of William Eisig.)

KLR

Committee that she anticipated a $5 million loss for the year ending December 31, 2005.[20] The pledge also resulted in BMC paying bonuses to certain employees as well as enabling the Hospital to comply with its bond covenants in 2005.[21] The management bonuses are confirmed by the BMC independent auditor in his deposition.[22] James J. Hannan, partner at WithumSmith+Brown, PC (WS&B), acknowledged in his deposition that the $5 million pledge from Omni was material to BMC's financial statements, both in terms of revenues and assets.[23]

The pledge form signed by Mr. Eisenreich on behalf of Omni on October 21, 2005 was a pledge of $5 million to BMC payable over a five-year period in equal annual installments, with the first installment due June 2006.[24]

As noted above, at the time Eisenreich made the pledge, he requested written confirmation that the pledge would not be legally binding. According to Caroline Evans,[25] Mr. Eisenreich was nervous about his pledge obligation in the event that he had a reversal of fortune and wanted something that said he would not be liable, "like a comfort letter."[26] As a result, CEO Robert Evans signed a letter also dated October 21, 2005 (the same date as the pledge) addressed to Mr. Eisenreich, which specified the following:

> *While Bayonne Medical Center regards a pledge as a promise, it is not legally binding. Bayonne Medical Center is dependent on the generosity and ability of its constituents to financially assist the Medical Center in bringing forth projects and programs; however, you are under no obligation to fulfill your pledge if your own personal financial circumstances change. While we hope that you will not experience any financial difficulties Bayonne Medical Center will work with you to accommodate unforeseen personal situations.*[27]

This letter later became known as the "comfort letter".

CEO Robert Evans did not prepare the comfort letter without consulting other members of the BMC senior team. He testified that he discussed Mr. Eisenreich's request with Caroline Evans and Marvin Appel inquiring what the basis of the request was. He also spoke with Vincent Lombardo, Executive Director of the BMC Foundation, and, as noted on page 7 of this report (footnote 13), he also discussed the "comfort letter" with CFO Aaron.

Mr. Evans was told that "it was (a) a lot of money, and (b) while he [Eisenreich] fully planned and assumed that we would have this nice, long-term relationship, there was no guarantee. And

---

[20] Bates #WILEN-fBOOO 12599 produced by Plaintiff 11/4/1 0, annexed as Exhibit 4 (As Noted in the Expert Report of William Eisig.)

21 April 12, 2010 deposition of Heather J. Aaron, pages 87-93 (As Noted in the Expert Report of William Eisig.)

22 Deposition of James J. Hannan; April 14, 2009; page 186

23 Deposition of James J. Hannan; April 14, 2009; pages 146 - 147

24 Connie Tauber Exhibit P-72. There is also a pledge form signed by Eisenreich on behalf of an entity called Bayonne Healthcare Development, dated October 14, 2005 for $5 million, payable over a five-year period in equal annual installments, with the first installment due July of 2008. However, this pledge form was crossed out and voided. (Connie Tauber Exhibits P-70 and P-71)

25 Caroline Evans was the wife of former CEO Robert Evans. She was the primary BMC contact person of Avery Eisenreich. (As Noted in the Expert Report of William Eisig.)

26 May 6, 2010 deposition of Caroline Evans (Vol. I), pages 111-113 (As Noted in the Expert Report of William Eisig.)

27 Robert Evans Exhibit P-62 (As Noted in the Expert Report of William Eisig.)

KLR

should we [BMC] be in a place that was different than the place we're in, should his business be in a place that's different than it's in, he would not want to be hounded or held responsible for the pledge." Mr. Evans testified that he "wanted to understand that, because I want to understand his level of commitment."[28]

Members of the BMC senior team have testified as to the linkage between Mr. Eisenreich's $5 million pledge (with the related comfort letter) and the leaseback by BMC of substantial space in the SNF building being developed by Omni. This fact is most clearly stated in Mr. Evans testimony where he indicates: "there was some understanding [that] there would be additional costs to the medical center for renting the space back, and certainly the pledge would be able to offset some of those."[29]

The BMC independent auditors were WithumSmith+Brown, PC. The WS&B audit partner on the BMC engagement was James L. Hannan. He has indicated that the audit materiality threshold on this engagement was $500,000.[30] Therefore, this $5 million pledge was definitely a material item of audit interest as confirmed by Hannan in his deposition.[31] Hannan also indicated that the pledge was an "unusual" transaction.[32] The significance of recognizing that the pledge was both a material and an unusual transaction is because such transactions should receive specific audit scrutiny during the course of an audit.[33]

As a standard part of the audit process, auditors read the minutes of Board of Trustee and Committee meetings. The purpose of such a review is to identify items and transactions that might affect the audit process.[34] In Mr. Hannan's deposition it is noted that while the BMC Board of Trustee minutes routinely note the receipt of donations and pledges to the Hospital in all amounts (some as low as $10,000), it is significant that the minutes do not mention the receipt of a $5 million pledge from Mr. Eisenreich.[35]

The reading of Trustee and Committee minutes is so important to the audit process that the auditor requests and receives written confirmation from management that all of the minutes have been supplied to the auditors as well as summaries of actions if minutes of those meetings are not yet available.[36]

Mr. Hannan has also testified that WS&B did not have a copy of the pledge form signed by Mr. Eisenreich.[37] Mr. Hannan indicated that in regard to this $5 million pledge, the auditors relied on the representations of various people in management and the confirmation of the pledge with the donor.[38]

[28] Deposition of Robert H. Evans; Exhibit 46, page 85
[29] Deposition of Robert H. Evans; Exhibit 38, page 70
[30] Deposition of James J. Hannan; April 14, 2009; page 69
[31] Deposition of James J. Hannan; April 14, 2009; page 146
[32] Deposition of James J. Hannan; April 14, 2009; page 172
[33] Paragraphs 2.11 thru 2.63 and Appendix A of the AICPA Audit and Accounting for Not-for-Profit Organizations
[34] Deposition of James J. Hannan; April 14, 2009; page 161
[35] Deposition of James J. Hannan; April 14, 2009; pages 161 - 166
[36] Exhibit 3D to deposition of Heather Aaron, CFO
[37] Deposition of James J. Hannan; April 14, 2009; page 183
[38] Deposition of James J. Hannan; April 14, 2009; page 142

KIR

It was noted during Mr. Hannan's testimony that the $5 million pledge was an unusual transaction. It was considered an unusual transaction due to its size and the fact that it was the only donation recorded by the Hospital rather than on the books of the Foundation. Mr. Hannan was asked if the fact that the $5 million pledge was not in the minutes, coupled with the fact that it was both an unusual and material transaction; should that have prompted additional scrutiny to this transaction on the part of the auditors? Hannan responded that the auditors believed that the "direct confirmation [with the donor] sufficed for purposes of audit confirmation."[39]

In February 2006, in connection with the WS&B December 31, 2005 BMC year-end audit, BMC sent an audit confirmation request to Omni asking that it confirm the $5 million pledge. The confirmation request was prepared and signed by CFO Heather Aaron at the request of WS&B .[40] The confirmation request was addressed to Mr. Avery Eisenreich at Omni Asset Management and noted the date the pledge was made, the pledge amount, the dates the payment installments were due and an indication that the pledge was "unrestricted".[41]

The facts surrounding the signature and return of the pledge confirmation is subject to conflicting testimony as outlined below.

When the pledge confirmation form was not signed and returned to the auditors by Mr. Eisenreich, Caroline Evans contacted him via e-mail. Her first e-mail was on March 8, 2006. The subject of this e-mail is "Non binding pledge confirmation". She indicates that her "auditors are looking for the signed pledge [pledge confirmation letter] to close the audit...Has it been returned?" On March 15, 2006 she again e-mailed Mr. Eisenreich indicating that she has received a telephone call from WS&B and that "we are held up because they have not received the non binding pledge confirmation. This is causing me some problems. Please call me if you can."[42]

Mr. Hannan has stated that the confirmation letter was addressed to Mr. Eisenreich and returned to WS&B. He indicates that he has no indication that the signature on the confirmation is not that of Mr. Eisenreich.[43] WS&B answers to Robert Evans' interrogatories in Docket No. 09-1688 stating a signed confirmation letter was received by WS&B from BMC, not from Mr. Eisenreich (annexed as Exhibit 82 to Gruen's declaration).

The pledge confirmation letter that is in the possession of the auditors is contained in the exhibits to Mr. Hannan's deposition. It is Plaintiff's Exhibit WSB-19. There is also a confirmation letter contained in the Exhibit package as Exhibit #80. The signatures purported to be that of Mr. Eisenreich and the handwritten date under the signature on the two pledge confirmation forms appear to be the handwriting of different individuals. In his deposition, Mr. Eisenreich has indicated that the pledge confirmation letter in the possession of the WS&B auditors does not contain his signature but that Exhibit 80, the one he sent to BMC, does contain his signature.[44]

---

[39] Deposition of James J. Hannan; April 14, 2009; page 170
[40] Connie Tauber Exhibit P-75
[41] Exhibit WSB-19 to Hannan Deposition
[42] Exhibits to Carrie Evans Deposition May 6, 2010; Exhibit 29; BMC V. Omni Declaration Exhibits
[43] Deposition of James J. Hannan; April 14, 2009; page 141
[44] Deposition of Avery Eisenreich; Exhibit 83, page 206

9



There is also a question about whether the "comfort letter" was provided to the auditors. Mr. Eisenreich in his deposition has indicated that he does not recall if, but he believes, he sent a copy along with the return of the pledge confirmation letter. He also does not recall if he returned the pledge confirmation letter to WS&B or to BMC. He does indicate in his deposition that Ms. Evans told him that she provided the WS&B auditors with a copy of the "comfort letter",[45] and he says he attached the "comfort letter" to the 10/21/05 pledge when he returned it signed to BMC in October 2005.

In the WS&B responses to Avery Eisenreich's First Set of Interrogatories, Mr. Hannan has indicated that "James Hannan and William Oster also have knowledge of not having been advised about Robert Evans' letter [the "comfort letter"] to Avery Eisenreich."[46]

---

[45] Deposition of Avery Eisenreich; Exhibit 81, pages 140 - 143
[46] Exhibit 82, page 8

10

KLR

## Accounting Analysis

### A. RELEVANT ACCOUNTING STANDARDS

In evaluating BMC's accounting treatment for the $5 million pledge from Omni, I considered the accounting requirements of Statement of Financial Accounting Standards No. 116, *Accounting for Contributions Received and Contributions Made* ("FAS 116") and the guidance contained in the American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide, *Not-for-Profit Entities*. I also considered the requirements relating to the collectability of receivables contained in Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("FAS 5").

The **Financial Accounting Standards Board** (FASB) Statements referred to above no longer exist in their original form. Financial Accounting Standards have been combined into a single source of authoritative nongovernmental U.S. Generally Accepted Accounting Principles (GAAP) called the *FASB Accounting Standards Codification*. The *Codification* is effective for periods ending after September 15, 2009 after which references to the original pronouncements is considered non-authoritative. In researching issues related to this case, I used the Codification and have referenced that document when appropriate. Using the FASB's cross reference tools, I have made sure that I have only accessed GAAP as it was applicable to audits of not-for-profit organizations with a fiscal year-end of December 31, 2005.

### B. DISCREPANCIES IN THE DEPOSITIONS REVIEWED

As noted in the Background section of this report, there are a number of discrepancies in the various depositions I reviewed to reach my conclusion. In order to reach a conclusion I had to make an assessment and judgment relative to those discrepancies. Summarized below are my assessments and the reasons for them.

#### Who Solicited the Pledge?

I have concluded that the differences in the depositions relative to who solicited the pledge from Mr. Eisenreich are not relevant. There are no conflicts in the testimony that Mr. Eisenreich was solicited for a $5 million pledge and that concurrent with his giving the pledge, he requested and received written assurance that the pledge was nonbinding. There are also no conflicts in the testimony that these facts were generally all known to many members of the BMC senior team.

Since Mr. Eisenreich had to sign two pledge forms (approximately one week apart) and Ms. Evans indicates she gave Mr. Eisenreich the second pledge form to sign, it is highly likely that Mr. Apsel solicited the initial pledge and then Ms. Evans subsequently took over the interaction and communications with Mr. Eisenreich and when she indicates that she solicited the pledge, she is actually referring to the second pledge form.

11



### Discrepancy Regarding Signature on
### The Pledge Audit Confirmation Form

In regard to the return of the pledge confirmation form, I note that Mr. Eisenreich has testified that the signature on the pledge confirmation which is represented as coming from the WS&B work-papers is not his signature. While this discrepancy is interesting and speaks to the adequacy of the audit, it is not relevant to whether the pledge should have been recorded as revenue by BMC at December 31, 2005.

The primary issue here is whether the pledge was properly recorded as revenue and the adequacy (or inadequacy) of the audit process is relevant only as to why the error of recording the pledge as revenue was not discovered by the auditors.

### $1 Million Wire Transfer Received from Omni in June 2006

Mr. Eisig regards the wire transfer of $1 million from a company owned by Mr. Eisenreich in June 2006 and its recording by BMC as the collection of the first pledge payment as providing credibility to the validity of the pledge as a recordable transaction. While noting that the facts surrounding the $1 million payment are in dispute and that the amount was removed from BMC's books as a pledge collection later in the year, Mr. Eisig nevertheless claims this is indicative of a valid pledge agreement.

Although the facts surrounding the $1 million payment in June 2006 may be in dispute by some, there is substantial testimony regarding this payment and the loan it actually represented. Key to this testimony is the fact that this $1 million was applied to the eventual Omni purchase of the property used for the SNF.[47] It is my judgment that this payment was in fact a loan and is unrelated to the pledge. Therefore, it does not enter into my basis for my conclusion.

## C. CONCLUSION

It is my professional opinion that the $5 million pledge that BMC holds from Mr. Eisenreich is not an asset of the Hospital recordable as a promise to give. (The authoritative accounting literature prefers to use the term *promise to give* in lieu of *pledge.*)[48] Rather it is, at best, an *intention to give* or an intention to provide a rent (and other cost) subsidy to BMC for its occupancy in the new Skilled Nursing Facility pursuant to the intended leaseback as was known to the CEO and other members of the senior team.

The responsibility for the accurate recording of transactions and their fair presentation in the financial statements in accordance with generally accepted accounting principles rests

---

[47] Exhibit #80 of the BMC V. Omni Declaration Exhibits

[48] Footnote 18 to Paragraph 5.47 of the AICPA *Audit and Accounting for Not-for-Profit Organizations*

KLR

with management. The auditors examine the financial records of an organization in order to form an opinion on the fairness of the financial statements. As a result of inadequate audit procedures and/or inexperience in non-profit accounting, the WS&B auditors failed during their audit to discover that this transaction was improperly recorded.

## Impropriety of Recording the Pledge as Revenue

### Is Mr. Eisenreich a donor?
### Is this transaction a contribution?

Paragraph 5 of Financial Accounting Standards Board (FASB) Statement No. 116, *Accounting for Contributions Received and Contributions Made*, defines a contribution as "an *unconditional* transfer of cash or other assets to an entity or a settlement or cancellation of its liabilities in a *voluntary nonreciprocal* transfer by an entity acting other than as an owner." (Emphasis added)

Given that Mr. Eisenreich and Omni were engaged in the negotiation of a transaction with the Hospital that would be significant to both of them, I question whether an actual donor/donee relationship existed between the two entities. I question whether any donation from a vendor or subcontractor of the Hospital constitutes an unconditional, voluntary, nonreciprocal transfer.

I believe that a pledge from a vendor is only good as long as the customer/vendor relationship is in place. In most instances the donations from vendors and similarly related donors are fulfilled within a short period of time and the question of collectability is, therefore, moot. In addition, due to their usual immaterial amount, the question of recording them as revenue or cost reductions is not an issue. However, the recording of a material, long-term pledge must be assessed with consideration of the relationship between the two entities.

The question becomes one of whether the donation is in fact a gift or a price reduction. If you conclude, as I have that a donation from a vendor is in fact a price reduction, it then follows that it should be recorded not as revenue, but, rather as a reduction of expense. And, when this donation is destined for the future (as in a pledge for future payment), it follows that it would not be recorded at all in the current accounting period.

It is clear from the testimony of many members of the BMC senior team that the Eisenreich pledge was linked to the leaseback of space in the SNF building by the Hospital. There are numerous other facts also supporting the conclusion that this transaction was not a typical pledge of nonreciprocal financial support:

> The fact that this pledge was not mentioned in the minutes of the Board of Trustees where other, much smaller, pledges are routinely documented therein indicates this was a transaction dissimilar from the typical donation.

13

KLR

The fact that this is the only donation recorded in the financial records of the Hospital instead of in the financial records of the Hospital's fund-raising affiliate – the Bayonne Medical Center Foundation – indicates this was a transaction dissimilar from the typical donation.

It is my opinion that this transaction is more similar to an exchange transaction than it is to a contribution. Exchange transactions are reciprocal transfers in which each party receives and sacrifices something of approximately equal value. In concluding that this transaction is an exchange transaction rather than a contribution, I took into consideration the following facts:

Mr. Evans, the CEO, indicated that the pledge amount was arrived at in conversations among the senior team relative to the costs that BMC would be incurring in connection with leaseback of space in the SNF being built by Omni, and that the "pledge would be able to offset some of those" [costs]. Thus, the reason for and the methodology of how the requested amount was calculated both lead me to identify this as an exchange transaction.

The long-term leaseback relationship between Omni and BMC was a critical part of the solicitation conversation with Mr. Eisenreich.

Indeed, the Board was not introduced to this transaction as a contribution. Contributions (even small ones), when they were received, were contemporaneously reflected in the Board minutes. The Board of Trustees was not made aware of this transaction as they were with other donations and this is especially significant as explained in the next paragraph below.

In terms of a not-for-profit organization's relationship with the community it serves, it is extremely important that the volunteer board be made aware of financial support coming from the community. The Board serves as ambassadors to the community for the organization and their failure to know of and acknowledge substantial contributive support would be a significant public relations faux pas. It is inconceivable to me that a voluntary contribution of this magnitude, if nonreciprocal, would not be contemporaneously noted by the BMC Board.

Conclusion: Mr. Eisenreich is not a donor. The transaction is not a contribution. The transaction is more in the nature of an exchange transaction. Exchange transactions are recorded when the exchange has been completed. Therefore, no revenue or receivable should have been recorded by BMC on its December 31, 2005 financial statements.

14

KIR

## Is this transaction unconditional?

Although I have already concluded above that this transaction did not qualify to be recorded as revenue or a receivable at December 31, 2005, I would like to address other issues related to this transaction.

Even if the transaction were a contribution, the next question that must be addressed is how the contribution should be recorded in the Hospital's 2005 financial records.

The same linkage between the pledge and lease back of space in the SNF leads me to conclude that payments under this transaction were conditional upon the completion of the facility and the leasing of space by the Hospital as CEO Evans testified. Conditional pledges are "not to be recorded as revenue and assets by the recipient organization until substantially all of the conditions have been met or until it is almost certain that the conditions will be met in the future."[49] The fact that this (conditional) language does not appear in any written document is irrelevant when one considers the terms of the comfort letter.

At December 31, 2005 there were no contracts in place relative to the SNF or the BMC leaseback of space. Therefore it was not certain or reasonably possible that the conditions calling for payment of the pledge would be fulfilled.

## The Impact of the "Comfort Letter"

The terms of this transaction include both the pledge form and the "comfort letter" taken together. It is generally understood that the controlling terms of financial support received by not-for-profit organizations originate from both the resource providers and the organization.[50]

The enforceability of pledges is discussed at great length in FAS 116 and this information has been summarized accurately by Mr. Eisig on page 15 of his report.[51] However, the material in FAS 116 contemplates a "typical" donor pledge. A "typical" donor pledge would not contain any mention of enforceability as was contained in the "comfort letter." The existence of the "comfort letter" was known to Marvin Apsel, CEO Evans, CFO Aaron, and her accounting department which should not have ignored the impact the "comfort letter" had on the pledge.

It is my opinion that the existence of the "comfort letter" from an accounting perspective changes the very nature of the pledge document to which it relates. The authoritative accounting literature speaks to transactions which it calls

---

[49] Paragraph 5.48 of AICPA *Audit and Accounting for Not-for-Profit Organizations*
[50] Paragraph 2.47 of AICPA *Audit and Accounting for Not-for-Profit Organizations*
[51] Expert Report of William Eisig, March 14, 2011

KLR

intentions to give.[52]   A pledge (or a *promise to give* in accounting terms) is reduced to an *intention to give* when the donor has the opportunity to change his/her mind prior to the time the pledge becomes payable.

The terms of the comfort letter provide Mr. Eisenreich with the ability to not comply with the terms of the pledge due to changes in either his or the Hospital's circumstances from what they were at the time of the pledge or from what they were contemplated to be when the payments were due. This makes the pledge conditional on future, uncertain events giving the transaction the characteristics of a conditional gift.

In addition, the unilateral right of Mr. Eisenreich to claim changed circumstances on his behalf, without any required verifiability on the part of the Hospital, or to invoke the promise of unenforceability contained in the "comfort letter", reduces the transaction to an *intention to give*. The authoritative literature indicates that *intentions to give* are not to be recorded as assets in the financial records of the recipient organization.[53]

Therefore, even if one rejects my conclusion that this is an exchange transaction not subject to recording as revenue and a receivable, it is equally not subject to recording as revenue and a receivable because it meets the definition of (a) a conditional pledge and, (b) the pledge is an *intention to give* and not a *promise to give* (pledge).

## Payment Dates of the Pledge

Do the pledge payment due dates (first payment was due in June 2006) contradict the linkage of the pledge to BMC's occupancy of the SNF building pursuant to the leaseback? The SNF building was not scheduled for completion until much later. The answer to this question is important because this linkage is a substantial reason why I have concluded that this is an exchange transaction and not a contribution.

Generally accepted accounting principles require that long-term pledges be recorded at their present value.[54]  As discussed in the Background section of this report, the initial pledge form presented to Mr. Eisenreich was changed by the Hospital and one of the changes made was to the due dates of the pledge payments. CFO Heather Aaron noted that the pledge payments had to be received within a certain period of time in order for them to be recordable at December 31, 2005.

---

[52] Paragraph 5.51 of AICPA *Audit and Accounting for Not-for-Profit Organizations*
[53] Ibid
[54] Paragraph 5.64 of AICPA *Audit and Accounting for Not-for-Profit Organizations*

KLR

Ms Aaron's characterization of the importance of the payment dates is imprecise. As the payment due dates extend further out, the present value of the transaction is reduced since present value is a function of time. So the payment due dates did not impact whether the transaction would be recorded in the BMC 2005 financial records but, rather, at what value the transaction would be recorded. Since the BMC income for the year, its compliance with bond covenants and executive bonuses all depended on the value of this transaction, the payment due dates were of a significant concern to the BMC senior team.

Mr. Eisenreich questioned the payment due date change wherein they no longer coincided with BMC's occupancy of the SNF. Ms. Evans told him she needed those dates for her Board and since Mr. Eisenreich had his comfort letter, the payment dates (as well any and all of the terms of the pledge) were essentially irrelevant to him.

Therefore the payment due dates do not impact my conclusions as stated.

## Inadequacy of the Audit Process

I have concluded for the reasons set forth above that the entry of the pledge as revenue on BMC's financial statement by CFO Aaron's accounting department was erroneous. A logical question arises as to how such a material, significant and unusual transaction could be recorded by the BMC accounting department in error and not be discovered by the auditors during their examination of the financial records.

The audit process is governed by Generally Accepted Audit Standards published by the American Institute of Certified Public Accountants. The following represent a small portion of those standards which are pertinent to this case:

"The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."[55]

"The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit."[56]

"*Audit evidence* is all the information used by the auditor in arriving at the conclusions on which the audit opinion is based and includes the information contained in the accounting records underlying the financial

[55] Generally Accepted Auditing Standards Section Au 110.02
[56] Generally Accepted Auditing Standards Section Au 150.02

17

statements."[57]    "*Sufficiency* is the measure of the quantity of audit
evidence. *Appropriateness* is the measure of the quality of audit evidence,
that is, its relevance and its reliability in providing support for, or
detecting misstatements in, the classes of transactions, account balances,"
[etc.].[58]  "The reliability of audit evidence is influenced by its source and
by its nature and is dependent on the individual circumstances under
which it is obtained."[59]  "Even when audit evidence is obtained from
sources external to the entity, circumstances may exist that could affect the
reliability of the information obtained."[60]

---

[57] Generally Accepted Auditing Standards Section Au 326.02
[58] Generally Accepted Auditing Standards Section Au 326.06
[59] Generally Accepted Auditing Standards Section Au 326.08
[60] Ibid

18

KLR

### Positive Audit Confirmation

Mr. Hannan, the WS&B audit partner, indicated that the auditors relied *exclusively* upon the representations of various members of BMC management *and* the audit confirmation letter in concluding that the pledge was a valid receivable. Unfortunately, the audit confirmation process if far from an ideal test of the validity of an asset and the limitations of the audit confirmation as audit evidence has been discussed in the accounting literature for over 20 years.

The limitations of the confirmation process are exacerbated in the case of not-for-profit organizations where the recipient of a confirmation may not be familiar with the purpose of the confirmation and the terms contained within the confirmation itself.

Recent high-profile audit failures at Parmalat and CF Foods point to a need to improve current audit confirmation practices. In both audits, the confirmation process failed to provide reliable evidence concerning the occurrence assertion for cash and accounts-receivable balances.[61] (The occurrence assertion in auditing states that "Transactions and events that have been recorded have occurred and pertain to the entity."[62])

The weakness in the confirmation process is caused by the inability of the auditor to authenticate who completed the confirmation request and to know how well they understood the confirmation request.    Auditors must be aware of the weaknesses inherent in the confirmation process when they exercise their judgment as to the amount or reliance they will attach to this form of audit evidence.

Although the confirmation in the hands of the WS&B is probably not the authentic confirmation signed by Mr. Eisenreich, the confirmation he did sign is exactly the same. As noted above, this discrepancy as to which confirmation is authentic is not important to the issue at hand (except to the extent that it suggests WS&B received the confirmation from BMC rather than directly from Omni). Rather, the question is how much should the auditors have relied upon the confirmation given the materiality, complexity, and unusual nature of this pledge and its impact on the BMC financial condition.

Mr. Doug Carmichael, a professor at CUNY Baruch College, warned in a 1991 article of the weaknesses in the confirmation process.    He suggested a requirement to authenticate, rather than merely obtain an awareness of the validity of client-provided mailing addresses. Carmichael suggests that auditors examine the respondent's competence, knowledge, motivation, ability, or willingness to

---

[61] "Automating the Confirmation Process" by George R. Aldhizer and James D. Cashell; The CPA Journal; NY State Society of CPAs; April 2006

[62] Generally Accepted Auditing Standards Section 326.15

19

KLR

respond and the respondent's objectivity and freedom from bias.[63]    While
Carmichael's thoughts are not incorporated into generally accepted auditing
standards, Mr. Carmichael is a respected authority in the profession having served
as chief auditor of the PCAOB[64] from 2004 to 2006 and the fact that such a well
respected person in the accounting and auditing community was addressing the
weaknesses of the confirmation process as far back as 1991 also points to the fact
that auditors must be especially careful when they exercise their judgment as to
the amount or reliance they will attach to this form of audit evidence.

The confirmation indicates that the pledge is "unrestricted" with no explanation of
what that qualification means.  In this particular instance, the "unrestricted"
nature of the pledge was interpreted by the auditors to mean that the pledge was
not contingent upon any future events in order for the pledge to become payable
to BMC.  Yet what do the auditors know of Mr. Eisenreich's knowledge of
unrestricted, temporarily restricted, permanently restricted, or conditional
pledges?

Mr. Hannan has testified that the pledge was both a material and unusual
transaction.  He has testified that compliance with the bond covenants was
material to the BMC financial condition.[65]  He has also confirmed that
compliance with the bond covenants was a function of the amount of BMC's
unrestricted net assets.[66]  In spite of this, it appears that this pledge transaction
received less attention than it should have with the result being that it was allowed
to be recorded as unrestricted revenue during the year ended December 31,
2005.[67]

The auditors' report is dated February 22, 2006 as is the BMC management
representation letter.  Auditing standards indicate that the auditor's report should
not be dated earlier than the date on which the auditor has obtained sufficient
appropriate audit evidence to support the opinion.  The pledge audit confirmation
letter – the only document that the auditors relied upon in their examination of the
pledge transaction – was dated March 17, 2006.

Since I have concluded that the pledge audit confirmation letter did not constitute
sufficient, appropriate audit evidence, the fact that it was not received in time for
the auditors to express their unqualified opinion on February 22, 2006 merely
represents just another example of the inadequacy of the audit process.

It is clear that the auditors did not obtain sufficient, appropriate (or timely) audit
evidence in regard to the pledge. Mr. Hannon indicated that in addition to
discussing Mr. Eisenreich's financial condition with members of BMC's senior

[63] "Pitfalls in the Confirmation Process" by Doug Carmichael, The CPA Journal, June 1991
[64] The PCAOB is the Public Company Accounting Oversight Board created by the Sarbanes-Oxley Act to oversee the auditors of
companies in order to protect the public interest.
[65] Deposition of James L. Hannan; April 14, 2009; page 108
[66] Deposition of James L. Hannan; April 14, 2009; pages 118 - 119
[67] Per Audited Financial Statements of BMC as of and for the year ended December 31, 2005

KLR

team, the only other research the auditors performed on Mr. Eisenreich was an internet search of Omni which verified that they were a company located at the address to which the confirmation was addressed.[68]

The existence of the positive confirmation received from Mr. Eisenreich does not constitute quality audit evidence.

### Recording the Pledge as Unrestricted Revenue

Even if the pledge was recordable as revenue, which it was not, it was still recorded incorrectly. This error also speaks to the competency of the BMC accounting department and the adequacy of the audit to discover these errors.

The pledge was recorded by BMC as unrestricted revenue. This is incorrect and contrary to the guidance expressed in the *AICPA Audit and Accounting Guide for Not-for-Profit Organizations*. In regard to long-term promises to give, the Guide indicates the following:

> "Contributions of unconditional promises to give with payments due in future periods should be reported as temporarily restricted contributions unless the donor expressly stipulates, or circumstances surrounding the receipt of the promise make clear that the donor intended it to be used to support activities of the current period."[69]

The implications of this error are that the BMC unrestricted income for the year ended December 31, 2005 is overstated by $4,717,000 (the present value of the $5 million pledge) and unrestricted net assets at December 31, 2005 are also overstated by the same amount.

Instead of a positive change in unrestricted net assets (reported as $782,916 in the certified financial statements) the elimination of the $4,717,000 pledge revenue affects the change in net assets from a positive $782,916 to a negative $3,934,084.

Such a result would certainly have been an issue regarding the bond covenant compliance and most likely would not have resulted in management bonus payments.

The BMC accounting staff failed to understand this part of accounting for pledges in not-for-profit organizations and the audit failed to bring this error to light.

---

[68] Deposition of James J. Hannan; April 14, 2009; pages 142 – 145

[69] Paragraph 5.39 of AICPA *Audit and Accounting for Not-for-Profit Organizations*



## Conclusion

In my opinion it was unreasonable for BMC to record the Eisenreich pledge as revenue during the year ended December 31, 2005 for the reasons set forth above. The pledge is not a contribution as defined by generally accepted accounting principles. The pledge was not given by a donor in a unilateral transaction. The pledge was an exchange transaction linked to the leaseback of space in the SNF building. The CFO, head of the BMC accounting department, knew of the leaseback and the "comfort letter" and while this letter may not have stated anything that was not already the past practice of BMC in regard to unfulfilled pledges, failure to realize that committing to writing, in a letter to a donor, that the pledge is nonbinding is a substantial change from other pledges and clearly makes this transaction not recordable as revenue.

The failure of the audit process to uncover the actual nature of this transaction may be due to the efforts of management or the abilities, or lack of same, of the audit team or both. However, since the proper recording of transactions and the resulting financial statements are the responsibility of management, the failure of the audit process to correct this error is not relevant to the question of whether this transaction was properly recorded. The $5 million pledge of Mr. Eisenreich was not properly recorded as a BMC asset at December 31, 2005.


*Frank A. Monti CPA*

Frank A. Monti, CPA, DABFE
April 25, 2011

22

KLR

Exhibit I

Personal Résumé

# FRANK A. MONTI, CPA, DABFCPA, DABFE
## CERTIFIED PUBLIC ACCOUNTANT
Certified in the States of RI, MA and MD

## DIPLOMAT AMERICAN BOARD OF
## FORENSIC CERTIFIED PUBLIC ACCOUNTANTS

## DIPLOMAT AMERICAN BOARD OF FORENSIC EXAMINERS

Principal of

KLR

Director of the Not-for-Profit
Services Division of Kahn, Litwin, Renza & Co., Ltd.

Founder of **Monti,** CPA in July 1981

**Monti,** CPA became a division of Kahn, Litwin, Renza & Co., Ltd. in January 2000. The KLR Not-for-Profit Services Division is a group of Certified Public Accountants dedicated to providing the highest quality professional services to owner-operated businesses and not-for-profit organizations in Rhode Island and Southern New England. The firm provides audit and review services, tax compliance and planning and consulting services to all of its clients on an as-needed basis. Mr. Monti is licensed by the states of Rhode Island, Maryland and the Commonwealth of Massachusetts.

Mr. Monti has provided testimony in the Family Court in Rhode Island, the US District Court and in various administrative hearings and other regulatory proceedings. He is a Board Certified Forensic Examiner admitted with the designation of Diplomat to the American Board of Forensic Examiners and is a past member of the American College of Forensic Examiners Advisory Board for the American Board of Forensic Certified Public Accountants.

**Boston Tax Institute**

Wrote, developed course material and instructs three full-day seminars for the Boston Tax Institute. The seminars are devoted to the subjects of *Generally Accepted Accounting Principles and Financial Reporting for Not-for-Profit Organizations, Obtaining and maintaining Tax-exempt Status by the Not-for-Profit Organization,* and *Tax Aspects of Tax-exempt Organizations.* These seminars have been presented once each year since 1993, are continually updated and continue to be presented by Mr. Monti and the Boston Tax Institute.

23

KLR

## American Institute of Certified Public Accountants

Instructs one-day seminars for the AICPA throughout the United States on accounting issues for non-profit organizations, including government auditing procedures and the requirements of OMB Circular A-133 as well as tax seminars on issues for tax-exempt organizations.

## Bryant University Center for Management Development

In the Fall of 1990, Mr. Monti wrote and developed the financial management course in the College's new Certificate Program in Non-Profit Management. He instructed this course from the winter session of 1991 thorough 1994.

Mr. Monti has also constructed a one-day seminar for the Bryant College Center for Management Development entitled *Reading and Understanding Financial Statements*. This seminar was taught in the Spring and Fall from 1992 through 1995.

## Rhode Island Foundation

Mr. Monti has created and taught a number of seminars for this Organization which markets educational materials and seminars to not-for-profit organizations through its *Initiative for Non-Profit Excellence* program.

## The Support Center, Providence

Mr. Monti has created and taught a number of seminars for this Organization which markets educational materials and seminars to not-for-profit organizations throughout New England.

## NonProfit Resources of Southern New England, Inc.

Mr. Monti is a founder and former Board Treasurer of this corporation devoted to the support of charitable, not-for-profit organizations in Southern New England.

## United Way of Southeastern New England

Mr. Monti was a member of the initial (1982) Management Assistance Program Series (MAPS) which developed a series of workshops designed to increase the effectiveness of management and Board members of not-for-profit organizations. This was a two-year assignment which during the first year developed the educational materials used in the workshops and then led the workshops for the second year. The materials were then used by other volunteer workshop leaders. These materials were utilized until the Bryant College certificate program began in 1991.

24

KLR

## Brown University and Providence College Faculty Member

From 1977 through 1989, Mr. Monti has served at various times on the Faculty of the Providence College undergraduate and Graduate School Business Department, the Providence College School of Continuing Education, the Brown University department of Economics and the Brown University Learning Community. He has taught various levels of accounting, accounting theory, auditing, financial management and accounting for non-financial managers.

## Bryant University

Mr. Monti teaches an online accounting/bookkeeping course that in 11 modules will teach a student how to be a fully functioning bookkeeper. This course was developed at the request of the University which was looking to train the vast numbers of unemployed individuals, providing them with an employable skill in as short a time as possible. Education for bookkeepers has long been a topic which Mr. Monti was wanted to address since the introduction of computerized bookkeeping programs promising more than they could reasonably deliver without a trained bookkeeper operating the computerized systems. This course began in the Fall of 2010 and students may begin the course at any time and learn at their own pace.

## American Institute of Certified Public Accountants

Member of Institute since 1973
1977 Member of the Task Force on Initial Staff Training
2003 Instructor and seminar leader in national Continuing Professional Education (CPE) program speaking on a variety of subjects relative to tax-exempt and not-for-profit organizations.

## Rhode Island Society of Certified Public Accountants

Member since 1973

1996 – '97 and 2002 – '03 President, NEGASC Corporation (New England Education Corporation for CPA's)

1991 and 2003 Chairman of the New England Graduate Accounting Study Conference (NEGASC) hosted by the Rhode Island Society of CPA's in June 1991 and 2003

1997 – 99 Chairman of the Committee to relocate the NEGASC Corporation from the Commonwealth of Massachusetts to the State of Rhode Island. This involved the dissolution of the Massachusetts corporation and transfer of the assets to a new charitable organization organized under the laws of Rhode Island.

2000 – 2006 Chairman of Non-Profit Organization committee

1984-87 Chairman of the Public Speakers Bureau

25



1980-84 Member of Public Speakers Bureau

1976-80 Member of Committee For Cooperation With Colleges And Universities

### The American Board of Forensic Examiners

1997 Member of Advisory Board of the American College of Forensic Accounting
1997 Awarded Diplomat Status American Board of Forensic Certified Public Accountants
(DABFCPA)
1994 Awarded Diplomat Status
American Board Forensic Examiner (DABFE)

### Admitted as an Expert Witness in Financial Areas

Rhode Island Family Court
1995   Justice Bedrosian
1995   Justice Lipsey
1994   Chief Justice Jeremiah

US District Court
1993   Justice Torres

### Warner-Lambert Company

1978 - 1981 Director of Accounting and Strategic Planning, and Assistant Treasurer for
the American Optical Division. ($500 million international subsidiary of Warner-
Lambert Company)

### Price Waterhouse

1970 - 1978 Senior Audit Manager in the Providence Office

1975 -1977 Manager in the Continuing Education Department in the Price Waterhouse
National Office in New York City. Here, Mr. Monti developed continuing education
materials for use around the country. One video tape production written and directed by
Mr. Monti won a first place award in a National competition for industrial educational
television. During 1977, Mr. Monti spent 6 weeks in London, England working with
**Price Waterhouse International** to design and instruct a course on the development of
continuing educational materials by Price Waterhouse affiliates worldwide.

26



**Education:**

Providence College, BS Degree, May 1970

Harvard University Intensive Program for Business Executives, August 1979

Brown University, Master of Arts, *Ad Eundem* May 1984

Over 40 hours of annual Continuing Professional Education (CPE) courses approved by the American Institute of Certified Public Accountants since 1970.

**Publications:**

*Toward a Certified Statement of Outcomes* an essay that appeared in the Spring 1999 issue of INNOVATING, published quarterly by THE INNOVATION GROUP of the Rensselaerville Institute. INNOVATING is dedicated to enabling individuals in organizations to lead change by example.

**Professional Memberships:**

American Institute of Certified Public Accountants
Rhode Island Society of Certified Public Accountants
American Board of Forensic Examiners (Board Member 1997)
Tailhook Association
Attleboro Historic Preservation Society, Inc. (President 1999 – 2007)

**Honors and Acknowledgements:**

1975 Member of the Year – Providence Chapter of the National Association of Accountants (NAA) [now the Institute of Management Accountants (IMA)]

2006 Time® Magazine Person of the Year – *You Control the Information Age*

KLR

Exhibit 2

**Documents and Other Resources**
**Examined by Expert**

## ACCOUNTING AND FINANCIAL REPORTING STANDARDS CONSIDERED:

In addition to considering all generally accepted accounting principles in force at December 31, 2005, I specifically relied upon the following accounting and financial reporting standards:

- FASB Statement No.5, *Accounting for Contingencies* *
- FASB Statement No. 116, *Accounting for Contributions Received and Contributions Made* *
- American Institute of Certified Public Accountants (AICPA) Auditing Standards
- American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide: *Not-for-Profit Organizations*
  Prepared By The Not-For-Profit Organizations Committee
  (Updated as of March 1, 2008) **

\* **Note**: the **Financial Accounting Standards Board** (FASB) Statements referred to above no longer exist in their original form. Financial Accounting Standards have been combined into a single source of authoritative nongovernmental U.S. Generally Accepted Accounting Principles (GAAP) called the *FASB Accounting Standards Codification*. The *Codification* is effective for periods ending after September 15, 2009 after which references to the original pronouncements is considered non-authoritative. In researching issues related to this case, I used the Codification and have referenced that document when appropriate. Using the FASB's cross reference tools, I have made sure that I have only accessed GAAP as it was applicable to audits of not-for-profit organizations with a fiscal year-end of December 31, 2005.

\*\* The 2008 editions of the AICPA Audit and Accounting Guides, including this guide, have been updated to conform with U.S. Auditing Standards (AU) section 120, *Defining Professional Requirements in Statements on Auditing Standards* in which professional requirements are categorized as either *unconditional requirements* or *presumptively mandatory requirements*, each of which is associated with specific wording such as "must or is required" or "should." These standards distinguish *professional requirements* set forth in the standards from *explanatory material* contained in the standards, the latter of which requires only the auditor's, practitioner's, or accountant's "attention and understanding."

KLR

Although the 2005 edition of the AICPA Audit and Accounting Guide is not
generally available at this time, I believe the changes incorporated into the
2008 guide, (the latest available) represent a clarifying improvement over
what existed in 2005 and utilizing this edition as a reference guide is totally
appropriate to this case.

The role of an Audit Guide in the understanding and implementation of
generally accepted auditing standards is explained in the guide as follows:

> Because interpretive publications (including AICPA Audit and
> Accounting Guides, for example) are recommendations, the publications
> cannot establish requirements. Paragraph .06 of AU section 150,
> *Generally Accepted Auditing Standards* (AICPA, *Professional Standards*,
> vol. 1), states, "The auditor should be aware of and consider interpretive
> publications applicable to his or her audit. If the auditor does not apply the
> auditing guidance included in an interpretive publication, the auditor
> should be prepared to explain how he or she complied with the SAS
> provisions addressed by such auditing guidance."

**Deposition Transcripts and Exhibits:**

Expert Report of William Eisig, March 14, 2011

Bayonne Medical Center and Affiliates
Consolidated Financial Statements
(With Consolidating Information)
December 31, 2005 and 2004
With Independent Auditors' Report

Deposition of James J. Hannan
Tuesday, April 14, 2009

Exhibits to Deposition of James J. Hannan

WSB-1, WSB-2, WSB-3, WSB-4
WSB-5, WSB-6, WSB-7, WSB-8
WSB-9, WSB-10, WSB-11, WSB-12
WSB-13, WSB-14, WSB-15, WSB-16
WSB-17, WSB-18, WSB-19, WSB-20
WSB-21, WSB-22, WSB-23.

BMC V. Omni  Declaration Exhibits #1 – 123

29

BMC audit representation letter addressed to WS&B
dated February 22, 2006

Brief of Defendants Bayonne/Omni Development, L.L.C.,
Bayonne Healthcare Development, L.L.C.,
Omni Asset Management, L.L.C.,
ATB Consulting Company,
And Avery Eisenreich
In Support of Motion for Summary Judgment