# EXHIBIT
# #9

Page 1



UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

**ORIGINAL**

In re BAYONNE MEDICAL CENTER,     :

                Debtor,           :

ALLEN D. WILEN,                   :

                                     DEPOSITION OF:
                Plaintiff,        :
                                     HERMAN BROCKMAN
                -vs-              :

BAYONNE/OMNI DEVELOPMENT,          :
LLC, et al.,
                                  :
                Defendants.        :

-------------------------------------------

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of EDWARDS, ANGELL, PALMER &

DODGE, L.L.P., One Giralda Farms, Madison, New

Jersey, on MONDAY, MARCH 29, 2010, commencing at

12:28 p.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

```
 1   A      Yes.

 2          Q      I'm continuing now from Page 61, Line

 3   22:

 4                 "QUESTION:  Did you ever see an

 5          original of the pledge?

 6                 "ANSWER:  No.

 7                 "QUESTION:  What did you mean by the

 8          first time you saw a copy of it?  Had you

 9          heard about the pledge, is that what you're

10          saying?

11                 "ANSWER:  Yes.

12                 "QUESTION:  So you had heard about

13   the pledge --

14                 "ANSWER:  Mr. Evans told me that he

15   had gotten a $5,000,000 pledge.

16                 "QUESTION:  So Mr. Evans told you

17   that?

18                 "ANSWER:  Yes."

19          So my next question to you would be:  Is

20   that statement also accurate, that you had heard

21   about the pledge before February of '09, when you

22   saw it attached to the subpoena, and that you had

23   heard about it through Mr. Evans?

24   A      Yes.

25          Q      What more can you tell me about what
```

1   Mr. Evans told you when he told you that he had

2   gotten the $5,000,000 pledge?

3   A      Nothing.  The only thing he told me, he got

4   a $5,000,000 pledge.  I asked him from who.  I

5   believe he said Omni.

6          Q      And relative to the dates on those

7   two exhibits, one is October 14, '05 and the other

8   is October 21, '05.

9   A      These both say 14.  Is there another one

10  here?  Okay.

11         Q      Relative to those dates, can you tell

12  me how much after those dates it was that Mr. Evans

13  told you that he had gotten a pledge?

14                MR. PIZZI:  Object to the form.

15  A      I don't know exactly when he told me.

16         Q      Was there anyone else with you when

17  Mr. Evans told you that he had received the pledge?

18  A      I don't know.

19         Q      Did you discuss the pledge further

20  with Mr. Evans at any time after that first

21  disclosure of his that he had received the pledge?

22  A      No.

23         Q      Did you discuss the pledge at any

24  time with Carrie Evans?

25  A      No.

# EXHIBIT
# #10

Page 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

CASE NO. 07-15195(MS)

CHAPTER 11

------------------------------------------X

In re:  Bayonne Medical Center,


            Debtor.


------------------------------------------X



DEPOSITION OF JAMES J. HANNAN

TUESDAY, APRIL 14, 2009









DEPOLINK

Court Reporting & Litigation Support Services

Phone (973) 353-9880     Fax (973) 353-9445

www.depolinklegal.com

Page 140

1    to the people at Omni Asset in an effort to

2    confirm the substance and any conditions on the

3    pledge.

4         Q.    Would you agree with me that there was

5    no copy of the pledge located in the Withum

6    papers?

7         A.    Yes, pledge agreement.

8         Q.    Pledge agreement.

9         A.    Yes.

10            (Confirmation Bates-stamped WSB891 and

11    WSB892 is marked as WSB Exhibit 14 for

12    Identification.)

13         Q.    I've handed you a two-page document

14    bearing the Bates-stamp numbers WSB891 and -892.

15    Take a second to look at that, and let me know

16    when you're done.

17         Are you done?

18         A.    Yes.

19         Q.    Have you seen this document before?

20         A.    Yes.

21         Q.    Is this the confirmation that was sent

22    out in connection with the Omni 5 million-dollar

23    pledge?

24         A.    Sent out under our control and received

25    in our office.

# EXHIBIT #10A

# Bayonne Medical Center

29th Street at Avenue E
Bayonne, New Jersey 07002



October 21, 2005

Mr. Avery Eisenreich
OMNI Asset Management, LLC
26 Journal Square
Jersey City, New Jersey 07306

Dear Mr. Eisenreich:

While Bayonne Medical Center regards a pledge as a promise, it is not legally binding. Bayonne Medical Center is dependent on the generosity and ability of its constituents to financially assist the Medical Center in bringing forth projects and programs; however, you are under no obligation to fulfill your pledge if your own personal financial circumstances change. While we hope that you will not experience any financial difficulties Bayonne Medical Center will work with you to accommodate unforeseen personal situations.

Thank you,

Robert H. Evans
President & CEO

www.bayonnemedicalcenter.org

Bayonne Medical Center Foundation

CONFIDENTIAL PLEDGE FORM

I/We pledge an unrestricted gift to support the programs and services at Bayonne Medical Center.

The total pledge of $ 5,000,000 will be paid over four years.

The pledge will be paid in (annual, semi-annual, quarterly or monthly) annual installments.

The first payment will be made on June 2006 (month/year)

☒ I/We wish to remain anonymous.

☐ I/We are interested in a naming opportunity and request the following: _____

This gift is in memory/honor of _____

Name: Omni Asset Management

Address: 26 Journal Sq. 16th Floor     Phone: 201-216-9580

Signature: _____     Date: 10/26/05

# EXHIBIT
# #11

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,       :

                    Debtor,          :

BAYONNE MEDICAL CENTER,             :        COPY
Debtor and
Debtor-in-Possession; and           :
ALLEN D. WILEN, in his
capacity as Liquidating             :   DEPOSITION OF:
Trustee and Estate
Representative for the Estate       :  CONNIE M. TAUBER
of Debtor, Bayonne Medical
Center,                             :

                    Plaintiff,       :

                    -vs-             :

BAYONNE/OMNI DEVELOPMENT,           :
L.L.C., a New Jersey limited
liability company; et al.,          :

                    Defendants.     :
--------------------------------

B E F O R E :

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

THURSDAY, JULY 22, 2010, commencing at 10:54 a.m.,

pursuant to Notice.


                      DepoLink
    Court Reporting & Litigation Support Services
        Phone (973) 353-9880    Fax (973) 353-9445
              www.depolinklegal.com

## Page 10

1    Q.   Sure. Who was your employer in 1999
2   when you started with the entities or Mr.
3   Eisenreich?
4    A.   Avery Eisenreich.
5    Q.   So he paid your paycheck?
6    A.   Correct.
7    Q.   Did it come out of a personal
8   checking account of some kind that he personally
9   controlled?
10    A.   No.
11    Q.   How did you get paid by Mr.
12   Eisenreich?
13    A.   He's the signer on the check.
14    Q.   Do you know what entity was the owner
15   of the bank account that you got paychecks from?
16    A.   I don't recall then.
17    Q.   What was your title?
18    A.   I didn't have a title at that time.
19    Q.   Did you ever have a title?
20    A.   I sometimes use a title, but I was
21   hired to do a variety of different job
22   responsibilities that would develop as my employment
23   continued.
24    Q.   Did you say you sometimes use a job
25   title?

## Page 11

1    A.   Yes, sometimes.
2    Q.   What is the title that you use?
3    A.   Director of finance.
4    Q.   When did you start using that?
5    A.   The beginning of 2000 something.
6    Q.   In the 2000s, in other words?
7    A.   Right.
8    Q.   Today are your job duties the same as
9   they were when you assumed that title of director of
10   finance?
11    A.   Yes.
12    Q.   So tell us what your job duties are.
13    A.   As director of finance, I overlook
14   the accounting department of some of Avery's
15   companies that he owns, not nursing homes.
16    Q.   What else do you do? Is that it?
17    A.   No.
18    Q.   I want a complete answer. When we
19   ask a question to you and you stop talking, I'm
20   going to assume that you completed your answer, but
21   perhaps the answer isn't complete. You have to say
22   everything that's responsive to the question.
23       So as I understand it, your duties include
24   overlooking the accounting department of some of
25   Avery Eisenreich's companies, not nursing homes.

## Page 12

1    A.   Correct.
2    Q.   What else are your job duties today?
3    A.   I am Avery's assistant, basically,
4   when he comes in at 4:00, 5:00 in the afternoon.
5    Q.   He comes in at 4:00 or 5:00, that's
6   when he comes in most days?
7    A.   Almost every day.
8    Q.   What does he do when he gets up in
9   the morning and 4:00?
10    A.   He has his own schedule.
11    Q.   Are you familiar with his schedule?
12    A.   Only sometimes.
13    Q.   How late does he work?
14    A.   It could be 8:00, 9:00.
15    Q.   How late -- what are your hours?
16    A.   9:00, on the average.
17    Q.   9:00 p.m.?
18    A.   Yes.
19    Q.   What time do you start work?
20    A.   Between 9:00 and 9:30.
21    Q.   What are the companies that you
22   oversee the accounting work for?
23    A.   A therapy company, a home care
24   company, a respiratory company, a pharmacy we own,
25   or he owns, I don't own anything, a medical company

## Page 13

1   that he owned, that I still manage, properties that
2   he owns. I can't remember anything else right now.
3    Q.   What are the names of these entities?
4    A.   The therapy company, Advantage Rehab,
5   Advantage Rehabilitation Services, Advantage
6   Respiratory, Promise Care of New Jersey, the medical
7   company was partners, Med B.
8    Q.   Med?
9    A.   Med B, L.L.C.
10    Q.   Med B-e-e?
11    A.   No, B. Partners Med B. Letter B,
12   L.L.C.
13    Q.   Did you say Med Partners?
14    A.   Partners Med, M-e-d, capital B,
15   L.L.C. And the realities then, very many. Do you
16   want me to list them all?
17    Q.   Yes.
18    A.   I'll be honest, I can't remember them
19   all.
20    Q.   Okay. Just tell us the ones you
21   recall.
22    A.   Rochelle Park Holding.
23    Q.   Rochelle Park, okay.
24    A.   Castle Hill Holding, S.A.C. Realty,
25   Great Falls Realty, the list is long. A lot of

# EXHIBIT
# #12

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :    :

           Debtor,    :

**ORIGINAL**

BAYONNE MEDICAL CENTER,    :
Debtor and
Debtor-in-Possession; and    :
ALLEN D. WILEN, in his    DEPOSITION OF:
capacity as Liquidating
Trustee and Estate    ROBERT H. EVANS
Representative for the Estate    :
of Debtor, Bayonne Medical    VOLUME I
Center,    :    (Pages 1-236)

           Plaintiff,    :

        -vs-    :

BAYONNE/OMNI DEVELOPMENT,    :
L.L.C., a New Jersey limited
liability company; et al.,    :

         Defendants.    :
------------------------------------

B E F O R E :

    SHARON B. STOPPIELLO, a Certified Court
Reporter and Notary Public of the State of New
Jersey, at the offices of GREENBAUM, ROWE, SMITH &
DAVIS, L.L.P., 75 Livingston Avenue, Roseland, New
Jersey, on MONDAY, JUNE 21, 2010, commencing at 9:19
a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1              MR. FALANGA:  Object to form.

2        Q.    Did you ever bring the comfort letter

3   to Withum's attention?

4              MR. FALANGA:  Object to the form.

5        A.    I did not, no.

6        Q.    Do you know whether Carrie or Marvin

7   or Paul Mohrle did?

8              MR. FALANGA:  Object to the form.

9        A.    I wouldn't know.

10        Q.    Do you know if anyone on behalf of

11   BMC brought this comfort letter to WSB's addition?

12              MR. FALANGA:  Object to the form.

13        A.    I don't know.

14        Q.    At some point in time did you sign a

15   management representation letter in connection with

16   WSB's audit of BMC's finances for 2005 in which you

17   told them, in words or substance, that the Omni

18   pledge was enforceable?

19              MR. FALANGA:  Object to the form.

20              MS. KIERKUT:  Object to the form.

21        A.    Management rep letters are something

22   that are fairly routine in our industry.  Generally

23   they're prepared either by the auditors, in this

24   case it would have been prepared by

25   WithumSmith+Brown, and in conjunction with our

Page 90

1   finance department, in particular our CFO.  The CFO

2   essentially puts the rep letter in front of a person

3   such as myself, the CFO, and says it's okay to sign

4   and then I sign it.  This particular rep letter

5   probably had at least two signatures besides mine.

6   It probably had Mr. Mohrle's who was the director of

7   finance at the time, it probably had Heather

8   Aaron's.  I would not state now or then that my

9   signature spoke to the enforceability of the pledge.

10        Q.     Other than you, so far as you know,

11   who before December 2005, if anyone, was aware of

12   the existence of the comfort letter, Tab 21?

13             MR. FALANGA:  Objection.

14        A.     I couldn't say, Mr. Gruen, but it was

15   not a secret.  I discussed it with several senior

16   management people.

17        Q.     Who?

18        A.     With Mr. Apsel, with Heather Aaron at

19   the time, with Marv, Carrie Evans.  Also Vinny

20   Lombardo when I asked his advice.  And the fact that

21   it's here, you know, it was probably pulled out of

22   the files of Bayonne Medical Center.  As I said, it

23   is what it is.

24        Q.     I don't mean to be critical, but I'm

25   not entirely sure you answered the question I put,

Page 100

1   with any of those persons before the management rep

2   letter about whether you should or shouldn't

3   communicate to Withum that it was BMC policy, as

4   you've described it here today, not to seek

5   enforcement of pledges?

6                    MR. FALANGA:   Object to the form.

7                    MS. KIERKUT:   Objection to norm.

8        A.      As I said before, I never thought

9   that it was something that had to be related.

10  Again, I didn't think it was a change in anything

11  regarding our policy, or certainly something that

12  would be communicated to an auditor, it never

13  crossed my mind.

14       Q.      The auditors before Withum were J. H.

15  Cohn?

16       A.      Correct.

17       Q.      And did J. H. Cohn do the audits for

18  the entire period of your tenure other than for the

19  year 2005?

20       A.      I believe they did 2004 and 2003.

21  I'm not certain.

22       Q.      So far as you know, did anyone ever

23  communicate to J. H. Cohn before they did their

24  audits the BMC policy with respect to

25  unenforceability of pledges as you've testified to

# EXHIBIT
# #13

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

    Debtor,      :

BAYONNE MEDICAL CENTER,            :
Debtor and
Debtor-in-Possession; and          :
ALLEN D. WILEN, in his              DEPOSITION OF:
capacity as Liquidating
Trustee and Estate                  ROBERT H. EVANS
Representative for the Estate      :
of Debtor, Bayonne Medical           VOLUME I
Center,                            : (Pages 1-236)

    Plaintiff,   :

    -vs-      :

BAYONNE/OMNI DEVELOPMENT,          :
L.L.C., a New Jersey limited
liability company; et al.,         :

    Defendants.   :
------------------------------------

B E F O R E:

  SHARON B. STOPPIELLO, a Certified Court
Reporter and Notary Public of the State of New
Jersey, at the offices of GREENBAUM, ROWE, SMITH &
DAVIS, L.L.P., 75 Livingston Avenue, Roseland, New
Jersey, on MONDAY, JUNE 21, 2010, commencing at 9:19
a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880 Fax (973) 353-9445
www.depolinklegal.com

Page 167

1    you talked with anyone about when the pledge would

2    be paid?

3         A.    When did I talk to anybody?

4         Q.    The first time you can recall.

5         A.    Probably around December of 2005,

6    January of 2006.

7         Q.    Well, do you recall whether it was

8    before you signed the letter of intent or after you

9    signed the letter of intent?

10        A.    I don't recall.

11        Q.    Did you ever threaten Mr. Eisenreich

12   that you wouldn't sign the letter of intent unless

13   he delivered the pledge?

14             MS. KIERKUT:   Object to the form.

15        A.    I did not.

16        Q.    To your recollection, was there any

17   duress involved?  Do you know what had I mean by

18   "duress"?

19        A.    I do.

20        Q.    Was there any duress involved with

21   the hospital obtaining the pledge from Mr.

22   Eisenreich or Omni Asset Management?

23        A.    I don't believe there was any duress,

24   no.

25        Q.    So it's your understanding that it

1  was a voluntary pledge, correct?

2      A.    Correct.

3      Q.    Did you ever hear from anybody that

4  Mr. Eisenreich was claiming that the pledge was

5  obtained by duress?

6      A.    Only in the context of this

7  litigation.

8      Q.    Do you recall when you heard that,

9  other than if it was through counsel?

10     A.    It was through counsel.

11           MS. KIERKUT:  We're not waiving any

12  privilege by that statement.

13           MR. FALANGA:  I understand that,

14  that's why I clarified it, I didn't want him to say

15  it.

16     Q.    Was the pledge in any way contingent

17  upon you agreeing to sign a letter of intent?

18     A.    No.

19     Q.    So as far as you were concerned, the

20  hospital would have signed the letter of intent

21  regardless of whether it obtained the pledge from

22  Mr. Eisenreich or Omni Asset Management?

23     A.    Absolutely.  Our biggest goal was to

24  get the nursing home built and to more forward with

25  the deal with Omni.

# EXHIBIT
# #14

Page 1



UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :

    Debtor,        :

ALLEN D. WILEN,         :

                  DEPOSITION OF:

    Plaintiff,      :

                  HERMAN BROCKMAN

   -vs-           :

BAYONNE/OMNI DEVELOPMENT,    :
LLC, et al.,
                  :

    Defendants.
-----------------------------------

B E F O R E:

   SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of EDWARDS, ANGELL, PALMER &

DODGE, L.L.P., One Giralda Farms, Madison, New

Jersey, on MONDAY, MARCH 29, 2010, commencing at

12:28 p.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1    they chose to go through with?

2    A      Yes, Mr. Evans brought to the board that

3    that was the company they were going for.

4         Q      Do you know recall that he said why

5    it was that that was the company they were going

6    with?

7    A      I believe he said something like they

8    already had the licensed beds.

9         Q      Did you understand what that meant?

10   A      That meant you didn't have to apply to the

11   state for the process of getting licensed beds,

12   which could take a substantial amount of time.

13   That's the way it was explained.

14        Q      And did Evans explain that the

15   candidates that were being considered for

16   development of the skilled nursing facility, that

17   Eisenreich or his company was the only one who held

18   such a license?

19   A      I believe that's what he said.

20        Q      At some point in time somebody then

21   began negotiations with Mr. Eisenreich with a view

22   towards implementing this idea.

23             MR. PIZZI:  Objection, no foundation.

24        Q      Is that correct?

25   A      I believe so.

1       Q       Who was it that began negotiations

2   with Mr. Eisenreich in furtherance of this idea?

3   A       From what I read, I believe it was Mr.

4   Evans.

5       Q       When you say from what you read, what

6   is it that you're referring to?

7   A       Some of the material I've read here that

8   says Mr. Evans in 2005 said this, et cetera, et

9   cetera.  And he was the one who reported to the

10  board about it, so I believe it was Mr. Evans.

11      Q       Did Mr. Evans make periodic reports

12  to the board of the progress that he was having in

13  negotiating a deal with Mr. Eisenreich to implement

14  his idea?

15  A       No.  He just reported that they were moving

16  forward on the nursing home project.

17      Q       Did he or did anyone else ever report

18  to the board that letters of intent had been

19  exchanged with Mr. Eisenreich with respect to

20  furthering this idea?

21  A       I don't recall.

22      Q       Do you recall ever seeing letters of

23  intent relating to negotiations with Mr. Eisenreich

24  in connection with furthering this idea?

25  A       No.

# EXHIBIT
# #15

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :

                    Debtor,    :

BAYONNE MEDICAL CENTER,    :
Debtor and
Debtor-in-Possession; and    :
ALLEN D. WILEN, in his
capacity as Liquidating    :    DEPOSITION OF:
Trustee and Estate
Representative for the Estate    :    MARVIN APSEL
of Debtor, Bayonne Medical
Center,    :

                    Plaintiff,    :

                    -vs-    :

BAYONNE/OMNI DEVELOPMENT,    :
L.L.C., a New Jersey limited
liability company; et al.,    :

                    Defendants.    :
------------------------------------

**ORIGINAL**

B E F O R E:

        SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

THURSDAY, OCTOBER 14, 2010, commencing at 10:05

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1    at all about that number beyond his telling you

2    that's the number that he wanted you to pursue?

3         A.    No.

4         Q.    He told you about talking points.

5    What talking points did he tell you?

6         A.    The talking points were, as I recall,

7    that a pledge of this magnitude would be a

8    demonstration of the commitment of Avery Eisenreich

9    and Omni to the Bayonne Medical Center, to the

10   Bayonne community, and a strong commitment to the

11   project.

12        Q.    Do you recall his giving you any

13   other talking points?

14        A.    He asked me to ask for the amount

15   noted over a period of five years, to be paid

16   annually over a five-year period.

17        Q.    Anything else?

18        A.    He asked me to do it expeditiously.

19        Q.    Did he tell you that Avery's

20   selection for the SNF project was going to turn on

21   whether this pledge was given?

22        A.    He did not say that to me.

23        Q.    Anything else you can recall about

24   that specific conversation with Rob Evans, this

25   first conversation?