# EXHIBIT
# #16

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,     :

        Debtor,     :

BAYONNE MEDICAL CENTER,     :
Debtor and
Debtor-in-Possesssion; and     :
ALLEN D. WILEN, in his
capacity as Liquidating     :     DEPOSITION OF:
Trustee and Estate
Representative for the Estate     :     CAROLINE EVANS
of Debtor, Bayonne Medical
Center,     :     VOLUME I
     (Pages 1-229)
        Plaintiff,     :

        -vs-     :

BAYONNE/OMNI DEVELOPMENT,     :
L.L.C., a New Jersey limited
liability company; et al.,     :

        Defendants.     :
------------------------------

B E F O R E:

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P., 85

Livingston Avenue, Roseland, New Jersey, on

THURSDAY, MAY 6, 2010, commencing at 10:09 a.m.,

pursuant to Notice.

DepoLink
Court-Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 36

1    tell you what the purchase price was?

2          A.    I don't remember if it was Marvin who

3    told me, but I found out that if it was, like,

4    $2,000,000.

5          Q.    Did you have any involvement

6    whatsoever in the negotiation with Avery for what

7    ultimately became the agreed purchase price for the

8    Bell Street building?

9          A.    You know what?  I did.  I had a

10   conversation with him, Paul Mohrle, Marvin, I was

11   involved in the conversation.  It was not a decision

12   I made, but I was definitely a part of the

13   conversation.

14         Q.    How did that conversation go, can you

15   recall for me?

16         A.    No, I don't remember exactly, but I

17   know that they were saying -- there was a dispute

18   early on, and Marvin conveyed this to all of us and

19   so did Heather.

20         Q.    A dispute about what?

21         A.    About appraisals, and that there

22   were, like, three or four of them.  And Avery was

23   saying, You're crazy, or something, because one of

24   them was just not in line with the other ones.  And

25   Marvin said, you know, He doesn't like this one, and

1.   all this other stuff.  So I remember that.  I

2    remember there were two of them, actually, and then

3    one that was crazy, that's what Marvin said.

4         Q.    What was the crazy one?

5         A.    I think it was like over $4,000,000,

6    or something like that.

7         Q.    And did Marvin say why that one was

8    crazy?

9              MR. FALANGA:  Object to the form.

10        A.    He did not.

11        Q.    Did anyone else characterize the one

12   that was over $4,000,000?

13        A.    No.

14        Q.    Did this discussion that you had with

15   Marvin about what you say were the three appraisals

16   lead then to a discussion among you, Marvin and

17   others about what the price should be?

18              MR. FALANGA:  Object to the form.

19        Q.    Go ahead.

20        A.    Yes.

21        Q.    And what was that discussion?

22        A.    Well, I think it was back and forth,

23   there was a lot of back and forth.  I said, How are

24   you going to do this?"

25        Q.    Who are you talking to?

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

                   Debtor,      :

BAYONNE MEDICAL CENTER,            :
Debtor and
Debtor-in-Possession; and         :
ALLEN D. WILEN, in his                      DEPOSITION OF:
capacity as Liquidating           :
Trustee and Estate                          ROBERT H. EVANS
Representative for the Estate     :
of Debtor, Bayonne Medical                  VOLUME I
Center,                           :        (Pages 1-236)

          Plaintiff,      :

         -vs-      :

BAYONNE/OMNI DEVELOPMENT,          :
L.L.C., a New Jersey limited
liability company; et al.,        :

        Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - -

**ORIGINAL**

B E F O R E:

    SHARON B. STOPPIELLO, a Certified Court
Reporter and Notary Public of the State of New
Jersey, at the offices of GREENBAUM, ROWE, SMITH &
DAVIS, L.L.P., 75 Livingston Avenue, Roseland, New
Jersey, on MONDAY, JUNE 21, 2010, commencing at 9:19
a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880      Fax (973) 353-9445
www.depolinklegal.com

Page 39

1      Q.      Did anyone tell him, yourself

2   included, that the purpose of getting a separate

3   appraisal was to assist in negotiating the price up

4   with Mr. Eisenreich?

5               MR. FALANGA:  Object to the form.

6      A.      Well, he was at that July board

7   meeting which I mentioned.  So he certainly heard

8   the same thing that I did from our vice chairman of

9   our board, John Grywalski.  And he probably heard

10  similar thoughts expressed between July of 2005 and

11  when that appraisal was sought.  And I think he knew

12  it was to a certain extent going to be used for

13  negotiation.

14     Q.      Did anyone, so far as you know, ask

15  him to inform the appraiser, the chosen appraiser

16  that that was the purpose of the appraisal that was

17  being sought?

18              MS. KIERKUT:  Objection to form.

19              MR. FALANGA:  Objection to form.

20     Q.      You can answer.

21     A.      I don't know that anyone advised him

22  specifically that that would be the purpose of the

23  appraisal, but I'm equally certain that he knew it.

24     Q.      So then BMC did obtain through Marvin

25  Apsel its own appraisal for purposes of continuing

Page 40

1    with the price negotiations with Omni; is that

2    correct?

3         A.      That's correct.

4                 MR. FALANGA:   Object to the form.

5         Q.      Do you remember reviewing that

6    appraisal yourself?

7         A.      I did not.  No, I did not.

8         Q.      You're smiling.  So I have to ask the

9    right question, and I have to try to get behind your

10   smile.  Did you have any conversations with anyone

11   at BMC about that appraisal?

12                MR. FALANGA:   Object to the form.

13        A.      I did, I had conversations with Mr.

14   Apsel and with Ms. Giblin and Heather Aaron about

15   that appraisal.

16        Q.      Can you recall those conversations in

17   words or substance the best that you can?

18                MR. FALANGA:   Objection.

19        A.      Well, Mr. Apsel actually came to me

20   and was concerned, because the appraiser did not

21   want to sign the appraisal.  He was concerned about

22   standing behind it, were the words I recall Mr.

23   Apsel using.  And what I said to both he and to Ms.

24   Aaron is that this appraisal will do us no good if

25   the appraiser will not stand behind it.

1          Q.     I'm sorry, I didn't mean to cut you

2     off.

3          A.     No, I'm done.

4          Q.     Did Marvin tell you why the appraisal

5     wouldn't sign the appraisal to stand behind it?

6                 MR. FALANGA:   Objection.

7          Q.     I'm going the rephrase that question.

8          A.     Go ahead.

9          Q.     Did Marvin tell you what, if

10    anything, the appraiser had told him was the reason

11    that the appraiser didn't want to sign it and stand

12    behind it?

13                MR. FALANGA:   Object to the form.

14         Q.     You can answer.

15         A.     He used several words, one was the

16    appraiser thought he was being pushed to give too

17    high an appraisal, he thought it was crazy and he

18    thought that he would have a problem, "he," the

19    appraiser would have a problem defending it.   That

20    is according to Mr. Apsel.

21         Q.     We talked about Marvin.   Did you

22    receive any reports or communications from anybody

23    else on the BMC side about this appraisal that you

24    had received or that had been received through

25    Marvin?

Page 42

1        A.      I recall having a conversation with

2   Stephanie Giblin, our chief nursing officer, and

3   Carrie Fleishell Evans, Carrie Evans, that they both

4   had different concerns about the second appraisal.

5        Q.      What were their concerns?

6                MR. FALANGA:  Objection.

7        Q.      As expressed to you.

8                MR. FALANGA:  Objection.

9        A.      As expressed to me, Stephanie

10  Giblin's concerns were that Mr. Eisenreich would

11  think we were not serious and it could end the

12  discussion for the nursing home.  Carrie Evans'

13  concerns were very similar to Stephanie's, that we

14  would look like we were, in essence, you know, being

15  ridiculous.

16       Q.      Did anyone else talk to you about

17  that appraisal?

18               MR. FALANGA:  Object to the form.

19       A.      They likely did, but I don't recall.

20  Those are the ones who stood out.

21       Q.      That appraisal was ultimately signed

22  by the appraiser; is that correct?

23               MR. FALANGA:  Object to the form.

24       A.      The appraiser ultimately signed it,

25  yes.

Page 43

1          Q.    Did anyone communicate with the

2    appraiser to help him overcome his resistance to

3    signing the appraisal?

4                MS. KIERKUT:  Object to the form.

5                MR. FALANGA:  Object to the form.

6          A.    I don't know what was said, but Mr.

7    Apsel did convince him to sign that appraisal.

8          Q.    If you'll open up to Number 3 in the

9    volume in front of you, I will represent to you, in

10   order to try to speed this along, although you're

11   free to read through all of the pages, that this is

12   a true copy of the appraisal report that you've just

13   referred to as being produced by the BMC side as far

14   as the negotiations with --

15               MR. FALANGA:  Object to the form of

16   the question.

17               MR. GRUEN:  There wasn't a question.

18               MR. FALANGA:  Object to the statement

19   on the record, the characterization.

20               MR. GRUEN:  Do you disagree with it?

21               MR. FALANGA:  I do.

22               MR. GRUEN:  You do.

23         Q.    Would you look at this exhibit, and

24   tell me if you've ever seen it before?

25         A.    I have seen it before.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,     :

               Debtor,     :            **ORIGINAL**

BAYONNE MEDICAL CENTER,           :
Debtor and
Debtor-in-Possession; and         :
ALLEN D. WILEN, in his                        DEPOSITION OF:
capacity as Liquidating           :
Trustee and Estate                      ROBERT S. BURNEY
Representative for the Estate     :
of Debtor, Bayonne Medical              VOLUME II
Center,                           :     (Pages 36-115)

           Plaintiff,     :

        -vs-                       :

BAYONNE/OMNI DEVELOPMENT,         :
L.L.C., a New Jersey limited
liability company; et al.,        :

         Defendants.     :
----------------------------------

B E F O R E :

     SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P.,

85 Livingston Avenue, Roseland, New Jersey, on

WEDNESDAY, DECEMBER 15, 2010, commencing at 10:02

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1    price had been negotiated prior to our involvement,

2    and we lost the ability to question how that

3    purchase price was developed because Rob Evans was

4    gone.  We felt it was appropriate to obtain an

5    objective third-party appraisal for the property.

6    So that when the question was asked, is there

7    validation for this, it could be answered in the

8    context of the bond issue, the closing of the bond

9    issue.

10        Q.    And did the fact that there was a

11   prior appraisal at $5.3 million, did that also cause

12   this issue to be of concern between you and Mr.

13   Ross?

14        A.    We were mindful of it.  That

15   appraisal was done before we were involved in this.

16   And there was a general understanding or belief that

17   for several reasons that other appraisal did not

18   reflect the appropriate value.  Again, we were not

19   involved in ordering it, developing it, I couldn't

20   answer any questions about how it was done, it was

21   done before we had involvement.  But it didn't

22   recognize the teardown nature of the buildings, and

23   I don't believe it recognized the environmental

24   issues.

25        Q.    The fact that the appraisal was out

1    extent to which the Cushman & Wakefield draft

2    document and the figure that's postulated in there

3    was communicated to anyone at the hospital.  So I

4    don't want to go back over that.  But I just want to

5    ask you this question.  If Marvin Apsel testified in

6    deposition that he knew nothing of the valuation of

7    any Cushman & Wakefield draft document, would you

8    have any reason to disagree with that testimony on

9    his part?

10        A.     Since I did not personally send this

11   document to him, I can't say that I would have a

12   problem with his testimony.  If he had -- I'll end

13   it there.

14        Q.     That's fine.

15             MR. PIZZI:  I have no other

16   questions.

17             MR. COPLON:  Just a few follow-ups,

18   in light of what Mr. Pizzi asked you.

19   REDIRECT EXAMINATION BY MR. COPLON:

20        Q.     Referring to the Walter appraisal of

21   October 17, 2005, which showed a value of 5,300,000,

22   you said that you were aware of it, but there was a

23   general understanding or belief that the other

24   appraisal was not accurate.  I think that's what you

25   just testified to a moment ago.  Is that correct?

1                      (At this point in the proceedings,

2            a brief recess is taken.)

3                      MR. PIZZI:  Let's just see if we can

4      do this without calling the judge.

5                      MR. CAMBRIA:  Give what the general

6      impression is, right?

7                      MR. PIZZI:  If you're able to

8      actually answer it by saying who was there and what

9      you recall.  If you don't recall specifics you have

10     to say that.

11         A.      I can't recall who said what to whom.

12     The general understanding was that that appraisal --

13     I'm sorry, the --

14                     MR. CAMBRIA:  The October 2005.

15         A.      Correct, the October 2005 appraisal

16     didn't adequately address the unique nature of this

17     transaction.  It was a simplistic appraisal, which

18     was based upon factors that were not appropriate to

19     this sale, like comparables of the buildings.  And

20     that, therefore, while it may show comparables of

21     buildings, it didn't reflect what a willing buyer

22     would do with this property with those buildings.

23     That's as far as I'll go.

24                     MR. PIZZI:  I thought the question

25     was what was said, and you're giving us your opinion

1    of the appraisal, which, again, is beyond your

2    expertise and also prohibited by the Judge's Order.

3    Sir, please.  Therefore, I've got to move to strike

4    that, and ask you to try to answer the question

5    that's asked, instead of giving your impressions.

6                 MR. COPLON:  Well, the question

7    was --

8                 THE WITNESS:  It was general

9    impressions.

10                MR. PIZZI:  No, no, the question was

11   what was said.

12                MR. COPLON:  You just didn't like the

13   answer, but let's move on.  You've got your motion

14   to strike and he's got his testimony.

15                MR. PIZZI:  There you go.

16        Q.    When you say that this was a general

17   understanding that was reached, this is a general

18   understanding that occurred as a result of either a

19   meeting or a conference where the participants were

20   you, Mr. Ross and hospital representatives?

21                MR. PIZZI:  Object to the form.

22                MR. CAMBRIA:  I object to the form of

23   the question.  My understanding is not that the

24   testimony was about what consensus was reached, but

25   rather what his individual impression was.  That was

1    my understanding.

2         A.     That's what I was trying to convey.

3         Q.     Well, who were the participants of

4    this general understanding.  You said "general

5    understanding."  Among whom?  You're speaking for

6    your own impression of the understanding?

7         A.     It was my impression based upon what

8    I believe to have been a conversation involving

9    someone from the hospital.  I don't recall the

10   details.  I cannot tell you whom.

11        Q.     It was certainly you, certainly Ross

12   and someone from the hospital?

13        A.     That's correct.

14        Q.     And when I say "someone," I mean an

15   executive.

16        A.     That's correct.

17        Q.     And when you ordered the Cushman &

18   Wakefield report, you did so, did you not, because

19   of this general understanding that the Walter

20   appraisal of October 17th, 2005 did not express fair

21   value in a credible fashion?

22               MR. PIZZI:  Object to the form.

23               MR. COPLON:  Excuse me, I'm just

24   getting a call from my daughter.  Let me apologize.

25               (At this point in the proceedings,

1            a brief recess is taken, whereupon the

2            pending question is read by the Reporter.)

3        A.      Not being an appraiser, I don't want

4   to use the terms "fair value" and "credible

5   presentation."  The concern was that it was

6   appraising the property for a different type of use,

7   and, therefore, did not accurately reflect the value

8   as it would relate to the Omni transaction.

9        Q.      And moving on from that, you explain

10   the importance to a 501(c) to avoid a transaction

11   where there's a private benefit that's bestowed on a

12   third party, correct?

13        A.      Yes.

14        Q.      The Omni transaction that closed on

15   October 8, 2006 --

16            MR. CAMBRIA:  December 8th.

17            MR. COPLON:  I'm sorry.

18        Q.      -- December 8th, 2006, would have

19   created potential problems with taxing authorities

20   and possibly the Attorney General's office if there

21   were excessive benefit?

22        A.      No.  That's way too broad a

23   characterization.  The issue is if the purchaser,

24   Omni, received the benefit of an inappropriate

25   purchase price, then, depending upon Omni's status,

# EXHIBIT
# #17



Cushman & Wakefield of New Jersey, Inc.
One Meadowlands Plaza, 7th Floor
East Rutherford, NJ 07073
201.508.5213 Tel
201.896.1911 fax
paul.korch@cushwake.com

November 22, 2006

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
53 Cardinal Drive
Westfield, New Jersey 07091

Re:    Appraisal of Real Property
       In a Restricted Use Appraisal Report

       Bayonne Medical Center - Excess Parcel
       East Side of Broadway Between East 29th and East 30th Streets
       Bayonne, Hudson County, New Jersey  07002

       C&W File ID:  06-15001-9421

Dear Mr. Ross:

In fulfillment of our agreement as outlined in the Letter of Engagement, we are pleased to transmit our appraisal in a restricted use report on the property referenced above.

The value opinion reported below is qualified by certain assumptions, limiting conditions, certifications, and definitions, which are set forth in the report. We particularly call your attention to the extraordinary assumptions and hypothetical conditions noted in this report.

This report was prepared for Lindabury, McCormick, Estabrook & Cooper, P.C. and is intended only for their specified use, for that of their client Bayonne Medical Center.  It may not be distributed to or relied upon by any other persons or entities due to its restricted use format. This appraisal report has been prepared in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP), including the Competency Provision of the Appraisal Foundation and the Appraisal Institute.

The property was inspected by and the report was prepared by Paul W. Korch, MAI, CRE under the supervision of Robert J. DiFalco, MAI.

## Extraordinary Assumptions and Hypothetical Conditions

### Extraordinary Assumptions

An extraordinary assumption is defined by the *USPAP* (2006 Edition, The Appraisal Foundation) as "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."


EXHIBIT

WILEN_ESI00003274

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 2

It is our understanding that two easements will be retained upon transferring of the property. One easement will be to provide loading access to the existing Bayonne Hospital main loading dock and the other easement will provide a pedestrian connection between the proposed new building which is to be constructed on the subject land and the existing adjacent Bayonne Hospital building. As we were not provided the details of these proposed easements, their effect, if any, has not been considered in the value of the subject land. Additionally, there are air rights of 1,176 square feet that will be conveyed at the northeast corner of the subject site, which will allow the proposed building to be cantilevered over the existing Bayonne Hospital property. We have considered the contributory value of the air rights in the valuation of the subject property.

Hypothetical Conditions

A hypothetical condition is defined by the *USPAP* (2006 Edition, The Appraisal Foundation) as "that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

The property is currently improved with a two story plus basement masonry commercial building and a one-story masonry and steel commercial building. However, as per the client's instructions we are appraising the land only for this assignment.

Restricted Use Appraisal Report

This is a restricted use appraisal report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(c) of the Uniform Standards of Professional Appraisal Practice for a Restricted Use Appraisal Report. As such, it presents no discussions of the data, reasoning, or analyses used in the appraisal process to develop the appraisers' opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraisers' file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated on the following page. The appraiser is not responsible for the unauthorized use of this report.

WILEN_ESI00003275

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 3

**Identification of Property**

Common Property Name:      Bayonne Medical Center - Excess Parcel

Location:      East Side of Broadway Between East 29th and East 30th
Streets
Bayonne, Hudson County, New Jersey 07002

The site is located along the easterly side of Broadway
between East 29th and East 30th Streets.

General Overview:      The property consists of a 20,035-square foot parcel of
land. Lot 4 is improved with a two story plus basement
masonry commercial building constructed in 1915±
containing approximately 17,500 square feet; and Lot 3
is improved with a one story masonry and steel
garage/storage building originally constructed in 1940±
containing approximately 5,000 square feet. Lots 1 and
2 are asphalt paved for surface parking. The property is
currently owner occupied by Bayonne Medical Center.

For purposes of this report, the improvements will not be
valued.

Assessor's Parcel Number:      Block 164 Lots 1, 2, 3 and 4

Legal Description:      A legal description for the subject property is included in
the property survey provided to us and retained in our
files.

**Purpose and Intended Use and Users of the Appraisal**

This appraisal is intended to provide an opinion of the current market value of the fee simple
interest in the property (land only) for the exclusive use of Lindabury, McCormick, Estabrook &
Cooper, P.C. and their client Bayonne Medical Center in evaluating a potential disposition of the
property. All other uses and users are unintended, unless specifically stated in the letter of
transmittal.

**Property Ownership and Recent History**

Current Ownership:      Bayonne Medical Center, Inc.

Sale History:      To the best of our knowledge, the property has not transferred
within the past three years

Current Disposition:      It is our understanding that Bayonne Medical Center is currently
under contract to sell the property to Omni Development, for a
reported purchase price of $2,000,000. Omni will be demolishing
the existing buildings at their expense for the redevelopment of
the property with a five-story nursing home/medical office facility.
We have not been provided with a copy of the contract nor have
been provided with a budget fro demolition of the existing

WILEN_ESI00003276

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 4

buildings.

### Dates of Inspection and Valuation

The value conclusion reported herein is as of November 8, 2006. The property was inspected on November 8, 2006 by Paul W. Korch, MAI, CRE. Robert J. DiFalco, MAI has reviewed the report but did not inspect the property.

### Property Rights Appraised

Fee Simple Estate

### Scope of Work

This appraisal presented in a restricted-use report is intended to comply with the reporting requirements set forth under the *Uniform Standards of Professional Appraisal Practice (USPAP)* for a Restricted Use Appraisal Report. In addition, the report was prepared to conform to the requirements of the Code of Professional Ethics of the Appraisal Institute and the Appraisal Foundation.

In preparation of this appraisal, we investigated a wide array of land sales in the subject's submarket and considered the input of buyers, sellers, brokers, property developers and public officials. Additionally, we investigated the general regional economy as well as the specifics of the local area of the subject.

The scope of this appraisal required collecting primary and secondary data relative to the subject property. The depth of the analysis is intended to be appropriate in relation to the significance of the appraisal issues as presented herein. The data have been analyzed and confirmed with sources believed to be reliable, in the normal course of business, leading to the value conclusions set forth in this report. In the context of completing this report, we have made a physical inspection of the subject property and the comparables. The valuation process involved utilizing generally accepted market-derived methods and procedures considered appropriate to the assignment.

This appraisal employs only the Sales Comparison Approach for vacant land. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable for market participants.

This Restricted Use Appraisal Report sets forth only the appraiser's conclusions. Supporting documentation is retained in the appraiser's file.

### Definitions of Value, Interest Appraised and Other Terms

The following definitions of pertinent terms are taken from *The Dictionary of Real Estate Appraisal*, Fourth Edition (2002), published by the Appraisal Institute, as well as other sources.

Market Value

Market value is one of the central concepts of the appraisal practice. Market value is differentiated from other types of value in that it is created by the collective patterns

WILEN_ESI00003277

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 5

of the market. A current economic definition agreed upon by agencies that regulate federal financial institutions in the United States of America follows, taken from Advisory Opinion-22 of *USPAP* of The Appraisal Foundation:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their own best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in US dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

Market Rent

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the specified lease agreement including term, rental adjustment and revaluation, permitted uses, use restrictions, and expense obligations; the lessee and lessor each acting prudently and knowledgeably, and assuming consummation of a lease contract as of a specified date and the passing of the leasehold from lessor to lessee under conditions whereby:

1. Lessee and lessor are typically motivated.

2. Both parties are well informed or well advised, and acting in what they consider their best interests.

3. A reasonable time is allowed for exposure in the open market.

4. The rent payment is made in terms of cash in United States dollars, and is expressed as an amount per time period consistent with the payment schedule of the lease contract.

5. The rental amount represents the normal consideration for the property lease unaffected by special fees or concessions granted by anyone associated with the transaction.

WILEN_ESI00003278

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 6

## Location

The subject property is situated along the east side of Broadway between East 29th and East 30th Streets in the City of Bayonne, Hudson County, New Jersey. Bayonne is the southern most municipality in Hudson County and is bounded by water on three sides, namely New York Bay to the east, the Kill Van Kull on the south and Newark Bay to the west. The Kill Van Kull separates Bayonne from Staten Island, New York with the Bayonne Bridge connecting the two municipalities. Bayonne is approximately 5.39 square miles in area.

## Access

Local area accessibility is excellent. Bayonne is readily accessible from the major highway arteries of Northern New Jersey. Access is primarily achieved from the following arteries:

| | |
|---|---|
| Route 440/169 | Four lane divided highway providing north/south travel. |
| Interstate 78 | Four lane divided highway providing east/west travel. |
| The New Jersey Turnpike | Six lane divided highway providing north/south travel. |

Highway access to the northern end of the city is via Interstate 78/New Jersey Turnpike Extension at Interchange 14A. Route 440 (formerly known as Route 169) connects at Interchange 14A and thence traverses south along the east side of the city. Route 440 passes the former Military Ocean Terminal (MOTBY), which the City of Bayonne will be redeveloping into a mixed-use project known as the Peninsula at Bayonne. Construction has been completed extending Route 440 south and west connecting it with the access ramps to the Bayonne Bridge. At that point there is a local access ramp to local streets along Avenue A just north of West 7th Street.

Additionally, State Highway Route 185 is partially completed to the north of Interchange 14A linking Routes 440 and 169 with developments along the eastern shore of Jersey City such as Port Liberte', Liberty Industrial Park and also with Interchange 14B of the New Jersey Turnpike.

The Hudson-Bergen Light Rail (HBLR) system runs east of Avenue E and parallel to Route 440. The HBLR currently terminates at the 22nd Street station. There is another station to the north at 32nd Street opposite the MOTBY entrance. The light rail system will eventually terminate at West 5th Street in the southern end of the city.

The subject property is located adjacent to the west of the Bayonne Medical Center, which occupies the remainder of the city block. A dedicated multi-level parking structure for the medical center is situated to the east of the main entrance along Avenue E. Broadway is primarily developed with commercial/retail properties many of which have upper floors with residential apartment units. The prime retail shopping district along Broadway is between 20th and 26th Streets.

## Military Ocean Terminal at Bayonne (MOTBY)

The Military Ocean Terminal at Bayonne ("MOTBY"), is a formerly owned United States Government installation situated on a peninsula jutting eastward into New York Bay, connected to mainland Bayonne at its westerly boundary at Route 440 between 34th and 44th Streets. Its

WILEN_ESI00003279

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 7

main gate is at State Highway Route 440 with a second gate at Avenue E and East 40th Street. MOTBY consists of 432.65 acres of dry land, 3.75 acres of dry dock and 242.40 acres of submerged land for a total area of 678.80 acres. The complex consists of numerous buildings for administrative and warehousing functions as well as residential and recreational areas. MOTBY functioned as a major ocean terminal in the northeast section of the United States, and features dredged channels and turning basins along its three waterfront boundaries to accommodate large ocean-going cargo vessels and military ships.

In the past few years, a decision was made by the government to close MOTBY. This is providing a major opportunity to redevelop the land, which is now owned by the City of Bayonne. According to discussions with Mr. William Jordan, the Executive Director of Bayonne Economic Development Corporation, a potential use of the 432 acres is for a major, mixed-use development of office, industrial and recreational properties. It is also our understanding the MOTBY property provides an opportunity for private enterprise to take advantage of its deep channels and its ability to attract cargo as an alternative to the Port Newark Terminal in Newark and Elizabeth. A few years ago MOTBY was in competition with the City of Camden to become the new home for the battleship New Jersey. However, Camden was chosen and currently the battleship New Jersey is a floating museum there located immediately south of the new aquarium.

MOTBY has been renamed The Peninsula at Bayonne by the city and redevelopment plans are underway at this time. In January 2004, the BLRA began its first Shoreline Stabilization project using redevelopment authority funds and grants administered by the US Department of Commerce Economic Development Administration. This $2.5 million project will stabilize 1,500 feet of shoreline on the south side of the property. This project will secure the existing electrical substation and fully occupied office building at the Peninsula and pave the way for ferry service for the Peninsula.

Real Estate Appraised

Site Description

The subject site is located along the east side of Broadway in the City of Bayonne, Hudson County, New Jersey. The property is rectangular in shape containing an area of 20,035± square feet or .46± acres that is at road grade. The site has 200.35 feet of frontage along Broadway and 100 feet of frontage along both East 29th and East 30th Streets.

As the improvements are not being valued herein, no further description of those buildings in being provided.

According to the National Flood Insurance Rate Map Panel Number 340218-0111D, dated August 16, 2006, the site is located in FEMA Zone X: Areas outside of a 100-year flood hazard.

We were provided with an "Air Rights Easement Map" survey of the property, which is retained in our files. The subject property has excellent frontage and visibility along all three streets.

We are unaware of any land use restrictions affecting the site and would recommend a title search to determine if any adverse conditions exist. Upon inspection of the site the appraiser did notice that there is an ongoing "pump and treat" system in place in the basement of the building on Lot 4. It was explained that this system is in place removing petrochemicals from

WILEN_ESI00003280

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 8

the ground water that resulted from a leaking underground storage tank, which has since been
filled with inert materials. This appraisal is predicated on the assumption that there are no
environmental issues and that the subject property would receive a NFA (No Further Action)
letter from the New Jersey Department of Environmental Protection.

We were not given a wetlands survey. If subsequent engineering data confirms the presence of
regulated wetlands, it could materially affect property value. We recommend a wetlands survey
by a competent engineering firm. Overall, the site is typical of the area and well suited for any
urban use.

Real Property Taxes

The property is subject to the taxing jurisdiction of Township of Bayonne. The assessor's parcel
identification number is Block 164 Lots 1, 2, 3 and 4. The assessments for the property are
presented in the chart below:

## PROPERTY TAX DATA (2005)

| 2006 Block/Lot Street Address on Broadway | 164/1 644 | 164/2 642 | 164/3 638-640 | 164/4 636 | Total |
|---|---|---|---|---|---|
| 2006 Assessed Value Land: Improvements: Total: | $104,000 $0 $104,000 | $96,000 $0 $96,000 | $200,000 $209,500 $409,500 | $440,000 $1,180,700 $1,620,700 | $840,000 1,390,200 $2,230,200 |
| Tax Rate | | | | | 0.05186 |
| Total Property Taxes | NA | NA | NA | NA | NA |
| 2007 Equalization Ratio | 48.73% | 48.73% | 48.73% | 48.73% | 48.73% |
| Land Area (square feet) | 2,627 | 2,374 | 5,001 | 10,035 | 20,037 |

*Note: All of the above tax parcels are listed as exempt properties on the municipal tax rolls.*

Zoning

The subject property is located in the CBD, Central Business District of the City of Bayonne.
Permitted uses within this district include: professional and business offices, retail commercial
uses, banks and deposit institutions, restaurants, movie theaters, cultural centers, dance
instruction studios, fast food service establishments, dwelling apartment uses above street level
uses provided the apartment has a minimum area of 600 square feet and no more than two
bedrooms, essential services and government offices. Conditional uses include educational
uses and commercial parking facilities.

The minimum lot area is 3,000 square feet and the minimum lot frontage is 30 feet. The
maximum building height is 5 stories or 55 feet.

WILEN_ESI00003281

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 9

Lots 3 and 4 individually as well as Lots 1 through 4 collectively are conforming in lot size and frontage. However, Lots 1 and 2 are non-conforming regarding lot size and frontage. Collectively, Lots 1 and 2 are conforming.

The determination of compliance of the existing improved use with permitted uses is beyond the scope of a real estate appraisal.

We know of no deed restrictions, private or public, that further limits the subject property's use. We cannot guarantee that no such restrictions exist. Deed restrictions are a legal matter and only a title examination by an attorney or title company can usually uncover such restrictive covenants. Thus, we recommend a title search to determine if any such restrictions do exist.

### Highest and Best Use As If Vacant

Commercial development to the highest density permitted under current zoning.

### Valuation Process

This appraisal employs only the Sales Comparison Approach for vacant land. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable for market participants.

### Sales Comparison Approach For Vacant Land

We estimated the subject property's land value by comparing it with similar, recently sold vacant sites in the competing area. Inherent in this approach is the principle of substitution, which holds that when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution.

By analyzing sales that qualify as arms-length transactions between willing and knowledgeable buyers and sellers, value and price trends can be identified. The basic steps of this approach are:

1. research recent, relevant property sales and current offerings throughout the competitive area;

2. select and analyze properties that are similar to the property appraised, considering changes in economic conditions that may have occurred between the sale date and the date of value, and other physical, functional, or locational factors;

3. identify sales that include favorable financing and calculate the cash equivalent price;

4. reduce the sale prices to a common unit of comparison such as price per square foot of land area;

5. make appropriate comparative adjustments to the prices of the comparable properties to relate them to the property being appraised; and

WILEN_ESI00003282

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 10

6. interpret the adjusted sales data and draw a logical value conclusion.

The most widely-used and market-oriented unit of comparison for properties such as the subject is the sales price per square foot of land area. All comparable sales were analyzed on this basis.

### Property Value As Vacant

The appraiser searched the marketplace for sales of commercial land in Bayonne, which are summarized on the chart in the addenda. We have analyzed these sales in comparison to the subject and applied the appropriate adjustments. All of the sales are either cash deals or were financed at market rates and terms requiring no adjustment. Supporting documentation is retained in the appraiser's file.

After analyzing the sales data and realizing that no two properties are exactly alike, we have made what we believe to be appropriate adjustments for time, conditions of sale and physical characteristics. The adjustments considered are subjective in nature but serve to illustrate the appraiser's thought processes in making adjustments for dissimilarities between the sale properties and the subject. In the final analysis, considering the subject's location and other factors, we believe its estimated fee simple value would be based on a unit rate of $95.00 per square foot. This equates to an estimated fee simple value for subject as follows:

Fee Land: 20,035± square feet @ $95.00 per square foot  =  $1,903,325

Plus Air Rights: 1,176± square feet @ $76.00* per square foot =    89,376

Total Value:                                                $1,992,701

Rounded to                                                  $2,000,000

* four-fifths of the fee land value based on story-height zoning

### Concluded Land Value

This appraisal employs only the Sales Comparison Approach for vacant land.

Based upon the Scope of Work agreed to with the Client, and as outlined within the accompanying report, we have developed an opinion that the market value of the fee simple estate of the referenced property (land only), subject to the assumptions, limiting conditions, certifications, and definitions, on November 8, 2006 was:

## TWO MILLION DOLLARS

### $2,000,000

WILEN_ESI00003283

Cushman & Wakefield of New Jersey, Inc.

Donald B. Ross, Esquire
Lindabury, McCormick, Estabrook & Cooper, P.C.
November 22, 2006
Page 11

Based on recent market transactions, as well as discussions with market participants, a sale of
the subject property at the above-stated opinion of market value would have required an
exposure time of approximately twelve (12) months. Furthermore, a marketing period of
approximately twelve (12) months is currently warranted for the subject property.

Respectfully submitted,

CUSHMAN & WAKEFIELD OF NEW JERSEY, INC.

DRAFT                              DRAFT

Paul W. Korch, MAI, CRE            Reviewed by:
Director                           Robert J. DiFalco, MAI
New Jersey License No. SCGREA RG00225    Managing Director
paul.korch@cushwake.com            New Jersey Certified General Appraiser
201.508.5213 Office Direct         License No. SCGREA RG00434
201.896.1911 Fax

WILEN_ESI00003284

## ASSUMPTIONS AND LIMITING CONDITIONS

"Report" means the appraisal or consulting report and conclusions stated therein, to which these Assumptions and Limiting Conditions are annexed.

"Property" means the subject of the Report.

"C&W" means Cushman & Wakefield, Inc. or its subsidiary that issued the Report.

"Appraiser(s)" means the employee(s) of C&W who prepared and signed the Report.

The Report has been made subject to the following assumptions and limiting conditions:

1.  No opinion is intended to be expressed and no responsibility is assumed for the legal description or for any matters that are legal in nature or require legal expertise or specialized knowledge beyond that of a real estate appraiser. Title to the Property is assumed to be good and marketable and the Property is assumed to be free and clear of all liens unless otherwise stated. No survey of the Property was undertaken.

2.  The information contained in the Report or upon which the Report is based has been gathered from sources the Appraiser assumes to be reliable and accurate. The owner of the Property may have provided some of such information. Neither the Appraiser nor C&W shall be responsible for the accuracy or completeness of such information, including the correctness of estimates, opinions, dimensions, sketches, exhibits and factual matters. Any authorized user of the Report is obligated to bring to the attention of C&W any inaccuracies or errors that it believes are contained in the Report.

3.  The opinions are only as of the date stated in the Report. Changes since that date in external and market factors or in the Property itself can significantly affect the conclusions.

4.  The Report is to be used in whole and not in part. No part of the Report shall be used in conjunction with any other analyses. Publication of the Report or any portion thereof without the prior written consent of C&W is prohibited. Reference to the Appraisal Institute or to the MAI designation is prohibited. Except as may be otherwise stated in the letter of engagement, the Report may not be used by any person(s) other than the party(ies) to whom it is addressed or for purposes other than that for which it was prepared. No part of the Report shall be conveyed to the public through advertising, or used in any sales, promotion, offering, or SEC material without C&W's prior written consent.

    Any authorized user(s) of this Report who provides a copy to, or permits reliance thereon by, any person or entity not authorized by C&W in writing to use or rely thereon, hereby agrees to indemnify and hold C&W, its affiliates and their respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the Report by any such unauthorized person(s) or entity(ies).

5.  Except as may be otherwise stated in the letter of engagement, the Appraiser shall not be required to give testimony in any court or administrative proceeding relating to the Property or the Appraisal.

WILEN_ESI00003285

## ASSUMPTIONS AND LIMITING CONDITIONS

6.  The Report assumes (a) responsible ownership and competent management of the Property; (b) there are no hidden or unapparent conditions of the Property, subsoil or structures that render the Property more or less valuable (no responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them); (c) full compliance with all applicable federal, state and local zoning and environmental regulations and laws, unless noncompliance is stated, defined and considered in the Report; and, (d) all required licenses, certificates of occupancy and other governmental consents have been or can be obtained and renewed for any use on which the value opinion contained in the Report is based.

7.  The physical condition of the improvements considered by the Report is based on visual inspection by the Appraiser or other person identified in the Report. C&W assumes no responsibility for the soundness of structural members or for the condition of mechanical equipment, plumbing or electrical components.

8.  The forecasted potential gross income referred to in the Report may be based on lease summaries provided by the owner or third parties. The Report assumes no responsibility for the authenticity or completeness of lease information provided by others. C&W recommends that legal advice be obtained regarding the interpretation of lease provisions and the contractual rights of parties.

9.  The forecasts of income and expenses are not predictions of the future. Rather, they are the Appraiser's best opinions of current market thinking on future income and expenses. The Appraiser and C&W make no warranty or representation that these forecasts will materialize. The real estate market is constantly fluctuating and changing. It is not the Appraiser's task to predict or in any way warrant the conditions of a future real estate market; the Appraiser can only reflect what the investment community, as of the date of the Report, envisages for the future in terms of rental rates, expenses, and supply and demand.

10. Unless otherwise stated in the Report, the existence of potentially hazardous or toxic materials that may have been used in the construction or maintenance of the improvements or may be located at or about the Property was not considered in arriving at the opinion of value.    These materials (such as formaldehyde foam insulation, asbestos insulation and other potentially hazardous materials) may adversely affect the value of the Property. The Appraisers are not qualified to detect such substances. C&W recommends that an environmental expert be employed to determine the impact of these matters on the opinion of value.

11. Unless otherwise stated in the Report, compliance with the requirements of the Americans with Disabilities Act of 1990 (ADA) has not been considered in arriving at the opinion of value. Failure to comply with the requirements of the ADA may adversely affect the value of the Property.    C&W recommends that an expert in this field be employed.

12. If the Report is submitted to a lender or investor with the prior approval of C&W, such party should consider this Report as only one factor together with its independent investment considerations and underwriting criteria, in its overall investment decision. Such lender or investor is specifically cautioned to understand all Extraordinary

WILEN_ESI0000328G

## ASSUMPTIONS AND LIMITING CONDITIONS

Assumptions and Hypothetical Conditions and the Assumptions and Limiting Conditions incorporated in this Report.

13. In the event of a claim against C&W or its affiliates or their respective officers or employees or the Appraisers in connection with or in any way relating to this Report or this engagement, the maximum damages recoverable shall be the amount of the monies actually collected by C&W or its affiliates for this Report and under no circumstances shall any claim for consequential damages be made.

14. If the Report is referred to or included in any offering material or prospectus, the Report shall be deemed referred to or included for informational purposes only and C&W, its employees and the Appraiser have no liability to such recipients. C&W disclaims any and all liability to any party other than the party that retained C&W to prepare the Report.

15. By use of this Report each party that uses this Report agrees to be bound by all of the Assumptions and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.

### Extraordinary Assumptions

An extraordinary assumption is defined by the USPAP (2006 Edition, The Appraisal Foundation) as "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

It is our understanding that two easements will be retained upon transferring of the property. One easement will be to provide loading access to the existing Bayonne Hospital main loading dock and the other easement will provide a pedestrian connection between the proposed new building which is to be constructed on the subject land and the existing adjacent Bayonne Hospital building.    As we were not provided the details of these proposed easements, their effect, if any, has not been considered in the value of the subject land. Additionally, there are air rights of 1,176 square feet that will be conveyed at the northeast corner of the subject site, which will allow the proposed building to be cantilevered over the existing Bayonne Hospital property. We have considered the contributory value of the air rights in the valuation of the subject property.

### Hypothetical Conditions

A hypothetical condition is defined by the USPAP (2006 Edition, The Appraisal Foundation) as "that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

The property is currently improved with a two story plus basement masonry commercial building and a one-story masonry and steel commercial building.    However, as per the client's instructions we are appraising the land only for this assignment.

WILEN_ESI00003287

## CERTIFICATION OF APPRAISAL

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

4. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

8. Paul W. Korch, MAI, CRE made a personal inspection of the property that is the subject of this report. Robert J. DiFalco, MAI, Managing Director, Valuation Services, reviewed and approved the report but did not inspect the property.

9. No one provided significant real property appraisal assistance to the persons signing this report.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. As of the date of this report, Paul W. Korch, MAI and Robert J. DiFalco, MAI have completed the continuing education program of the Appraisal Institute.


## DRAFT

Paul W. Korch, MAI, CRE
Director
New Jersey License No. SCGREA
RG00225

## DRAFT

Robert J. DiFalco, MAI
Managing Director
New Jersey Certified General Appraiser
License No. SCGREA RG00434

WILEN_ESI00003283

ADDENDA

WILEN_ESI00003289



View of the Corner of Broadway and East 29th Street – Tax Lot 4



View of Tax Lot 3, 638-640 Broadway

WILEN_ESI00003290



View of Corner of Broadway and East 30th Streets, Tax Lots 1 and 2



View of Tax Lots 1 and 2 Looking West from Hospital Loading Dock Area

WILEN_ESI00003291



View of Broadway Looking South



View of Broadway Looking North

WILEN_ESI00003292



View of East 29th Street Looking East Towards Medical Center (on left)



View of Lot 4 Looking West Along East 29th Street

WILEN_ESI00003293

SUMMARY OF LAND SALES

| No. | Location | Grantor / Grantee | Price Date | Site Sqft / Site Acres | Zoning Utility* | Public Utilities | Price/SF / Price/Acre | COMMENT |
|---|---|---|---|---|---|---|---|---|
| 1 | 479-491 Broadway Bayonne, New Jersey | Joseph & Miriam Saloml / Penachno Development Co., LLC | $600,000 Nov-04 | 9,298 SF 0.2124 Ac | CBD Good | All available | $27.42 $4,243,778 | This is the sale of a vacant lot, which is currently remains undeveloped. |
| 2 | 538 Broadway Bayonne, New Jersey | Victor Lasalla et al. / TSL Group LLC | $638,000 Feb-03 | 4,300 0.0994 Ac | CBD Good | All available | $126.00 $5,459,000 | This is the sale of a vacant lot, which currently remains undeveloped. |
| 3 | 524 Broadway Bayonne, New Jersey | 524-528 Broadway Associate LLC / Bayonne Parking Authority | $500,000 Jun-04 | 6,689 0.1539 Ac | CBD Good | All available | $74.64 $3,251,202 | This property was purchased for a municipal parking lot. |
| 4 | 691-699 Broadway Bayonne, New Jersey | K & P Partners / 32nd Broadway Bayonne Associates | $1,780,000 Dec-89 | 22,216 0.6100 Ac | CBD Good | All available | $79.77 $3,431,311 | This property was purchased for development of a Walgreen's Pharmacy with on-site parking. |
| 5 | 732 Avenue E Bayonne, New Jersey | Cumberland Farms / Avenue E, LLC | $835,000 Mar-08 | 9,910 0.2277 Ac | TTD Good | All available | $84.15 $3,668,862 | This property was a former Gulf Station and was purchased to enhance the retail frontage along Avenue E. |
| 6 | 838 Broadway Bayonne, New Jersey | JAM Construction, Inc. / Gamkehard & Hlrdeen Paul | $167,000 Jul-08 | 2,600 0.0574 Ac | C3 Good | All available | $64.60 $2,907,035 | This lot was purchased for the construction of a 3-story mixed-use building. |
| 7 | 577 Broadway Bayonne, New Jersey | TB Construction / Zina Gammuzza | $298,000 Mar-04 | 5,000 0.1148 Ac | C3 & R2 Good | All available | $58.00 $2,570,240 | This is the sale of two lots. The lot along 41st Street was developed with a 2 family house. The vacant commercial lot remains vacant. |
| 8 | 1035-1037 Broadway Bayonne, New Jersey | G & O Foreign Car Specialist Inc. / Oliver Plan et al | $1,100,000 Jun-05 | 12,550 0.2881 Ac | UBD Good | All available | $91.63 $3,891,964 | This is the sale of two lots on adjacent corners. Both lots remain vacant. |

| | Price Date | Site SF / Site Acres | Zoning Utility* | Public Utilities | Price/SF / Price/Acre |
|---|---|---|---|---|---|
| Survey Low | $167,000 | 2,600 SF 0.0574 Ac | | | $27.42 |
| Survey High | $1,780,000 | 22,216 SF 0.6100 Ac | | | $126.00 |
| Average | $601,000 | 9,046 SF 0.2077 Ac | | | $83.18 |
| Survey Low | 1989 | 2,600 0.0574 Ac | | | $2,570,199 |
| Survey High | 2008 | 20,000 0.6000 Ac | | | $5,459,000 |
| Average | 2004 | 20,105 0.2079 Ac | | | $3,623,370 |
| Subject Property | | 29,035 0.6668 | CBD Good | All Available | |

* Utility includes shape, access, frontage and visibility.

WILEN_ESI00003294

CUSHMAN & WAKEFIELD

Cushman & Wakefield of New Jersey, Inc.
One Meadowlands Plaza, 7th Floor
East Rutherford, NJ 07073
(201) 896-9400 Tel
(201) 896-1911 Fax

November 21, 2006

Donald B. Ross, Jr.
Lindabury, McCormick, Estabrook & Cooper, P.C.
53 Cardinal Drive
Westfield, NJ 07091

# INVOICE

**Invoice No: 06-15001-9421**
**Invoice for Appraisal, Restricted Report**

636-644 Broadway
Bayonne, NJ

| | |
|---|---|
| Appraisal Fee: | $3,000.00 |
| Total Invoice: | $3,000.00 |
| Less Retainer: | $0.00 |
| **Total Balance Now Due:** | **$3,000.00** |

Please make your checks payable to CUSHMAN & WAKEFIELD VALUATION and return with one copy of this invoice to the above address.

Sincerely,
CUSHMAN & WAKEFIELD OF NEW JERSEY, INC.
Enza Minervini
Area Administrator
Phone: (201) 508-5215
Fax: (201) 896-1911
Email: enza_minervini@cushwake.com
**Federal Tax ID #: 13-2662112**

11/22/2006 11:41:04 AM

Page 1 of 1

WILEN_ESI00003295