# EXHIBIT
# #18

1

1  UNITED STATES BANKRUPTCY COURT
   Case NO.  07-15195 (MS)

2
   IN RE:  BAYONNE MEDICAL CENTER:                   **ORIGINAL**
3                                      :
   ALLEN D. WILEN,                     :
4                                      :    DEPOSITION OF:
               Plaintiff,             :
5                                      :    ADOLPH WALTER
        v.                             :
6                                      :
   BAYONNE/OMNI DEVELOPMENT            :
7  LLC, et al,                         :
                                       :
8              Defendants.             :
                                       :
9  _____:

10       TRANSCRIPT of testimony as taken by and

11  before MELISSA A. HILDEMANN, a Certified Shorthand

12  Reporter Realtime and Notary Public of the State of

13  New Jersey, at the offices of GRUEN & GOLDSTEIN,

14  1150 West Chestnut Street, Union, New Jersey 07083,

15  on Monday, March 1, 2010, commencing at 10:04 in the

16  morning.

17

18

19

20

21

22

23

24

25

1          A.          I would think so, yes.

2          Q.          Now, under the heading Highest

3    and Best Use on the same page, I'm quoting -- tell

4    me if I read it incorrectly.  "As a more

5    productive income-producing enterprise as proposed

6    by Bayonne Medical Center, see Addendum."  Did I

7    read that correctly?

8          A.          Where -- what page are you on?

9    Oh, there's no page numbers on it.

10         Q.          There is no page number.  It's

11   called "Summary and Conclusions."  The very

12   beginning.

13         A.          Oh, yeah, "Reconciliation."

14                     MR. FALANGA:  No, look at your

15   report.

16                     MR. GRUEN:  I'll find it for you.

17         Q.          Okay.  So I'm going to ask you to

18   look at what you defined as the highest and best

19   use.  Have you read it?  It's just one sentence.

20         A.          I am reading it.  I have

21   cataracts.

22         Q.          Okay.  Just take your time.  I'll

23   read it aloud again.  "Highest and best use as a

24   more productive income-producing enterprise as

25   proposed by Bayonne Medical Center.  See

1    Addendum."

2         A.        Yeah, highest and best use would

3    be with all the vacant land.  It would be more

4    productive.  Actually, maybe I was referring here,

5    I had my mind, at that time, the building that

6    they were going to be putting up.

7         Q.        Well, you refer to the Addendum.

8    That was the Addendum we saw earlier that talked

9    about the building they were going to put up --

10             MR. FALANGA:  Object to form.

11        Q.        -- correct?

12             MR. FALANGA:  Object to form.

13        A.        I think so.

14        Q.        So my question then would be, did

15   you value this property based upon this

16   description of highest and best use?

17             MR. FALANGA:  Object to the form.

18        A.        I thought the highest and best

19   use would be that that vacant land would be --

20   could be used for some other use.

21        Q.        Did you factor any of the

22   features of the Addendum into your appraisal?

23             MR. FALANGA:  Object to the form.

24   Let the record reflect that --

25        A.        I didn't know this was the

1   Addendum.

2                    MR. FALANGA:   That's -- object to

3   the form.

4         A.        I didn't do this.

5                    MR. FALANGA:   Right.   I'm letting

6   the record reflect that Mr. Gruen has presented the

7   witness with Exhibit D. Walter-4, which is not the

8   report.

9

10  EXAMINATION BY MR. GRUEN:

11        Q.        You want the question back again

12  now?

13        A.        I didn't consider that at all.

14        Q.        Okay, thank you.

15                   Are you familiar with the term

16  Certificate of Need?

17        A.        I've heard of it.

18        Q.        Okay.   Did you consider at all in

19  connection with your appraisal whether Bayonne

20  Medical Center had a Certificate of Need for

21  development consistent with the Addendum?

22        A.        I didn't get into this.

23        Q.        "This," meaning the Addendum.

24        A.        The Addendum.

25                   MR. FALANGA:   Object to form.

1      Q.        The Addendum had no impact on

2   your analysis; is that correct?

3      A.        No.

4      MR. FALANGA:  Object to form.  The

5   characterization of the Addendum has not been

6   established in the record.

7      A.        I did it as is.  Do I even have

8   that?  "See Addendum," okay.

9      Q.        Once again, the Addendum was

10  something you received from Bayonne Medical

11  Center; is that correct?

12      MR. FALANGA:  Object to form.

13      Q.        You can answer the question.

14      A.        Yes.

15      Q.        And before doing your appraisal

16  report, correct?

17      MR. FALANGA:  Same objection.

18      A.        Yes.

19      Q.        If the -- if the buildings were

20  smaller than the 25,000 square feet that you've

21  shown us you determined was their square footage,

22  would that affect your opinion as reflected in the

23  appraisal?

24      A.        I think it would.

25      Q.        Okay.  I'm going to skip through

# EXHIBIT
# #19

1

1  UNITED STATES BANKRUPTCY COURT
   Case NO.  07-15195 (MS)
2
   IN RE:  BAYONNE MEDICAL CENTER:            **ORIGINAL**
3
   ALLEN D. WILEN,
4                                      :   DEPOSITION OF:
                   Plaintiff,          :
5                                      :   ADOLPH WALTER
        v.                             :
6                                      :
   BAYONNE/OMNI DEVELOPMENT            :
7  LLC, et al,                         :
                                       :
8                  Defendants.         :
   _____ :
9

10        TRANSCRIPT of testimony as taken by and

11  before MELISSA A. HILDEMANN, a Certified Shorthand

12  Reporter Realtime and Notary Public of the State of

13  New Jersey, at the offices of GRUEN & GOLDSTEIN,

14  1150 West Chestnut Street, Union, New Jersey 07083,

15  on Monday, March 1, 2010, commencing at 10:04 in the

16  morning.

17

18

19

20

21

22

23

24

25

12

1      Q.        Brockman?

2      A.        Herman Brockman.

3      Q.        And the details, meaning what

4    they had in mind.

5      A.        Pretty well this.  Yes.  I don't

6    know if it's in the appraisal there.  Is there a

7    letter?  Here.  I asked -- that's where the

8    confusion came in.  They asked me how much would

9    this be about.

10     Q.        How much would you charge?

11     A.        How much I would charge?  And

12   from him talking about putting up a new building

13   on the land that was vacant, and I asked him, You

14   have construction plans and so on; and he was

15   unsure, but I gave a quote on doing a -- also a

16   construction, new construction there.

17     Q.        On doing what about new

18   construction?

19     A.        A nursing home they wanted to

20   build.

21     Q.        But what was the proposal about,

22   this alternate proposal or additional proposal

23   that you made?

24     A.        That I made?

25     Q.        Yeah.

13

1        A.        I was only interested in what I

2   would -- they were interested in how much I would

3   be charging for an appraisal.

4        Q.        Okay.

5        A.        It was a lot more than what it

6   wound up.  And that's what that letter here -- I

7   asked Apsel to send me some kind of a thing

8   because after that meeting, they were all over the

9   place.  They weren't specific like people that are

10  -- they were layman.  So I was confused as to

11  actually what did they want me to do.  Did they

12  want me to do an appraisal on what it would cost

13  for putting up a new -- a new building.  Then I

14  quoted it.  It was a lot more, maybe $7,500, in

15  that range, I usually would charge for something

16  like that.  So I called them up -- Marvin, I

17  called up -- I don't know if it was the same day

18  or next day -- to get a clarification.  I asked

19  him to make up something, a list, and this is what

20  he made up and sent me.

21       Q.        Okay.

22       A.        And in here --

23                 MR. GRUEN:  We can mark this now.

24                 (Exhibit Walter-4, Multiuse Medical

25  Arts Building, marked for identification.)

14

1         Q.        So you say a couple days later

2    after that first meeting with Hausmann, Apsel and

3    Brockman, they sent you this document, Defendant

4    Walter-4, as you understood it, to further clarify

5    what they had in mind.

6         A.        I needed a clarification as to

7    what they expected me to do.  Actually, that's

8    what it comes down to.

9         Q.        Okay.  So you got this document

10   in response to your request to them for

11   clarification of what they wanted you to do.

12             MR. FALANGA:  Object to the form.

13        Q.        Is that correct?

14        A.        I believe -- I believe that's

15   what he made up here, explaining everything here,

16   but it still had the nursing home in here.  He's

17   talking about nursing -- all I did was then went

18   down, they were interested in a price, too, to

19   keep the price down.  So --

20        Q.        Price, meaning your fee?

21        A.        My fee.  They settled on that I

22   do as is --

23        Q.        Appraisal.

24        A.        -- appraisal, which is vacant

25   land and the building, two buildings on there.

15

1   They call it the phone building.  And then there

2   was a building next to it, attached to it, but

3   separate, that was formerly a glass, auto glass,

4   but it was vacant.

5          Q.          That's the warehouse building.

6          MR. FALANGA:  Object to form.

7          Q.          Was that warehouse building

8   one-story?

9          A.          That's a one -- no, that's not

10  the one -- actually, the warehousing was in the

11  phone building.  They had storage in there, and

12  they had the supplying utility, oil burners,

13  furnaces, small offices, but mostly a lot of

14  storage, a lot of wasted space that wasn't being

15  used, so to speak --

16         Q.          Uh-huh.

17         A.          -- but could be used for offices

18  when I was going through it.

19         Q.          So after you received Defendant

20  Walter-4, is this correct, you then --

21         A.          I called them up and talked to

22  him on the phone.  I says, Listen, you know, this

23  here is -- is -- I still don't know.  I says, I

24  think what you need -- I told them what I thought

25  would be good because he didn't have plans

16

1  available --

2              MR. FALANGA:  Can I see?

3              THE WITNESS:  Yes.

4        A.        There was no plans available as

5  far as the new construction they were going to put

6  on there.

7              So I said, Why don't I do the -- do

8  it as vacant land as is, what you have there now.

9  Get a value on that.  And when you get the plans,

10 or the contractors, or whoever, you know, get it

11 together and at least you know what the land is

12 and what you have there.

13             MR. FALANGA:  What was marked is

14 Walter-2.  I apologize.  I was confused here.

15             THE COURT REPORTER:  It was 2 -- so

16 1 was the subpoena, 2 is the report, 3 is the

17 September 16th letter and 4 is the whatever is

18 there.

19             MR. FALANGA:  That's it.  Thank

20 you.

21             THE WITNESS:  Am I confusing or

22 what?

23             MR. GRUEN:  No, no.  It's fine.

24

25 EXAMINATION BY MR. GRUEN:

17

1        Q.        When you made the suggestion,

2   what was the response, if any?

3        A.        Well, they asked how much.  And I

4   quoted, I think it was 40 -- $4,800 for it.  And I

5   came at -- the price I came to is because usually

6   in Bayonne or Jersey City, Hudson County, if it

7   was, like, a mixed-use, with a store on the bottom

8   and maybe three/four commercial units --

9   apartments above, I would charge about 2,000.  So

10  I figured two floors...

11       Q.        Any further discussions about the

12  scope of your assignment in that next call?

13                 MR. FALANGA:  Object to the form.

14       A.        My what?

15       Q.        The scope of your assignment.

16  What it is that you were going to be doing.

17  Anything else that you discussed about what you

18  were going to be doing, as opposed to your fee, in

19  the next call?

20       A.        I put it -- I think I have it in

21  my -- about a fee?

22       Q.        No.  Other than the fee.  The

23  assignment, what you were going to be doing.  Any

24  further discussion about --

25       A.        I told them I was going to do it

18

1   as is.

2          Q.        Let me -- let take you to --

3          A.        You might want that.  I have a

4   copy.

5          Q.        I'm going to come back to it.

6          MR. FALANGA:  We're going to need

7   to keep the original exhibits here.

8          THE WITNESS:  Oh, I'm sorry.

9          MR. FALANGA:  That's okay.  Just

10   until the conclusion of the deposition.

11          THE WITNESS:  I have it here.  Just

12   stamp it Copy, so I don't get them mixed up.

13

14   EXAMINATION BY MR. GRUEN:

15          Let me show you on your appraisal

16   report, Walter-2.  The pages are not numbered, but

17   it's the first series of photographs.  The one on

18   the top is called, "Subject, front view," and the

19   one on the bottom is called "Subject, front view."

20          A.        Yes.

21          Q.        I referred earlier in my

22   questioning to a one-story warehouse.  Does the

23   photograph on the bottom reflect what you saw at

24   the site?

25          A.        The bottom one does, yes.

19

1          Q.          Okay.  Is that -- would it be

2     fair to describe that as a one-story warehouse?

3                    MR. FALANGA:  Object to the form.

4          A.          It was vacant, and I don't know

5     if they were using it as a warehouse.  It had an

6     overhead door.  I think they were using storage

7     space.  If it was locked, I couldn't get in, so

8     this is from memory.  I looked in through the

9     glass.

10         Q.          Now, did you have any further

11    conversations with either Brockman, Hausmann or

12    Apsel beyond the one that you just described and

13    before you undertook the appraisal?

14         A.          Just say that again.

15         Q.          Any further conversations with

16    any of these gentlemen from Bayonne Medical Center

17    before you went out and did the appraisal?

18         A.          Before I went out, no.

19         Q.          Did they ever tell you that they

20    were proposing to sell the property?

21         A.          No, they wanted to put a

22    construction -- a nursing home on it.

23         Q.          Okay.  So they did not tell you

24    that they were interested in selling the property?

25                    MR. FALANGA:  Object to the form.

20

1        A.        No.  I don't think they knew
2   themselves what they wanted to do...
3                  MR. FALANGA:  It's all on the
4   record, so you know.
5                  THE WITNESS:  It's --
6                  MR. FALANGA:  I understand.
7                  THE WITNESS:  I was very confused
8   with them.  They were amateurs, so to speak.
9        Q.        How were they amateurs?
10       A.        Amateurs?
11       Q.        Yeah.
12       A.        They were all over the place.  I
13  couldn't -- that's why I had to call up and find
14  out what exactly do you want, you know, as far as
15  the appraisal is concerned.
16       Q.        But ultimately then, if I
17  understand you correctly, after the clarification,
18  you determined that the facts set forth in
19  Defendant Walter-4 would not be the basis for your
20  appraisal report; is that correct?
21                 MR. FALANGA:  Object to the form.
22       Q.        You can answer.  So you ignored
23  for purposes of the appraisal what's set forth in
24  that document, correct?
25       A.        Well, yeah.  I got clarification

21

1  on it.

2          Q.          But the facts set forth in that

3  document were not used by you in connection with

4  the generation of the appraisal report.

5          A.          No, no.

6                      MR. FALANGA:  Objection to the

7  form.

8          Q.          Now, there's a series of

9  handwritten notes that I'm taking out of the file

10 that you produced a moment ago in response to the

11 Document Demand No. 1.  They are on lined, white

12 sheets.  These are the documents that you

13 mentioned that you put the red pen on.  And I'm

14 going to have these marked as one exhibit.

15                      (Exhibit Walter-5, Handwritten

16 Notes, marked for identification.)

17         Q.          Last sheet, on the next-to-last

18 sheet there is a diagram.  Are these the buildings

19 that comprise the subject of your appraisal?

20         A.          Yes.  This is --

21                      MR. FALANGA:  Object to the form.

22         A.          This is a -- the thing you just

23 pointed out before.

24         Q.          Referring to the building on the

25 left side?

# EXHIBIT
# #20

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,          :

            Debtor,                    :          **ORIGINAL**

BAYONNE MEDICAL CENTER,                :
Debtor and
Debtor-in-Possession; and             :
ALLEN D. WILEN, in his                          DEPOSITION OF:
capacity as Liquidating               :
Trustee and Estate                     ROBERT S. BURNEY
Representative for the Estate         :
of Debtor, Bayonne Medical               VOLUME II
Center,                                :   (Pages 36-115)

            Plaintiff,                 :

            -vs-                       :

BAYONNE/OMNI DEVELOPMENT,              :
L.L.C., a New Jersey limited
liability company; et al.,            :

            Defendants.               :
-----------------------------------

B E F O R E:

      SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P.,

85 Livingston Avenue, Roseland, New Jersey, on

WEDNESDAY, DECEMBER 15, 2010, commencing at 10:02

a.m., pursuant to Notice.

                    DepoLink
      Court Reporting & Litigation Support Services
         Phone (973) 353-9880    Fax (973) 353-9445
                www.depolinklegal.com

1    you're reading from the bottom of the page on

2    LMEC001?

3              MR. COPLON:  Correct, yes.

4         A.    I believe that's because the

5    buildings that were in existence at the time had to

6    be demolished, and that was an added expense to the

7    purchaser.  In other words, the buildings themselves

8    were specialty-use buildings for a hospital that

9    couldn't be used by other users.

10        Q.    The buildings that existed were old

11   buildings, correct?

12        A.    Correct.

13        Q.    And when you say specialty use for

14   the hospital, what were they used for?

15        A.    I don't recall the exact uses.  I

16   think some of them may have been storage and other

17   things, but they were built for use by the hospital.

18   They were not going to be used and retrofitted for

19   the use contemplated by Omni, or anyone else for

20   that matter.

21        Q.    So when the hospital was looking to

22   sell this property, is it fair to say that Cushman &

23   Wakefield was instructed or was told everybody

24   recognizes these buildings are teardowns, have to be

25   coming down?

1            MR. CAMBRIA:  I object to the form of

2    the question in terms of everybody realized.  It

3    just is rather vague.  But go ahead, you can answer.

4        A.      I think it was understood that no one

5    would pay for the value of buildings that they have

6    to knock down.

7        Q.      And was it equally understood that no

8    one would want the buildings in their current

9    condition?

10           MR. PIZZI:  Object to the form.

11       A.      I can't say that nobody would want

12   them.  There wasn't a buyer that was interested in

13   them of which the hospital was aware.  And there

14   were also certain environmental issues related to

15   those buildings.

16       Q.      What environmental issues are you

17   talking about?

18       A.      I don't have the details here, but

19   there was certain environmental remediation that had

20   to be conducted in those buildings.

21       Q.      So it was understood when Lindabury

22   commissioned the Cushman & Wakefield people, it was

23   understood that the concept of value would require

24   the appraiser to consider that any buyer would have

25   to both demolish the existing structures, remove the

1    existing structures and take care of environmental

2    issues?

3         A.     That would be correct.

4         Q.     Any transfer of that land to anybody?

5         A.     I can't say that.  Could there be in

6    the universe of buyers someone who would buy the

7    building as they existed?  I don't know.  No one had

8    apparently approached the hospital with that

9    transaction.

10        Q.     And that would explain why the

11   engagement letter by which Lindabury retained

12   Cushman & Wakefield asked the appraiser to consider

13   the hypothetical condition that the property is

14   considered to be vacant land only?

15              MR. PIZZI:  Object to the form.

16        A.     I didn't have any direct

17   communications with Cushman & Wakefield, but I

18   believe that what you're saying is accurate.

19        Q.     I notice on Bates stamp 3, Page 3, it

20   appears that Robert DeFalco signed the engagement

21   letter addressed to Mr. Ross, but there's no

22   signature of Mr. Ross.  Can you explain that?

23        A.     No.  I never saw this until just

24   recently.  I never even saw the engagement letter

25   until just recently.  So I don't know why it wasn't

1    signed.

2         Q.    The Cushman & Wakefield engagement

3    letter on Page 4 has a schedule of information that

4    Cushman & Wakefield needed to complete its

5    assignment.  Did you have anything to do with the

6    communication or transmittal of that information?

7         A.    I did not personally, no.

8         Q.    If you look at Page 2 of the

9    engagement letter, LMEC2, it promises a report

10   within five days under the heading "Report

11   Delivery."  Do you see that?

12        A.    Yes.

13        Q.    Did you have an understanding of why

14   that seems kind of rapid for an appraisal?

15             MR. CAMBRIA:  Object to the form of

16   the question.

17        Q.    Can you explain why?

18        A.    I was not part of the discussions

19   between D.B. Ross and Cushman & Wakefield.  I think

20   that at the time we wanted this appraisal as quickly

21   as possible.

22        Q.    And for the record, for the reasons

23   you said earlier this morning?

24        A.    Correct.

25        Q.    Because of the financing issues?

1     A.     Correct.

2            MR. PIZZI:  Object to the form.

3     Q.     In the process of selecting Cushman &

4  Wakefield, did you participate in that?  Do you know

5  why they --

6     A.     No, I was not involved in that.  When

7  we determined that it was appropriate to obtain an

8  appraisal, D.B. said, "I'll take care of that."  He

9  was the general outside counsel to the hospital and

10  he was willing to undertake that.  I was busy with a

11  lot of other things at the time, so I gladly allowed

12  him that role of taking care of obtaining the

13  appraisal.

14     Q.     And the decision to go to Cushman &

15  Wakefield, did you have any anything to do with

16  that?

17     A.     I don't recall having anything to do

18  with it.  I think the only thing I do recall talking

19  about was we wanted to have the appraisal prepared

20  by someone who's qualified and whose opinions were

21  respected.

22     Q.     Did you have experience with Cushman

23  & Wakefield prior to this?

24     A.     Yes.

25     Q.     And you knew them to be qualified and

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,    :

                 Debtor,    :

BAYONNE MEDICAL CENTER,          :
Debtor and
Debtor-in-Possession; and        :
ALLEN D. WILEN, in his                    DEPOSITION OF:
capacity as Liquidating           :
Trustee and Estate                        PAUL W. KORCH
Representative for the Estate    :
of Debtor, Bayonne Medical
Center,                          :

           Plaintiff,    :         **ORIGINAL**

          -vs-.    :

BAYONNE/OMNI DEVELOPMENT,         :
L.L.C., a New Jersey limited
liability company; et al.,       :

         Defendants.    :
------------------------------------

B E F O R E:

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of GRUEN & GOLDSTEIN, ESQS.,

1150 West Chestnut Street, Union, New Jersey, on

MONDAY, JANUARY 10, 2011, commencing at 9:15 a.m.,

pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

1          A.     Yes.

2          Q.     Did he tell you why it was limited to

3    land only?

4          A.     Again, there were the issues over the

5    cost of demolition that were unknown at the time.

6          Q.     Did he tell you at any time why the

7    engagement letter didn't include the value of the

8    improvements at the property?

9          A.     Well, I do remember to a certain

10   extent the improvements were quite old and had

11   functional deficiencies.  And there were discussions

12   on whether or not valuing the property as improved

13   would yield a credible number.

14         Q.     And what does a "credible number"

15   mean?

16         A.     A number that would be considered

17   reliable.

18         Q.     And did you conclude that including

19   the improvements would not yield a credible number?

20              MR. PIZZI:  Objection.  It calls for

21   opinion.  This man is a fact witness.

22              MR. GRUEN:  We all understand that,

23   and arguments will be made later to the Judge over

24   the significance of this question and others related

25   to it.

1        A.      Could you restate the question?

2                (The pending question is read by the

3        Reporter.)

4        A.      Well, I think we suggested it.   I

5        don't know if we included it.

6        Q.      Suggested what?

7        A.      That the land only should be

8        appraised.

9        Q.      And the client agreed with your

10       conclusion?

11       A.      Again, I don't know if it was a

12       conclusion more than a suggestion at the time.

13       Q.      The client ultimately agreed with

14       your suggestion?

15               MR. PIZZI:   Objection.

16       Q.      Did the client ultimately agree with

17       your suggestion?

18       A.      When you say "my suggestion," that

19       would be through Mr. DiFalco.

20       Q.      Did the client ultimately agree with

21       the suggestion that was communicated through Mr.

22       DiFalco?

23       A.      I believe so, if they signed the

24       engagement letter to that effect.

25       Q.      Do you know the name Omni?