# EXHIBIT
# #21

1

```
 1   UNITED STATES BANKRUPTCY COURT
     Case NO.  07-15195 (MS)
 2
     IN RE:  BAYONNE MEDICAL CENTER:        ORIGINAL
 3                                    :
     ALLEN D. WILEN,                  :
 4                                    :    DEPOSITION OF:
                     Plaintiff,       :
 5                                    :    ADOLPH WALTER
          v.                          :
 6                                    :
     BAYONNE/OMNI DEVELOPMENT         :
 7   LLC, et al,                      :
                                      :
 8                   Defendants.      :
                                      :
 9   ─────────────────────────────────
10        TRANSCRIPT of testimony as taken by and
11   before MELISSA A. HILDEMANN, a Certified Shorthand
12   Reporter Realtime and Notary Public of the State of
13   New Jersey, at the offices of GRUEN & GOLDSTEIN,
14   1150 West Chestnut Street, Union, New Jersey 07083,
15   on Monday, March 1, 2010, commencing at 10:04 in the
16   morning.
17
18
19
20
21
22
23
24
25
```

12

1      Q.          Brockman?

2      A.          Herman Brockman.

3      Q.          And the details, meaning what

4 they had in mind.

5      A.          Pretty well this.  Yes.  I don't

6 know if it's in the appraisal there.  Is there a

7 letter?  Here.  I asked -- that's where the

8 confusion came in.  They asked me how much would

9 this be about.

10     Q.          How much would you charge?

11     A.          How much I would charge?  And

12 from him talking about putting up a new building

13 on the land that was vacant, and I asked him, You

14 have construction plans and so on; and he was

15 unsure, but I gave a quote on doing a -- also a

16 construction, new construction there.

17     Q.          On doing what about new

18 construction?

19     A.          A nursing home they wanted to

20 build.

21     Q.          But what was the proposal about,

22 this alternate proposal or additional proposal

23 that you made?

24     A.          That I made?

25     Q.          Yeah.

13

1      A.        I was only interested in what I

2   would -- they were interested in how much I would

3   be charging for an appraisal.

4      Q.        Okay.

5      A.        It was a lot more than what it

6   wound up.  And that's what that letter here -- I

7   asked Apsel to send me some kind of a thing

8   because after that meeting, they were all over the

9   place.  They weren't specific like people that are

10  -- they were layman.  So I was confused as to

11  actually what did they want me to do.  Did they

12  want me to do an appraisal on what it would cost

13  for putting up a new -- a new building.  Then I

14  quoted it.  It was a lot more, maybe $7,500, in

15  that range, I usually would charge for something

16  like that.  So I called them up -- Marvin, I

17  called up -- I don't know if it was the same day

18  or next day -- to get a clarification.  I asked

19  him to make up something, a list, and this is what

20  he made up and sent me.

21     Q.        Okay.

22     A.        And in here --

23               MR. GRUEN:  We can mark this now.

24               (Exhibit Walter-4, Multiuse Medical

25  Arts Building, marked for identification.)

14

1      Q.     So you say a couple days later

2 after that first meeting with Hausmann, Apsel and

3 Brockman, they sent you this document, Defendant

4 Walter-4, as you understood it, to further clarify

5 what they had in mind.

6      A.     I needed a clarification as to

7 what they expected me to do.  Actually, that's

8 what it comes down to.

9      Q.     Okay.  So you got this document

10 in response to your request to them for

11 clarification of what they wanted you to do.

12      MR. FALANGA:  Object to the form.

13      Q.     Is that correct?

14      A.     I believe -- I believe that's

15 what he made up here, explaining everything here,

16 but it still had the nursing home in here.  He's

17 talking about nursing -- all I did was then went

18 down, they were interested in a price, too, to

19 keep the price down.  So --

20      Q.     Price, meaning your fee?

21      A.     My fee.  They settled on that I

22 do as is --

23      Q.     Appraisal.

24      A.     -- appraisal, which is vacant

25 land and the building, two buildings on there.

1   They call it the phone building.  And then there

2   was a building next to it, attached to it, but

3   separate, that was formerly a glass, auto glass,

4   but it was vacant.

5           Q.        That's the warehouse building.

6               MR. FALANGA:  Object to form.

7           Q.        Was that warehouse building

8   one-story?

9           A.        That's a one -- no, that's not

10  the one -- actually, the warehousing was in the

11  phone building.  They had storage in there, and

12  they had the supplying utility, oil burners,

13  furnaces, small offices, but mostly a lot of

14  storage, a lot of wasted space that wasn't being

15  used, so to speak --

16          Q.        Uh-huh.

17          A.        -- but could be used for offices

18  when I was going through it.

19          Q.        So after you received Defendant

20  Walter-4, is this correct, you then --

21          A.        I called them up and talked to

22  him on the phone.  I says, Listen, you know, this

23  here is -- is -- I still don't know.  I says, I

24  think what you need -- I told them what I thought

25  would be good because he didn't have plans

16

1    available --

2                    MR. FALANGA:  Can I see?

3                    THE WITNESS:  Yes.

4           A.        There was no plans available as

5    far as the new construction they were going to put

6    on there.

7                    So I said, Why don't I do the -- do

8    it as vacant land as is, what you have there now.

9    Get a value on that.  And when you get the plans,

10   or the contractors, or whoever, you know, get it

11   together and at least you know what the land is

12   and what you have there.

13                   MR. FALANGA:  What was marked is

14   Walter-2.  I apologize.  I was confused here.

15                   THE COURT REPORTER:  It was 2 -- so

16   1 was the subpoena, 2 is the report, 3 is the

17   September 16th letter and 4 is the whatever is

18   there.

19                   MR. FALANGA:  That's it.  Thank

20   you.

21                   THE WITNESS:  Am I confusing or

22   what?

23                   MR. GRUEN:  No, no.  It's fine.

24

25   EXAMINATION BY MR. GRUEN:

17

1          Q.          When you made the suggestion,

2   what was the response, if any?

3          A.          Well, they asked how much.  And I

4   quoted, I think it was 40 -- $4,800 for it.  And I

5   came at -- the price I came to is because usually

6   in Bayonne or Jersey City, Hudson County, if it

7   was, like, a mixed-use, with a store on the bottom

8   and maybe three/four commercial units --

9   apartments above, I would charge about 2,000.  So

10  I figured two floors...

11         Q.          Any further discussions about the

12  scope of your assignment in that next call?

13                     MR. FALANGA:  Object to the form.

14         A.          My what?

15         Q.          The scope of your assignment.

16  What it is that you were going to be doing.

17  Anything else that you discussed about what you

18  were going to be doing, as opposed to your fee, in

19  the next call?

20         A.          I put it -- I think I have it in

21  my -- about a fee?

22         Q.          No.  Other than the fee.  The

23  assignment, what you were going to be doing.  Any

24  further discussion about --

25         A.          I told them I was going to do it

18

1   as is.

2         Q.        Let me -- let take you to --

3         A.        You might want that.  I have a

4   copy.

5         Q.        I'm going to come back to it.

6               MR. FALANGA:  We're going to need

7   to keep the original exhibits here.

8               THE WITNESS:  Oh, I'm sorry.

9               MR. FALANGA:  That's okay.  Just

10  until the conclusion of the deposition.

11              THE WITNESS:  I have it here.  Just

12  stamp it Copy, so I don't get them mixed up.

13

14  EXAMINATION BY MR. GRUEN:

15              Let me show you on your appraisal

16  report, Walter-2.  The pages are not numbered, but

17  it's the first series of photographs.  The one on

18  the top is called, "Subject, front view," and the

19  one on the bottom is called "Subject, front view."

20        A.        Yes.

21        Q.        I referred earlier in my

22  questioning to a one-story warehouse.  Does the

23  photograph on the bottom reflect what you saw at

24  the site?

25        A.        The bottom one does, yes.

19

1     Q.        Okay.  Is that -- would it be

2   fair to describe that as a one-story warehouse?

3                MR. FALANGA:  Object to the form.

4     A.            It was vacant, and I don't know

5   if they were using it as a warehouse.  It had an

6   overhead door.  I think they were using storage

7   space.  If it was locked, I couldn't get in, so

8   this is from memory.  I looked in through the

9   glass.

10     Q.        Now, did you have any further

11   conversations with either Brockman, Hausmann or

12   Apsel beyond the one that you just described and

13   before you undertook the appraisal?

14     A.         Just say that again.

15     Q.        Any further conversations with

16   any of these gentlemen from Bayonne Medical Center

17   before you went out and did the appraisal?

18     A.         Before I went out, no.

19     Q.        Did they ever tell you that they

20   were proposing to sell the property?

21     A.         No, they wanted to put a

22   construction -- a nursing home on it.

23     Q.        Okay.  So they did not tell you

24   that they were interested in selling the property?

25                MR. FALANGA:  Object to the form.

20

1        A.        No.  I don't think they knew

2   themselves what they wanted to do...

3                   MR. FALANGA:  It's all on the

4   record, so you know.

5                   THE WITNESS:  It's --

6                   MR. FALANGA:  I understand.

7                   THE WITNESS:  I was very confused

8   with them.  They were amateurs, so to speak.

9        Q.        How were they amateurs?

10       A.        Amateurs?

11       Q.        Yeah.

12       A.        They were all over the place.  I

13  couldn't -- that's why I had to call up and find

14  out what exactly do you want, you know, as far as

15  the appraisal is concerned.

16       Q.        But ultimately then, if I

17  understand you correctly, after the clarification,

18  you determined that the facts set forth in

19  Defendant Walter-4 would not be the basis for your

20  appraisal report; is that correct?

21                  MR. FALANGA:  Object to the form.

22       Q.        You can answer.  So you ignored

23  for purposes of the appraisal what's set forth in

24  that document, correct?

25       A.        Well, yeah.  I got clarification

21

1   on it.

2          Q.          But the facts set forth in that

3   document were not used by you in connection with

4   the generation of the appraisal report.

5          A.          No, no.

6                      MR. FALANGA:  Objection to the

7   form.

8          Q.          Now, there's a series of

9   handwritten notes that I'm taking out of the file

10  that you produced a moment ago in response to the

11  Document Demand No. 1.  They are on lined, white

12  sheets.  These are the documents that you

13  mentioned that you put the red pen on.  And I'm

14  going to have these marked as one exhibit.

15                     (Exhibit Walter-5, Handwritten

16  Notes, marked for identification.)

17         Q.          Last sheet, on the next-to-last

18  sheet there is a diagram.  Are these the buildings

19  that comprise the subject of your appraisal?

20         A.          Yes.  This is --

21                     MR. FALANGA:  Object to the form.

22         A.          This is a -- the thing you just

23  pointed out before.

24         Q.          Referring to the building on the

25  left side?

51

1   the neighborhood from -- that were very similar

2   sized properties and so -- land, frontage in the

3   central business district.

4          Q.        So the answer to my question

5   would be, that the source for the commercial

6   rental shown on Page 48 of your report was your

7   own files?

8          A.        From my own files.

9          MR. FALANGA:   Objection to form.

10         Q.        Okay.  And did your own files

11  contain copies of the leases for these commercial

12  rental properties?

13         A.        If there were leases, yes.

14         Q.        Do you know for a fact that your

15  file contained copies of the leases for these

16  properties?

17         A.        I always ask for them.

18         Q.        Do you know for a fact that your

19  files contained --

20         A.        No, the fact -- I don't know

21  that.

22         Q.        Do you know what the dates -- if

23  there were leases, do you know what the date of

24  the lease was for 738 Broadway?

25         A.        No.

52

1        Q.        Is there anything in the file

2    that you brought today that would reflect that you

3    referred to or considered a lease for 738 Broadway

4    when rendering the numbers on Page 48?

5        A.        No.

6        Q.        Is there anything that shows that

7    you referred to a lease for 1050 Broadway, when

8    rendering the numbers on Page 48 for that property

9    --

10       A.        No.

11       Q.        -- and the same for 360 Broadway?

12                 MR. FALANGA:  Object to form.

13       Q.        And the same for 360 Broadway?

14       A.        Yes, no.

15                 MR. FALANGA:  Objection.

16       Q.        Excuse me.  Yes, meaning there is

17   nothing that indicates that you referred for

18   leases --

19                 MR. FALANGA:  Objection to form.

20       Q.        -- is that correct?

21       A.        I don't -- no, I don't have it.

22       Q.        Okay.  Do you have anything in

23   your file at all, in the appraisal file, that

24   shows that you, in fact, referred to leases when

25   rendering the numbers on Page 48 for any of these

53

1   three properties?

2                    MR. FALANGA:   Object to the form.

3        A.        No.

4        Q.        Okay.  Do you have a recollection

5   for a fact, you're under oath, that you refer to

6   the actual leases when rendering the numbers on

7   Page 48?

8                    MR. FALANGA:   Object to the form.

9        A.        I don't know -- when I --

10       Q.        Sir, that's a yes-or-no answer.

11       A.        No.  No.

12       Q.        Do you know for 738 Broadway;

13   what the date of the lease was, if it was under a

14   lease?

15       A.        I don't know that.

16       Q.        Do you know what the terms of the

17   lease were, if it was under lease?

18       A.        No.  Not --

19       Q.        So you --

20       A.        Not now.

21       Q.        Do you know whether it was gross

22   or net?

23       A.        Not for sure.

24       Q.        Okay.  Do you know if it was for

25   an office building or some other type of use?

54

1          A.          Let me just do something here.

2   Let me just see.  Where is the --

3                     THE WITNESS:  I shouldn't talk.

4   The pictures and the details -- Explanation of

5   adjustment.  Let me go through here.

6          Q.          There are no adjustments under

7   the Income and Expenses Functions; isn't that

8   correct?

9          A.          That's correct.  But let me just

10  see here, they may be in my files.

11         Q.          Are there files of yours that you

12  did not bring with you today in response to the

13  subpoena?  Sir?

14         A.          I'm thinking.  It takes me a

15  little while, please.  In five years, I have

16  depreciated 30 percent, also.

17         Q.          Is that functional, external, or

18  --

19         A.          It's getting to be everything.

20         Q.          Functional, external and

21  obsolescence.  That's the word.

22         A.          The little hair helps.

23         Q.          So, again, my question was, is

24  there any part of your file that you did not

25  produce today in response to the subpoena?

66

1          A.          As standing, the -- the

2    improvements to the land and the improvements, the

3    building.

4          Q.          Yes.

5          A.          Standing there now, if it's --

6    anything happens to it in the meantime, separate

7    valuation of the land and the -- and the building.

8          Q.          By "something happens to it,"

9    what do you mean?

10         A.          Burns down.

11         Q.          So if the building --

12         A.          Or is demolished.

13         Q.          For instance, if the building

14   were demolished or not there -- are you saying if

15   the building were demolished or not there, that

16   this appraisal report would not be reliable?

17         A.          Well --

18                      MR. FALANGA:  Object to the form.

19         A.          No, I don't -- utilization, for

20   use, it wouldn't be used.

21         Q.          So it would no longer be under

22   the existing program of utilization if the

23   building were to be removed, and, therefore, this

24   appraisal report would not be reliable; is that

25   what you're saying?

67

1          MR. FALANGA:  Object to form.

2     A.      No, it may change the whole

3 thing.

4     Q.      The whole picture.

5          MR. FALANGA:  Object to the form.

6     A.      Yeah.

7     Q.      And the picture means the whole

8 valuation process, right?

9          MR. FALANGA:  Object to the form.

10    A.      No.  That's not what I'm saying.

11    Q.      Okay.  What are you saying then?

12    A.      I'm saying that the value may be

13 different --

14    Q.      Uh-huh.  So value is the same as

15 valuation --

16    A.      -- utilization, the use of it.

17          THE COURT REPORTER:  One at a time,

18 guys.

19          THE WITNESS:  I'm sorry.

20    Q.      So, if the building were removed,

21 that would change the valuation process and result

22 in a different valuation?

23          MR. FALANGA:  Object to the form.

24    A.      I appraised this as is.

25    Q.      Okay.  And therefore, if the

68

1   building were demolished or removed, it would

2   result in a different valuation?

3                    MR. FALANGA:  Object to form.

4          A.        I don't know.  That's speculation

5   on my part.

6          Q.        Well, it's speculation on your

7   part.  And yet, didn't your report in part rely

8   upon the reproduction costs of the building?

9                    MR. FALANGA:  Object to the form.

10         A.        No.  I went out and --

11         Q.        Didn't you do a cost analysis?

12         A.        Huh?

13         Q.        Didn't you do a cost analysis?

14         A.        Yes, I have that here.  We didn't

15  --

16         Q.        Okay.  And wasn't that a cost

17  analysis of the reproduction cost to reproduce the

18  existing building?

19         A.        Yes.

20                   MR. FALANGA:  Object to the form.

21         Q.        If the existing building were

22  demolished, would that impact your valuation?

23                   MR. FALANGA:  Object to the form.

24         A.        I wasn't asked for that.  I was

25  ask to do an appraisal as is --

69

1          Q.          If you had been -- if you had

2     been told --

3          A.          -- of the existing properties.

4          Q.          If you had been told that the

5     existing building was going to be demolished,

6     would that affect your valuation?

7          A.          If I were told it would be?  I

8     don't know if I would do the appraisal.

9          Q.          Because?

10         A.          Because it's not my -- my field.

11         Q.          And when you say it's not your

12    field, you wouldn't be --

13         A.          It's not my expertise.

14         Q.          You wouldn't be qualified then,

15    as an expert, to deliver an valuation report if

16    the building were going to be demolished; is that

17    what you're saying?

18                     MR. FALANGA:  Object to form.

19         A.          I would have never done an

20    appraisal report like that.

21         Q.          Okay.

22                     Let's continue under the heading

23    Important Definitions.  The definition of market

24    value, I'm going to read it into the record.

25                     "The most probable price which a

70

1  property should bring in in a competitive and open

2  market, under all conditions requisite to a fair

3  sale, the buyer and seller each acting prudently

4  and knowledgeably, and assuming the price is not

5  affected by undue stimulus.  Implicit in this

6  definition, is the consummation of a sale as of a

7  specified date and passing of title from seller to

8  buyer under conditions."  Then you list five

9  conditions.  I'm not going to ask you about the

10 conditions.

11          If both the buyer and the seller

12 knew at the time of the sale that the improvement

13 was going to be torn down, would the valuation --

14 should the valuation not reflect that?

15          MR. FALANGA:  Object to form.

16     A.      I did it as is.

17     Q.      Okay.  But within your

18 definition, the buyer and seller, each acting

19 prudently and knowledgeably, if each of the buyer

20 and the seller knew at the time of the sale that

21 the building was going to be torn down, would that

22 affect valuation?

23          MR. FALANGA:  Object to the form.

24     A.      I was not aware of a buyer.

25     Q.      I'm not criticizing you.  I'm

71

1   saying, if the buyer and the seller knew at the

2   time of the sale that the building was going to be

3   torn down, would that affect valuation?

4       MR. FALANGA:  Object to the form.

5     A.   I'd say it's a good question, and

6   I don't think I could answer it because -- no, I

7   can't answer that question.  It's an opinion.

8     Q.   If both the buyer and the seller

9   knew at the time of the sale that the building was

10  going to be torn down, shouldn't the valuation be

11  based upon land value less demolition expenses?

12      MR. FALANGA:  Object to the form.

13    A.   I didn't consider that.  I wasn't

14  informed that of a buyer or seller.

15    Q.   But I'm saying if the buyer and

16  the seller knew it was going to be torn down,

17  wouldn't that be the appropriate approach to the

18  valuation.

19    A.   That's beyond my expertise.  I

20  would have look to the details.

21      THE COURT REPORTER:  I -- would

22  have to --

23    Q.  THE WITNESS:  Oh, I'm sorry.

24      THE COURT REPORTER:  I didn't hear

25  -- you have to give the rest of you answer.  "That's

100

1    Q.        Look at Page 53 of your report.

2    A.        Page 53?

3    Q.        Yeah.  I'm going to read the last

4   two paragraphs.

5            "The Cost approach begins with an

6   estimation of land value and estimate of

7   reproduction or replacement costs new.

8   Depreciation from all causes is then estimated and

9   subtracted from the estimate of reproduction or

10  replacement cost new.  The cost approach provides

11  a reliable indication of value when the appraised

12  improvements are new or are relatively new."

13  Would you agree with that so far?  Yes?

14   A.        Yes.

15   Q.        "And do not suffer items of

16  functional or external obsolescence.  When this is

17  not the case, the value indicated by this approach

18  becomes less reliable."

19            So is that what you mean when you

20  say that an 80-year-old building is not typically

21  the subject of a cost approach, because of the

22  functional or external obsolescence that has to be

23  factored into the conclusion?

24            MR. FALANGA:  Object to the form.

25   A.        I'm say -- I'm saying what I have

101

1  written here, and I don't know what...

2          Q.          Is the problem with the cost

3  approach with an 80-year-old building that the --

4          A.          Where does 80-year-old building

5  come in here?

6          Q.          Is there a problem using the cost

7  approach for an 80-year-old building --

8                      MR. FALANGA:  Object to the form of

9  the question.

10         A.          I don't know --

11         Q.          Is the cost approach reliable

12  when using an 80-year-old building, given the

13  functional and external and physical depreciation?

14                     THE COURT REPORTER:  Hold on.

15                     MR. FALANGA:  Object to the form of

16  the question.  Sorry.

17         A.          Hold on a minute, I got to --

18         Q.          We're going to go back.  "The

19  cost approach" -- I'm, again, reading from Page

20  53.  "The cost approach provides a reliable

21  indication of value when the appraised

22  improvements are new or are relatively new."  Is

23  an 80-year-old building, in your estimation, new

24  or relatively new?

25                     MR. FALANGA:  Object to the form of

102

1   the question.

2         A.        It is not.

3         Q.        Okay.  Now, let me continue.

4   "When this is not the case, the value indicated by

5   this approach becomes less reliable."  Does that

6   mean then for a building, that's not new or

7   relatively new, that the value indicated by the

8   cost approach becomes less reliable?

9               MR. FALANGA:  Object to the form.

10        A.        Where is this?

11        Q.        Page 53, second paragraph.

12        A.        I have to read it to myself --

13        Q.        Go ahead, take your time.

14        A.        If you don't mind.

15        Q.        Sure.

16              I'll do it from scratch.  Reading

17   again from the same paragraph, then, Mr. Walter,

18   "When a building is not new or relatively new, the

19   value, indicated by" -- you say that the value

20   indicated by this approach becomes less reliable,

21   what do you mean by that?

22        A.        I mean there's a depreciation

23   involved.

24        Q.        And the older the building, the

25   more depreciation; is that correct?

103

1          MR. FALANGA:  Object to the form.

2     Q.        Is that correct?

3     A.        Not always.

4     Q.        Okay.  Then what is it about an

5  old building that makes the cost approach less

6  reliable?

7     A.        Because the cost to build,

8  rebuild or replace would change.

9     Q.        Well, in the next sentence --

10    A.        It is more costly to...

11    Q.        In the next sentence, you

12  actually answered my question, don't you?  You

13  say, "The primary weakness of the cost approach is

14  in the accurate reflection of the total accrued

15  depreciation on the total property value, which by

16  its nature, is very difficult to measure.  The

17  physical age of the subject improvements decreases

18  the accuracy of the cost approach to value."  You

19  would agree with that?

20    A.        Well, yes.

21         MR. FALANGA:  Object to form.

22    Q.        And therefore, an 80-year-old

23  building is -- withdrawn.

24

25    A.        I don't see an 80-year old here,

104

1    though.

2            Q.        Well, you told us that in your

3    report, didn't you?

4            A.        80-year old --

5            Q.        Excuse me.

6            A.        I'm sorry.

7            Q.        Would you agree that employment

8    of the cost approach valuation of an 80-year-old

9    building is unreliable because of the

10   depreciation, which is so difficult to measure?

11           MR. FALANGA:  Object to the form of

12   the question.

13           A.        I don't know if I can agree with

14   that.

15           Q.        Do you agree that the primary

16   weakness of the cost approach with a building that

17   is not new or relatively new, is an accurate

18   reflection of total accrued depreciation, which is

19   difficult to measure, and that the physical age of

20   the improvement decreases the accuracy of the cost

21   approach to value?

22           MR. FALANGA:  Object to the form of

23   the question.

24           A.        I believe that -- when an

25   appraiser does this approach, his experience comes

105

1  into play, and it is known that there is a certain

2  amount of experience from past appraisals that

3  were done, to take that and use his expertise to

4  come up with a reasonable opinion.  That's what I

5  believe.

6          Q.      So are you saying then that that

7  experience permits you, even with an 80-year-old

8  building, to --

9          A.      Yes.

10         Q.      -- let me finish the sentence --

11         A.      I do believe that.

12         Q.      -- to reliably use the cost

13 approach?

14                 MR. FALANGA:  Object to the form of

15 the question.

16         A.      I can't answer that question

17 anyway.

18         Q.      The next paragraph says, "There

19 are additional weaknesses in employing the cost

20 approach."  And I'm skipping down to the next

21 sentence.  "In addition, accurately estimating

22 accrued depreciation in improvements, which are

23 not of new or recent construction, is difficult to

24 measure and speculative in nature amidst changing

25 market conditions."

115

1          A.        The question again, please.

2                    MR. GRUEN:  I'll have the question

3    read back.

4                    (Record read.)

5                    MR. FALANGA:  Objection to the form

6    of the question.

7          A.        I don't know about inconclusive.

8          Q.        Did you use the word

9    "inconclusive" on Page 40 of your report?

10         A.        Yes.

11         Q.        Okay.  So are you saying that

12   that's accurate or inaccurate, that statement?

13   Are you saying that your report is inaccurate in

14   that respect?

15                   MR. FALANGA:  Objection to the

16   form.

17         A.        No, I'm not saying that.  I'm

18   saying it's a poor --

19         Q.        Poor choice of words?

20         A.        Yes.

21         Q.        Okay.  If you knew that the

22   parties intended, with this property, to tear down

23   the building and not reconstruct it, would you not

24   have employed the cost reproduction analysis?

25         A.        I don't know.

# EXHIBIT
# #22

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
CASE NO. 07-15195(MS)
CHAPTER 11

In re BAYONNE MEDICAL CENTER,      :

Debtor,      :                **ORIGINAL**

BAYONNE MEDICAL CENTER,          :
Debtor and
Debtor-in-Possession; and        :
ALLEN D. WILEN, in his                    DEPOSITION OF:
capacity as Liquidating          :
Trustee and Estate .             ROBERT S. BURNEY
Representative for the Estate    :
of Debtor, Bayonne Medical          VOLUME II
Center,                          :   (Pages 36-115)

Plaintiff,      :

-vs-      :

BAYONNE/OMNI DEVELOPMENT,        :
L.L.C., a New Jersey limited
liability company; et al.,       :

Defendants.      :
------------------------------------

B E F O R E :

    SHARON B. STOPPIELLO, a Certified Court

Reporter and Notary Public of the State of New

Jersey, at the offices of CONNELL FOLEY, L.L.P.,

85 Livingston Avenue, Roseland, New Jersey, on

WEDNESDAY, DECEMBER 15, 2010, commencing at 10:02

a.m., pursuant to Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 53

1   It was higher than the 2,000,000.  I don't recall

2   the exact amount.  I think it was somewhere in the

3   vicinity of $5,000,000.

4        Q.    And as you were contemplating the due

5   diligence that would be required by the financing

6   agency, were you aware that there had been an

7   earlier appraisal that showed a higher value?

8        A.    I was aware of that, yes.

9        Q.    Did you consider communicating that

10  to the financing authority, the Facilities Authority

11  I should say?

12       A.    We never got to that stage.  The

13  transaction was canceled before we ever got into the

14  details of due diligence.

15       Q.    I see.  Now, the report of Cushman &

16  Wakefield dated November 22, 2006, RB-2, contains a

17  marking on Page 11 indicating that it's a draft.

18  Can you explain why it was marked "Draft"?

19       A.    I don't know why Cushman & Wakefield

20  marked it "Draft."  I assume it's because it was not

21  considered to be the final document.

22       Q.    Were there any communications that

23  you were aware of to secure a final document?

24       A.    I don't believe so, because what

25  happened was by the time this document, this draft

Page 54

1    document was issued, the reason for its necessity

2    was over.  In other words, prior to November 22nd,

3    the bond transaction was put off.

4         Q.    I see.  So there was no need to have

5    Cushman & Wakefield finalize its report?

6         A.    That's correct.

7         Q.    Would that have entailed an

8    additional expense to Cushman & Wakefield?

9         A.    I don't know.

10        Q.    When you received this report, did

11   you have an understanding as to whether the

12   indication of a $2,000,000 value, which appears on

13   Page 10, was anything other than a good-faith

14   professional analysis of the value of that property?

15             MR. PIZZI:  Object to form.

16             MR. CAMBRIA:  I object to form of the

17   question.  It hasn't been established yet, as far as

18   I can recall, as to when he would have received

19   this.  I know it's dated November 22nd.  I'm not

20   sure that it's been established that Mr. Burney

21   received it on or about that date.  You might want

22   to check that first.

23             MR. COPLON:  Mr. Cambria's point is

24   well taken.  Withdraw the question.

25        Q.    When did you receive this document?

1         A.       I don't recall the precise date.   I

2    believe what happened was it was e-mailed to D.B.

3    Ross and D.B. may have forwarded the e-mail to me.

4    It was sometime in at least November 22nd.   It may

5    have been a couple of days afterward.   I don't

6    recall the exact day.

7         Q.       But you got this document relatively

8    contemporaneously with the date that appears on it?

9         A.       Relatively, and, again, I can't tell

10   you what that means.   Within several days probably.

11        Q.       Well, can we establish this?   Did you

12   have knowledge of and possession of this document or

13   awareness of this document prior to December, the

14   first week in December, when the Omni/Bayonne

15   transfer occurred?

16        A.       Yes.

17        Q.       You knew about it?

18        A.       Yes.

19        Q.       And you knew at the time that the

20   report contained an opinion, or at least a draft

21   opinion of $2,000,000, you were aware of that?

22        A.       Yes.

23        Q.       And you were about to go in on behalf

24   of a client and do a closing where the purchase

25   price was $2,000,000?

1        A.      Yes.

2        Q.      Did you communicate this report to

3   anyone at the hospital?

4        A.      I personally did not.  I believe D.B.

5   Ross probably did.

6        Q.      To whom?

7        A.      I don't know for certain.  I would

8   suspect it was to Marv Apsel.

9        Q.      Mr. Brockman?

10       A.      I don't know.  I doubt it.

11              MR. PIZZI:  I just want to note that

12   I object to everything after "I personally did not"

13   in that answer.

14       Q.      Can you describe your understanding

15   of the circumstances under which Robert Evans and

16   Carrie Evans had left the hospital?

17       A.      I have no specific knowledge as to

18   the details under which they left.  They didn't

19   leave at the same time.  Rob Evans left several

20   weeks earlier.  I know he left rather suddenly.  I

21   don't know the details.

22       Q.      Was it your understanding when this

23   Cushman & Wakefield report was ordered that it was

24   important for the hospital to carefully review any

25   decisions that they had made?

1           MR. CAMBRIA:  Object to the form of

2    the question.

3           MR. PIZZI:  Object to the form.

4    Could you read it back?

5           (The pending question is read by the

6           Reporter.)

7      A.      I wouldn't put it that broadly.  We

8    anticipated that we were going to be asked the

9    question whether the purchase price was determined

10   objectively.  Since Rob Evans was gone, we didn't

11   have the benefit of his knowledge.

12     Q.      So when Cushman & Wakefield was asked

13   to review this, this was a case of Lindabury making

14   sure that Evans had not entered into a transaction

15   at less than fair value?

16          MR. PIZZI:  Objection.

17          MR. CAMBRIA:  Objection to the form

18   of the question.

19     A.      The purpose was to provide evidence

20   that the purchase price was a reasonable one.

21     Q.      And when you received the Cushman &

22   Wakefield report of November 22, this was, I guess,

23   approximately two weeks before a closing was

24   contemplated, where the title to the property would

25   exchange hands at a $2,000,000 price, correct?

1      A.      That's correct.

2      Q.      Now, the report of Cushman &

3  Wakefield is marked "Draft."  Did you have any

4  understanding as to whether the $2,000,000 price was

5  subject to further changes?

6          MR. PIZZI:  Objection, no foundation.

7      A.      No.  This report was not ordered in

8  the context of the sale to Omni.  This report was

9  obtained in the context of being able to provide

10  documentation if requested in connection with the

11  bond issue.

12      Q.      I guess let me just backtrack.  So

13  the report had a different purpose than the Omni

14  transaction?  It wasn't related to Omni, per se?

15      A.      That's correct.

16      Q.      But I guess my question is:  Did you

17  have an understanding that the closing that you were

18  about to attend was at a transaction price where a

19  professional organization, such as Cushman &

20  Wakefield, had at least preliminarily in draft form

21  told you it's a square price, it's a fair price?

22          MR. PIZZI:  Object to the form.

23      A.      We were aware of what the report said

24  prior to the closing.

25      Q.      And were you aware that this

1    $2,000,000 figure was sufficiently developed,

2    professionally developed and, if need be, you could

3    have asked Cushman & Wakefield to sign the report?

4    It wasn't just a number that appeared there

5    randomly?

6              MR. PIZZI:  Objection.

7              MR. CAMBRIA:  Object to form of the

8    question.  I don't think this witness has said

9    anything at all about the propriety or the validity

10   of the opinions that are expressed in this report

11   and I don't think he would be qualified to do so.

12        A.    The report says what it says.  I'm

13   not a real estate appraiser.

14        Q.    Right.  But I mean do you have any

15   reason to believe or a basis to believe that this

16   number was artificial, fictional, not reliable?

17        A.    No, I have no reason, no basis --

18              MR. PIZZI:  Object to the form.

19        A.    -- to believe that.

20        Q.    Just for argument's sake, so it's

21   clear, you were the closing attorney.  Did you also

22   negotiate the language of the contract with Gruen?

23        A.    Yes.

24        Q.    So you were familiar with the

25   provisions of the contract itself?