**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BAYONNE MEDICAL CENTER,<br><br>          Debtor.<br><br><br>BAYONNE MEDICAL CENTER, Debtor and Debtor-in-Possession; and ALLEN D. WILEN, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor, Bayonne Medical Center,<br><br>          Plaintiffs,<br><br>          v.<br><br>BAYONNE/OMNI DEVELOPMENT, L.L.C., a New Jersey limited liability company; BAYONNE HEALTHCARE DEVELOPMENT, L.L.C., an unregistered entity;  OMNI ASSET MANAGEMENT, L.L.C. a New Jersey limited liability company; ATE CONSULTING COMPANY, a New Jersey corporation; AVERY EISENREICH, individually and trading as Bayonne Healthcare Development, L.L.C.; JOHN and JANE DOES 1 through 10; and ABC CORPS. 1 through 10,<br><br>          Defendants. | Bankr. Case No. 07-15195 (MS)<br><br>Chapter 11<br><br><br><br><br><br><br><br><br>Adv.  Proc. No.  09-1689(MS) |

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'  MOTION**
**FOR SUMMARY JUDGMENT**

---

**CONNELL FOLEY LLP**
85 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  (973) 535-0500
*Counsel for Debtor, Bayonne Medical Center and Allen D. Wilen, in his Capacity as Liquidating Trustee And Estate Representative for the Estate of Debtor, Bayonne Medical Center*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................. 1

LEGAL ARGUMENT ............................................................................................. 6

POINT I
SUMMARY JUDGMENT STANDARD ............................................................... 6

POINT II
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS
II, V, AND VI FAILS BECAUSE DEFENDANTS ARE INSIDERS AND
REPAYMENT OF THE "NOTE" WAS A PREFERENCE ................................... 7

POINT III
SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON COUNTS
III AND IV MUST BE DENIED BECAUSE FACT ISSUES EXIST
WHETHER THE ALLEGED LOAN WAS GENUINE AND BECAUSE
DEFENDANTS FAIL TO ADDRESS APPLICABLE LAW ............................... 14

A.   Genuine Fact Issues Exist Whether the $1M Wire From Omni to the
Hospital in June 2006 Was Paid on Account of the Pledge and Not the
Alleged Loan ..................................................................................................... 16

B.   Defendants Have Failed to Address the Applicable Legal Standards
Governing Actual and Constructive Fraud ......................................................... 19

  1.   Genuine Fact Issues Exist as to Multiple "Badges of Fraud" ................... 19
  (i)    *The transfer was to an insider* ................................................ 19
  (ii)   *The transfer was disclosed or concealed* ............................... 19
  (iii)  *Before the transfer was made, the debtor had been sued or threatened with suit*
         20
  (iv)   *The debtor removed or concealed assets* ............................... 21
  (v)    *The value of the consideration received by the debtor was not reasonably
         equivalent to the value of the asset transferred.* ........................... 22
  (vi)   *The debtor was insolvent when the transfer was made.* .................... 22
  2.   Apparent Authority is Irrelevant to Constructive Fraud and, In Any Event,  Genuine
Fact Issues Exist as to Whether the Hospital Received Reasonably Equivalent Value
Under Section 548(b) ......................................................................................... 24
C.   To the Extent Applicable at all, Genuine Issues of Material Fact Exist as
to "Apparent Authority" ..................................................................................... 25

i

POINT IV
DEFENDANTS' MOTION DIRECTED TO COUNT I FAILS BECAUSE
THE PLEDGE IS ENFORCEABLE AS A MATTER OF LAW AND,
ALTERNATIVELY, GENUINE ISSUES OF MATERIAL FACT EXIST
AS TO DEFENDANTS' PLEDGE "DEFENSES" ............................................................. 27

A.    The Pledge is Enforceable as a Matter of Law ............................................................. 28

1.    New Jersey Law Requires that an Unambiguous and Expressly Unconditional
Pledge Be Enforced as Written ........................................................................................ 28
2.    The Side Letter Has No Effect Upon Enforceability. ................................................. 31
3.    The Pledge is Fully Enforceable by the Liquidating Trustee Under New Jersey Law
for the Purpose of Paying the Hospital's Pre-Petition Debts ........................................... 34
B.    Alternatively, Genuine Issues of Fact Material to the Enforceability of
the Pledge Require a Trial ................................................................................................. 36

POINT V
DEFENDANTS' MOTION FAILS AS TO COUNTS IX THROUGH XIII
BECAUSE FACT ISSUES EXIST WHETHER THE HOSPITAL
RECEIVED REASONABLY EQUIVALENT VALUE FOR THE BELL
BUILDING ........................................................................................................................ 39

POINT VI
THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
WHETHER THE DEFENDANT LLC'S ARE ALTER-EGOS OF
EISENREICH. ................................................................................................................... 44

CONCLUSION ........................................................................................................................ 47

2535538-01

# TABLE OF AUTHORITIES

*Cases*

*Abbot v. Eviciti Corp.*, 2005 U.S. Dist. LEXIS 15464 (S.D. Ind. June 29, 2005) ............................................................................................. 41, 42

*Abeles v. Adams Eng'g Co.*, 64 N.J. Super. 167 (App. Div. 1960) ....................................... 25, 32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ......................................................................... 6, 18, 40

*Berel Co. v. Sencit F/G McKinley Assocs.*, 710 F. Supp. 530 (D.N.J. 1989) ........................... 25

*Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488 (5th Cir. 1993) ........................................ 39

*Boyle v. County of Allegheny*, 139 F.3d 386 (3d Cir. 1998) ..................................................... 40

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd.*, 229 F.3d 245 (3d Cir. 2000) .............................................................. 18

*Casriel v. King*, 2 N.J. 45, 65 A.2d 514 (1949) ....................................................................... 29

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...................................................................................... 6, 27

*Eastern States Agric. & Ind. League v. Vail*, 97 Vt. 495 (Sup. Ct. 1924), *superseded by statute on other grounds as stated*, 120 Vt. 228 (1958) ................................... 33

*Erickson v. Leonard*, No. A-2305-06T3, 2008 N.J. Super. Unpub. LEXIS 743 (App. Div. Mar. 18, 2008) .................................................. 45, 46

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968) .......................................................... 6

*Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) .................................... 22, 40, 44

*George v. Harris*, 4 N.H. 533 (N.H. Sup. Ct. 1829) ................................................................ 30

*Gilchinsky v. Nat'l Westminster Bank*, 159 N.J. 463 (1999) ............................................ 19, 20, 21

*Gizzi v. Texaco, Inc.*, 437 F.2d 308 (3d Cir. 1971) ................................................................. 25

*Hemstreet v. Brostmeyer (In re Hem-street)* 258 B.R. 134 (Bankr. W.D. Pa. 2001) ..................................................................................... 40

*Hyman v. WM Fin. Serv., Inc.*, No. 07-3497, 2008 WL 1924879 (D.N.J. Apr. 29, 2008) ................................................................................ 25

iii

*Impink v. Reynes*, 396 N.J. Super. 553 (App. Div. 2007) ............................................................. 29

*In re Alper-Richman Furs, Ltd.*, 147 B.R. 140 (Bankr. N.D. Ill. 1992) ........................................ 43

*In re El Mundo Corp.*, 208 B.R. 781 (Bankr. D.P.R. 1997) ......................................................... 23

*In re MDIP, Inc.*, 332 B.R. 129 (Bankr. D. Del. 2005) ..................................................... 40, 41, 43

*In re Norvergence, Inc.*, 405 B.R. 709 (Bankr. D.N.J. 2009) ...................................................... 19

*In re Pinto Trucking Service, Inc.*, 93 B.R. 379 (Bankr. E.D. Pa. 1988) .................................... 19

*In re Truong*, 285 Fed. Appx. 837, 2008 WL 2640446 (July 7, 2008) ........................................ 20

*In re Winsted Memorial Hospital*, 249 B.R. 588 (Bankr. D. Conn. 2000) ............................ 34, 35

*Jewish Fed'n of Cent. New Jersey v. Barondess*, 234 N.J. Super. 526 (Law
    Div. 1989) ................................................................................................... 28, 30, 32, 36

*Levison v.Weintraub*, 215 N.J. Super. 273 (App. Div. 1987) ..................................................... 29

*Lyon v. Barrett*, 89 N.J. 294 (1982) ........................................................................................... 45

*Marini v. Ireland*, 56 N.J. 130 (1970) ........................................................................................ 29

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) ................................................................... 6, 40

*Metzger v. Farris (In re e2 Communications, Inc.)*, 320 B.R. 849 (Bankr.
    N.D. Tex. 2004) ..................................................................................................... 38

*Montclair Nat'l Bank & Trust Co. v. Seton Hall College of Medicine and
    Dentistry*, 96 N.J. Super. 428 (App. Div. 1967), *cert. denied* 50 N.J. 301
    (1967) ............................................................................................................. 34, 35

*More Game Birds in America, Inc., v. Boettger,* 125 N.J.L. 97, 14 A.2d
    778 (1940) ................................................................................................... passim

*Pastore v. Bell Tel. Co.*, 24 F.3d 508 (3d Cir. 1994) ...................................................... 40, 41, 43

*Salsbury v. Northwestern Bell Tel. Co.*, 221 N.W.2d 609 (Iowa 1974) .......................... 29, 31, 32

*Savage & Assoc., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 81 (Bankr.
    S.D.N.Y 2005) ........................................................................................................ 38

*Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139
    (Bankr. E.D. Va. 2007) ........................................................................................ 39

*Shadel v. Shell Oil Co.*, 195 N.J. Super. 311 (1984) .................................................................. 25

iv

*Shubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns)*, 554 F.3d 382 (3d Cir. 2009)........................................................................................ 3, 8, 9

*Smith v. City of Allentown*, 589 F.3d 684 (3d Cir. 2009)................................... 6, 36, 40

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006)................................................... 32

*The Great Atlantic and Pacific Tea Co., Inc. v. Checchio*, 335 N.J. Super. 495 (App. Div. 2000)................................................................................................ 29

*Va. Sur. Co. v. Macedo*, 2009 U.S. Dist. LEXIS 90603 (D.N.J. Sept. 30, 2009)..................................................................................................................... 32

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007) ................................... 43

*Wilen v. Pamrapo Savings Bank, S.L.A. (In re Bayonne Med. Ctr.)*, 429 B.R. 152 (Bankr. D.N.J. 2010) ...................................................... 3, 7, 10, 13

*Wilen v. Pamrapo Savings Bank, S.L.A. (In re Bayonne Med. Ctr.)*, No. 08-2256, Bankr. Case No. 07-15195 ................................................... passim

*Woodmere Academy v. Steinberg*, 41 N.Y.2d 746 (1977) ...................................... 29, 33

**Statutes**

11 U.S.C. § 548(a)(1)(A) (2011) ................................................................................. 19

11 U.S.C. § 548(b) ....................................................................................... 25, 44, 45

11 U.S.C. §548(a) ......................................................................................................... 19

N.J. STAT. ANN. § 25:2-26(g) (2011) ......................................................................... 21

N.J. STAT. ANN. §. 25:2-26(d) (2011) ........................................................................ 21

N.J.S.A. 25:2-26.......................................................................................................... 19

**Other Authorities**

*Restatement (Second) of Contracts* § 73 (1981) ....................................................... 26

**Rules**

Fed. R. Bankr. P. 56(c) ................................................................................................ 38

Fed. R. Civ. P. 56(a) ...................................................................................................... 6

## PRELIMINARY STATEMENT

Plaintiffs, Bayonne Medical Center (the "Debtor" or the "Hospital") and Allen D. Wilen, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of the Debtor, Bayonne Medical Center ("Liquidating Trustee") (collectively "Plaintiff"), submit this brief in opposition to the motion for summary judgment as to all Counts of the Complaint filed by defendants, Avery Eisenreich and the Omni Entities. [1]

As the Court is now aware, by this action, Plaintiff seeks: (1) in Count I to enforce the $5M unconditional Pledge executed by Avery Eisenreich in October 2005 which was relied upon by the Hospital and confirmed to outside auditors; (2) recovery of the $1,037,313.23 "credit" transferred by the Debtor to the Omni Entities in connection with the transfer of the Bell Building Property,[2] which Defendants portray as the repayment of a fraudulent loan, but which was either a preference to an insider (Count II) or an actual or constructively fraudulent transfer pursuant to Section 548 of the Bankruptcy Code and N.J. STAT. ANN. § 25:2-25 and 25:2-27 (Counts III-VIII); and (3) the avoidance of the transfer of the Bell Building Property in its entirety as constructively fraudulent (Counts X-XIV).

In blunderbuss fashion, Defendants seek summary judgment against the Liquidating Trustee with respect to each of the three components of the Complaint. Each argument made proves Defendants to be unreliable reporters of the discovery record in this action and of applicable law. Examination of Defendants' arguments shows the facts to be either precisely the converse of what Defendants posit or clearly in dispute, necessitating a trial on the merits. Where Defendants rely upon legal arguments to avoid liability, Defendants provide the Court with

---

[1] The various entities owned by Avery Eisenreich are referred to collectively herein in as the "Omni Entities" or "Omni."

[2] All abbreviations in this brief have the same meaning as in Plaintiff's May 6, 2011 moving brief.

1

extraneous law and ignore the law that *does* apply to Plaintiff's claims.   In short, Defendants

contend they should be awarded summary judgment because "they say so."  The facts and relevant

guiding authorities say exactly the opposite.

On the Pledge claim (Count I), Defendants portray as "universally acknowledged" that the

$5M Pledge, <u>unconditional on its face</u>, was in fact conditional – conditional upon an August 24,

2006 lease which was not in existence at the time the Pledge was made.   The argument goes that,

because the subsequent lease was terminated, the Pledge should not be enforced by the Court.  The

gall of this argument is stunning.   If the Pledge was merely used as a scheme to disguise the

grossly above-market lease ($35/sq. ft. or $700,000 per year), as Eisenreich suggests, then the

entire transaction was a tax fraud.

Fortunately, the discovery record defeats Eisenreich's effort to argue that the Pledge was

conditioned on anything.  *Only Eisenreich* testified that the Pledge and the Lease were linked; no

one else involved in soliciting the Pledge corroborates him.[3] Not a single email, letter or

handwritten note remotely hints at such a condition.   In fact, no documentary evidence (i.e. the

Pledge confirmation to auditors) – not even the "comfort" letter upon which Eisenreich relies so

heavily – makes <u>any</u> mention of this purported "lease condition."   Thus, the factual premise for

Defendants' motion on the Pledge count – that such a linkage is "universally acknowledged" –

could not possibly lead to summary disposition of this claim.   More importantly, the Pledge is

unconditional on its face and, under the applicable law and public policy, both of which Eisenreich

disregards, unconditional pledges are enforced *as written*.   Not only does Eisenreich's argument

---

[3] When asked about whether there was a "relationship" between the pledge and the lease, Carrie
Evans, who met with Eisenreich about the Pledge, replied: "Not that I knew."  Marvin Aspel, who
also solicited the pledge, testified: "There's no specific mention of leasebacks . . . ." Robert Evans
said he never met with Eisenreich about the Pledge, so anything he said about the Pledge is
inadmissible hearsay.  (*See* R. 56.1(a) Stmt. at ¶¶ 48 & 86.)

2

that the Pledge died when the Lease was cancelled fail as a matter of law, summary judgment must be entered *for Plaintiff* on the Pledge.

With respect to Plaintiff's claim to recover the $1M "credit" wrongfully given to Eisenreich in connection with the Bell Building transfer (Count II), Defendants seek a judgment that Eisenreich was <u>not</u> an insider as a matter of law, an impossibility on this record.  Defendants' legal argument focuses solely on an attempt to align Eisenreich with Pamrapo Savings Bank[4] as of October 2006 (when insider status was not found) and to differentiate Eisenreich from the same bank in December 2006 (when insider status was found).  This is folly.  Eisenreich's theory is exactly the opposite of what occurred in *Pamrapo*.  There is no question that Eisenreich <u>was</u> an insider at the time the letters of intent were executed.  Eisenreich admits he and the Hospital were partners.  At most, Eisenreich could only attempt to show that having been an insider he subsequently became a "non-insider" – a feat Eisenreich does not even attempt.  To be sure, Eisenreich never cites, let alone distinguishes, the controlling Third Circuit authority in *Winstar*,[5] which compels the conclusion that Eisenreich was an insider as a matter of law, precisely the opposite premise of Defendants' motion.

Defendants also contend they are entitled to judgment as a matter of law on Plaintiff's actual and constructively fraudulent transfer claims involving the Alleged Loan (Counts III-IV & VII-VIII).  Ignoring (or perhaps conceding?) that "someone" forged Herman Brockman's signature on the Alleged Note and Corporate Resolution authorizing the Alleged Loan, Defendants suggest that Robert Evans had "apparent authority" to sign the alleged $1M promissory note

---

[4] *See Wilen v. Pamrapo Savings Bank, S.L.A. (In re Bayonne Med. Ctr.)*, 429 B.R. 152 (Bankr. D.N.J. 2010).

[5] *Shubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns)*, 554 F.3d 382, 396-97 (3d Cir. 2009).

thereby legitimizing the Alleged Note's repayment at the Bell Building closing.[6]  Eisenreich's "apparent authority" argument is no such panacea for Defendants.  There are genuine issues of material fact whether the Alleged Loan was merely a fraudulent construct to disguise the first installment payment on the Pledge.  Further, since the first payment of the Pledge was due at the time the Alleged Loan was made, there was no basis to "credit" the repayment of the Alleged Loan in connection with the transfer of the Bell Building six months later.  Defendants also ignore the law governing actually fraudulent transfers as well as the significant fact issues relating to the existence of multiple badges of fraud supporting Plaintiff's claims for relief.

Finally, Defendants seek judgment on Plaintiff's claims to avoid the Hospital's transfer of the Bell Building (Counts IX - XIII) as if somehow the value of that asset as of December 8, 2006 can be divined by the Court as a matter of law.  Defendants' contentions in this regard rely upon the post-dated "June 8th Resolution" as seemingly "validating" the transfer and the unsigned, draft Cushman and Wakefield appraisal procured by the Hospital's attorneys as seemingly "validating" the low $2 million purchase price. As with Eisenreich's "apparent authority" argument, these contentions are no panacea. Neither the post-dated June 8th Resolution nor the inadmissible unsigned, draft Cushman and Wakefield appraisal estop Plaintiff from pursuing the avoidance of the Bell Building transfer.  As a fiduciary to creditors of the Hospital, Plaintiff has an independent duty to examine the suspect transactions at issue herein.  That investigation has revealed facts which warrant the avoidance of the transfer for the benefit of creditors.  Aside from the dubious manner in which Eisenreich and Carrie Evans selected the price to be paid, Plaintiff has identified four expert witnesses who place a value on the Bell Building in December 2006 well in excess of

---

[6] Defendants do not argue a lack of apparent authority entitles them to judgment on Counts V and VI, which are based on New Jersey's fraudulent transfer law.

4

$4 million.  Most certainly genuine issues of material fact exist preventing summary disposition of these claims.

While there are genuine issues of material fact which prevent the Court from ruling upon Eisenreich's arguments, one thing, however, is clear – if Eisenreich's version of the facts holds true, Eisenreich was no innocent bystander.  Instead, perhaps because of his intimate relationship with Carrie Evans, Eisenreich was an active participant in the apparent schemes carried out by Rob and Carrie Evans to the detriment of the Hospital and its creditors.  Eisenreich was complicit in:

- structuring the Pledge payments to permit the accounting for the Pledge in current income, thereby permitting the Hospital to post what became a "phantom" profit for 2005 while permitting present-day bonuses to Rob Evans and Heather Aaron, among others;

- structuring the Pledge as an unlawful charitable donation/lease abatement to disguise the unquestionably excessive lease terms;

- keeping the Alleged Loan a secret with Carrie and Rob Evans, allowing a forgery to go undetected, and enabling Carrie to first claim to Hospital employees it was the payment on the Pledge and then, when that was no longer necessary, to claim it was a deposit on the Bell Building purchase price.

Further, made aware by Carrie Evans that the Hospital essentially had no funds available to fund its operations, Eisenreich used that information to dangle the $1M Alleged Loan while fixing the lowball Bell Building purchase price.

For all these reasons, Defendants' motion for summary judgment on all Counts of the Complaint should be denied.

2535538-01

**LEGAL ARGUMENT**

**POINT I**

**SUMMARY JUDGMENT STANDARD**

Summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To grant the motion, the court must determine that there is no genuine issue of material fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). All that is required from a nonmoving party to defeat summary judgment is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968). It is a settled rule that "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the fact finder, not for the court to develop on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006). Defendants' entire motion is riddle with "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence" all of which are matters for the Court to determine at trial. Accordingly, Defendants have failed to meet their burden and their Motion must be denied.

## POINT II

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS II, V, AND VI FAILS BECAUSE DEFENDANTS ARE INSIDERS AND REPAYMENT OF THE "NOTE" WAS A PREFERENCE

Defendants' argument that summary judgment is warranted with respect to Counts II, V, and VI rests solely upon the hope that the Court will not subject the Eisenreich transactions with the Hospital to close scrutiny, choosing instead to adopt Defendants' position that Defendants were not insiders at the time of the December 8, 2006 closing and, therefore, the one year look-back does not apply. (Def.'s Br. at 47.)  Not only have Defendants failed to show they are entitled to summary judgment as a matter of law on their insider status, the undisputed facts and applicable law conclusively establish that Defendants were both statutory and non-statutory insiders as a matter of law.

Defendants devote most of their energy to comparing themselves to Pamrapo Savings Bank, S.L.A. ("Pamrapo Savings"), the creditor/bank in *Wilen v. Pamrapo Savings Bank, S.L.A. (In re Bayonne Med. Ctr.)*, 429 B.R. 152, 175 (Bankr. D.N.J. 2010) (*"Pamrapo II"*).  Defendants mechanically list the elements of closeness between the Hospital and Pamrapo Savings and then conclude that, because the Court found Pamrapo Savings was not an insider as of October 2006, Eisenreich and the Omni Entities could not possibly be insiders as of December 2006.  (Def.'s Br. at 48-50.)  This theory ignores both the controlling Third Circuit case governing non-statutory insider law and this Court's finding that Pamrapo Savings *was* an insider for purposes of a transfer that occurred two months later, on December 8, 2006, in a transaction with striking similarities to the one at issue here, which also took place on December 8, 2006 after the tainted Board meeting on December 7th.  *See Wilen v. Pamrapo Savings Bank, S.L.A. (In re Bayonne Med. Ctr.)*, No. 08-

2256, Bankr. Case No. 07-15195, Transcript re: Hearing Held 12/29/09, Dkt. No. 40 (Docketed Jan. 6, 2010) (*"Pamrapo I"*).

Moreover, Defendants' argument is exactly the opposite of what occurred in *Pamrapo*. There is no question that Eisenreich <u>was</u> an insider at the time the letters of intent were executed as Eisenreich and the Hospital were admittedly partners. (Pltf.'s SOF ¶ 46.)  At most, Defendants could only attempt to show that, having been an insider, they subsequently became "non-insiders" – a feat Defendants do not even attempt.  Defendants fail even to cite the Third Circuit's recent decision in *Shubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns)*, 554 F.3d 382, 396-97 (3d Cir. 2009).  The reason for this omission is obvious.  In *Winstar*, the Third Circuit found non-statutory insider status "amply demonstrated" in factual circumstances resembling those in the present case. (*See* Pltf.'s Moving Br. at 17-27.)

In *Winstar,* the Third Circuit found, *inter alia*, the defendant's ability to influence the debtor to enter into transactions contrary to the debtor's best interest sufficient to demonstrate insider status.  *Winstar*, 554 F.3d at 397.  The parties in *Winstar* began their relationship by entering into a strategic partnership.  *Id.* at 391.  The relationship devolved into one whereby the defendant had the ability to influence the debtor into transactions not in the debtor's best interest such as purchasing goods it did not need and could not afford.  *Id.* at 397.  In addition, the defendant in *Winstar* had the "ability to involve [the debtor's] employees in certain improper transactions that benefited [defendant]."  *Id.* (internal citations omitted).  Finally, the Third Circuit in *Winstar* relied upon the fact that the defendant used the debtor to enrich itself at the debtor's expense.  *Id.* at 392-93; 397.

The material facts in *Winstar* are analogous to those here.  (*See* Pltf.'s Moving Br. at 17-27.)  As in *Winstar*, Defendants were not innocent bystanders but rather active participants in the

8

apparent schemes carried out by Rob and Carrie Evans to the detriment of the Hospital and its creditors.  Eisenreich was a willing participant in the structuring of the Pledge and the secret and fraudulent loan and, because of his unquestionably closer than arms' length and intimate relationship with Carrie Evans, Eisenreich learned inside information such as the fact that the Hospital essentially had no funds available to fund its operations in June 2006.  Using this inside information (as well other indicia of a closer than normal business relationship as set forth in Plaintiff's Motion for Summary Judgment), Eisenreich dangled the $1M Carrie ostensibly "needed" to fix the lowball Bell Building purchase price in exchange.  In short, Defendants plainly had a "close" relationship that subjects their transactions with the Hospital to closer scrutiny by the Court.  *Id.*; *see also Winstar*, 554 F.3d at 397-99 (finding insider status "amply demonstrated" where defendant had ability to influence debtor into transactions not in the debtor's best interest).

Defendants also attempt in vain to distinguish the circumstances that gave rise to this Court's finding of undue influence in *Pamrapo I* to the facts here. (Def.'s Br. at 51-52.) Defendants' contentions, however, are largely unsupported by the record and, in any event, not determinative given the overwhelming evidence of insider status supported by the undisputed facts as set forth in Plaintiff's Motion.   First, Defendants tout the absence of an "interlocking directorate;" however, such a circumstance is not a prerequisite for a finding of non-statutory insider status and beside the point given the compelling evidence of undue influence and closer than arms' length dealings between the Defendants and the Hospital's key officers.  (*See* Pltf.'s Moving Br. at 17-27.)[7]

---

[7] As set forth at length in Plaintiff's Motion for Summary Judgment, Eisenreich also qualifies as a statutory insider pursuant to Section 101(31), rendering discussion of "whether [he] was a non-statutory insider altogether . . . meaningless."  *Winstar*, 554 F.3d at 396.

Defendants next contend that Eisenreich had no inside information because he was not a Board member. This bald conclusion is unsupported by the record. Rather, the facts make clear that because of his unusually close relationship with Carrie Evans, Eisenreich was privy to much insider information, including most notably the fact that the Hospital had no money in June 2006 in which to conduct its operations. Eisenreich told Carrie he "think[s] about [her] daily and would love to just say 'hello.' (Ex. 70.)[8] Carrie Evans referred to Eisenreich as "my dear." (Ex. 45.) Remarkably, Carrie even emailed the Hospital's attorneys and employees *subsequent to both Rob Evans and her resigning from the Hospital* to direct the closing on the Bell Building. (Pltf.'s SOF ¶¶ 59-61; 63).[9] It is not clear whether Carrie was covering her tracks or helping Eisenreich or both. What is clear is that, as his friends at the top of the Hospital were abandoning ship, Eisenreich knew the Hospital was insolvent, which explains the "time of the essence" letter he issued demanding immediate closing just months before the Debtor's bankruptcy filing. (Ex. 76.)

These uncontroverted facts demonstrate that the Hospital's officers were aware of the Hospital's critical financial situation as of this time. *Pamrapo I*, at 110-12 (December 7, 2006 "watershed" board meeting was an "announcement of financial crisis"); *Pamrapo II*, 429 B.R. at 160 ("BMC borrowed the money to address cash flow problems"); 166 (Mohrle testified that "creditors were clamoring for payment"); 167-68 ("Brockman, under 'Chairman's Report-Financial Updates,' informed the board that BMC was in 'a more severe financial position than

---

[8] References to Exhibit numbers 1 through 91 refer to those exhibits attached to the Certification of Stephen V. Falanga filed in support of Plaintiff's Motion for Partial Summary Judgment on May 6, 2011 (Dkt. No. 48). Exhibits numbered 92 through 105 are attached to the Certification of Stephen V. Falanga filed in support of Plaintiff's Objection to Defendants' Motion for Summary Judgment filed herewith. References to "Def.'s Ex." are to the exhibits attached to the Declaration of Fred R. Gruen filed in support of Defendants' Motion for Summary Judgment on May 6, 2011 (Dkt. No. 47).

[9] "Pltf.'s SOF" refers to Plaintiff's Statement of Undisputed Facts filed in support of Plaintiff's Motion for Partial Summary Judgment on May 6, 2011 (Dkt. No. 48).

initially anticipated.'"); 169 ("[T]he desperate state of BMC's finances came to light after hospital CEO Evans had left.  . . . Evans was "cooking the books" and "duped" the board.); 173 ("BMC was 'clearly in the zone of insolvency contemplating bankruptcy."); 180 ("October was a huge 'loss' month for BMC . . . .") .

Moreover, it is an outright misrepresentation to claim, as Defendants do, that the Hospital's counsel (Lindabury) was "intimately involved in the making of the loan and the repayment" at issue here.  There is no evidence that Lindabury had any role in the Alleged Loan. (*See* R. 56.1(a) Stmt. at ¶ 104.)  To be sure, the forged Alleged Note and forged Corporation Resolution were prepared by Eisenreich's counsel.  Regardless, even if Lindabury had a role, Defendants mischaracterize the facts in the *Pamrapo* decisions, misapply the facts of this case, and rely upon disputed and inaccurate facts.  Specifically, in finding that the bank was an insider as of December 8, 2006 in *Pamrapo I*, the Court relied on the fact that the Hospital did not have counsel present at the "watershed meeting" of December 7, 2006 when it made the decision to grant the mortgage to Pamrapo despite the Hospital's impending bankruptcy.  *Pamrapo I*, at 114.  It was at this *same watershed meeting* that the Hospital Board, without counsel, made the decision to go through with the sale of the Bell Building Property to Bayonne/Omni the very next day, and after which Brockman decided to credit Bayonne/Omni the very $1M Plaintiff seeks to recover.  (Pltf.'s SOF ¶¶ 85-87.)

Defendant's contention that Eisenreich and Omni "had no ability to and did not unduly influence BMC on December 8, 2006" is an unsupported legal conclusion that should be rejected for all the reasons in Plaintiff's Motion. Eisenreich consistently influenced Rob and Carrie Evans in a mutually beneficial insider relationship.  Later, it appears Eisenreich used this insider knowledge to influence Herman Brockman to take further actions that were not in the best interest

of the Hospital or its creditors.  Most notably, Brockman pushed through the closing on the Bell Building Property sale for a price of $2M when the property had been appraised for $5.3M (Pltf.'s SOF ¶¶ 48; 86); according to the minutes, Brockman revealed the imminent closing to the Board only one day before it occurred without mentioning the sale price, (Pltf.'s SOF ¶ 86); and apparently, after the Board meeting and without the Board members' knowledge or authorization, Brockman permitted the fraudulent Alleged Loan to be repaid in the form of the $1,037,313.23 "credit".  (Pltf.'s SOF ¶¶ 83; 87).  Additionally, while Plaintiff disputes Defendants' contention, based on Fred Gruen's sworn testimony, that Brockman orally agreed in a conversation with Gruen without Hospital counsel present to the "demise" of the $5M Pledge,[10] such a concession would be further evidence of Eisenreich's undue influence over the Debtor because Brockman had no obligation to forgive the Pledge and in doing so unquestionably took actions to the detriment of the Hospital and its creditors.

Defendants also attempt to distinguish *Pamrapo* by claiming "[t]here was no expectation BMC could repay when the mortgage was given" whereas here "it was anticipated from the start BMC could and would repay as a credit against the land purchase price." This effort fails because the record is devoid of any evidence that the June 2006 Alleged Loan was to be repaid at closing[11]. (*See* R. 56.1(a) Stmt. at ¶ 96.)  In addition, Brockman displayed the same disregard for the best

---

[10]  This contention is disputed by Brockman's own deposition testimony and, in any event, would have resulted in a violation of RPC 4.2 because the alleged conversation took place outside of the presence of legal counsel.  (R. 56.1(a) Stmt. at ¶ 95.)  Accordingly, this Court should refuse to even consider Defendants' testimony in support of this alleged concession as it was, at best, procured unethically.  To do otherwise would be to sanction unethical and impermissible behavior.

[11] Defendants note that, in *Pamrapo*, repayment came after a default.  While there was no default here, the transfer was made before the Alleged Note had even matured, (*see* Ex. 74), further evidencing Eisenreich's ability to obtain concessions from the Debtor that were not in the Debtor's best interest.

interests of the Hospital and its creditors here when he permitted its last unencumbered asset to be transferred to Eisenreich at a price well below market value, (Pltf.'s SOF ¶ 86), and, even more egregiously, agreed to "credit" $1M of much needed liquidity as repayment of the Alleged Loan even though it contained his forged signature.  (Pltf.'s SOF ¶¶ 76; 82).

Finally, Defendants argue that the closing and, therefore, the transfer, was not rushed here as was the mortgage transaction in *Pamrapo*.  On the contrary, the undisputed facts make abundantly clear that the closing *was rushed*.  Eisenreich directed his attorney to send a "time of the essence" letter demanding that the Hospital close on the sale of the Bell Building Property or face legal action.  (Ex. 75.)  In questioning the lack of economic benefit to the Hospital and Carrie Evan's instructions *from afar,* Paul Mohrle challenged her: "[W]e rec'd the settlement document today for the Avery closing that shows cash to seller for $188,967.50. what's the rush???????" (Ex. 105.)  The closing took place less than a week after Eisenreich's time of the essence letter and just one day after the "watershed" Board of Trustees meeting, despite the fact that the Hospital was not prepared to vacate the Bell Building and had no incentive to close.  (Pltf.'s SOF ¶¶ 94-97.) Again, the transaction only benefited Eisenreich but was detrimental to the Hospital and its creditors.

In finding that Pamrapo Savings was an insider for purposes of the December 8, 2006 mortgage transfer, the Court "stressed" the "critical nature of the December 7, 2006 BMC board meeting." *Pamrapo II*, 429 B.R. at 172.  When listing the factors that led to its holding, this Court observed, "[t]he transfer was authorized at and made after the watershed board of trustees meeting of December 7, 2006, at which the BMC board was advised of the hospital's desperate financial condition, the unavailability of the hoped for HCFFA bond funding, and the substantial prospect of bankruptcy." *Id.* at 179.  This Court also placed weight on the fact that the loan was unsecured

prior to the mortgage transfer and that Hospital's obligation to the bank was satisfied in full (as opposed to the partial payment made several months prior); the Hospital was insolvent as of the December 8, 2006 transfer and "[b]ankruptcy was in the hospital-bank lexicon;"[12] and the bank was "pressing very hard for the collateral," which also happened to be one of the Debtor's last freed up assets. *Id.* at 179-80. As described in detail in Plaintiff's Motion, all of these factors are also present here. (*See* Pltf.'s Moving Br. at 24-27.) Lastly, while the Court in *Pamrapo* was understandably "mindful not to impair service on boards, particularly service for the benefit of a nonprofit community hospital," such public policy concerns are not implicated in the present case. *Id.* at 184.

Accordingly, Defendants fail in their attempt to distinguish this case from the insider transaction in *Pamrapo*. Rather, the material facts not in dispute lead to the inevitable conclusion that Defendants exercised undue influence over and engaged in less than arms' length dealings with the Debtor and were therefore insiders at the time of the December 8, 2006 transfer as a matter of law. (*See* Pltf.'s Moving Br. at 17-27.) For the foregoing reasons and all those reasons set forth in Plaintiff's Motion, the Court should subject these transactions to close scrutiny and deny Defendants' Motion for summary judgment on Count II of the Complaint.[13]

### POINT III

### SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON COUNTS III AND IV MUST BE DENIED BECAUSE FACT ISSUES EXIST WHETHER THE ALLEGED LOAN WAS

---

[12] The same was not true as of the October 2006 transfer.

[13] Inasmuch as insider status is irrelevant to Plaintiff's state law constructive fraud claim under Count V, and certain claims under Count VI, Defendants' Motion for summary judgment as to these claims must be denied because they have offered no argument that they are entitled to judgment as a matter of law. Moreover, to the extent insider status is relevant to Plaintiff's remaining state law claims under Counts V and VI, Defendant's Motion for summary judgment as to these claims should be denied for all the reasons set forth above because Defendants were insiders.

14

**GENUINE AND BECAUSE DEFENDANTS FAIL TO
ADDRESS APPLICABLE LAW**

Counts III and IV seek to recover as a fraudulent transfer under §548 of the Bankruptcy

Code the $1M "credit" to Eisenreich's Bayonne/Omni Development LLC at the December 8, 2006

closing.  Eisenreich seeks summary judgment on those Counts simply by arguing that Robert

Evans had "apparently authority" to sign a purported $1M promissory note which Eisenreich

claims was repaid at the closing and that Plaintiff should be "estopped" from avoiding the $1M

transfer.  (Def.'s Br. at 52-60.)  These arguments entirely ignore the law governing fraudulent

transfers and fail to confront, let alone counter, the overwhelming factual record showing that the

$1M received by the Hospital in June 2006 was not on account of a validly authorized loan and

that the Alleged Loan was a sham.  Ignoring that "someone" forged Herman Brockman's signature

on the Alleged Note and Corporate Resolution authorizing the Alleged Loan, Defendants still

argue that Robert Evans had "apparent authority" to sign the $1M Alleged Note thereby

legitimizing the Alleged Note's repayment at the Bell Building closing.[14]  (Def.'s Br. at 54.)

Eisenreich's "apparent authority" argument is no such panacea for the defense.  There are

genuine issues of material fact whether the Alleged Loan was merely a fraudulent construct to

disguise the first installment payment on the Pledge.  Further, since the first payment of the Pledge

was due at the time the Alleged Loan was made, there was no basis to "credit" the repayment of

the Alleged Loan in connection with the transfer of the Bell Building six months later.  Defendants

also ignore the law governing actually fraudulent transfers as well as the significant fact issues

relating to the existence of multiple badges of fraud supporting Plaintiff's claims for relief.  As

such, Defendants' arguments assume precisely that which Plaintiff disputes.  Whether the June

---

[14] Defendants do not argue a lack of apparent authority entitles them to judgment on Counts V and
VI, which are based on New Jersey's fraudulent transfer law.

2006 $1M wire was a Pledge payment, and the Alleged Note and Corporate Resolution a cover-up to enable Eisenreich to be repaid that sum, are issues of fact precluding summary judgment in Defendants' favor.  Resolution of these fact issues will determine whether the Hospital received reasonably equivalent value in exchange for the $1M closing credit under Section 548(b), and whether the Hospital transferred the $1M at closing with the intent to hinder, delay or defraud creditors under Section 548(a) in Counts III and IV.

A.      **Genuine Fact Issues Exist Whether the $1M Wire From Omni to the Hospital in June 2006 Was Paid on Account of the Pledge and Not the Alleged Loan**

As set forth in Plaintiff's Rule 56.1 Statement submitted herewith, genuine fact issues exist as to whether the $1M wired from Omni to the Hospital on June 23, 2006 was on account of a validly authorized loan or the first installment of the Pledge, and whether the Alleged Loan was a sham contrived by Eisenreich and Carrie Evans so that Eisenreich could potentially recoup the $1M Pledge installment that would otherwise have constituted property of the Hospital's bankruptcy estate.  In agreeing to keep the Alleged Loan secret with Carrie and Rob Evans, Eisenreich enabled a forgery to go undetected and permitted Carrie to first claim to Hospital employees it was the payment on the Pledge and then, when that was no longer necessary, to claim it was a deposit on the Bell Building purchase price.  (*See* Ex. 105.)

The following undisputed facts establish that the June 2006 wire from Omni was a first Pledge installment: (1) the October 21, 2005 Pledge expressly provided that the first $1M installment would be paid to the Hospital in June 2006 (*see* Pledge (Ex. 18)); (2) the Hospital recorded the Pledge in its books and records as an account receivable due to the Hospital. (Ex. 22); (3) more than three months after executing the Pledge, Eisenreich reaffirmed its validity and accuracy by countersigning the Audit Confirmation Letter which confirmed, among other things, that the first $1M installment would be paid in June 2006 (*see* Ex. 28 (audit confirm with no

16

exceptions); Pltf.'s SOF ¶ 38); (4) the $1M wire from Omni was in fact received by the Hospital in

June 2006 – the *same month* the first Pledge installment was due. (*see* <u>Ex. 18</u>; Pltf.'s SOF ¶ 42);

(5) the $1M wire transfer was recorded by the Hospital as a *payment against the Pledge* at the

direction of Carrie Evans. (*see* Pltf.'s SOF ¶¶ 42-43); and (6) despite claiming that the $1M

closing credit was in satisfaction of the Alleged Loan, Eisenreich *never turned in or cancelled* the

Alleged Note at the closing and it remains in Eisenreich's possession to this day. (Pltf.'s SOF ¶ 93;

Gruen 85:24-88:3 (<u>Exs. 95 & 5</u>).)  In fact, the Hospital's accounting records establish that the $1M

wire was only reclassified as an alleged advance on the Bell Building property sale at Carrie

Evans's direction on November 29, 2006, just days prior to the closing. (*see* Pltf.'s SOF ¶ 72).

　　　　While these facts alone make clear that genuine issues exist as to whether the $1M wire

that was "repaid" at closing was on account of the Pledge or a genuine loan, the circumstances

surrounding the negotiation and execution of the Alleged Note and Corporate Resolution are also

highly suspect and lead to the inevitable conclusion that a trial is required as to whether the

Alleged Loan or the Pledge (or both) were schemes carried out by Rob and Carrie Evans to the

detriment of the Hospital and its creditors and for their mutual benefit.  Specifically, in addition to

the fact that the existence of the Alleged Loan was never disclosed to or approved by the

Hospital's Board, (*see* Pltf.'s SOF at ¶ 79), and that the Alleged Note and Corporate Resolution

purporting to authorize the Alleged Loan both contained the forged signature of Herman

Brockman, (*id.* at ¶¶ 76 & 78), Eisenreich agreed with Carrie Evans *not to discuss* the existence of

the Alleged Loan documents with anyone.  (*Id.* at ¶ 79).  Accordingly, Eisenreich was aware that

the Alleged Loan was to "stay between" he and Carrie Evans and that it was "not for public

consumption." (<u>Ex. 57</u>.)  This type of conspired secrecy is entirely inconsistent with a true loan

agreement.  Moreover, the record is devoid of any evidence to support Defendants' unfounded

contention that the $1M wire was understood to be repaid at the Bell Building closing or that it was intended as a deposit against the Bell Building purchase price. (*see* Rule 56.1 Statement at 96). On the contrary, neither the Alleged Note nor the Alleged Corporate Resolution make any reference to this alternative "repayment agreement," and the discovery record makes clear that Robert Burney, the attorney representing the Hospital in connection with the Bell Building sale, *had no knowledge* of the Alleged Loan until he received the draft HUD statement just a few days before the closing. (*See id.* at 96 and104). The Purchase and Sale Agreement, executed months after the Alleged Loan was made, likewise contains no indication that the Hospital was ever indebted to Defendants. (*Id.* at 109).

For all these reasons, genuine issues of material fact exist about whether the $1M wire to the Hospital was ever intended as a loan as opposed to the first Pledge installment, an issue critical to Plaintiff's actual and certain constructive fraud claims. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd.*, 229 F.3d 245, 250 (3d Cir. 2000) (reiterating that the purpose of fraudulent conveyance law is "to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away"). Given that the Court, at the summary judgment stage, must view the facts, and draw all inferences, in the light most favorable to Plaintiff, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), a trial is required and Defendants' Motion for summary judgment on Counts III and IV should be denied.[15]

---

[15] For the same reasons, Defendants' "receipt of benefits"/estoppel argument also fails as it too ignores the obvious fact issues relating to whether the Alleged Loan was a sham contrived to fraudulently repay Eisenreich his first Pledge installment.

**B.    Defendants Have Failed to Address the Applicable Legal Standards Governing Actual and Constructive Fraud**

In addition to disregarding the genuine fact issues material to Counts III and IV, Defendants have utterly failed to address the applicable legal standards governing the Bankruptcy Code's actual and constructive fraud provisions.

1.    <u>Genuine Fact Issues Exist as to Multiple "Badges of Fraud"</u>

The relevant inquiry on Plaintiff's actual fraud claim under 11 U.S.C. §548(a) is whether the Debtor transferred an interest in property with the "actual intent to hinder, delay or defraud" creditors. 11 U.S.C. § 548(a)(1)(A) (2011).  This analysis is driven by a balancing of factors, also known as "badges of fraud," set forth in N.J.S.A. 25:2-26. *In re Norvergence, Inc.*, 405 B.R. 709, 732 (Bankr. D.N.J. 2009).  While the existence of just a single badge can "cast suspicion on the transferor's intent[,] . . . a finding of 'several [badges] in one transaction generally provides conclusive evidence of an actual intent to defraud.'"  *Norvergence*, 405 B.R. at 732 (quoting *Gilchinsky v. Nat'l Westminster Bank*, 159 N.J. 463, 477 (1999)).  For the purposes of avoiding transfers based on actual fraud, courts must look to the intent of the *transferor*, not the transferee. *See, e.g.*, *In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988).

Here, the discovery record makes clear that genuine fact issues exist as to at least six of the enumerated "badges of fraud" set forth below as it relates to the Debtor's $1M transfer to Omni as a "credit" against the $2M Bell Building purchase price.

(i)    *The transfer was to an insider*

For the reasons set forth in Point II (A) of Plaintiff's Motion and Point II, *supra*, Defendants were insiders of the Debtor as contemplated by the Bankruptcy Code at the time of the December 8, 2006 transfer.

(ii)    *The transfer was disclosed or concealed*

19

This badge is found where the transfer was carried out in such a way that creditors would be unaware that the transfer had in fact occurred. *See generally, In re Truong*, 285 Fed. Appx. 837, 838-39, 2008 WL 2640446, at *1-2 (3d Cir. July 7, 2008). Conversely, "[t]he openness and veracity of the transaction is irrelevant where other factors establish the debtor's intent to impede exaction." *Gilchinsky*, 159 N.J. at 480-81. Here, the facts make clear that the Alleged Loan was contrived and concealed from start to finish. Those in management who knew about the $1M transfer in June 2006 believed it to be a payment on the Pledge. Paul Mohrle at Carrie Evan's direction booked the funds as a payment of the first installment of the Pledge which was due the same month. (Pltf.'s SOF ¶¶ 42-43.) Moreover, Carrie Evans obtained Eisenreich's agreement to keep the Alleged Loan secret. (Pltf.'s SOF ¶ 79.) Further, the Board minutes make clear that neither the Alleged Loan nor the Alleged Note was ever disclosed to, voted on or approved by the Board of Trustees. *Id.* Nor was the Board made aware of the forgery of the Alleged Note and Corporate Resolution purporting to authorize the Alleged Loan. (Pltf.'s SOF ¶ 87.) Despite knowing the loan documents were forged, however, Brockman authorized the repayment of the Alleged Loan as a credit against the purchase price of the Bell Building Property without the Board's knowledge or consent upon being presented with the Alleged Note by Eisenreich over five months after its putative execution. (Pltf.'s SOF ¶¶ 83 & 87.)

       (iii)    *Before the transfer was made, the debtor had been sued or threatened with suit*

This badge of fraud is found when the debtor is facing threatened or pending litigation, including actions to collect a judgment, at the time of the transfer. N.J. STAT. ANN. §. 25:2-26(d) (2011); *see also Gilchinsky*, 159 N.J. at 479. Here, the Debtor was on the verge of filing for bankruptcy at the time of the transfer which is the factual equivalent of being sued to collect a judgment. *See Wilen v. Pamrapo,* 429 B.R. at 178. Additionally, Eisenreich was pressuring the

20

Debtor to close on the sale of the Bell Building Property.  Eisenreich directed his attorney to send a "time of the essence" letter directing the Hospital to close on December 11, 2006 and threatening to pursue all available remedies should the Hospital representatives "fail to appear and close title on that date."  (Ex. 76.)  Simultaneously, creditors like Pamrapo were scrambling to shore up their lien positions by whatever means necessary while the Hospital struggled to pay its vendors, meet payroll, and to conduct its day-to-day activities.  *Pamrapo I*, at 126.

(iv)    <em>The debtor removed or concealed assets</em>

This badge of fraud is found where the debtor, in transferring the assets, effectively prevented them from being available to its creditors.  N.J. STAT. ANN. § 25:2-26(g) (2011); *see also Gilchinsky*, 159 N.J. at 479.  Here, the Debtor transferred more than $1M to Omni at the December 8, 2006 closing as a credit against the $2M purchase price to be paid to the Hospital to acquire the Bell Building.  Because genuine fact issues exist as to whether the June 2006 wire to the Hospital was on account the Pledge or a genuine loan, such fact issues also exist as to whether the closing "credit" effectively removed $1M from the Debtor's assets that would otherwise have been available for distribution to its creditors in bankruptcy.  As such, genuine fact issues unquestionably exist as to the presence of this "badge of fraud" as well.

In addition, the circumstances surrounding the $1M transfer are highly suspect.  First, the Alleged Loan was negotiated by Carrie Evans, who was not an officer of BMC and lacked authority to bind the Hospital in this respect.  (Pltf.'s SOF ¶¶ 72-84.)  While Evans maintains that at all times she was working under Paul Mohrle's direction, Mohrle testified to the contrary.  *Id.* Additionally, the Alleged Note contains the forged signature of Herman Brockman.  (Pltf.'s SOF ¶ 76.)  Upon discovery of this fact, Herman Brockman failed to notify the Board of Trustees and allowed the $1M credit at the Bell Building closing despite his personal knowledge of the forgery.  (Pltf.'s SOF ¶ 87.)  Moreover, the loan evidenced by the Alleged Note was not authorized by the

21

Board of Trustees, (Pltf.'s SOF ¶ 79), and the $1M wire transfer to the Hospital was immediately booked as the first installment of Eisenreich's Pledge. (Pltf.'s SOF ¶ 30). Finally, the Debtor provided the $1M credit to Bayonne/Omni even though the $1M Alleged Loan was purportedly owed to ATE Consulting – an entirely different entity.

> (v) *The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred.*

The threshold inquiry for purposes of this "badge of fraud" is whether the debtor received any value at all in exchange for the transfer. *See Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir. 2006). Thus, if no value is found to have been conveyed, the court need not conduct the comparison to determine "whether the debtor got roughly the value it gave" by considering the "totality of the circumstances, and the debtor by design is unable to escape this badge of fraud." *See id.* at 212-13. Because, as discussed above, genuine fact issues exist as to whether the $1M transfer from ATE Consulting to the Debtor on June 23, 2006 was intended as the first installment on the Pledge and not a loan to the Hospital, genuine fact issues also exist as to this "badge of fraud." In this regard, if the June 2006 wire was in fact the first Pledge installment as the facts suggest, the Debtor received absolutely *no* value in return for the $1M transfer made to Bayonne/Omni at the December 8, 2006 closing because Omni had no right to be repaid that sum and the Debtor's doing so deprived the estate of more than $1M in needed capital.

> (vi) *The debtor was insolvent when the transfer was made.*

The Debtor's insolvency as of December 8, 2006 is stipulated. (Pltf.'s Supplemental Initial Disclosures (Ex. 80).)

In addition to these enumerated "badges of fraud," other non-statutory considerations also cast the shadow of fraud over the transfer. Specifically, the $1M transfer was made in the context

of a credit provided against the purchase price of the sale of another of the Debtor's assets, which had the effect of concealing the transfer from other creditors. (Pltf's SOF ¶ 89.) The underlying sale was also rushed to closing and consummated at significantly below-market value. (Pltf.'s SOF ¶¶ 86; 96-97.) The timing of the property sale and the rushed nature of the closing is highly suspect. *See In re El Mundo Corp*., 208 B.R. 781 (Bankr. D.P.R. 1997). The closing on the Bell Building and the issuance of the $1M credit against the sale price was unnecessarily and inexplicably hurried. (Pltf.'s SOF ¶¶ 96-97.) Omni issued a "time of the essence" letter, (Ex. 76), only after Robert Evans resigned from his position as the Hospital's CEO and "[t]he hospital was in disarray." *See Pamrapo I* at 120 ("It had no CEO, it had no permanent chief financial officer, it has already gone through a failed awful effort at a transaction with the Staten Island Hospital that had been affiliated with Saint Vincent's. There was no possibility of bonding ability them out. They had just gone through a $10 million bridge loan with Nuveen and the money was gone."). Moreover, at the time of the closing, the Hospital was not even prepared to vacate the Bell Building Property, necessitating a Use and Occupancy Agreement that permitted the Hospital to remain in the building *at no charge* for an additional six months. (Pltf.'s SOF ¶ 97.) Additionally, Brockman, without the knowledge and consent of the Board, sold the property for a mere $2M even though, less than a year earlier, the property had been appraised by the Hospital as having a fair market value of $5.3 million. (Pltf.'s SOF ¶ 86.)

What the evidence does not show is also highly relevant here. In particular, there is no evidence that the $1M credit at the closing was even contemplated or discussed in the context of the sale of the Bell Building until December 2006. Further, there is no evidence that the Board of Trustees authorized the $1M Alleged Note, the forgery, or the issuance of a credit to

Bayonne/Omni in the context of the closing on the Bell Building to satisfy the purported indebtedness to ATE.

The haste by which the closing occurred, the discounted purchase price, and the secrecy about the terms of the sale of the Bell Building and the $1M credit on the Alleged Note, although not enumerated "badges of fraud," add to the already dark and deep shadow of fraud that has been cast over the transfer.  As such, there exists more than sufficient evidence at this stage to rebut Defendants' deficient Summary Judgment Motion on Plaintiff's Actual Fraud Count and to demonstrate the existence of genuine fact issues material to this Count requiring a trial.

2.      Apparent Authority is Irrelevant to Constructive Fraud and, In Any Event, Genuine Fact Issues Exist as to Whether the Hospital Received Reasonably Equivalent Value Under Section 548(b)

Defendants' "apparent authority" argument is irrelevant to Plaintiff's ability to avoid and recover the $1M closing credit as a constructively fraudulent transfer under 11 U.S.C. § 548(b). Section 548(b) asks only whether the Debtor has transferred an interest in property, while insolvent, for less than reasonably equivalent value. As such, what Eisenreich claims to have believed or relied upon in connection with his dealings with the Hospital is inapplicable.  Thus, as with Plaintiff's actual fraud claim, Omni has failed to address the pertinent legal standard governing constructive fraud, failed to demonstrate it is entitled to judgment as a matter of law, and its Motion must be denied.

Moreover, for all the reasons discussed in connection with the fifth "badge of fraud," *supra*, genuine issues of material fact exist as to whether the Hospital received any value whatsoever in exchange for the $1M closing credit to Bayonne/Omni.  For this reason as well, Omni's Motion should be denied as to Count IV.

24

2535538-01

C.    **To the Extent Applicable at all, Genuine Issues of Material Fact
Exist as to "Apparent Authority"**

Finally, to the extent it is in any way relevant to the Court's assessment of Plaintiff's fraudulent transfer claims, and for the reasons set forth in Point III.A above, genuine issues of material fact exist as to whether Eisenreich *actually* believed the Alleged Loan documents were genuine and enforceable.  As such, genuine fact issues clearly also exist as to whether Eisenreich *reasonably* relied on these documents and Evans's authority to bind the Debtor as required in order establish apparent authority, thus precluding any judgment as a matter of law on this issue. *See Shadel v. Shell Oil Co.*, 195 N.J. Super. 311, 315 (1984) (denying summary judgment on apparent authority and reiterating that the element of reasonably reliance is a question of fact for the fact finder) (quoting *Gizzi v. Texaco, Inc.,* 437 F.2d 308, 309-10 (3d Cir. 1971)).  Actual reliance is a prerequisite for reasonable reliance and it is Defendants' burden to prove they justifiably relied on the Alleged Loan documents and on Evans's authority to bind the Debtor. *Abeles v. Adams Eng'g Co.*, 64 N.J. Super. 167, 190 (App. Div. 1960).  In light of the genuine fact issues material to, *inter alia*, whether the Alleged Loan was a sham from the outset Eisenreich knew not to be genuine, Defendants' have certainly not carried their burden of proving their reliance on the Alleged Loan documents and Evans's authority was reasonable as a matter of law. Defendants' Motion as to Counts III and IV should be denied for this reason as well.[16]

Moreover, assuming Eisenreich did rely on Evans's authority to bind the Debtor to the Alleged Loan, his reliance was unreasonable as a matter of law.  First, the Alleged Note and

---

[16] Because the Pledge constituted a pre-existing legal duty, Eisenreich's compliance with this obligation is not valid consideration for the Alleged Note in any event. *Berel Co. v. Sencit F/G McKinley Assocs.*, 710 F. Supp. 530, 536 (D.N.J. 1989) (citing *Restatement (Second) of Contracts* § 73 (1981)) ("[A] party cannot create a valid contract to provide a pre-existing legal duty, because there is no valid consideration."); *Hyman v. WM Fin. Serv., Inc.*, No. 07-3497, 2008 WL 1924879, at *3 (D.N.J. Apr. 29, 2008).  As such, Eisenreich was not entitled to rely upon the Alleged Note under any circumstances.

Corporate Resolution, which were prepared by Eisenreich's *own attorney*, specifically required the signature and approval of *both* Evans and Brockman in order to bind the Hospital.  (*See* Alleged Note and Corporate Resolution (Ex. 74).)  Had Eisenreich truly believed Evans alone had the authority to bind the Hospital, he would not have required Brockman's authorization on the loan documents.  Regardless, however, because Eisenreich was clearly aware that the Alleged Note and Corporate Resolution required the approval of both Evans and Brockman, he was at a minimum put on inquiry notice as to the invalidity and unenforceability of the Alleged Loan when he received a promissory note purporting to contain Brockman's signature certified as of Friday June 23, 2006 when Carrie Evans had just hours before advised him that Brockman was *unavailable to sign* any documents until the following Monday.  (Ex. 61.)  Instead of investigating this blatant inconsistency and apparent fraud, Eisenreich ignored it along with the fact that the notary's certification was not even dated the same day as the Alleged Loan documents were purportedly executed.  (Ex. 74.)

Moreover, at the very outset of the purported "loan" negotiations, Carrie Evans expressly conveyed to Eisenreich that the Alleged Loan "stays between us" and that it was "not for public consumption."  (Ex. 57.)  If nothing else, these suspicious circumstances certainly should have raised red flags as to the validity and enforceability of the Alleged Loan.  The Alleged Loan remained such a secret that it was not even disclosed to the Debtor's Board, its attorneys, its accounting department, or its bond financiers.  (Pltf.'s SOF ¶ 79.)

In addition, Defendants utterly fail to address the fact that material elements of the Alleged Loan transaction were never consummated.  For example, Defendants acknowledge that they never even received an executed UCC-1 Statement in connection with the Alleged Loan. (Def.'s Br. at 53.)  At a minimum, the suspect circumstances described above raise genuine issues of

26

material fact as to whether Defendants reasonably relied on the Alleged Loan precluding judgment as a matter of law on apparent authority.  For all the foregoing reasons, Defendants' Motion for Summary Judgment on Counts III and IV should be denied. [17]

**POINT IV**

**DEFENDANTS' MOTION DIRECTED TO COUNT I FAILS BECAUSE THE PLEDGE IS ENFORCEABLE AS A MATTER OF LAW AND, ALTERNATIVELY, GENUINE ISSUES OF MATERIAL FACT EXIST AS TO DEFENDANTS' PLEDGE "DEFENSES"**

In moving for summary judgment on the pledge count, Defendants are required to prove to this Court that there exists no genuine dispute as to any fact material to the enforcement of the October 21, 2005 Pledge and that it is entitled to judgment as a matter of law declaring the Pledge unenforceable. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Despite their burden, Defendants largely ignore governing New Jersey law relating to the enforceability of charitable pledges and rely upon factual assertions they claim to be "undisputed" but which are hotly contested on the discovery record.

With what should be enough to end the Court's inquiry, Defendants concede in their Motion that Eisenreich knowingly and voluntarily executed the October 21, 2005 Pledge.  (*See* Def.'s Br. at 61).  Despite Eisenreich's execution of an unambiguous and unconditional pledge instrument, Defendants argue that the Pledge is somehow non-binding by relying on a series of alleged oral representations from Carrie Evans which predated Eisenreich's execution of the Pledge and culminated in the so-called "comfort" or side letter, (*see* Def.'s Br. at 61-62), which in any event also does not support Defendants' claims.  Second, Omni argues that the Pledge is

---

[17] For all the same reasons, summary judgment should be denied as to Counts VII and VIII as the genuine fact issues relating to whether the $1M wire was a Pledge payment and the Alleged Note and Alleged Corporate Resolution a sham are also clearly material to Plaintiff's right to relief under the Declaratory Judgment and Unjust Enrichment Counts.

27

unenforceable because of Eisenreich's alleged perception based, again, upon certain purported oral representations that predated Eisenreich's execution of the Pledge, that the Pledge was conditioned upon the Hospital's agreement to enter into a long term lease of space at the SNF building, which never came to fruition. *Id.* at 60-61. Finally, Defendants argue the Pledge is unenforceable because the enforcement of the Pledge for the benefit of the Hospital's creditors in bankruptcy is not a viable "charitable purpose" for the Pledge. Each of these arguments fails upon close examination. *Id.* at 67.

**A.      The Pledge is Enforceable as a Matter of Law**

> 1.      New Jersey Law Requires that an Unambiguous and Expressly Unconditional Pledge Be Enforced as Written

Each of Defendants' purported Pledge "defenses" is predicated upon their impermissible attempt to employ extrinsic (and contested) facts in order to convert a clear, unambiguous, expressly unconditional and unrestricted pledge into a conditional obligation. New Jersey law, however, flatly prohibits Defendants' attempt to create ambiguity in an otherwise unequivocal and enforceable pledge agreement.

Under New Jersey law, charitable pledges are to be enforced in accordance with their terms as a matter of public policy. *See More Game Birds in America, Inc., v. Boettger,* 125 N.J.L. 97, 102, 14 A.2d 778, 781 (1940); *Jewish Fed'n of Cent. New Jersey v. Barondess*, 234 N.J. Super. 526, 528 (Law Div. 1989). The New Jersey Supreme Court made clear in *More Game Birds* that without express conditions to enforceability set forth *in the pledge itself*, the pledge must be found unconditional and unrestricted and enforced as such. *See More Game Birds*, 125 N.J.L. at 102 (enforcing an analogous pledge as written and rejecting a similar attempt to condition an otherwise unambiguous and unrestricted pledge because the pledgor could "easily have inserted his condition in his subscription" had he desired to condition his obligation); *see*

*also Salsbury v. Northwestern Bell Tel. Co.*, 221 N.W.2d 609, 613 (Iowa 1974) ("[W]here a subscription is unequivocal, the pledgor should be made to keep his word.").

The Supreme Court's holding in *More Game Birds* is reinforced by generally accepted principles for the enforcement of contracts under New Jersey law. New Jersey law mandates that "where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." *Impink v. Reynes*, 396 N.J. Super. 553, 560 (App. Div. 2007) (citations omitted). As the New Jersey Supreme Court has held "[i]t is of course not the province of the court to make a new contract or to supply any material stipulations or conditions which contravene the agreement[] of the parties." *Marini v. Ireland*, 56 N.J. 130, 143 (1970); *see also Levison v.Weintraub*, 215 N.J. Super. 273, 276 (App. Div. 1987) ("[Courts] have no right to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently.") (citations and internal quotations omitted). Moreover, while extrinsic evidence of "the situation of the parties and the surrounding circumstances" is admissible in certain circumstances "to aid in determining the meaning of what has been said" in a writing, such evidence is never admissible for the purpose of altering the express terms of a writing. *See, e.g.*, *Casriel v. King*, 2 N.J. 45, 65 A.2d 514 (1949) (cited by *The Great Atlantic and Pacific Tea Co., Inc. v. Checchio*, 335 N.J. Super. 495, 501 (App. Div. 2000)). In fact, the Supreme Court in *More Game Birds* expressly rejected a similar effort by the pledgor to defeat a pledge by relying upon evidence of extrinsic facts in an attempt to render conditional an expressly unconditional pledge as violative of New Jersey's parol evidence rule. *See More Game Birds*, 125 N.J.L. at 102. Courts in other jurisdictions have reached the same conclusion in cases about pledges. *See, e.g.*, *Woodmere Academy v. Steinberg*, 41 N.Y.2d 746, 750 (1977) (holding that, where a pledge is made in writing . . . parole evidence "may not be used to supply"

unexpressed conditions); *George v. Harris*, 4 N.H. 533, 535-36 (N.H. Sup. Ct. 1829) (parole evidence inadmissible to contradict or vary the terms of a "direct, positive, unconditional, and [written pledge]").  Rendering conditional an expressly unconditional Pledge is precisely what Defendants' attempt to accomplish with their Motion, yet New Jersey law forecloses this ploy.

While Defendants understandably downplay the significance of *More Game Birds* and *Jewish Federation*, given how strongly those cases weigh in favor of enforcement of the Pledge as a matter of law,[18] they make no meaningful effort to address these authorities.  (*See* Def.'s Br. at 67).  The fact that in *More Game Birds* and *Jewish Federation* a portion of the pledged sums had been paid is a distinction without a difference. The decisions in those cases were not dependent upon any partial pledge payment and Omni makes no attempt to explain why this fact would render the Pledge in the present case any less enforceable than the analogous pledge in *More Game Birds.*  Further, the record shows that a partial payment of Eisenreich's Pledge *was* made on June 23, 2006, so the distinction Defendants attempt is non-existent.[19]  Moreover, as discussed in Section 3, *infra*, Defendants' attempt to distinguish *More Game Birds* and *Jewish Federation* by claiming the enforcement of the Pledge in the present case for the benefit of the Hospital's creditors in bankruptcy would not further the Hospital's charitable purposes is simply contrary to New Jersey law.

Accordingly, given that all of Defendants' purported Pledge "defenses" impermissibly require this Court to impose conditions or otherwise re-write the terms of a clear, unambiguous,

---

[18] Omni mentions these cases in passing in the last few pages of its brief point.  (*See* Def.'s Br. at 66-67).

[19] For example, as more fully set forth in Point III.A, (1) Eisenreich admits wiring $1M to the Hospital at the end of June 2006 – the same month the first Pledge installment was due, and in the same amount (*see* Pltf.'s SOF ¶¶ 42-43); (2) the wire transfer was recorded by the Hospital as a *payment against the pledge*; (*id.*) and (3) the Alleged Note and Corporate Resolution authorizing the Alleged Loan contain the forged signature of Herman Brockman (Pltf.'s SOF ¶ 76).

expressly unconditional and enforceable Pledge in *contravention* of New Jersey law, Defendants certainly have not – and cannot – satisfy their burden of proving they are entitled to judgment in their favor declaring the Pledge unenforceable as a matter law.   Had Eisenreich desired to condition or restrict his Pledge obligation in any way, he "could easily have inserted his condition in his subscription."  *More Game Birds*, 125 N.J.L. at 102; *see also Salsbury*, 221 N.W.2d at 613. The Pledge, however, contains no such restrictions or conditions. On the contrary, the Pledge expressly provides that it is "unrestricted." (*See* Pledge (Ex. 18).)   As Defendants themselves concede in their Motion, this Court is without the power to reform the Pledge terms.  (*See* Def.'s Br. at 62.)   Thus, Defendants' Motion for summary judgment on the Pledge count should be denied, and for all the reasons set forth in Count I of Plaintiff's Motion, Plaintiff is entitled to summary judgment enforcing the terms of the Pledge as written as a matter of law.

2.      The Side Letter Has No Effect Upon Enforceability.

Even if the Court were to consider the October 21, 2005 letter from Evans to Eisenreich suggesting that the Pledge was "not legally binding" (the "Side Letter"), Eisenreich's own conduct defeats any argument based upon the Side Letter. As a preliminary matter, the Side Letter was written by Evans without the knowledge or approval of the Board, which is prohibited by the Hospital's bylaws (the "Bylaws").   Evans's power as President of the Hospital was expressly subject to the limitations and restrictions set forth in the Bylaws. (Ex. 91 at 11).  In this regard, Section 14.01 of the Bylaws makes clear that "[c]ontracts, conveyances or other instruments" that purport to bind the Hospital may not be executed unless "authorized by the Board of Trustees." *Id.* at 28.  Despite this directive, the record is devoid of any evidence that the Board was aware of or approved the Side Letter.  Thus, Evans was without the authority to write the Side Letter on behalf of the Hospital.

2535538-01

Any attempt by Defendants to claim they relied upon Evans's apparent authority in drafting the letter fails as a matter of law. In this regard, Defendants have the burden of proving they justifiably relied on the Side Letter and on Evans' authority to bind the Hospital. *Abeles v. Adams Eng'g Co.*, 64 N.J. Super. 167, 190 (App. Div. 1960). Moreover, "[o]ne dealing with a corporation may not assume with safety that the officer is acting within his authority," and the "mere statement of an officer that he had such authority is not enough." *Id.* Defendants have made no showing in their Motion that they justifiably relied on the Side Letter or Evans's authority, nor could they. Evans's erroneous representation that the Pledge was not "legally binding" is a legal opinion upon which Eisenreich had no right to rely. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006) (reiterating the well-settled principal that "statements of the law are considered merely opinions and may not be relied upon absent special circumstances"); *Va. Sur. Co. v. Macedo*, 2009 U.S. Dist. LEXIS 90603, *23 (D.N.J. Sept. 30, 2009) (same). Eisenreich would have no right to rely on Evans's erroneous legal opinion even assuming Evans had the authority to issue the Side Letter. *Id.*

In any event, and as discussed above and in Plaintiff's Motion, Evans's representation in the Side Letter is contrary to controlling New Jersey law, which specifically holds that charitable pledges *are* legally binding and enforceable as a matter of public policy. *See, e.g.*, *Jewish Federation*, 234 N.J. Super. at 528. Further, the Supreme Court of least one state which adheres to the same public policy of enforcing charitable pledges as New Jersey enforced a pledge analogous to the one at issue here as written despite the pledgor's purported reliance on representations by officers of the charity that the pledge "was not a legal obligation." *See Salsbury*, 221 N.W.2d at 611-613 (affirming trial court's decision enforcing charitable pledge as written). If such extra-contractual representations such as the Side Letter were sufficient to render an otherwise valid

32

pledge unenforceable, it would entirely undermine the settled public policy of this state favoring the enforcement of charitable pledges to ensure a pledgor does *not* evade his promise to contribute. *See More Game Birds*, 125 N.J.L. at 102. Quite the opposite, such a result would invite the very type of evasiveness New Jersey public policy is designed to prevent as well as undercut the stated policy of "resolv[ing] doubtful questions so as to avoid [a pledge's] repudiation." *See Woodmere Acad.*, 41 N.Y.2d at 749-50 (citing *Eastern States Agric. & Ind. League v. Vail*, 97 Vt. 495, 505 (Sup. Ct. 1924), *superseded by statute on other grounds as stated*, 120 Vt. 228 (1958)).

Eisenreich's own conduct shows he disregarded Evans's meaningless legal representations in the Side Letter. There is no dispute that *more than three (3) months after executing the Pledge*, Eisenreich reaffirmed the Pledge's validity and accuracy by countersigning the February 6, 2006 Audit Confirmation Letter confirming the unrestricted, unconditional nature of the Pledge. (Def.'s SOF ¶ 15; Def.'s Br. at 63; Audit Confirm Letter (Ex. 28).) As with the Pledge itself and, as Defendants concede in their Motion, Eisenreich could easily have listed exceptions to the audit confirmation such as an alleged belief that that the Pledge was in some way limited or conditional; however, he did not do so. (*See* Audit Confirmation Letter (Ex. 28); Def.'s Br. at 63.) As such, Defendants' argument that Eisenreich relied on Evans's Side Letter is belied by Eisenreich's own conduct.

Finally, even accepting Evans's statements on their face, Eisenreich can not attempt to invoke any protection under the Side Letter absent proof of an unforeseen detrimental change in his own personal financial circumstances significant enough that he is no longer financially capable of making good on the Pledge. (*See* Side Letter (Ex. 29).) Eisenreich, however, has produced no evidence whatsoever suggesting that his current personal financial condition renders him unable to satisfy his Pledge obligations to the Hospital. On the contrary, Eisenreich has

33

formally stipulated in this case that such a change has not occurred.  (Eisenreich 104:19-105:3

(Ex. 3).)  Even assuming that Eisenreich had suffered an unforeseen adverse change in his

personal financial circumstances – which Eisenreich's own testimony makes clear he has not – the

Side Letter further provides only that the Hospital would "work with [Eisenreich] . . . to

accommodate" such a situation.   (Side Letter (Ex. 29).)   The Side Letter therefore provides

Eisenreich no refuge.

Not only must Defendants' motion for summary judgment based upon the Side Letter be

denied, the factual record and relevant law makes clear that the Pledge is valid, unconditional,

unrestricted and enforceable as written, and remains due and owing as a matter of law.

3.    The Pledge is Fully Enforceable by the Liquidating Trustee
Under New Jersey Law for the Purpose of Paying the
Hospital's Pre-Petition Debts

Finally, Defendants argue that "New Jersey does not recognize pledges as enforceable

debts" under the present circumstances because enforcement of the Pledge in bankruptcy for the

benefit of the Hospital's pre-petition creditors would not further the charitable purposes of the

Hospital or the Pledge.  (Def.'s Br. at 67.)  This argument contradicts applicable New Jersey law.

Courts addressing facts analogous to those at issue here have specifically held that pre-

petition gifts to a subsequently bankrupt charity constitute property of the debtor's estate

recoverable by the debtor or trustee for the payment of pre-petition debts incurred while the debtor

was operating. *See In re Winsted Memorial Hospital*, 249 B.R. 588, 592-94 (Bankr. D. Conn.

2000) (citing *Montclair Nat'l Bank & Trust Co. v. Seton Hall College of Medicine and Dentistry*,

96 N.J. Super. 428, 437-38 (App. Div. 1967), *cert. denied* 50 N.J. 301 (1967))).

For example, in *Winsted*, the bankruptcy court cited to the New Jersey Appellate

Division's decision in *Montclair* and held that pre-petition unrestricted charitable gifts to a

subsequently bankrupt not-for-profit Hospital to be used for the Hospital's general charitable

purposes constituted property of the hospital's estate the chapter 7 trustee was permitted apply toward payment of the hospital's pre-petition debts. *See In re Winsted*, 249 B.R. 588, 592-94, 596. There, although the hospital had ceased operations and filed a liquidating bankruptcy petition under chapter 7 after receiving the charitable gift, the gift was made while the hospital was operating and the hospital had "neither dissolved its corporate existence nor finished winding down its affairs." *See id.* at 594.

Moreover, it is the settled law in New Jersey that a charitable organization which has not dissolved its corporate existence is entitled to continue to receive and use charitable gifts to pay debts incurred while the charity was operating even though it has since become entirely inactive. *See Montclair*, 96 N.J. Super. at 438 (finding a defunct not-for-profit educational institution entitled to receive and apply charitable gift toward payment of debts incurred while operating). Here, as in *Winsted* and *Montclair*, the Pledge is expressly unconditional and unrestricted,[20] was made and became binding under New Jersey law almost a year and a half before the Hospital filed for bankruptcy while the Hospital was operational,  and the Hospital has "neither dissolved its corporate existence nor finished winding down its affairs" despite filing for bankruptcy. Accordingly, despite Defendants' erroneous assertion to the contrary, Plaintiff is entitled to recover and apply the Pledge under the present circumstances toward payment of the Hospital's pre-petition debts incurred while the Hospital was operating.  It is precisely on account of the repayment of such pre-petition debts that Plaintiff, as liquidating trustee of the Hospital's estate, is seeking recovery of the Pledge funds to which the estate is entitled.

---

[20] Moreover, to the extent Defendants' argument is at all predicated upon their baseless assertion that the Pledge was "conditioned" upon the Hospital's leaseback of space at the SNF, it fails for the reasons set forth in Section A.1.

For all the foregoing reasons, Defendants have failed to satisfy their burden of demonstrating they are entitled to judgment as a matter of law on their purported Pledge "defenses" and Defendants' Motion for summary judgment on Count I should be denied. [21]

## B.    Alternatively, Genuine Issues of Fact Material to the Enforceability of the Pledge Require a Trial

While Plaintiff respectfully submits that Defendants have failed to prove they are entitled to judgment as a matter of law on their Pledge "defenses,"[22] in the event the Court elects to consider the extrinsic "facts" upon which Defendants now rely for the proposition that the Pledge was somehow "conditioned" in determining the enforceability of the Pledge despite the foregoing legal arguments as to why such facts should not be considered, for all the reasons set forth in Plaintiff's Statement pursuant to Local Civil Rule 56.1(a) submitted herewith, there clearly exist genuine disputes of material fact that require a trial.

First, Plaintiff's Rule 56.1 Statement makes clear that the testimony upon which Defendants purport to rely in support of the conditional nature of the Pledge either does not suggest the existence of any such condition, or constitutes inadmissible hearsay that cannot be used in support of summary judgment. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009); *see also* Fed. R. Bankr. P. 56(c) (requiring that evidence in support of an alleged fact on summary judgment be admissible).

For example, Defendants' reliance on the Lawler Report is misplaced as that document is inadmissible hearsay and never states the Pledge was conditioned upon the Hospital's agreement

---

[21] The laundry list of cases pertaining to *inter vivos* gifts to which Defendants' cite is a red herring as none of those cases deals with charitable pledges. As such, they are inapposite. New Jersey law governing the enforcement of charitable pledges is settled and set forth in *More Game Birds* and *Jewish Federation*. As explained above, Defendants have failed to meaningfully distinguish either of those cases.

[22] For all the reasons set forth above and in its Motion, Plaintiff submits it is entitled to judgment as a matter of law enforcing the unambiguous and expressly unconditional Pledge as written.

to leaseback SNF space.  Even taking the report at face value, it merely surmises that the Pledge write off – which, as Plaintiff's expert will demonstrate at trial, does not render the Pledge unenforceable – was in some way "associated with the renegotiation" of the parties' business relationship pertaining to the SNF.  This is far from suggesting the existence of any Pledge "condition" at all, let alone the type of testimony that could overcome an expressly *unconditional* written Pledge.  In any event, Lawler's deposition testimony makes clear he has no personal knowledge of the events leading up to the Pledge write off.  Rather, his statements are admittedly based upon his interpretation of what Herman Brockman told him about the Pledge write off, which is inadmissible hearsay.  (*See* R. 56.1(a) Stmt. at ¶ 18.)  Moreover, Herman Brockman *never* testified that the Pledge was conditioned upon or in any way linked to the Hospital's leaseback of SNF space.  (*See* R. 56.1(a) Stmt. at ¶ 19.)

Robert Evans's testimony that he "c[a]me to hear" from some unknown third party that the Pledge was "renegotiated" as a result of "the [SNF] project becoming smaller and eliminating the rent" is likewise inadmissible hearsay and does not support the proposition that the Pledge contained any condition.  (*See* Def.'s Br. at 65.)  Neither does Evans's testimony that the Hospital contemplated the Pledge "would be a way to offset" SNF lease costs suggest that any Pledge condition existed.  (*See* R. 56.1(a) Stmt. at ¶ 48.)  Rather, Evans's testimony at best supports nothing more than the Hospital's own reflection as to how it intended to utilize the Pledge funds.

Accordingly, the only record evidence that remotely supports the existence of the alleged leaseback condition is Eisenreich's own testimony, which is flatly contradicted by the record.  (*See* R. 56.1(a) Stmt. at ¶¶ 6; 48; 64 & 86.)

Perhaps most compelling, however, is the simple fact that there exists no writing of any kind that connects the lease to the Pledge.  Not only is there no signed agreement to this effect,

there is no email nor any handwritten note that makes such a link.  Neither the Pledge, the Side Letter nor the Audit Confirmation, executed some three months after the October 21, 2005 Pledge and which reaffirmed the amount and validity of the unconditional, unrestricted Pledge, contains any reference whatsoever to the existence of this alleged condition.  (*See* Pledge (Ex. 18); Side Letter (Ex. 29), Audit Confirmation Letter (Ex. 28).)  That no reference to the alleged leaseback condition appears in the Side Letter is particularly telling as, from what can be discerned from the testimony upon which Defendants purport to rely, Defendants claim this condition came into being during the same time period and as part of the same conversations that lead to the Side Letter.  (*See* Def.'s SOF at ¶¶ 86-87).  If the Pledge were truly conditioned upon the SNF leaseback, however, common sense dictates that it would have been reflected somewhere in one of the three written documents discussing the Pledge terms.  The utter lack of any reference to the alleged leaseback condition in *any* document alone raises a genuine issue of fact as to whether this condition existed requiring a trial.

Finally, while Plaintiff disputes Defendants' contention that Herman Brockman released Omni's obligation to fulfill the Pledge as being entirely unsupported, if Herman Brockman did agree to such a forgiveness on behalf of the Hospital, the release itself would constitute a transfer of an interest in the Debtor in property and is actually and constructively fraudulent pursuant to Section 548 of the Bankruptcy Code.  *See, e.g., Savage & Assoc., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 81, 86 (Bankr. S.D.N.Y 2005) ("Generally speaking, the broad definition of 'transfer' is sufficiently robust to cover the release of an obligation to pay money.  The right to collect a debt is 'property or . . . an interest in property,' and the release disposes of or parts with it." (*quoting Metzger v. Farris (In re e2 Communications, Inc.)*, 320 B.R. 849, 856 (Bankr. N.D. Tex. 2004))); *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 163 (Bankr.

38

E.D. Va. 2007) ("The phrase 'transfer or incur obligations' found in § 548 of the Bankruptcy Code is used in the 'most comprehensive' sense, and it is intended to include every means and manner by which property can pass from the ownership and possession of another. Any transaction that reduces or extinguishes valuable legal rights (such as the granting of a release) is subject to avoidance." (citations omitted)); *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1492 (5th Cir. 1993) ("[T]he Code's expansive definition literally encompasses every mode of parting with an interest in property." (internal quotation marks omitted)).

Accordingly, Defendants lose all credibility in representing to this Court that the leaseback condition is "universally acknowledged." (*See* Def.'s Br. at 63.) For all the reasons set forth in Plaintiff's Rule 56.1 Statement, the record makes clear there are genuine issues of material fact that necessitate a trial in the event the Court considers the extrinsic evidence upon which Defendants attempt to rely. Under no circumstances are Defendants entitled to Summary Judgment on the Pledge count and their Motion as to Count I should be denied.

## POINT V

### DEFENDANTS' MOTION FAILS AS TO COUNTS IX THROUGH XIII BECAUSE FACT ISSUES EXIST WHETHER THE HOSPITAL RECEIVED REASONABLY EQUIVALENT VALUE FOR THE BELL BUILDING

Defendants' Motion for summary judgment on Counts IX through XIII fails given the obvious factual issues surrounding the value of the Bell Building at the time of the December 8, 2006 closing which is critical to a determination on these counts. The competing expert reports and deposition testimony relevant to this issue leave no doubt that there exists a genuine dispute between the parties as to the fair market value of the Bell Building as of the closing and, accordingly, Defendants' Motion for Summary Judgment on Counts IX through XIII should be denied.

In determining whether the debtor received "reasonably equivalent value" for the purposes of fraudulent transfer law when at least some value was conveyed, the court is required to analyze the "totality of the circumstances, including" (1) the fair market value of what debtor received; (2) whether an arm's-length relationship existed between the debtor and transferee; and (3) whether the transferee acted in good faith. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212-13 (3d Cir. 2006).   As such, "whether reasonably equivalent value was exchanged is an inherently factual issue" as to which "considerable latitude must be allowed to the trier of the facts." *Hemstreet v. Brostmeyer* (*In re Hem-street*) 258 B.R. 134, 138 (Bankr. W.D. Pa. 2001); *In re MDIP, Inc.*, 332 B.R. 129, 133 (Bankr. D. Del. 2005) (citations omitted).

Moreover, "[i]t is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006); *In re MDIP, Inc.*, 332 B.R. at 135 (citing *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998)).   On summary judgment, the court must view the facts and draw inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   If the non-moving party's evidence contradicts the movant's evidence, the non-movant's evidence "must be taken as true." *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 512 (3d Cir. 1994).

Plaintiff disputes Defendants' contention in the present case that the fair market value of the Bell Building Property was just $2M as of the December 8, 2006 closing when it is undisputed that the same property was appraised by the Hospital in October 2005 at more than $5M.  (*See* R. 56.1(a) Stmt. at ¶ 116-118; Ex. 38.)   The fact that Eisenreich paid less than half this appraised value itself raises a genuine issue as to whether the Hospital received less than reasonably equivalent value in exchange for the Bell Building requiring a trial.  As further support for its

40

position, however, Plaintiff retained three (3) additional real property valuation experts intimately familiar with the market conditions in Bayonne, New Jersey at the time in question, each of whom prepared a comprehensive report valuing the Bell Building property at no less than $4M as of December 8, 2006 – twice what Eisenreich paid for the property. (*See* R. 56.1(a) Stmt. at ¶ 115.) Accordingly, there unquestionably exists a genuine dispute as to the fair market value of the Bell Building as of the closing within the meaning of Fed. R. Civ. P. 56. Defendants cannot avoid this genuine fact issue by ignoring the existence of Plaintiff's expert reports. *See In re MDIP, Inc.*, 332 B.R. at 135 (holding that a court "cannot simply disregard" a party's evidence at the summary judgment stage). This is especially true when Plaintiff is afforded the benefit of all reasonable inferences in defending Omni's summary judgment Motion as required. *See Pastore*, 24 F.3d at 512.

Defendants gain nothing by relying upon *Abbot v. Eviciti Corp.*, 2005 U.S. Dist. LEXIS 15464 (S.D. Ind. June 29, 2005). The holding in *Abbott* upon which Defendants rely – that the debtor's expert reports failed to raise a genuine issue of material fact as to valuation – was not made in the context of a determination as to reasonably equivalent value under 11 U.S.C. § 548(b). *Abbot*, 2005 U.S. Dist. LEXIS 15464, at *21-22. Instead, the court's discussion in *Abbott* of the debtor's asset valuation was in the context of plaintiff's attempt to hold a third-party liable for the debtor's financial obligations under a de facto merger or consolidation theory, which certainly has no relevance here. *Id.* at 21-22. As such, the holding in *Abbott* is inapposite to this Court's determination as to reasonably equivalent value of the Bell Building. If a purchaser of property were able to dismiss a claim under § 548(b) on summary judgment simply by pointing to the fact that he purchased the property, and so automatically paid fair market value, it would

effectively eviscerate the bankruptcy code's constructive fraud provisions.   Thus, *Abbott* is inapplicable to this Court's determination as to reasonably equivalent value in the present case.

Moreover, the facts in *Abbott* are markedly different from those here.  First, there was no dispute in *Abbott* that the transaction at issue was entered into at arms' length. *Abbot*, 2005 U.S. Dist. LEXIS 15464, at *23.  On the contrary, and for all the reasons set forth in Plaintiff's Motion, the discovery record in the present case makes clear the dealings between Eisenreich and the Hospital were anything but arms' length transactions conducted in good faith in the ordinary course of business by parties with independent interests.   (*See* Pltf.'s Moving Br. at 17-27 (detailing the highly suspect and clearly less than arms' length dealings relating to, *inter alia*, the selection of Eisenreich as the Hospital's SNF partner, execution of the Purchase and Sale Agreement and Bell Building purchase price, closing timeline, and repayment of the forged Alleged Loan at closing).)   The undisputed facts show that the Hospital's principals were repeatedly willing to structure their transactions with Eisenreich, especially the Bell Building sale, to accommodate Eisenreich's interests at the expense of Hospital's, which is the antithesis of arms' length dealings.  *Id.*

In addition, and unlike the Bell Building, the property at issue in *Abbott* had been *exposed to the free market*. *Abbott*, 2005 U.S. Dist. LEXIS 15464, at *22-23.  The court in *Abbott* gave great weight to the "undisputed" fact that the debtor "worked very hard at finding potential buyers" for the property and that, despite those efforts, no one but the ultimate buyer was interested in purchasing the property. *Id.*  Here, on the other hand, the Bell Building was never exposed to competitive bidding from potentially interested third-parties.  Rather, the nature of the transaction between Omni and the Hospital ensured that the purchase price for the Bell Building would be decided quietly between Omni and the Hospital without ever testing the value of the

property on the free market.  Accordingly, unlike *Abbott*, the $2M purchase price for the Bell Building was determined without ever finding out if "any better deal was available" to the Hospital. *Abbott*, 2005 U.S. Dist. LEXIS 15464, at *24.[23]

As such, taking Plaintiff's evidence as true as it must at the summary judgment stage, *see Pastore*, 24 F.3d at 512, there unquestionably exists a genuine fact issue as to whether Eisenreich paid fair market value for the Bell Building at the closing requiring a trial. *See, e.g.*, *In re MDIP, Inc.*, 332 B.R. at 135 (reiterating that a court may not weigh the evidence on summary judgment and relying, in part, on Plaintiff's expert report in finding the existence of a genuine issue of material fact as to the reasonably equivalent value of a purchase price); *In re Alper-Richman Furs, Ltd.*, 147 B.R. 140, 154 (Bankr. N.D. Ill. 1992) (summary judgment inappropriate for "battle of experts") (citations omitted).

Further, contentions that the post-dated alleged June 8th Resolution "validates" the transfer, and the unsigned, draft inadmissible Cushman and Wakefield appraisal procured by Hospital's attorneys "validates" the low $2M purchase price, are off the mark.  As with Eisenreich's "apparent authority" argument, these contentions are no panacea.  Neither the post-dated June 8th Resolution nor the inadmissible unsigned, draft Cushman and Wakefield appraisal estop Plaintiff from pursuing the avoidance of the Bell Building transfer.  As a fiduciary to creditors of the Hospital, Plaintiff has an independent duty to examine the suspect transactions at issue herein.  That investigation has revealed facts which warrant the avoidance of the transfer for the benefit of creditors including the dubious manner in which Eisenreich and Carrie Evans selected the price to be paid.

---

[23] For the same reasons, *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) is also inapposite. The court's decision there was limited to a specific stock valuation issue not decided in the context of a determination of reasonably equivalent value under § 548(b) in a case where, like *Abbott* and unlike here, the asset was expressly subject to the free market.

As noted above, and contrary to Defendants' baseless assertion, the Bell Building sale was also clearly entered into between Omni and the Hospital at less than arms' length and in bad faith - both of which are material to this Court's determination as to whether the Hospital received reasonably equivalent value under *Fruehauf.* (*See* Pltf.'s Br. at 17-27.)

For all the foregoing reasons, Defendants' Motion for summary judgment on Counts IX through XIII should be denied.

**POINT VI**

**THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE DEFENDANT LLC'S ARE ALTER-EGOS OF EISENREICH.**

Eisenreich has admitted that he controls each of the Omni Entities, and that he ignored their various corporate forms and used them interchangeably with respect to his transactions with the Debtor. (Gruen 78:16-79:17 (Ex. 5); Eisenreich 84:22-88:1; 264:17-266:25 (Ex. 3); Tauber 25:2-21; 20:11-24:1 (Ex. 2).). Furthermore, Defendants' counsel has stipulated that the Omni Entities are one and the same for the purposes of the December 8, 2006 transfer. (Gruen 78:16-79:17 (Ex. 5).) For these reasons alone, the Omni Entities are effectively alter egos of Eisenreich and one another and should be treated as such. As Eisenreich's own deposition testimony and that of his representatives makes clear Eisenreich did not differentiate among the Omni Entities in his dealings with the Debtor, neither should this Court. *Id.*

Without citing any law, Defendants baldy assert that Eisenreich cannot be held personally liable on the Debtor's "repayment" of the forged $1M Alleged Note because "the loan was made by ATE and repaid to Bayonne/Omni," or on the Pledge because it "was made by Omni Asset Management, LLC." (Def.'s Br. at 73-74). Under New Jersey law, "[o]ne who accepts the benefits of incorporation must also accept the burdens that flow from the use of a corporate structure." *Erickson v. Leonard*, No. A-2305-06T3, 2008 N.J. Super. Unpub. LEXIS 743, at *18

44

(App. Div. Mar. 18, 2008) (quoting *Lyon v. Barrett*, 89 N.J. 294, 300 (1982)).  A member who misuses the corporate form risks that the Court will pierce the corporate veil. *Id.*  New Jersey courts have identified a number of factors that constitute misuse of the corporate form and warrant piercing the corporate veil.  "The failure to distinguish between shareholder money and assets and corporate money and assets is probably the most significant." *Id.* (citations omitted).  Failure to observe corporate formalities also evidences misuse of the corporate form. *Id.* Also significant is an entity's gross undercapitalization, as a "party entering into a business relationship with a corporation [is] . . . generally entitled to rely upon certain assumptions, one being that the corporation is more than a mere shell—that it has substance as well as form." *Id.* at *19 (citations omitted).  Defendants' conduct with respect to the Pledge and the Alleged Note and Corporate Resolution satisfy each of these criterion and warrant piercing the corporate veil.

First, the very fact that the "the loan was made by ATE and repaid to Bayonne/Omni" conclusively establishes that Eisenreich failed to observe the proper corporate forms, and treated the entities he created (or purported to create) as extensions of himself and each other.  Under the plain terms of the forged Alleged Corporate Resolution, "ATE Consulting Co." was to "loan" and be repaid $1M.  (Ex. 74.)  Even assuming "ATE Consulting Co." was an existing legal entity, which it is not, (Pltf.'s SOF ¶ 12), the Debtor instead paid the $1M with interest to *Bayonne/Omni* as a "credit" against the purchase price of the Bell Building Property.  (Ex. 73.)  As such, Eisenreich – the principal owner and "disclosed agent" of both these entities (Def.'s Br. at 74) – clearly commingled their respective rights and obligations.  As noted above, the "failure to distinguish between shareholder money and assets and corporate money and assets is probably the most significant" factor justifying piercing the corporate veil. *Erickson*, 2008 N.J. Super. Unpub. LEXIS 743, at *18 (citations omitted).

45

Similarly, Eisenreich testified that OAM has no employees and owns no real estate. (Eisenreich 19:17-24 (Ex. 3).)  Connie Tauber, Eisenreich's Director of Finance, further testified that OAM was a "shell" and that it "has no assets."  (Tauber 25:15-21 (Ex. 2).)  Knowing full well that OAM was merely a "shell" for his various personal business ventures and lacked sufficient funds to fulfill such a considerable financial obligation, Eisenreich nonetheless pledged $5M to the Debtor using this entity as a shield.  (*See* Pledge (Ex. 18).)  However, a "party entering into a business relationship with a corporation [is] . . . generally entitled to rely upon certain assumptions, one being that the corporation is more than a mere shell—that it has substance as well as form."  *Erickson*, at 2008 N.J. Super. Unpub. LEXIS 743, at *19 (quoting authority omitted).  Moreover, even though OAM was the entity obligated on the Pledge, Eisenreich caused the first $1M installment to be made in the name of ATE Consulting Co., (Def.'s Ex. 97 at 21), thereby exacerbating his abuse of his entities' corporate forms.

In short, the Omni Entities were operated as alter egos of Eisenreich and each other.  They conducted no real business and had no employees, or did not even legally exist.  Their assets were used as Eisenreich's own, they were used to fulfill debts of affiliate entities without any consideration, and those entities that made promises to the Hospital possessed no assets.  Accordingly, Eisenreich and the Omni Entities should be held jointly and severally liable to Plaintiff as a matter of law for all amounts owed.  At a minimum, however, genuine issues of material fact exist precluding summary judgment.

46

## <u>CONCLUSION</u>

For all the foregoing reasons, Omni's Motion for Summary Judgment should be denied in

its entirety.

> CONNELL FOLEY LLP
> *Counsel for Debtor, Bayonne Medical Center and Allen D. Wilen, in his Capacity as Liquidating Trustee And Estate Representative for the Estate of the Debtor, Bayonne Medical Center*
>
> By: <u>*/s/ Stephen V. Falanga*</u>

Dated:  May 31, 2011
> Stephen V. Falanga
> Peter J. Pizzi

47