<u>**NOT INTENDED FOR PUBLICATION**</u>

**FILED**
JAMES J. WALDRON, CLERK
November 1, 2011
U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: s/ Margaret Cohen, DEPUTY

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re<br><br>BAYONNE MEDICAL CENTER,<br><br>       Debtor. | Case No.:     07-15195 (MS)<br><br>Chapter 11 |
| BAYONNE MEDICAL CENTER, Debtor and Debtor-in-Possession; and ALLEN D. WILEN, in his Capacity as Liquidating Trustee and Estate Representative for the Estate of Debtor, Bayonne Medical Center,<br><br>       Plaintiffs,<br>v.<br><br>BAYONNE/OMNI DEVELOPMENT, LLC, *et al.*<br><br>       Defendants. | Adv. Pro. No.:  09-1689 (MS) |

## O P I N I O N

<u>**APPEARANCES**</u>

**CONNELL FOLEY LLP**
Stephen V. Falanga, Esq.
Peter J. Pizzi, Esq.
85 Livingston Avenue
Roseland, NJ  07068
Counsel for Debtor/Plaintiff, Bayonne
Medical Center and Allen D. Wilen, in
his Capacity as Liquidating Trustee and
Estate Representative for the Estate of
Debtor Bayonne Medical Center

**GRUEN & GOLDSTEIN**
Fred R. Gruen, Esq.
1150 West Chestnut Street
Union, NJ  07083
*and*
**HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP**
Richard B. Honig, Esq.
One Gateway Center
Newark, NJ  07102-5386
Counsel for Defendants Bayonne/Omni Development, LLC,
Bayonne Healthcare Development, LLC, OMNI Asset
Management, LLC, ATE Consulting Company and Avery
Eisenreich

# TABLE OF CONTENTS

I.    INTRODUCTION. .................................................................................................... 3

    A.    Basic Facts. ................................................................................................ 3

    B.    Pleadings and Summary Judgment Motions. ............................................. 9

    C.    Jurisdiction and Core Issues. ................................................................... 12

        1.    The Plaintiff's Efforts to Enforce Noncore Claims in the Bankruptcy Court. ...... 13

        2.    Adjudication of the Balance of the Causes Pled. ................................ 19

        3.    Conclusion - Bankruptcy Court Authority to Hear and Determine. ..... 20

    D.    Summary Judgment Standard. ................................................................. 21

II.    THE VIABILITY OF THE PLEDGE. ................................................................... 21

    A.    The Write-off of the Pledge and Termination of the Lease. .................... 22

        1.    The Write-off of the Pledge on BMC's Books of Account. .................. 22

        2.    Lease Termination Negotiations. ........................................................ 23

        3.    The Closing of December 8, 2006. ..................................................... 24

        4.    The Write-off of the Pledge Is Not Otherwise Explained. .................. 27

    B.    The Nonbinding and/or Conditional Nature of the Pledge at Outset. ...... 29

        1.    Impetus for Solicitation and Pre-Pledge Discussion. ......................... 30

        2.    BMC Policy or History Regarding Pledge Enforcement. ................... 32

        3.    The Comfort Letter. ............................................................................ 34

        4.    The Audit Letter. ................................................................................ 37

        5.    June 2006 Loan. ................................................................................. 38

        6.    The August 24, 2006 Agreements. ..................................................... 43

        7.    Pledge Write-off, Lease Termination and December 8, 2006 Closing. ..... 45

    C.    The Trustee's Conspiracy and "Anti-Kickback" Act Theories. ............... 45

        1.    Conspiracy Theory. ............................................................................ 45

        2.    Anti-Kickback Act. ............................................................................. 52

    D.    Conclusion. .............................................................................................. 55

III.    ALLEGATION THAT EISENREICH WAS AN "INSIDER." ............................. 55

    A.    Statutory Insidership. ............................................................................... 55

    B.    Nonstatutory Insidership. ......................................................................... 56

        1.    Overview. ........................................................................................... 56

        2.    *In re Winstar Commc'ns, Inc.* – Case Distinguished. ........................ 60

        3.    *Wilen v. Pamrapo* (the "*Pamrapo Decision*") – Case Compared. ...... 61

    C.    Conclusion. .............................................................................................. 66

IV.    EVALUATION OF SALE PRICE OF BMC's REAL PROPERTY – "REASONABLY EQUIVALENT VALUE." ............................................................ 66

    A.    "Fair Market Value." ............................................................................... 67

    B.    Arm's Length Relationship. ..................................................................... 79

    C.    Good Faith. .............................................................................................. 79

    D.    Conclusion – "Reasonably Equivalent Value." ....................................... 81

V.    VALIDITY OF NOTE AND SALE. ...................................................................... 81

    A.    The Note. .................................................................................................. 81

    B.    The Sale. ................................................................................................... 85

    C.    Conclusion. .............................................................................................. 87

VI.    "ACTUAL FRAUD" CAUSES OF ACTION. ...................................................... 87

VII.    SUMMARY AND EFFECT OF CONCLUSIONS. .............................................. 88

**HONORABLE MORRIS STERN, Bankruptcy Judge**

## I.    INTRODUCTION.

This is an adversary proceeding initiated by a liquidating trustee following the

bankruptcy and demise of a nonprofit community hospital.[1]  The plaintiff trustee's advocacy

tracks a perceived prepetition conspiracy between a developer and members of the

debtor-hospital's management hierarchy.  However, the trail ends with the hospital selling its

real estate at reasonable value for the development of what the hospital's consultant reported in

2005 would be a much needed and economically sensible nursing home.  The scenery along the

way to the sale includes a pledge by the developer which, though substantial in amount, *was

recognized at outset to be nonbinding*.  The pledge, in fact, was eventually nullified in the books

and records of the hospital.  This was done close in time to the real estate sale, which was

concluded contemporaneously with the *termination* of a hospital leaseback of a portion of the

space to be developed.  The net result is the meritorious sale, leaving the hospital uncommitted to

the said-to-be overly expensive leaseback but without the hoped-for pledge.  This result justifies

complete summary judgment in favor of the defendants.

### A.    Basic Facts.

This court had previously decided trustee avoidance claims in this bankruptcy case.

Background of the Chapter 11 case and liquidation of Bayonne Medical Center ("BMC") is set

forth in *Wilen v. Pamrapo Savings Bank, S.L.A.*, 429 B.R. 152 (Bankr. N.J. 2010) (hereinafter

"*Pamrapo Decision*"); that background to the extent not specifically referred to herein is

incorporated in this opinion by reference.[2]

---

[1] The hospital assets were purchased by a for-profit entity which continues to operate an acute care
medical facility.

[2] The trustee initiated two other adversary proceedings in this Chapter 11 case, one against BMC officers
and trustees and one against the BMC auditor.  Both were resolved without decision by this court.  To the

The immediate chapter in the BMC experience began with a December 2004 consultant's report to the hospital (the "AON Report"). Ex. P-8. It was entitled "Bayonne Nursing Home Feasibility Study," and *inter alia* touted both the financial and service benefits of siting a skilled nursing facility (an "SNF") on the BMC campus. That feasibility study was then the subject of follow up action, including meetings and/or contact in the spring of 2005 with parties interested in partnering with BMC in the project.[3] However, it was clear that one candidate – Eisenreich or one of his "Omni" entities – had a distinct advantage over other SNF developers. Eisenreich, an experienced nursing home developer and manager, held the vitally important (and apparently the *only available*) State-issued certificate of need for Hudson County nursing home beds.[4]

---

extent that the trustee asserts a conspiracy theory between the current defendants and hospital officers or trustees, that theory (and any direct damages attributable to it) could well have been pled and resolved in the single suit against officers and directors. To the extent that the trustee asserts that the same conspiracy or other purportedly untoward conduct of the defendants impacted on the audit process and hospital financial statements, any direct damages attributable to that impact likewise could have been pled and resolved in the single suit against the auditor. In any event, it is clear to this court that the alluded-to specific damages arising from the purported conspiracy are not the subject of the trustee's Complaint.

[3] Avery Eisenreich ("Eisenreich"), through his "Omni" entity network was an early candidate, but was not the sole party considered in this period. See Ex. P-85 (BMC Finance Subcommittee Minutes of May 5, 2005) at 2; *see also* Ex. P-6, R. Evans, T.14:5-11 (identifying two other candidates by name and referencing a third unnamed other party); Ex. P-86 (BMC Board of Trustees Executive Committee Meeting Minutes of July 14, 2005) citing an unnamed candidate, not Omni, known to Trustee Finnerty.

[4] *See* Ex. P-86, in which then BMC Trustee Grywalski (affiliated with AON) reported as follows:

> •Currently, there is a state moratorium on nursing home beds.
> . . .
> • . . . Omni Asset Management, LLC, an experienced SNF developer/operator, has expressed an interest in this project. An important consideration concerning Omni is the fact that they already own a sufficient number of licensed nursing home beds that could be transferred to our project (with no CN then being needed.)
>
> •An important next step to this project will be to attain an independent valuation of the property (pre and post construction) thus providing BMC with negotiating leverage.
> . . .

Eisenreich had submitted a proposal as early as June 21, 2005 suggesting various

business configurations for the SNF.  *See* Ex. P-14.  It became clear that he was the primary

candidate, given the "license" he held for Hudson County nursing home beds.  *See* Ex. P-11,

Grywalski, T.10:16-11:15.  *See also* Ex. P-6, R. Evans, T.17:17-19:21.[5]  Eisenreich's enterprise

and the hospital entered into a generally nonbinding letter of intent advancing the development

process on November 30, 2005.  *See* Ex. P-33.

---

The Executive Committee then took favorable action as follows:

> It is the consensus of the Executive Committee that it would be
> in the best interests of BMC to 1.) Have a valuation of the
> property performed and, 2.) To pursue development of this
> initiative under the option of partnering with a
> developer/operator and to negotiate the most favorable
> arrangement possible.

In addition, there was the following agreement of the Committee:

> Before putting this motion to vote, Mr. Grywalski stated that he
> would inform Omni representatives that we will continue
> discussions and will also be looking to pursue this initiative with
> other firms.  Mr. Finnerty added that he is aware of another such
> developer and requested a meeting be scheduled with
> representatives of this firm.  This was agreed to as well.

> [5] I think the point Mr. Grywalski was making was if you were
> going to build this nursing home, Omni was going to be the
> partner.  And he also spoke highly of Omni at that meeting,
> based on his own research.  Also, he spoke to one of our former
> presidents of the medical staff, Dr. John Dedousis, who was a
> medical director for one of the Omni facilities and spoke to Mr.
> Grywalski, and spoke very highly of Omni, as well.

Ex. P-6, R. Evans, T.19:13-21.

Eventually the SNF project morphed into a detailed sale of BMC real estate (the "Bell Building" site on the hospital campus), rather than a joint venture.[6]  The steps along the way included:  a negotiated $2 million sale price, a complex sale contract[7] and a hospital leaseback[8] of 20,000 square feet of space to be built in the SNF, both executed on August 24, 2006; some post-agreement adjustments;[9] and a December 8, 2006[10] closing at which title to the real estate was conveyed but the leaseback was formally terminated.[11]

In October 2005 Eisenreich was targeted by BMC officers as a potential contributor in hospital fundraising efforts.  This BMC initiative resulted in a pledge (the "Pledge") of $5 million by an Eisenreich entity, evidenced by a short-form document.[12]  A companion "comfort letter"[13] was issued to meet Eisenreich's requirement that the Pledge be "nonbinding."[14]  BMC "booked" a discounted amount of 2005 income based upon the Pledge.  This improved its financial picture helping to prop up its "numbers" so as to fend off a much-dreaded bond default.  Avoidance of such default was described as a matter of hospital survival.[15]  And, it is claimed

---

[6]*See* Ex. P-40 (Minutes of June 8, 2006 Board of Trustees Meeting, pp. 4-5).

[7] *See* Ex. P-43 (Purchase and Sale).

[8] *See* Ex. P-44 (Executed Lease).

[9] *See* Point III (B)(3), *infra*.

[10] *See* Ex. P-73 (HUD-1 Settlement Statement).

[11] *See* Ex. P-106 (Lease Termination Agreement).

[12] *See* Ex. P-18 (October 21, 2005 pledge form); *see also* Ex. P-16 (earlier pledge form subject to later revision).

[13] *See* Ex. P-29 (Letter dated October 21, 2005).

[14] Though the plaintiff contests the effect of the comfort letter, it is undisputed that Eisenreich sought it for the purpose of rendering the Pledge nonbinding and that the letter was, in fact, issued. *See, e.g.,* deposition testimony of BMC executive Apsel (part of the pledge solicitation team) referring to Eisenreich's requirement of the comfort letter, Ex. P-10, T.104:22-105:9, and Apsel's testimony that the CEO said he would "do it," i.e., issue the letter. *Id.* at T.105:24-106:20.

[15] *See* Ex. P-7, CFO Aaron, T.88:3-90:25.

that booking such "income" supported bonuses for Chief Executive Officer R. Evans and Chief

Financial Officer H. Aaron.[16]  The Pledge was verified by Eisenreich in the audit process

initiated in early 2006 and exemplified by Eisenreich's execution of a confirmation letter on

March 17, 2006.  *See* Ex. P-28.  Ultimately, the Pledge was written off in the books of account of

BMC at or about the date of the closing and lease termination.[17]

The significant  (indeed critical) projects on the BMC agenda for 2006 included an

ongoing effort to affiliate with the Staten Island division of St. Vincent's Hospital (NY),[18] and to

secure a New Jersey Health Care Facility Finance Agency-backed overarching bond issue of $80

million.[19]  The SNF, though meaningful to the hospital's future and to the community, was less

significant relative to these agenda items.  As it turned out, both the St. Vincent's effort and the

bond financing failed; BMC filed a Chapter 11 bankruptcy petition on April 16, 2007.

---

[16] *See* Ex. P-7, Aaron, T.90:3-93:21.

[17] *See* Exs. P-71 and 72.

[18] *See, e.g.,* Ex. P-7, Aaron, T.90:15-25 (effort to merge was necessary to avoid "dire straights," (sic) and as with avoidance of bond default, a matter of having "the facility [i.e. BMC] *survive*").  (Emphasis added.)

[19] The HCFFA bond issue "would have purportedly solved the hospital's tight money problems." *Pamrapo Decision*, 429 B.R. at 161 (footnote omitted).

In and around June 2006, BMC was becoming cash starved.[20]  Eisenreich was again approached for funds.  Through one of his entities he transferred $1 million to BMC and received an interest-bearing note due December 31, 2006.  *See* Ex. P-74.  The transfer date and amount *coincided* with the Pledge's would-be first installment.  Internal hospital bookkeeping first accounted for the transfer as a payment on the Pledge but was then adjusted to be an advance against the real estate sale.[21]

Both before and after the execution of formal agreements with Eisenreich's entity, BMC executive staffing suffered defections.  CFO Heather Aaron left in May 2006;[22] CEO R. Evans gave notice in October 2006 (and effectively absented himself then from the hospital).[23]  By December 2006 the hospital was into its final slide into insolvency, culminating in the April 2007 bankruptcy filing.

---

[20] *See* Point II (B)(5) *infra;* and *Pamrapo Decision*, 429 B.R. at 160-65.

[21] *See* Point II (B)(5), *infra*.

[22] Ex. P-7, Aaron, T.6:5-13.

[23] Ex. P-6, R. Evans, T.7:14-24.

### B.    Pleadings and Summary Judgment Motions.

On April 15, 2009 the Adversary Complaint initiating this proceeding was filed.  BMC,

as debtor and debtor-in-possession, along with Allen D. Wilen, as the liquidating trustee (via the

Order confirming the plan of liquidation entered on April 9, 2009) became the named plaintiffs.

Wilen serves in both his capacity as trustee and as representative of the estate of the debtor.  For

ease of reference a singular "plaintiff" (or "trustee") is denominated throughout this Opinion.

Fourteen counts were pled.[24]  Basically, the pleading asserts the following: (i) the New Jersey

common law action to enforce the Pledge; (ii) fraudulent transfer causes pursuant to the

Bankruptcy Code (11 U.S.C. § 548) and New Jersey law (N.J.S.A. 25:2-25 and 27), focusing on

both the repayment of the promissory note through a credit at the time of the real estate closing

and the sale of real property at a price alleged to be less than reasonably equivalent value; (iii)

voidable preferences to an alleged insider occasioned by the same note repayment and real estate

sale per both 11 U.S.C. § 547 and N.J.S.A. 25:2-27; and (iv) related and ancillary causes.

---

[24] The Counts of the First Amended Complaint are:

| I. | Claim for Enforcement of the Pledge |
|---|---|
| II. | Claim for Avoidance of Preferential Transfer as to Repayment of Alleged Promissory Note |
| III. | Claim for Fraudulent Transfer as to Repayment of Alleged Promissory Note – Actual Fraud |
| IV. | Claim for Fraudulent Transfer as to Repayment of Alleged Promissory Note – Constructive Fraud |
| V. | Claim for Fraudulent Transfer as to Repayment of Alleged Promissory Note – N.J.S.A. 25:2-25 |
| VI. | Claim for Fraudulent Transfer as to Repayment of Alleged Promissory Note – N.J.S.A. 25:2-27 |
| VII. | Declaratory Judgment of Invalidity and/or Unenforceability as to Alleged Promissory Note |
| VIII. | Claim for Unjust Enrichment as to Alleged Promissory Note |
| IX. | Claim for Fraudulent Transfer as to Sale of Bell Building – Constructive Fraud |
| X. | Claim for Fraudulent Transfer as to Sale of Bell Building – N.J.S.A. 25:2-25 |
| XI. | Claim for Fraudulent Transfer as to Sale of Bell Building – N.J.S.A. 25:2-27 |
| XII. | Declaratory Judgment of Invalidity and/or Unenforceability as to Transfer of Bell Building Property |
| XIII. | Claim for Unjust Enrichment as to Transfer of Bell Building Property |
| XIV. | Attorneys' Fees and Costs |

More than two years of discovery and motion practice ensued.  Trial dates were established (and adjourned) for March 16, 2010, March 30, 2010, May 12, 2010, July 21, 2010, October 28, 2010, and May 26, 2011.  Finally, facing a firm, fixed trial date of June 30, 2011, summary judgment motions were filed by each side.  Volumes of supporting documents and multiple rounds of briefs were submitted.  Oral argument was heard on June 8, 2011 and July 1, 2011.

Following comprehensive hearings on the summary judgment motions, the plaintiff made two applications.  One was to add an argument contesting the propriety of linking the Pledge and the leaseback (footed in "Anti-Kickback" legislation), and the second was to reopen discovery as to a purported relationship between Chairman of the BMC Board of Trustees Brockman and Eisenreich.  The court permitted additional briefing as to Anti-Kickback allegations.[25]  As to reopening discovery, a formal motion was heard on September 26, 2011.  The motion was granted based on the fact that the additional briefing schedule on Anti-Kickback had already extended this matter.  This court permitted discovery for the limited purpose of serving the plaintiff's subpoena on a third party for documents pertaining to political contributions by Eisenreich which, by public record (accurate or inaccurate) indicated that he was  a "pharmacist" and an employee of "Brockman's Pharmacy."  In opposing the motion Eisenreich had certified to this court that he never told anyone that he was a pharmacist or was so employed.  Moreover, the record reflected Brockman's deposition testimony that he had sold the pharmacy *before* the contributions in question.  Plaintiff's counsel conceded that the records he was now basing his

---

[25] This was done at a conference of August 12, 2011.  It was at this conference that the court solicited the positions of the parties regarding consent to its authority to "hear and *determine*" the causes before it. The court's request was a function of the June 23, 2011 United States Supreme Court decision in *Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).  *See* Point I (C), *infra*.  A further on-the-record telephone conference was held October 24, 2011 to consider briefing of the issue of the plaintiff's consent to this court's adjudication of noncore matters, based upon the conduct of the plaintiff (and his predecessor) in the case and adversary proceeding.  Final briefing was permitted on the issue to October 28, 2011.

motion on were "on the internet." Rather than deny counsel what obviously was a *very* late

demand on a subject that was discoverable at a much earlier date, this court allowed the most

circumscribed, time-restricted effort at discovery. However, nothing materialized by the

discovery deadline.[26]

Plaintiff had moved for summary judgment on Counts I and II, and certain claims under

Counts IV, V and VI. That is, the trustee sought a *judgment* from this court deeming the Pledge

"valid and enforceable"[27] pursuant to Count I. As to Count II, the trustee sought judgment for

the purported preferential repayment of the $1 million June 2006 note (via a credit at the

December 2006 real estate closing), all per 11 U.S.C. § 547; embedded in this effort and

necessary to it to avoid a ninety-day statutory time bar was the assertion that the repayment was

---

[26] The Order of September 28, 2011 provided:

> Discovery is *closed* as of 10/31/11, regardless of response or absence of response to subpoena; conference per ¶ 2 above [i.e., a mechanism for immediate access to this court in the event the subpoena response justified further discovery] will *NOT* result in further extended discovery unless clear and convincing case is made that extension will promptly generate relevant and material evidence; current extension was *NOT* based on any determination of relevance of FEC reports, and was granted with 10/31/11 deadline in mind so that decision on pending motions would not be delayed.

A conference was held on October 31, 2011. It was determined (for the reasons set forth on the record) that the response to the subpoena and the plaintiff's unsubstantiated speculation did not justify extension of the grace it was given to reopen discovery for but a limited purpose. In addition to the squelching of any notion that Eisenreich listed himself as a "Brockman Pharmacy" employee and "pharmacist" (the FEC contribution forms produced per the subpoena list him as an "Omni" employee and owner of nursing homes), the time had long since passed for the trustee to engage in investigation to uncover meaningful facts to put at issue the absence of any showing of a material Eisenreich-Brockman connection in this proceeding. It is emphasized that the plaintiff's counsel had earlier conceded that even the now blunted political contribution discovery *could have been initiated by an internet search*, presumably at a time within the original discovery period (given that the origin of the extended discovery was a 2006 FEC report).

[27] The trustee's pleading of the state common law cause in the bankruptcy court, his denominating the cause "core" (*see* ¶ 22 of the Complaint) and the inclusion of a form of judgment with this motion specifying "judgment is entered in favor of plaintiff . . . in the amount of $5,000,000.00" are relevant per Point I (C), *infra*.

made to or for the benefit of "insiders," i.e., Eisenreich and Omni entities.  Aspects of Counts IV,

V and VI (fraudulent transfer allegations under 11 U.S.C. § 548(a)(1)(B), N.J.S.A. 25:2-25(b),

and N.J.S.A. 25:2-27(a)) were moved by the trustee, to wit, that the debtor had received less than

"reasonably equivalent value" at the time of the "repayment of the 'note.'"[28]

The defendants moved for summary judgment *in toto*.  Cutting across the stated causes of

action, the principal assertions of the defendants are:  no defendant was an "insider" of BMC; the

June 2006 transfer of $1 million to BMC was a loan, and hence, an obligation of BMC,

enforceable by Eisenreich and/or his entities; the real estate transaction provided BMC with

"reasonably equivalent value"; and, that both the loan and the real estate transaction are not

subject to invalidation or challenge as being "unauthorized."

### C.    Jurisdiction and Core Issues.

The plaintiff-trustee posited jurisdiction and venue in this court per 28 U.S.C. §§ 157 and

1334 (as to jurisdiction) and 28 U.S.C. § 1409(a) (as to venue).  The action *in all of its causes*

was said to be "core" per 28 U.S.C. § 157(b)(2)(A)(F)(H) and (O).  *See* Complaint ¶¶ 21-23.  As

thus structured, the plaintiff sought both a hearing before and a *determination* by this court on all

of its pled causes.

At oral argument on July 1, 2011 focusing on Count I of the Complaint, the court advised

counsel to the trustee that the effort to enforce the Pledge did not appear to be "core."  *See*

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 84-87 (1982); 28 U.S.C.

§ 157(b).  Counsel did not disagree at that point.  In fact, upon careful review of the Complaint,

---

[28] Rather than choosing to argue *in his affirmative motion* that there was no loan (an argument which would have been premised on the allegation that the $1 million June 2006 was payment of the Pledge's first installment), the trustee narrowly advocated the more technical points that the obligee on the note differed from the SNF site real estate purchasing entity, and that the note was never presented for cancellation at the closing.  *See* Plaintiff's Brief, Adv. Pro. Dkt. 48 at 35-39.  The broader argument was put forth only in opposition to the defendants' motion.  *See* Plaintiff's Brief, Adv. Pro. Dkt. 51 at 14-18 and 25-27.

other causes are found to be *noncore.*  That is, in addition to Count I (the Pledge) the following

causes are not specifically listed in 28 U.S.C. § 157(b)(2) or otherwise "arising under title 11, or

arising in a case under title 11" per 28 U.S.C. § 157(b)(1):

> Count VII (for a declaration of the invalidity and/or unenforceability of the June 2006 promissory note as being issued without authority);
>
> Count VIII (for unjust enrichment through payment of the allegedly unauthorized note);
>
> Count XII (for a declaration of the invalidity and/or unenforceability of the December 2006 transfer of real estate as being undertaken without authority); and
>
> Count XIII (for unjust enrichment through inadequate payment for that allegedly unauthorized real estate transfer).[29]

The Pledge (Count I) and the balance of the aforereferenced noncore causes of action arose

prepetition under New Jersey law.

### 1.    The Plaintiff's Efforts to Enforce Noncore Claims in the Bankruptcy Court.

This court having found and determined that those prepetition New Jersey law-based

causes of action are noncore, nevertheless finds and determines that they are *related to* the BMC

bankruptcy case.  *See* 28 U.S.C. § 1334(b).  That is, the outcome of this proceeding as to the

noncore causes of action will have a significant effect on the continuing liquidation of the estate

in bankruptcy, thereby establishing a "close nexus" to the confirmed liquidating plan.[30]  In fact,

---

[29] This cause seems to blend fraudulent conveyance concepts (a statutory core matter) with corporate authorization issues (a noncore area).

[30] *See Halper v. Halper*, 164 F.3d 830, 836-37 (3d Cir. 1999) ("a proceeding is core (1) if it invokes a substantive right provided by title 11 or (2) if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case," and "[n]on-core proceedings include the broader universe of all proceedings that are not core proceedings but are nevertheless 'related to' a bankruptcy case") (internal citations omitted); *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) ("[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy") (emphasis omitted).  After confirmation the test for noncore relatedness is qualified by the concept of "close nexus."

in addition to the obvious financial impact of the noncore claims upon the estate, any decision characterizing the Pledge as "binding" or "nonbinding" will affect and become intertwined with core counts of the Complaint, including fraudulent conveyance and preference claims.  Indeed, the core and noncore counts of the Complaint constitute a blended controversy emanating from a common fact base which melds them together (as the plaintiff has recognized by his single comprehensive pleading).  The entire controversy should be heard at one time in one forum so as to implement *effectively* the plan of liquidation.  *See Fed. R. Civ. P*. 18.  The necessary "close nexus" of the noncore claims to the plan of liquidation is thus established.

Given the "related to" character of the noncore claims, subject to issues concerning consent, this court has been delegated authority to hear but not determine those claims.[31]  After a hearing not accompanied by consent of the parties to a bankruptcy court adjudication, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court."  28 U.S.C. § 157(c)(1).  However, with the consent of the parties, this court may *by statute* (and, of course, premised on an order of referral) *determine* noncore matters related to a Title 11 case.  *See* 28 U.S.C. § 157(c)(2).

The Federal Rules of Bankruptcy Procedure include a consent process as follows:

---

*In re Resorts Int'l*, 372 F.3d 154, 168-69 (3d Cir. 2004) ("the jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan.  But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate"); and, *In re Seven Fields Dev. Corp*., 505 F.3d 237, 264-65 (3d Cir. 2007) (emphasizing the use of the "close nexus" test regardless of whether the conduct at issue arose pre or post-confirmation where the "dispute [is] raised post-confirmation").  *Sub judice*, the plan of liquidation, confirmed less than a week before the Complaint was filed, provided for and contemplated actions by the liquidating trustee such as the matter at bar.  The trust was to endure post-confirmation to assure the implementation of the plan through litigation and/or collection efforts, including (but not limited to) precisely the type of action complained of here.  The plan implementing the liquidation process is ongoing.

[31] *See* 28 U.S.C. § 157(a) and this district's Order of Reference of July 23, 1984.

### Rule 7008.  General Rules of Pleading

(a) . . . In an adversary proceeding before a bankruptcy judge, the complaint, counterclaim, cross-claim, or third-party complaint shall contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge.

*Sub judice*, as indicated earlier, the plaintiff pled that all of its causes of action were core; the defendants neither admitted nor denied this assertion.  *See* Answer ¶ 22 (Adv. Pro. Dkt. 6). In this posture, a rather usual course of events is to have "outsider" defendants (i.e., *not* debtors or successors to debtors as in the immediate case) arguably retain their right to object to determination of noncore (but "related to") causes by this court, if, as, and when it should be determined (as here) that the plaintiff misstated the core character of one or more of its causes.[32] However here, as will be seen, it is the *plaintiff-protagonist of core* and initial solicitor of "across-the-board" bankruptcy court judgments who has abruptly attempted to reverse course on the determination of noncore causes by this court.

---

[32]*See In re Shea & Gould*, 198 B.R. 861 (Bankr. S.D.N.Y. 1996); *but see In re Aero-Fastener, Inc.*, 177 B.R. 120 (Bankr. D. Mass. 1994) (relying on *Fed. R. Bankr. P.* 7012(b)).

Besides the discussion at oral argument centering on the plaintiff's erroneous core recitation in his pleading, there was another event which generated a court initiative regarding the issue of consent to adjudication.   The recent decision of *Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011), interdicted the motion and decision-making process *sub judice.*   That opinion raises issues pertaining to this court's authority to decide *statutory-core matters,* but also reflects more generally on the efficacy of parties' consents to bankruptcy court adjudication where an Article III judge is otherwise constitutionally prescribed.   *See* 131 S. Ct. at 2607.

Given the posture of the immediate matter and the recent decision in *Stern v. Marshall*, this court solicited the position of the parties at the August 12, 2011 hearing as to consent to this court *determining* issues before it.   The defendant immediately consented to have this court decide all issues and causes put before it in this proceeding.[33]   However, the plaintiff did not fully consent and expressed the trustee's position by letter of August 19, 2011 (Adv. Pro. Dkt. 77):

> In furtherance of the Court's request at the conference in the above-referenced adversary proceeding held on August 12th, Plaintiffs do not consent to the entry of final orders or judgment by the Bankruptcy Court in those matters determined to be non-core.

It is emphasized that when this court solicited positions on August 12, 2011, it was made clear that the plaintiff's pleadings and litigation initiatives to that date may well have already provided "consent" and that as such it might be too late to change course.   And, it was likewise emphasized at the conference that no "consent" can bestow upon this court jurisdiction where there is no *subject matter jurisdiction*.

---

[33] Adv. Pro. Dkt. 75 (letter dated August 12, 2011 from defense counsel).

The court must now address two issues relating to consent to determine the state law-based Pledge enforcement cause of action (and the other causes premised on lack of authority). First, has the plaintiff so consented (and not *permissibly* revoked consent)? And, if it be determined that such consent persists, is it effective in providing this court with the authority to determine per Count I the enforceability of the Pledge and likewise to adjudicate Counts VII, VIII, XII and XIII?

This court finds that the trustee-plaintiff, by virtue of his pleading and conduct in this litigation, has consented to this court's adjudication of *all* matters pled in his Adversary Proceeding Complaint.[34] *See, e.g., Olick v. House (In re Olick)*, 2011 WL 2565665 (Bankr. E.D. Pa. June 28, 2011); *Nationwide Life Ins. Co. v. Am. Med. Imaging Corp. (In re Am. Med. Imaging Corp.)*, 133 B.R. 45 (Bankr. E.D. Pa. 1991); and *Heiser v. Neuman Med. Ctr., Inc. (In re St. Mary Hosp.)*, 117 B.R. 125 (Bankr. E.D. Pa. 1990); *see also In re C. W. Min. Co.*, 2009 WL 4906702 (D. Utah Dec. 11, 2009); *cf. Roell v. Withrow*, 538 U.S. 580 (2003); *Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928 (11th Cir. 1995); and *Fed. R. Bankr. P.* 7012. By letter of

---

[34]On its face, Adversary Complaint noncore causes were initially the subject of express trustee consent by virtue of the following:

> (i)     As plaintiff, the trustee filed his complaint in the bankruptcy court and in each of Counts I, VII, VIII, XII and XIII, "demand[ed] judgment,"  including but not limited to specified dollar value judgments ($5 million for Count I and $1,037,313.23 for Counts VII and VIII) and a declaration that the real estate transfer be declared "null and void" (Count XII); and

> (ii)     The trustee chose to designate every cause of action "core," thus as plaintiff more than simply implying consent to adjudication by this court (*see* Complaint, ¶¶ 21-23 and the import of *Fed. R. Bankr. P.* 7008(a)). This designation expressed consent.

It is noteworthy that as to the Count I Pledge enforcement, the trustee has now moved, seeking "summary judgment on Count I in the amount of $5 million," as stated in the Conclusion to the plaintiff's initial brief, and provided a form of Order for Judgment reflecting the same demand for *this court's adjudication*.

August 19, 2011, counsel to the trustee attempts to withdraw consent with respect to noncore

matters.  It is thus adjudication here of the *noncore* proceeding(s) to which the trustee has

objected belatedly.  However, that effort to reverse course should be unavailing.  Only after oral

argument of opposing summary judgment motions was completed and the defendants had

explicitly consented to adjudication of all Adversary Proceeding matters by this court, did the

plaintiff announce his nonconsent to this court's determination of noncore matters.  Thus, the

trustee's litigation of this matter from April 15, 2009 up to his counsel's August 19, 2011

reversal of tactics consistently expressed consent to adjudication here.  The plaintiff's late-day

tactical change of heart will not be permitted.   It is a variation of forum shopping, undertaken

only after full exposition by both sides of the contested issues and expansive court inquiry into

and colloquy regarding the merits of various positions of the parties.  Moreover, absolutely no

reason or cause was expressed by the plaintiff for the effort to withdraw consent.  *See, e.g.,*

*Carter v. Sea Land Servs., Inc.*, 816 F.2d 1018, 1020-22 (5th Cir. 1987); *Carder v. Lawler*, 2010

WL 3703285 (W.D. Pa. Sept. 14, 2010); and *In re Kingsley Capital, Inc.,* 423 B.R. 344, 351-52

(B.A.P. 10th Cir. 2010).   In fact, the plaintiff – demanding until the August 19 letter full and

complete adjudication by this court of all of the causes pled here and placed solely by the

plaintiff before this court – has waived his right to "withdraw" his consent and is estopped from

denying that he has consented to adjudication by this court.

      Having concluded that there has been (and continues to be) full consent to proceed with

adjudication in this court, the question persists:  is such consent effective under the law?  This

court concludes that 28 U.S.C. § 157(c)(2) expressly permits adjudication here of noncore

matters by consent, and that *Stern v. Marshall* does not hold or suggest otherwise.  That recent

Supreme Court case dealt with adjudication by the bankruptcy court of a *statutorily core* cause of

action (that is, the estate's *counterclaim* to a claim and an exception-to-discharge adversary

proceeding).  *See* 28 U.S.C. § 157(b)(2)(C).  *Adjudication* of the state-law based counterclaim,

not consented to by the creditor-claimant, was held to be beyond the *constitutional* authority of the non-Article III bankruptcy court.  *Sub judice*, the immediate context is adjudication by consent of noncore but "related to" causes of action.  Adjudication of the Pledge enforcement (Count I) and the other cited noncore causes, per 28 U.S.C. § 157(c)(2), is within the subject matter jurisdiction of this court, is permitted, and is not barred by *Stern v. Marshall. See* 131 S. Ct. at 2607.

**2.       Adjudication of the Balance of the Causes Pled.**

There is some irony, however, fostered by *Stern v. Marshall*.  No clear *statutory* authority persists for the adjudication *by consent* of statutorily "core" matters, which are, nevertheless, matters not otherwise to be adjudged by non-Article III judicial officers.  This "gap" would logically and appropriately be filled by judicial extension of § 157(c)(2).  The potential for such circumstances would arise where (as in *Stern v. Marshall*) open-ended state-law based *counterclaims* are pled by debtors but (unlike that case) consent to adjudicate were to be found.  However, *Stern v. Marshall* could implicate more than just state law based counterclaims as statutory core matters which are nonetheless beyond the adjudicatory authority of this court (absent consent).  A pall may have been cast upon bankruptcy court adjudication of the wide range of frequently litigated "proceedings to determine, avoid, and recover fraudulent conveyances" in bankruptcy.  *See* 131 U.S. at 2614 (including n.7 and text associated with it). Such proceedings are "core" by statute.  28 U.S.C. § 157(b)(2)(H).  The same pall may extend to avoidance of preferences, likewise deemed core by statute.  28 U.S.C. § 157(b)(2)(F).[35]

*Sub judice,* unlike *Stern v. Marshall*, the plaintiff-trustee has expressed consent to adjudication by this court of *all* causes pled.  That is, having expressed the necessary consent to

---

[35] Unlike state law based counterclaims as in *Stern v. Marshall* (core statutorily per § 157(b)(2)(C)), there are substantive Bankruptcy Code underpinnings for the "Procedures" of 28 U.S.C. § 157(b)(2)(F) and (H), to wit:  11 U.S.C. § 544(b) (avoidance actions under "applicable law," here N.J.S.A. 25:2-25 and 27); § 547 (preferences); and, § 548 (fraudulent conveyances).

adjudication of all *noncore causes* (*see* Point I (C)(1), *supra*), the trustee *a fortiori* has consented

to the balance of the causes pled, i.e., the *statutory core causes*.[36]  The defendants have likewise

consented.   Therefore, even if absent consent the Constitution would generally have an Article

III judge adjudicate the statutory core matters at issue in this proceeding (*a proposition not

decided here*), consent of the parties for determination by a non-Article III judge would appear to

authorize this court to hear and *determine* Counts II through VI, and IX through XI (i.e., the

statutory core causes).

### 3.    Conclusion - Bankruptcy Court Authority to Hear and Determine.

This court finds that it is authorized by consent to hear and determine *all* causes of action

pled by the plaintiff *sub judice*.  If it be determined on appeal that this conclusion regarding

adjudication is in part or *in toto* erroneous, then this Opinion and the Order and Judgment issued

herewith should be considered, to the extent necessary and as an alternative to final judgment,

proposed findings of fact and conclusions of law per 28 U.S.C. § 157(c)(1), directly or by logical

extension.

---

[36] The effort by the plaintiff to withdraw his clear expressed consent per counsel's August 19, 2011 letter only attempts to deny consent "to the entry of final orders or judgment by the Bankruptcy Court in those matters determined to be non-core."   The fraudulent conveyance and preference claims here are statutorily core, and this court readily makes that determination.   (The Supreme Court in *Stern v. Marshall* made the same determination as to the debtor's counterclaim in that case.  *See* 28 U.S.C. § 157(b)(2)(C).)   Hence, on its face, counsel's letter could be read as dispositive of consent issues for statutory core matters (i.e., reiterating earlier expressed consent).   In any event, given the finding of consent independent of counsel's August 19, 2011 letter, there is no need to speculate in this case as to the overall import and breadth or narrowness of *Stern v. Marshall* and its impact, if any, on fraudulent conveyance and preference adjudication authority.

### D.    Summary Judgment Standard.

The granting of summary judgment here is proper if and to the extent that there is no genuine issue of material fact in dispute, and, when viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). At the summary judgment stage "the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993). The application of summary judgment in bankruptcy adversary proceedings in particular is an often efficient means to preserve limited estate assets. It "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (*quoting Fed. R. Civ. Proc.* 1).

In this case, notwithstanding the volumes of material submitted by both parties as movants and respondents, the court has undertaken careful review of each material allegation to see if it is trial worthy, i.e., whether there is a "*genuine* dispute as to any *material* fact." *See Fed. R. Civ. P.* 56(a) (emphasis added).

## II.    THE VIABILITY OF THE PLEDGE.

Plaintiff seeks to enforce the $5 million pledge signed by Eisenreich on behalf of one of his entities ("Omni Asset Management") on October 21, 2005. Ex. P-18. Much of the dispute between the parties as to the Pledge goes to its binding nature (or conditionality) or its firmness at the point in time of issue. Indeed, it is clear to this court that the Pledge was *not intended to be binding when issued* and was not in fact binding. *See* Point II (B), *infra*. However, even if one were to assume *arguendo* that there was no such clarity when the Pledge issued, the events in and around early December 2006 served to both terminate or otherwise cancel the Pledge, as well as to acknowledge that it was nonbinding. More particularly, the linkage between the

termination of a long-term and expensive leaseback by the lessee-hospital and the virtually

contemporaneous write-off of the Pledge in the books and records of the hospital is obvious.  *See*

Ex. P-44 (Lease of August 24, 2006 between Bayonne/Omni Development, LLC as "Landlord"

Bayonne Medical Center, Inc. as "Tenant"); and Ex. P-106 (Lease Termination Agreement of

December 8, 2006).

### A.    The Write-off of the Pledge and Termination of the Lease.

#### 1.  The Write-off of the Pledge on BMC's Books of Account.

In terms of documentary evidence, there is an internal hospital accounting department

e-mail of November 29, 2006 to Paul Mohrle, Acting CFO of BMC, indicating that the October

2005 Omni Asset Management pledge receivable was "reversed."  The e-mail (Ex. P-71)

provides in full form, the following:

> Also reversed in October was the Omni Asset Management
> pledge receivable that was booked last year in October,
> 2005.  The negative P & L effect on Other Operating
> Revenue is $4,717,300.  The $1 million cash payment that
> was received from Omni Asset Management in July, 2006
> has been set up as a liability in October under accrued
> expenses.

Indeed, at Ex. P-72 the hospital's general ledger reflects November 29, 2006 activity reversing

the Omni pledge of $4,717,300 as of October 2006.[37]

This write-off is also reported in meeting minutes of the Board of Trustees of BMC of

December 1, 2006 (Ex. P-88) as follows:

> **FINANCIAL REPORT:**  Mr. Brockman [Chairman of the
> Board] proceeded to relate BMC's serious financial
> standing and detailed certain problematic financial
> practices that had recently been uncovered.  He noted that a
> preliminary assessment indicates that there is the potential
> that these practices could result in an approximate year-end
> deficit nearing $30 million which would include the $5

---

[37] The odd amount of $4,717,300 is $5 million, discounted for the "stretched payments" without interest
per the Pledge.

million dollar pledge by Omni write off.

*See also* Ex. D-61,[38] another BMC inter-accounting office e-mail of December 12, 2006 which

requests an October 2006 financial statement, modified to include a line item for "Restatement of

Accounts Receivable: Write-off of 2005 Pledge  (4,717)."

## 2.  Lease Termination Negotiations.

The Board of Trustees meeting minutes of December 7, 2006 (Ex. P-76) includes the

following (emphasis added):

> **Skilled Nursing Facility** – Mr. Brockman reported that the
> closing with Omni Asset Management for the on-site
> Skilled Nursing Facility is scheduled to take place
> tomorrow.  *He was successful in renegotiating and
> releasing BMC from being obligated to lease back 20,000
> square feet.*  Aspects surrounding a promissory note were
> related and it was commented that this is an important
> project for the community that we must move forward with.

Brockman's deposition testimony confirms that, in what was said to be late November or early

December 2006, Brockman conferred with Eisenreich. Eisenreich pressed to close the sale, but

Brockman refused to close on terms that included the executed leaseback.  Ultimately,

Eisenreich acquiesced. Ex. P-125, Brockman, T.57:20-62:15. C. Evans had issued by e-mail a

"go forward directive" to BMC counsel on November 30, 2006 (9:03 AM), referring to

Brockman-Eisenreich contact, and her discussion of the night before with "Marvin" [Apsel]

("[h]e has the appraisal information he was waiting for"). Ex. P-65. Counsel responded (12:08

PM), referring to his partner, "D.B.," as follows:

> Mr. Brockman advised D.B. within the last few minutes
> that there will be no closing until Mr. Brockman has
> reviewed the terms of the transaction.  I am advising Fred
> Gruen accordingly.
>
> D.B. and I are supposed to meet with Mr. Brockman

---

[38] Defendants' exhibit submissions are, to a certain extent, out of "sync."  Adv. Pro. Dkt. 47 runs exhibit
numbers "D-1 through 123"; however, Dkt. 50 restarts numbering and will be designated "DII 1-47"; Dkt.
62 continues the original numbering, "D-124, etc."

tomorrow morning.

### 3. The Closing of December 8, 2006.

At the December 8, 2006 closing of the PSA (i) the BMC June 2006 note obligation of $1 million was credited to the purchaser on the HUD-1 closing statement (Ex. P-73) *and* (ii) the leaseback was formally terminated by written agreement (Ex. P-106). Plaintiff argues that linkage between the Pledge write-off and the lease termination, if any, would have been reflected in the termination agreement. That agreement was silent as to the Pledge. However, the purchaser's closing counsel (who drafted the lease termination agreement), not knowing of the Pledge until the closing, related the following telltale event of December 8, 2006:

> A.    Avery [Eisenreich] is to my right, Herman Brockman I believe is across the table from me. Avery said, "Now that the lease is dead," this is in words or substance, "the pledge doesn't exist anymore." And I said, "What did you say"?
>
> Q.    Who did he say that to?
>
> A.    To Herman. I said, "What are you talking about?" And he told me that he had made a pledge. I can't say that I remember what the amount was. I do remember he said, "Yeah, I made a pledge, and it was related to the lease. The lease is no longer part of the deal and the pledge is no longer part of the deal." I said, "Don't we want to paper that up?" He said, "No, it's not necessary."
>
> Q.    Who said, "No, it's not necessary"?
>
> A.    Avery. And Herman said, "Yes, that's right."
>
> Q.    Herman said, "Yes, that's right"?
>
> A.    I'm telling you, Herman said, "Yes, that's right. The pledge was related to the lease, and I understand that the pledge has no vitality anymore." And I remember saying to Avery, "Are you sure you don't need the paper?" He said, "We don't need it." And that's what I remember.

Ex. P-95, Gruen, T. 83:16-84:14.[39]

---

[39]Fred Gruen, Esq. represents the defendants, as co-counsel, in this proceeding; at oral argument of June 30, 2011, and with the court's emphasis of this testimony, the court offered the plaintiff yet another

Plaintiff raises three arguments in an effort to offset the effect of this event at the closing. First, in brief language best left to rest there, counsel asserts that Gruen violated the Rules of Professional Conduct by "engaging" Brockman in such conversation out of the presence of BMC counsel. Gruen responds (and the context of the testimony bears out) that he was essentially a bystander as his client addressed Brockman and Brockman responded. Plaintiff's argument here is at best ill-conceived.

Plaintiff next argues that Brockman has testified in depositions contrary to what Gruen relates. Yet, on close examination the cited statements are not in fact contrary to the December 8 declaration. Rather, Brockman says, variously, that he did not give "a lower price" for the BMC real estate, as Eisenreich requested when confronted by Brockman's position on the lease in their preclosing meeting (Ex. P-125, Brockman, T.62:6-11); and that he did not recall the Pledge write-off statement attributed to him in the December 1, 2006 Meeting Minutes nor that anyone told him the Pledge was "written off" (Ex. P-125, Brockman, T.22:24-25:13). His testimony including lack of recollection here is not at odds with Brockman's December 8, 2006 declaration as quoted by Gruen ("[t]he pledge was related to the lease, and I understand that the pledge has no vitality anymore").

Ultimately the plaintiff argues that the Brockman declaration is inadmissible hearsay. *At a minimum*, the disputed declaration is a *verbal act* which exposes the reason why Gruen did not "paper" the cancellation or nullification of the Pledge in a formal writing (thus convincingly responding to the plaintiff's anti-linkage contention based upon the absence of any reference to the Pledge cancellation in the lease termination agreement). *See Fed. R. Evid.* 801(c).[40]

---

opportunity to cross-examine Mr. Gruen then and there as to his statement. Plaintiff's counsel declined the offer.

[40] An extrajudicial statement is not hearsay if it is not offered for the truth of its content. When the significance of the statement is the fact that it was made, rather than its content, the statement is not

It should be noted that the unobjected to *Gruen-Eisenreich* discussion in the presence of Brockman – without considering any input from Brockman – is weighty.  By this analysis accepting as evidence the truth of the Brockman declaration is not necessary to link the Pledge write-off to the lease termination, given the *actuality* of the near contemporaneous events as evidenced by undisputed documents and the Gruen-Eisenreich interchange at the closing in Brockman's presence.  However, Brockman's statement *is admissible for its evidentiary value* as a declaration of the BMC view per *Fed. R. Evid.* 801(d)(2) ("Admission by party-opponent").[41] Indeed, sometime after the closing Brockman explained the write-off of the Pledge to a financial consultant, Lawler, by again linking it to the lease termination.  *See* Point II (A)(4), *infra.*

---

hearsay:

> A verbal act is an utterance of an operative fact that gives rise to legal consequences.  Verbal acts, acts known as statements of legal consequence, are not hearsay, because the statement is admitted merely to show that it was actually made, not to prove the truth of what was asserted in it.

5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 801.11[3] (Joseph M. McLaughlin, ed., Matthew Bender, 2d ed. 1997) (referring to the Advisory Committee Note to the original rule).  *See e.g., Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 218, n.20 (3d Cir. 2002); *see also U.S. v. Manfre*, 368 F.3d 832, 839 (8th Cir. 2004); *U.S. v. Reilly*, 33 F.3d 1396, 1410 (3d Cir. 1994).

[41] BMC, both in its prepetition status and as debtor-in-possession would, in the immediate circumstances, be viewed as a party-opponent of Eisenreich; BMC Chairman Brockman's statement would therefore be admissible under *Fed. R. Evid.* 801(d)(2), which provides, in relevant part, that a statement is not hearsay if it is

> offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. . . .

The liquidating trustee, plaintiff here, cannot avoid the admission given that he stands in the place and stead of BMC and the action on the Pledge is derived directly from BMC (not from rights inherent in third-party creditors).  *See Calhoun v. Baylor*, 646 F.2d 1158 (6th Cir. 1981), where the trustee had filed a fraudulent transfer action seeking to recover on behalf of the creditors of the estate.  The defendant offered oral evidence by an agent of the debtor supporting his contention that the transfers were not

Finally, the "Residual Exception," *Fed. R. Evid.* 807, applies here.  Brockman's statement goes to a material fact (i.e., Pledge-leaseback connection); its high probative value is a function of its declaration at the precise moment of the sale; and, the statement provides the best view of historic events which are at the center of this litigation.

### 4.       The Write-off of the Pledge Is Not Otherwise Explained.

In this proceeding where the plaintiff would seek a trial on purported disputed facts, the plaintiff offers essentially no explanation for the undisputed act of BMC in writing the $5 million Pledge off of its books of account.[42]  Yet no objective observer of the BMC-Omni relationship could reasonably conclude that the Pledge write-off and the lease termination just happened to

---

fraudulent transfers.  The Sixth Circuit held against admitting the evidence per the rule, given that the trustee's action was that of a creditor, i.e., not a cause of action in which the trustee was standing in the debtor's shoes.  *Contrast Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448-49 (2007) (*citing* 4 COLLIER ON BANKRUPTCY ¶ 502.03[2][b], pp. 502-22 (rev. 15th ed. 2006)).  The court notes that its conclusion *sub judice* is in conflict with the holding in *Jubber v. Sleater (In re Bedrock Mktg., LLC)*, 404 B.R. 929 (Bankr. D. Utah 2009) (trustee suit on promissory notes issued to the debtor prepetition), *citing* RUSSELL, BANKRUPTCY EVIDENCE MANUAL § 801.16 (2007-08 ed.).  That Manual discussed *Calhoun*.  Unfortunately, the 2010 edition of the Manual now cites both *Calhoun* and *Bedrock* without distinguishing the creditor-based action of *Calhoun* from the debtor-derived cause in *Bedrock*.

[42] The plaintiff contends that BMC's outside auditor's memorandum of December 22, 2006 provides some *possible* rationale for the $5 million write-off (other than the relationship to the lease termination and/or the fact that the Pledge was nonbinding from outset).  In a rank included hearsay statement, the auditor relates to his colleagues that BMC's replacement CEO (Gene Greenan), "this afternoon" told the auditor (Bill Oster) that the $5 million Pledge was "no good" and "they (Omni) are stating that the Pledge was made 'under duress.'"  Ex. P-108.  Of course, who said precisely what to whom (if anything), and when, is basis enough to completely discount this as a straw at which the plaintiff clutches.  There is nothing in the record which reflects a deposition of Oster, Greenan or others to investigate the accuracy or circumstances of the purported declaration.  But even if the declaration were accepted as "evidentiary" (a quantum conclusionary leap), it would only reflect Eisenreich's thesis that he sought to do business with BMC by providing an SNF proposition and was confronted with an aggressive solicitation for a huge pledge.  Nothing in the much after-the-fact auditor's memo delinks the Pledge and the lease termination. And, in fact, shortly after the December 22, 2006 cryptic Oster e-mail memo, a full-scale consultant's report was issued which is quite specific about the "apparent" linkage.  See the immediate next footnote and corresponding text.

coincide (especially since the plaintiff offers no credible rationale for the write-off).[43]  It was *either* that there was *direct* linkage between the termination of the lease and the Pledge cancellation on BMC's books and records, or, that there was a somewhat more extended connection between the Pledge write-off and the real estate sale and closing (including the lease termination).  That more extended connection would be by way of acknowledgement at the culmination of the long-developing BMC-Eisenreich transaction that (i) the Pledge was nonbinding, and (ii) no donated funds would be volunteered.  The extension of the Pledge write-off connection to the events (*in toto*) leading up to the closing are more fully described in Point II (B), *infra*.  Thus, it is immaterial whether the lease termination and the Pledge write-off was a precise "tit-for-tat" exchange, or that at the time of the lease termination there was simply an *acknowledgement* that the Pledge would not be honored because the reluctant pledgor's *recognized* donative intent (i.e., to fund the gift with lease value and proceeds) had been frustrated.  Either way, the Pledge is not enforceable.[44]

---

[43]The defendant would rely on a report and deposition testimony of a financial consultant, James P. Lawler, retained by BMC in December 2006 to review and report on the financial condition of the hospital.  Ex. D-7 (page from report) offers the following:

> Also, in 2006, BMC wrote off a pledge receivable of $4.7 million which was recorded as revenue in 2005.  Apparently, the write-off was associated with the renegotiation of the long-term agreement with a potential developer.

Lawler's deposition testimony as to the source of his report about the write-off was Brockman.

> One of the things I had noticed in my review of the financial statements is that there had been a receivable on the books at one time, a pledge receivable and then there was an adjustment to remove that pledge in the subsequent year, and I was discussing that with Mr. Brockman and he mentioned that it was in conjunction with the skilled nursing facility developer, and he indicated that apparently there was an agreement at one time, and then the agreement was renegotiated, and as part of the renegotiation, the pledge was no longer part of the arrangement.

### B.    The Nonbinding and/or Conditional Nature of the Pledge at Outset.

Of course, the Pledge at outset (October 21, 2005) was plainly connected to

BMC-Eisenreich business dealings centered on the SNF.  Yet at the time of the Pledge,

Eisenreich had no commitment from the hospital for the development.  There is thus no business

rationale for Eisenreich – basically a stranger to BMC and its trustees and executives – to pony

up a huge pledge ($5 million being the largest pledge ever received by the hospital)[45] in October

of 2005 on other than a nonbinding or conditional basis.  That is what Eisenreich claims to have

done.  In support of his position he relies on a "comfort letter" addressed to him, dated October

21, 2005, and headlining "[w]hile Bayonne Medical Center regards a pledge as a promise, it is

not legally binding." [46] Ex. P-29.  Like much of the trustee's arguments *inter alia*, when

confronted with plain documentary evidence developed at the time of the events in question (as

distinguished from a reconstruction of events and *just plain surmise*), he weaves a flimsy web of

---

Ex. D-8, Lawler, T.21:10-22.  The developer was identified as Omni.  Ex. D-8, Lawler, T.34:2-36:1.  The plaintiff guards the record with a hearsay objection and resistance to the defense's prayer for an exception for the report as a business record per *Fed. R. Evid.* 803(6).  This evidence dispute need not be resolved on the basis of business records; *see* Point II (A)(3), *supra,* admitting Brockman's statement linking the Pledge and the lease termination.  Indeed, Lawler's recitation of Brockman's declarations supports Gruen's quoting of Brockman setting forth the connection of the lease termination to the Pledge.

[44]The plaintiff's totally unsupported assertion that "the Pledge was a critical factor in the selection of Eisenreich as the Hospital's partner in the SNF project" could well be read to be somewhat at odds with plaintiff's de-linkage thesis.  *See* plaintiff's brief, Adv. Pro. Dkt. 48 at 9.  In any event, Eisenreich's unimpeached qualifications as the developer of the SNF, holding the *only* issued certifications for such development in Hudson County, established him as the logical selectee well before he was solicited for the Pledge.

[45] *See* Ex. D-8A, Hannan, T.174:20-175:3.

[46] The balance of the short letter, signed by President and CEO Robert H. Evans, recites the following:

> Bayonne Medical Center is dependent on the generosity and ability of its constituents to financially assist the Medical Center in bringing forth projects and programs; however, you are under no obligation to fulfill your pledge if your own personal financial circumstances change.  While we hope that you will not experience any financial difficulties Bayonne Medical Center will work with you to accommodate unforeseen personal situations.

conspiratorial theory.  Against such extended argumentation the comfort letter speaks loudly for itself.

While the post-October 2005 life of the Pledge took a number of twists and turns, it ended as a write-off on the books of account of BMC by December 2006, yet another documented event which is at least consistent with (if not confirmatory of) the conditional or nonbinding nature of the Pledge.

### 1.  Impetus for Solicitation and Pre-Pledge Discussion.

CEO Rob Evans described his state of mind in overseeing the solicitation of the Pledge. Solicitation was based on a yet-to-be-established long-term relationship between BMC and Eisenreich (or his entity), *as well as the anticipated leaseback.*  As to the latter, Evans said:

> A     [S]omeone mentioned, I'm not sure who it was, but someone mentioned that one of the concerns that we had about the entire transaction, if we had a concern, was in paying our lease fees over the first couple of years of the go life of the deal.
>
> Q     "Lease fees" meaning the leaseback?
>
> . . .
>
> A     Leaseback.
>
> . . .
>
> A     This would be a way perhaps to defray some of those costs. And someone else had said, you know, it's not uncommon for landlords to give lessees, three, five, seven, ten years free rent or reduced rent, why couldn't we do that.  That was the thinking.  Whether it was right or wrong, who knows.

Ex. P-6, R. Evans, T.66:8-22.  *This squares precisely with Eisenreich's stated intent in signing the Pledge, i.e., that the lease would fund or otherwise account for the gift.*  Ex. P-3, Eisenreich, T. 59:22-60:10.

In the solicitation process, both Carrie Evans and Marvin Apsel (a BMC vice president and seemingly the Chief Operating Officer) stated (and it is undisputed) that Eisenreich insisted on a comfort letter from BMC at the time he made the Pledge.[47]   Indeed, Apsel reported back to his boss, Rob Evans, that Eisenreich required a letter from him "stating that the pledge that [Eisenreich] is making is essentially nonbinding."[48]  Ex. P-10, Apsel, T.104:22-105:9; *see also* 106:12-17.  Apsel says that Evans declared that he would issue the required letter.  Ex. P-10, Apsel, T.106:18-20.

---

[47] Eisenreich said Carrie Evans provided a rationale for soliciting the $5 million amount.

> A    She wanted a pledge to the hospital in order to help the hospital build out the space and cover rent for the first couple of years and their leased space, because the space wasn't going to be revenue generating for the first couple of years.  To which she said, "If you give us a pledge, it could offset that cost."
>
> Q    And did you respond?
>
> A    To which I said, "And if the nursing home doesn't get built *or the hospital doesn't sign its lease, why would I agree to give you a pledge?*"  To which she responded, "It's unenforceable, non-binding."  To which I said, "Get me a letter accordingly."

Ex. P-3, Eisenreich, T.59:22-60:10  (emphasis added).  As to the numeric derivation for the $5 million amount, it was said to be lease-based.  *Id.* at T.62:17-64:24.  Eisenreich provided both *his* rationale  (*id.* at 62:20-63:5) and that of C. Evans (*id.* at 63:6-64:13).  Her testimony, general in nature, does not support such a numeric derivation (Ex. P-12, C. Evans, T.89:24-91:13).  However, she does tie the Pledge which she and Apsel were soliciting to "a long term relationship" to be developed between Eisenreich and BMC, i.e., the proposed twenty-year lease.  *Id.* at 87:13-88:5.  And, though it is clear that Carrie Evans says she told Eisenreich that the Pledge was nonbinding, she is not precise as to when she first said it.  (Ex. D-19, C. Evans, T.94:24-95:13; D-22, T.109:1-110:25; D-23, T.111:1-20).  Eisenreich also testified that he commended to Carrie Evans the more usual path of a rent and buildout allowance as a lease provision, and her rejection of that approach.  ("I asked her, '[w]hy are we structuring it this way?  Why don't we structure it as a standard rent concession and buildout'").  Ex. P-3, Eisenreich, T.105:23-107:2.

[48] The plaintiff puts forth a conspiracy theory implicating Eisenreich with the Evanses.  That theory is not supported by a material factual foundation.  In any event, *Apsel* is never so implicated or the subject of any such "impeachment" effort.

## 2.  BMC Policy or History Regarding Pledge Enforcement.

Various BMC personnel testified in depositions that they believed a pledge would not be enforceable and/or that BMC had a history of not seeking enforcement of delinquent or defaulted pledges.  The record does not include testimony or documentary evidence to the contrary.

At her deposition Carrie Evans testified that, if a prospective donor became anxious about liability on a pledge "you had to kind of go through the conversation about how a charitable pledge is not binding. . . . It was the spiel I went through [with] everybody who I asked for money if they asked me" (Ex. D-22, C. Evans, T.109:8-14).  She testified that Rob Evans, Stephanie Giblin (Director of Nursing), Heather Aaron (CFO), Apsel, and BMC Foundation[49] head Vincent Lombardo had all made similar statements to prospective donors (C. Evans, Ex. D-22, T.109:20-110:25; Ex. D-23, T.111:1-3).  Vincent Lombardo, who as Chief Administrative Officer of the Foundation was often at the center of pledge solicitation, is said to have told her "'[t]hey weren't binding'" (Ex. D-15, C. Evans, T.28:7-17).  Apsel also reported Lombardo's telling him that a pledge was "a promise made" and words to the effect that "you can't get blood out of rock."  (Ex. D-68, Apsel, T.99:2-23).  When Eisenreich asked Apsel if a pledge was binding, Apsel said, "I don't know."  (Ex. D-69, Apsel, T.104:19-25).  Apsel then testified that he did not discuss with any BMC personnel whether BMC had a *policy* with respect to pledge enforcement, although he was not aware that BMC had ever taken action against anyone to enforce a pledge (Ex. D-72, Apsel, T.116:8-21).  Paul Mohrle (Director of Finance and then acting CFO) when asked whether he knew of any action taken to enforce a pledge, replied "[n]ot to my knowledge" (Ex. D-73, Mohrle, T.105:18-20).  Similarly, when

---

[49] BMC's "first day" application to use cash collateral filed along with its Chapter 11 petition on April 16, 2007 in the bankruptcy case described the Bayonne Medical Center Foundation as the debtor's one "wholly-owned subsidiary. . .founded in 1982. . .funded through voluntary contributions by individuals, businesses and other foundations and its purpose is to assist in the financial support of the Debtor" (Case docket entry 4, ¶ 10).

asked for BMC policy regarding the enforcement of pledges, CFO Heather Aaron responded

with an accounting principle ("if a pledge is due and not received, then it has to be removed

from your books. . .[t]hat's the only enforcement that I know of") (Ex. D-65, Aaron, T.33:2-11).

Pressed to answer whether during her tenure BMC had sued anyone to enforce a dishonored

pledge, Aaron answered "[n]ot to my knowledge" (*id.* at T.33:12-21).

Significantly, CEO Rob Evans testified to the "working knowledge" of BMC personnel

regarding pledges:

> A.    As I understood it, we did not have a policy, per se, to the
> collectability of pledges, per se but we, "we," the senior
> management team, as well as the board, did have a working
> knowledge that served as our policy.
>
> Q.    And what was the working knowledge?
>
> A.    The working knowledge was that we, Bayonne Medical
> Center, would treat pledges not as debts, and we would
> seek to build relationships with the people who pledge to
> us.  And that if at the end of the day we were not able to
> collect the pledge, you know, we would either try and find
> a way to perhaps work with the donor or develop some
> other mechanism, but we did not view them as debts.
> That's it.

(Ex. D-41, R. Evans, T.77:7-21).  Evans also reported that Lombardo told him that "'[w]e don't

do anything'" to enforce a pledge (Ex. D-44, R. Evans, T.81:9-25) and that "never in the history

of Bayonne Hospital have we ever pursued anyone for a pledge" (Ex. D-45, R. Evans,

83:16-24).[50]  Herman Brockman, the longtime Board Chairman, was also firm in his belief that a

pledge was not legally binding (Ex. P-127, Brockman, T.80:7-22).[51]

---

[50] This statement attributed to Lombardo by R. Evans, though not part of a conversation recalled by
Lombardo (Ex. P-96, Lombardo, T.21:8-14), is nonetheless consistent with Lombardo's stated experience
(*id.* at T.15:19-24).  *See also id.* at T.19:18-20:13 (where Lombardo distinguished pledges requiring
proceeds to be used only for a specific purpose, i.e., "restricted" pledges, and "unrestricted" pledges such
as the Pledge *sub judice*).

[51] Brockman emphasized that if pledges were legally binding "we would have had a lot of money in the
hospital that never came in."  Ex. P-127, Brockman, T.80:20-22.

One cannot conclude (in a summary judgment motion context) that there was a clear and persisting BMC *policy* against enforcement of pledges in the event of payment default. However, the testimony does establish both a course of conduct and an *undisputed historical basis* for the CEO and others to believe that pledges were, generally, "nonbinding" and that such an articulation in a letter was at least understandable. It thus supports the "headline" sentence of the October 21, 2005 letter ("it is not legally binding") as *an intended* freestanding statement, neither unprecedented nor necessarily dependent on the pledgor's future financial condition.

### 3. The Comfort Letter.

In sum, the trustee argues that the "not legally binding" lead off sentence of the comfort letter (i) states a legal conclusion not within the ken of CEO Evans, and (ii) that the balance of the letter ("if your own personal financial circumstances change") modifies the otherwise stark "not legally binding" import of the letter's opening statement.

Regarding what the CEO could express as to the nonbinding nature of the Pledge, the plaintiff attempts to move the analysis from one of transactional *intent* into some mechanical or absolutist application of limited case law. The attempt is unavailing. BMC's CEO could certainly express the parties' mutual *understanding*, recognizing and acceding to the pledgor's request that the Pledge not be binding and enforceable. Precedent is not to the contrary. In *More Game Birds in Am., Inc. v. Boettger*, 125 N.J.L. 97,101 (N.J. 1940), it was determined on public policy grounds that a voluntary subscription to charity could be a binding obligation, even for "consideration which in a purely business contract might be regarded as questionable," *quoting N. J. Orthopaedic Hosp. & Dispensary v. Wright*, 95 N.J.L. 462, 464 (N.J. 1921). In *More Game Birds* the donor paid a portion of the pledge and then stopped. When sued for the pledge balance, the donor argued that the pledge failed as a contract for lack of consideration and that the court should admit as parol evidence the donor's testimony that, upon entering the

pledge, he imposed the oral condition that, once the purpose of the charity was satisfied (raising awareness about the condition of wild fowl), nothing more would be required of him.  *Id.* at 99-100.  The trial court found the pledge to be a revocable offer (not a binding contract) and admitted the donor's parol evidence.  On appeal the New Jersey Supreme Court reversed, declining to admit as parol evidence the donor's attempt to condition the pledge orally.  "Had [the donor] desired to condition that obligation he could easily have inserted his condition in his subscription."  125 N.J.L. at 102.  In the instant case, in clear and convincing contrast, at the express request of the donor, Eisenreich, BMC generated a contemporaneous written condition to the Pledge (i.e., that it "not [be] legally binding"), by letter of October 21, 2005.  *See also Jewish Fed'n of Cent. N.J. v. Barondess*, 234 N.J. Super. 526, 529 (Law Div. 1989) (acknowledging, in a case where the conditionality of the pledge was not at issue, the Statute of Frauds did not apply to the admitted oral charitable subscription, but "[t]hat is not to say that there are not some defenses to a claim on a charitable subscription").[52]  What remains clear is that the intention of

---

[52] *See Salsbury v. Northwestern Bell Tele. Co.*, 221 N.W.2d 609, 613 (Iowa 1974); *Pappas v. Bever*, 219 N.W.2d 720, 721-22 (Iowa 1974); and *Pappas v. Hauser*, 197 N.W.2d 607, 609 (Iowa 1972), a trio of cases involving a receiver's efforts to collect pledges made to a college which folded within a year of opening.  In *Bever* and in *Hauser* the prospective donor submitted a pledge card couched in the language, "I/We intend to pay."  In *Hauser* the court deemed that formula ambiguous and considered as parol evidence a side conversation in which the college representative told the donor to "forget about" the pledge if the donor "had a financial reversal or the College should fail."  *Hauser*, 197 N.W. 2d at 609.  In *Bever* there was no side conversation, but the court deemed the formula, "I/We intend" to be an expression of "'state of mind, put in such a form as neither to invite nor to justify action in reliance by another person'" and did not manifest the signer's *intent* to obligate himself.  *Bever*, 219 N.W.2d at 721-2 *citing* 1 CORBIN, CONTRACTS § 15 at 33 (1963).  In *Salsbury*, by contrast, the donor's representative lacked a pledge form by the time he received authorization to make the pledge and instead wrote a letter in which he stated that the contribution had been approved; that the donor would pay $15,000 over a recited schedule.  *Salsbury*, 221 N.W.2d at 610.  The college transferred the information in the letter to a pledge card, assigned it (as it did all pledge cards) to a material supplier and executed a guarantee to obtain credit from the supplier.  The court found the donor bound by the letter which "set its own terms and was impervious to defenses which might avail against the pledge cards," such as excluded parol evidence that the fundraiser occasionally told prospective donors that the pledge card was not binding.  *Id.* at 611.  The instant case is controlled instead by a pledge card and a contemporaneous letter which declared the intent that the Pledge was nonbinding.  *See generally Brody, The Charity Bankruptcy and Ghosts of Donors Past, Present, and Future,* 29 SETON HALL LEGIS. J. 417, 513 (2005) (synthesizing authorities as to the *binding* effect of charitable pledges including the characteristic that "[t]he promise is in writing and does not negate intent of enforceability").

the parties at the time of the charitable subscription controls. *Sub judice,* the mutual intent was that the Pledge be *nonbinding.* This is a material fact in this case, and one which the plaintiff has not put at "genuine issue" for summary judgment purposes.

The trustee's other argument as to the letter's text (i.e., that to render the Pledge nonbinding change in financial circumstances must be demonstrated), fails for at least three reasons. First, the history of pledge-default and at least the internal understanding of nonenforcement (obviously to avoid turning off future potential donors), belies nonenforcement solely in situations involving financial reversals. Second, the text of the letter's first sentence does not have any "if" aspect to it. It is clearly stated and direct. And, third, even if change of "financial circumstances"[53] were to be tied to the nonbinding language, in the specific context of the SNF development deal (i.e., the impetus for the Pledge) failure to consummate a valuable part of the deal (here, the leaseback) would seem to readily qualify as a change of financial circumstances sufficient to render the Pledge nonbinding. Most specifically, the relationship between the Pledge and the lease – that is, the concept that the lease value and proceeds were to account for the Pledge – has been detailed earlier. *See* Point II (B)(1) *supra.*

It bears emphasis that even if the comfort letter were to be read as the trustee would have it (a wrong construction by this court's reckoning), the lease termination satisfied the would-be condition for nonenforcement of the Pledge even if (*arguendo*) the Pledge had been *potentially* binding and enforceable up until that change in the pledgor's financial circumstances.

---

[53] Notably, change of "financial circumstances" is hardly a tight standard for "holding in" any pledgor. This looseness and generality is consistent with both a history of BMC nonenforcement and the uniform view of the BMC hierarchy that such pledges were nonbinding.

### 4. The Audit Letter.

In February 2006 BMC's auditors, in their review of 2005 hospital finances, sought through a BMC letter request, certain confirmation of the Pledge from Eisenreich. Ex. P-28. After much delay, Eisenreich countersigned the BMC confirmation letter. This event, as viewed by the trustee, is said to underscore the binding nature of the Pledge. However, the facts in the record do not support the trustee.

First, the confirming letter countersigned by Eisenreich simply requests, "[f]or the purpose of independent verification only," confirmation of information relating to the Pledge as of December 31, 2005. The requested information is essentially a restatement of much of the Pledge (i.e., date made, amount, restrictions on use, if any, and payment installment dates). Ex. P-28 (dated February 6, 2006) goes on as follows:

> Please indicate in the space provided below whether the above is in agreement with your records. If it is not, please furnish our auditors with any information you may have that will help them reconcile the difference.

Eisenreich says that he signed the reply (which is dated March 17, 2006) and believes he sent the countersigned letter back to BMC with a copy of the comfort letter. Ex. P-3, Eisenreich, T.147:8-14; and 155:24-156:4. It is clear that he did not comment, in the area allotted for that purpose, to the effect that he believed the Pledge was nonbinding and unenforceable. This would have been a red flag that the trustee insists should have been placed in the reply by the purportedly business savvy Eisenreich. Yet, even assuming *arguendo* that the pledgor did not return the comfort letter as part of his reply to the audit verification,[54] the *text of the audit letter* is not in any way inconsistent with the Eisenreich position that the Pledge was *neither binding nor enforceable*. No BMC or auditor inquiry was addressed to that subject. Indeed, the trustee

---

[54] Eisenreich also said he believed that C. Evans had sent the comfort letter to the auditors. Ex. P-3, Eisenreich, T.155:24-156:10. For immediate purposes, the court will also discount this testimony.

offers no legal theory[55] pursuant to which Eisenreich would be required to volunteer

information which (i) was available to the audited enterprise (BMC), *and* (ii) was not, in fact,

solicited for audit purposes.

In addition, Eisenreich's long delay in executing the audit reply is punctuated with

prompting e-mails from Carrie Evans.  Each brings forward the comfort letter's mantra that the

Pledge is "nonbinding."  *See* Exs. P-45 and 46.  Specifically, on March 8, 2006[56] (a month after

the audit letter request), C. Evans presses for Eisenreich's reply in an e-mail *with a subject line*

"*Non binding pledge confirmation*"; Eisenreich's response carries forth that subject.  Ex. P-46,

C. Evans' March 15, 2006 e-mail, is clear:

> Avery
> I received a call from Withum Smith and Brown [the
> auditor] – we are held up because they have not received
> the *non binding pledge* confirmation.  This is causing me
> some problems.  [Emphasis added.]

This court concludes that the audit letter argument of the plaintiff is without legal basis or

merit in casting the preexisting Pledge as other than nonbinding.

### 5.  June 2006 Loan.

In June 2006 an Eisenreich entity transferred to BMC $1 million and received an interest

bearing note due no later than December 31, 2006.  That note, Ex. P-74, is dated June 22, 2006

---

[55] Here, again, the trustee would see conspiracy and plant Eisenreich in the middle of it.  No facts support this hypothesis.  *See* Point II (C), *infra*.

[56] The trustee, clutching at straws of conspiracy, emphasizes that Ex. P-45 opens with "Hello my dear"; this from C. Evans who is in the pledge solicitation business and, as such, an accomplished sales person. No facts are otherwise offered by the plaintiff to establish (or even tend to establish) a material personal or financial relationship between Eisenreich and C. Evans (or R. Evans or any other hospital executive or trustee).  See Point II (C), *infra*.

but seemingly notarized the next day.  It bears dual signatures: R. Evans, President and CEO, and H. Brockman, Chairman of the Board of Trustees.  From the defendants' perspective, the documented evidence of a *loan* supports the thesis that the Pledge was nonbinding and SNF deal-related.  (Recall that no firm SNF deal was formalized until August 24, 2006.)  However, the trustee sees more conspiracy, emphasizing several atypical aspects of the transaction.

The internal accounting for the $1 million transaction appears, *at first blush*, to indicate that some in the hospital hierarchy wanted the Pledge to continue as a "booked" item of income for the year-end 2005.  The transfer, in fact, was recorded initially as payment of the first installment on the Pledge, though the entry was later adjusted to be an advance on the real estate transaction.[57]  There is also some mystery surrounding the promissory note:  Brockman says he did not sign the note or know of the loan in June 2006, yet he is one of the two hospital signatories and his signature is notarized by a BMC employee.  There is a C. Evans e-mail which advises Eisenreich that the loan agreement is "not for public consumption" (Ex. P-57), and one in the buildup to the note execution which references Brockman's unavailability (Ex. P-60).  Out of all of this the trustee argues that the transaction was not a loan at all, but rather evidenced payment of the first installment on the Pledge, and, further, that no loan was "authorized" (thereby rendering it unenforceable).[58]

Eisenreich defends, certifying that his understanding of the "keep it confidential" request of C. Evans was that those *outside the hospital* should not be informed of the loan.  *See* Decl., Adv. Pro. Dkt. 62 (June 24, 2011).  This is consistent with the introduction to the "not for public consumption" advisory of C. Evans in Ex. P-57, where she says "[a]s for loan agreement, I will

---

[57] Ex. P-13, Mohrle, T.85:12-93:25.  Careful scrutiny of the flow of deposit funds shows that of the $500,000 to be deposited as a down payment per the PSA ¶¶ 2.1 and 2.2 (Ex. P-43), only $100,000 was so remitted (*See* Ex. P-73); no explanation in the record can be found for the "gap."  It is not a great leap to conclude that the $1 million note obligation served as a "super satisfaction" of the balance of the down payment.  In fact, the corrected bookkeeping entry for the $1 million June receipt also reflects the same.

[58] As to enforceability, *see also* Point V, *infra*.

speak to DB [D.B. Ross, Esq., outside counsel] separately." Regarding the BMC bookkeeping entries, there are absolutely no facts to suggest that Eisenreich could be tied to or be held responsible for the internal bookkeeping of BMC with respect to the transfer. And, most significantly, C. Evans – very much contrary to the trustee's conspiracy theory – told Mohrle to *correct* the bookkeeping entry in July or August of 2006. By the plaintiff's reckoning, C. Evans would have wanted to maintain the appearance of a binding and performing Pledge obligation of Eisenreich. *Yet she countermanded the accounting entry which, if left unchanged, would have helped maintain the purported charade.*[59]

Note that a June 2006 cash shortfall was the subject of concern to the BMC accounting department, which was assuaged on June 21, 2006 by C. Evans ("I just spoke to Avery – if we get signatures today – we will have the money Friday"). Ex. D-90. If Eisenreich were simply meeting his first Pledge installment obligation, no "signatures" would be necessary. Rather, it is quite clear that this was "bridge financing" of one sort or another. To this specific effect, *see* Ex. D-99 (e-mail of May 22, 2006 to C. Evans and Paul Mohrle from R. Evans) referencing "*outside bridge financing from Avery*" and denoting C. Evans "as his [*Paul's*] first line of assistance in negotiating some of these items. . . ." *See* R. Evans' testimony comprehensively detailing the May-June 2006 build up to the $1 million loan, which included cash shortage concerns and the need to integrate billing systems in anticipation of a December 2006 closing of the St. Vincent's merger. Ex. DII-41, R. Evans, T.206:1-209:25. In this context, R. Evans directly addresses the Pledge-SNF connection as follows:

> Q.    While you were having this brainstorming session about how to raise $1,000,000 for the CBO [Central Billing Office] to deal with the St. Vincent's acquisition, why didn't you discuss asking Omni Asset Management to make good on its $5,000,000 pledge?
>
> A.    To tell you the truth, I didn't think about it.

---

[59] *See generally,* Ex. P-13, Mohrle, T.85:12-93:25.

Q.      Why not?

A.      Why didn't I think about it?

Q.      Right.   A $5,000,000 [sic] to the hospital, the hospital
desperately needs money to complete a CBO for a
transaction scheduled to close in December of 2006, and
you didn't think about that as part of your brainstorming
session?

A.      *I guess because I understood from the very beginning that
the pledge was essentially linked to the actual building and
operation of the skilled nursing facility.    I couldn't
legitimately see Omni giving us the pledge at that
particular [time]. . . .*

*Id*. at 209:6-25 (emphasis added).

In addition, a series of e-mails between C. Evans and Eisenreich's CFO-type, Connie
Tauber (with copies to Eisenreich), undercuts the trustee's position regarding Brockman's
availability to sign the note.  On June 23, 2006, C. Evans and Tauber corresponded (Ex. P-60)
regarding fund wiring instructions and note signatures. As to the *note*,[60] C. Evans says "I
mentioned to Avery that Mr. Brockman was not here on Friday – *I got his signature yesterday* –
and then he left."  (Emphasis added.)  Assuming the worst – i.e., that Brockman did not sign and
that C. Evans was not truthful in her e-mail – the *documentary evidence* would support
Eisenreich's belief that he had a "good" note for his $1 million exchange and that he did not (and
reason would dictate *would not*) knowingly accept a forged note.[61]  Beyond this point, no one
argues that the note was not at least signed by R. Evans as President and CEO.

---

[60] There is reference on this run of e-mails to another document – a "UCC" – which was not available for
Brockman's signature before he left; Tauber says "no problem have Rob sign it. . . ."  This is a clear
reference to a UCC form which in fact never materialized in the record of this proceeding.

[61] The loan transaction and note were supported by a *board resolution* dated June 22, 2006.  Ex. P-74 (last
page following note).  This, too, bears the purported signatures of the CEO and the Board Chairman.
Assuming for summary judgment purposes that it was not signed by Brockman it nonetheless would serve
to reassure Eisenreich (and the attorney who was handling the transaction for him) of its propriety.

In any event, and even if one were to discount some of Eisenreich's undocumented protestations for summary judgment purposes, it is clear that he took a note at the time of the transfer, that C. Evans solicited the June funds,[62] that the CEO's signature on the note was authentic, that eventually Brockman acknowledged the repayment obligation,[63] and that, when the note issued, the SNF deal was in the process of being reduced to formal documents (but was not there yet).[64]  In sum, all that the June 2006 transfer shows is that Eisenreich, once again, had obtained documentation (the note and supporting resolution) which is thoroughly inconsistent with the trustee's thesis.  The fact that Eisenreich might well have sought to ingratiate himself with BMC personnel by making the loan *or* at least not offend those with whom he was trying to do a deal, does not evidence his involvement in a conspiracy with the Evanses or other hospital executives.  This is particularly the case when one considers that Eisenreich put his $1 million at risk, to one or another degree, before having a hard-and-fast SNF deal.  As to that transfer serving to either characterize or recharacterize the Pledge as binding and unconditional, again the note serves as the best and most convincing contraindicator.[65]

---

[62] C. Evans acknowledges that she solicited the loan to facilitate "IT" aspects of the hoped-for purchase of a St. Vincent's Hospital facility (Staten Island); she very loosely connected the IT needs to the leaseback space in the SNF (Ex. P-12, C. Evans, T. 192:24-200:2).   Eisenreich explains the need for a note, given his point that "[t]he pledge was associated with the lease.  The lease wasn't in effect, and the building wasn't up and wasn't generating income yet" (Ex. P-3, Eisenreich, T. 268:20-22).  *See also id.* at 175:2-14.

[63] *See* Board of Trustees meeting minutes of December 7, 2006 (Ex. P-76); HUD-1 Settlement Statement of December 8, 2006 (Ex. P-73); and Ex. P-125, Brockman, T. 79:17-84:24.

[64] *See, e.g.,* Ex. P-57 (series of e-mails running from June 13, 2006 to June 19, 2006 between C. Evans and Eisenreich, discussing both the loan agreement and the SNF deal).

[65] The $1 million transfer was by no means a secret event; the funds receipt showed up timely in the hospital's account.  *See, e.g.,* Ex. P-31 (excerpts from BMC general ledger, "run date" 7/5/06, etc.).

### 6.   The August 24, 2006 Agreements.

Full and formal documents[66] were developed for the sale of the BMC real estate[67]

adjacent to the hospital to an Eisenreich entity for the express purpose of development of the

SNF.  The terms, seemingly agreed upon in June-July 2006,[68] were embodied in the documents

executed on August 24, 2006.  In its final version, the deal was distinctly different from the

earliest outline.  Instead of a co-ventured nursing home, it was decided by BMC that its nonprofit

status could not be accommodated in partnership with the developer.[69]  Hence, an outright real

estate sale was structured with ample restrictions to assure ultimate use as an SNF.[70]

Notwithstanding substantial changes in the deal over time, a leaseback of space by the

hospital remained as a component (reduced from as much as 40,000 square feet to the

---

[66] Ex. P-43 (executed "Property Sale Agreement" or "PSA"); and Ex. P-44 (executed lease).

[67] The PSA, ¶ A describes the property as "636-644 Broadway, in the City of Bayonne, Hudson County, New Jersey, also known and designated as Block 164 Lots 1, 2, 3 and 4 . . . ."  PSA ¶ 1(a) further describes the property as "comprising approximately 20,000 square feet of land . . . and improved by one and two story attached brick and masonry buildings of approximately 25,000 square feet in the aggregate" with certain easements. Ex. P-43.  As will be expanded upon in Point IV (A), *infra,* the buildings were 80+/- years old and, in effect, a cost or liability in the development of a 100,000 square foot multistory new building on a 20,000 square foot lot; the buildings were marked for demolition (and attendant environmental remediation).

[68] Outside BMC counsel (R.S. Burney, Esq.) generated a Board resolution dated *as of* June 8, 2006 authorizing the sale, a document not drafted until September 27, 2006, and testified at his deposition as follows:

> When we were engaged to represent the Medical Center in connection with the sale of the property, the business terms had been agreed upon by the parties.  They were provided to us in June of 2006 by Carrie Evans. Those terms, including the purchase price, are included in this resolution.

Ex. D-133A, Burney, T.132:24-133:4.  *See also* e-mail correspondence of July 18-20, 2006 (Exs. P-50 and P-52).

[69] *See* Ex. P-40 (Minutes of June 8, 2006 BMC Board of Trustees Meeting at 4-5).

[70] The PSA (Ex. P-43) recites:  (at "C") its basic intent that "Purchaser will construct and operate a 100,000 square foot building containing, in part, a 120-bed skilled nursing facility ("SNF") on the Real Property. . . ."; a deed restriction (at ¶ 1) generally limiting the land use to SNF purposes; and, a reversion provision (¶ 29.3) promoting the actualizing of the SNF.

contracted-for 20,000 square feet,[71] and from a term of "not less than" twenty-five years to the finalized period of 20 years)[72].

Much is argued by the trustee about authorization to enter into the August 24 contracts and the purchase price (*see* Points IV and V, *infra*), but careful examination of the agreements themselves (obviously the product of drafting and/or review by not only Eisenreich's counsel but also BMC's outside law firm) reflects expected commercial terms and arm's lengthedness.  The degree to which the BMC Board of Trustees was briefed on the precise deal terms before the August 24 contract execution is not completely clear, though Brockman believes he knew the purchase price in June 2006.[73]  However, it is clear that after R. Evans left his post as CEO,

---

[71]Eisenreich's June 21, 2005 initial proposal included a leaseback of 18,000 square feet  (Ex. P-14).   The November 30, 2005 Letter of Intent from the debtor to Eisenreich stated that Bayonne would rent space on two floors, "not to exceed 40,000 square feet" (Ex. P-33, p.2, ¶ 3).  Eisenreich countersigned the Letter of Intent but, in his return cover letter dated December 13, 2005 under "Modifications, changes or comments" stated  "Minimum square footage to be leased by Bayonne is 36,000 square feet, two full floors" (Ex. P-33, ¶ 3).  E-mails dated June 12, 2006 from C. Evans to Eisenreich (P-48) and from C. Evans to Burney (Ex. P-49) also cited 40,000 square feet to be leased back to the debtor.  But a July 18, 2006 e-mail from C. Evans to R. Burney, copied to Eisenreich, asked C. Evans to mail the sale agreement and lease agreement "space and rent calculated for 20,000 square feet" (Ex. P-50).  A July 20, 2006 e-mail from Burney to Gruen confirmed the reduction: "I understand that Carrie and Avery have spoken at length and that the terms of the Lease have changed.  The amount of space being leased has been reduced to 20,000 s.f. . . ." (Ex. P-52).  The signed August 24, 2006 lease described the Demised Premises as "one floor comprising approximately 20,000 square feet of floor space" (Ex. P-44).

[72]  The November 30, 2005 Letter of Intent stated that the Primary Term would be "for not less than twenty-five years" (Ex. P-33, p.2, ¶ 4).  According to July 18, 2006 and July 20, 2006 e-mails at Ex. P-48 through 50, C. Evans and Eisenreich negotiated the reduction in the square footage from 40,000 to 20,000, but when Eisenreich learned from the forwarded July 20, 2006 e-mail from Burney to Gruen (Ex. P-50) that the term of the lease by BMC's reckoning should be reduced to "10 years with a 10-year option," Eisenreich wrote to C. Evans, "ouch when did the term change.  I need a minimum of 20 years on the initial term.  Please let me know the issue with the term" (Ex. P. 53, July 21, 2006 e-mail from Eisenreich to C. Evans).  C. Evans responded, "Ok no problem - we can make the terms twenty" (Ex. P-53).

[73]  Brockman, in response to a deposition question ("By June 8th [2006] had it been determined that the . . . property would be sold to the Eisenreich entity for $2,000,000?"), responded "I believe so."  Ex. P-125, Brockman, T.51:6-11.  *See also* Ex. P-127, Brockman, T.48:18-50:23, where Brockman indicates his assumption that he knew of the $2 million purchase price in June 2006.  The June 8, 2006 Board Meeting Minutes (Ex. P-40 at 5), "approve[s] and authorize[s] . . . sale of the land at market value."

Brockman insisted upon reviewing the terms of the deal before the December 8, 2006 closing.[74]

His review resulted in or paralleled the canceling of the lease. He then advised the Board of his

successful renegotiation of the deal and that the closing was imminent. *See* Ex. P-76.

Nothing in the June-August 2006 period can be established to impugn the documented

defense proposition that the earlier Pledge was nonbinding.

### 7.    Pledge Write-off, Lease Termination and December 8, 2006 Closing.

As detailed at Point II (A), *supra*, the events of November 30 through December 8, 2006

show the inextricable linkage of the Pledge to the leaseback. That linkage, in turn, strongly

supports the defendants' contention that the Pledge was *from outset* nonbinding.

## C.    The Trustee's Conspiracy and "Anti-Kickback" Act Theories.

### 1.    Conspiracy Theory.

The trustee argues that Eisenreich and the Evanses were allied in a conspiracy. This

contention would be the "glue" for much of his contentions throughout this proceeding. The

trustee would thus interpose Eisenreich's purported complicity with and closeness to the CEO

and his wife when asserting Eisenreich's "insider" status, valuation of the real estate deal, as well

as in connection with the Pledge. That connection is at best murky, even as argued, given the

time line of events (i.e., *Pledge first*, then audit letter, June 2006 loan, sale and lease agreements

---

[74] In a November 30, 2006 e-mail C. Evans gave Burney her "go forward" directive and advised him to "prepare closing documents for execution tomorrow" (Ex. P-64). In his December 1, 2006 response Burney declared "Mr. Brockman advised D.B. [Ross] within the last few minutes that there will be no closing until Mr. Brockman has reviewed the terms of the transaction" (Ex. P- 64).

of August 2006, and December 8, 2006 closing, lease termination and Pledge write off).

However, viewed most favorably to the plaintiff for summary judgment purposes, the argument

will be addressed here, and to the extent not revisited hereinafter as it would relate to "insider"

and reasonably equivalent sale value issues, is incorporated where those topics are discussed.

The conspiracy theory is summed up in plaintiff's brief (Adv. Pro. Dkt. 51), at 5, as

follows:

> Eisenreich was said to be complicit in:
>
> • structuring the Pledge payments to permit the accounting for the Pledge in current income, thereby permitting the Hospital to post what became a "phantom" profit for 2005 while permitting present-day bonuses to Rob Evans and Heather Aaron among others;
>
> • structuring the Pledge as an unlawful charitable donation/lease abatement to disguise excessive lease terms;
>
> • keeping the Alleged Loan a secret with Carrie and Rob Evans, allowing a forgery to go undetected, and enabling Carrie to first claim to Hospital employees it was the payment on the Pledge and then, when that was no longer necessary, to claim it was a deposit on the Bell Building purchase price; and
>
> • having been made aware by Carrie Evans that the Hospital essentially had no funds available for its operations, using that information to "dangle" the $1M Alleged Loan while fixing the low ball Bell Building purchase price.

This web of assertions is introduced by the plaintiff as follows:

> While there are genuine issues of material fact which prevent the Court from ruling upon Eisenreich's arguments, one thing, however, is clear – if Eisenreich's version of the facts holds true, Eisenreich was no innocent bystander. Instead, *perhaps* because of his *intimate* relationship with Carrie Evans, Eisenreich was an active participant in the *apparent schemes carried* out by Rob and Carrie Evans *to the detriment of the Hospital and its creditors*.

*Ibid.* (emphasis added).  However, no "*intimate relationship*" is in evidence in this proceeding's record ("perhaps" or otherwise), "*apparent* schemes carried out by Rob and Carrie Evans" are not necessarily so apparent when viewed in the context of BMC's 2005-06 struggles, and so too with contentions of "detriment" to the hospital.

The origins of the solicitation of pledges from a range of donation candidates were by no means clandestine.[75]  Nor was the solicitation of donations to the nonprofit hospital outside the bounds of its normal functions and general needs.  Nevertheless, as the trustee posits matters, the Evanses and Eisenreich *collectively* "co-opted" the normal financial processes of BMC for their personal benefit and to the detriment of the hospital.

There is no material evidence in the record of this proceeding to support the allegation of Eisenreich's conspiratorial involvement with the hospital hierarchy.  Rather, Eisenreich entered the business life of BMC as a stranger with a specific project proposal.  He doggedly pursued that project, which was *undisputedly* to be a benefit to BMC and the community it services. Eisenreich was highly (if not uniquely) qualified to develop the SNF, and his acquisition of real estate necessary to site the SNF (as will be seen) was at fair value.  His reaction to being pursued for a large pledge and then a loan was that of a businessman with his focus on the SNF project. He surely did not initiate the BMC solicitations of him – nor is there any evidence that he welcomed being so targeted.[76]

Moving past the threshold (but decisive) point that Eisenreich was a businessman without involvement with the inner working of hospital activities (proper or improper), the purported

---

[75] *See* Ex. P-6, R. Evans, T.64:4-66:7.  R. Evans described the senior staff meeting during which a list of candidates was reviewed (targeting "either vendors or significant companies, entities that had similar interests as Bayonne Medical Center").
.

[76] The trustee's allegation that Eisenreich had and used inside information about hospital finances "to dangle the $1M Alleged Loan while fixing the low ball Bell Building price" has not an iota of evidentiary support; the loan initiation was from BMC executives and nothing in the record even hints to the contrary. *See* Point II (B)(5), *supra.*

*mala fides* of the Evanses (and others) is far from established.[77]  Earlier litigations against officers and BMC trustees and against the hospital's outside auditor were settled without any finding of fact to support the trustee's allegation.  Review of the finances of the hospital in 2005 and 2006 exposes a dilemma that overarched any concerns for the SNF project.  The significant projects on the "plate" of the BMC executives in that period were (i) the cross-region amalgamation of BMC with the Staten Island hospital which was part of St. Vincent's deeply troubled system, and (ii) the fostering of an $80 million bond issue (to recast its existing bond debt structure and provide desperately needed liquidity).[78]  Along the way to these major goals, BMC had to appear to remain financially viable – avoiding, e.g., covenant defaults on its existing bond debt.  In fact, the hospital was struggling to keep its doors open.  The trustee weaves his conspiracy theory, isolating and emphasizing a performance-based bonus for CEO Evans as motivation for booking the Pledge as "income" in 2005.  The theory is rooted in personal interest of the CEO.  However, the motivation for bookkeeping extravagances of the hospital cannot be so limited; the BMC future was intertwined with how the hospital's financial picture was painted at that time.  As such, the conduct of the executives (proper, improper, or somewhere in between) was arguably within the scope of their work and could well be attributable to the institution.  In any event, they cannot be attributed to Eisenreich.  In context, the interplay of the BMC "big picture" merger goal and the bonus issue is best explained in CFO Aaron's deposition testimony as follows:

> Q.    . . . let me ask you, what were the ramifications of not
>         being in the black, or being in the black for the 2005 year?

---

[77] In addition, under the circumstances *sub judice*, the defense of *in pari delicto* might be implicated; issues of waiver of this affirmative defense persist and hence that defense is not considered by the court at this time.  *See generally, In re Lafferty*, 267 F.3d 340, 358-60 (3d Cir. 2001).

[78] *See Pamrapo Decision*, 429 B.R. at 161-65 (generally as to $80 million bond refinancing and, at n.19 specifically referring to "the purchase of a Staten Island Hospital. . . .").

A.    We had requirements from the bonding authority to be at a certain ratio at the end of the year, and that was a major requirement.

Q.    And if you were not within that ratio at the end of the year, what happened, as you understood it?

A.    As I understood it, that the bonding authority would then have come in and review and make recommendations.

Q.    When you say "make recommendations," what do you mean?

A.    Well, you would be in default of your bonds. You'd be in default of your bond covenants.

Q.    So the impact of being in default on bond covenants, what were the consequences of that?

A.    The consequences of that, to my recall, would be that they would then have the opportunity to bring in their own people to review and then take steps that they thought were necessary to keep the hospital operating.

. . .

Q.    . . . If you're in default of a loan, obviously the lender can call the loan in, in other words. Does that happen with bonds of this kind?

. . .

A.    To my recall, many, many, circumstances would have to ensue before something like that is done. Especially with one community-based facility, it's the only one in town.

Q.    But obviously if you're in default on bond covenants, the lender can exercise rights that are provided in the various instruments, right?

A.    Yes, sir.

Q.    So was this something that you, in the position of CFO, devoted attention to?

A.    All day.

Q.    So the pledge played an important role in making 2005 a year in which the hospital was not in default, right?

A.    Yes.

Q.    Do you know if Mr. Evans had an employment contract?

A.    Yes.

Q.    And do you know if he received any compensation associated with whether the hospital was in compliance or not in compliance with bond covenants?

A.    I know that the contract had information related to that in it. But I can say for the period that I was there that that didn't seem to apply.

Q.    What do you mean by that?

A.    We were in the process, the board had been told that we were in the process of having a merger with St. Vincent's facility, in lieu of the fact that Bayonne Medical Center, if we didn't partner with someone, was going to be in dire straights [sic].    *So the whole idea of meeting certain requirements on the bond document, I mean, it was just a matter of the facility just had to survive.  So basically we're working on trying to get donations and trying to partner up with someone to have the facility survive.*

Q.    Did you see Mr. Evans' employment contract in your capacity as CFO?

A.    Yes.

Q.    At some point you knew what the bonus provisions were?

A.    Yes.

Q.    And did the contract call for him to get a bonus if the hospital hit certain financial targets?

A.    Yes.

Q.    And did the hospital hit the financial targets needed in 2005 for Mr. Evans to get a bonus?

A.    From what I recall, on the contract, no, all the requirements were not met.  But it wasn't met the year before, either.

Q.    Did he get a bonus in 2005?

50

A.     I believe so.

Q.     I'm sorry, when I say 2005, I mean in 2006 for the year 2005.

A.     Yes.

Q.     And was the payment of that bonus in part driven by the financial results for 2005?

A.     I would say in part.

Q.     And do you know approximately the amount of the bonus he received in 2006 for the 2005 financial year?

A.     It was over a hundred.

Q.     And was your compensation in part also determined by whether the hospital conformed to financial targets?

A.     My compensation was based on what Mr. Evans deemed as my goals for the year.  *So my main priority was trying to get the facility to the point where we could merger with another facility for survival.   So my bonus was predominately based on the acquisition with St. Vincent's Hospital.*

Ex. P-7, Aaron, T.88:3-92:14 (emphasis added).  Again, *in context* and given the sheer

magnitude of BMC as an economic enterprise, the $5 million pledge (as well as the land sale)

was *relatively* unimportant as the hospital sank in a sea of red ink.  All of management was

increasingly pressured by the weight of hospital finances.  Eisenreich walked into the middle of a

storm, not of his making, and was pounced upon by ever more desperate executives who were

trying to keep the BMC doors open.  Whether those executives let some or a great deal of

self-interest drive their conduct may never be known.  However, that question need not be

answered at the summary judgment stage *sub judice* because: (i) it is perfectly clear (and

dispositive of the conspiracy theory) that Eisenreich was not an initiator of or participant in

efforts to "cook" the BMC books, and he has not been deemed responsible under any trustee

cited legal theory for liability arising from the hospital's bookkeeping;[79] and (ii) for what it is

worth, it has never been *established* that the efforts of the Evanses or others were untoward.

Finally, the trustee's constant theme – the "excessive lease terms" – is not supported by

facts in the record.  While the trustee has submitted *four* real estate related appraisals or

valuations in conjunction with these motions (Exs. P-38, 101, 102 and 103), not one evaluates

the lease rate as "excessive" or even above market.   Moreover, the trustee's most comprehensive

submission (Ex. P-101, Brody) actually uses the August 24, 2006 lease rate in projecting the

value of the real estate.  *See* Ex. P-101 at 71.  Most telling, however, is the rental rate used by

AON in its feasibility study of January 2005; this hospital commissioned report used a $32 per

square foot annual rental – comparable to the $35 lease figure.  *See* Ex. P-8 at 19.  Surely the

lease was valuable – particularly to Eisenreich – but by pegging a conspiracy theory and other

notions of less than arm's length or good faith bargaining on an *unsupported* claim of

"excessive" charges, the trustee has spoken volumes about the fundamental weakness of his case

here.  And, of course, this valuable lease was terminated before any rent was realized by

Eisenreich or his Omni entities.

## 2.  Anti-Kickback Act.

The plaintiff sought leave after "final" briefing and oral argument on the summary

judgment motions to submit further written argument.  Leave was granted.  The plaintiff's latest

argument is to contest the defendants' oft-stated position (by virtue of brief characterizations)

that the Pledge and the lease are connected in a "*quid pro quo*" relationship.  In roundabout

---

[79] To the extent that the trustee sued the BMC auditors (and settled), Eisenreich could have been pled or impled as a party purportedly contributing to misleading financial statements if legal theory and facts allowed; he was not so targeted.  Nor is he being sued here for damages attributable to such purported conduct.  To the extent that he allegedly knowingly participated in a bonus scam, he could have been included in the trustee's suit (again, now settled) against the officers and directors; he was not so sued. Nor is he being sued here for damages attributable to such purported conduct.  Rather, as to the Pledge, unsupported concepts of conspiracy are briefed but left without material connection to Pledge enforcement issues.

fashion, the plaintiff implicates the Anti-Kickback Act, 42 U.S.C. § 1320(a)-7(a)(a)(5), 7(b)(1) and 7(b)(2) (2011).  Since, as is contended by the plaintiff, such a relationship would have violated the Act, one must assume that the hospital personnel and Eisenreich would *not* have comported themselves in such a violative manner.[80]   The argument's punch line is that "the Pledge is a valid, enforceable independent obligation . . . not tied to the lease." *Ibid.*  This much belated construct is a detour which does not justify a deep foray into the Anti-Kickback Act.[81] The plaintiff's position (i) wrongly assumes Pledge enforceability *from outset,* and (ii) ignores the thoroughly obvious *relationship* (however one characterizes that relationship) between the Pledge and the entirety of the *then-evolving* SNF deal (including but not limited to the leaseback portion).

Contrary to the plaintiff's threshold assumption, the Pledge was not intended by Eisenreich to be enforceable when he signed the pledge form, and no amount of trustee wishful thinking can discount the *undisputed* fact that Eisenreich *required* a letter confirming that the Pledge was "nonbinding."  That contemporaneous letter was issued by the BMC CEO and cannot be overcome by brief-talk.  *No facts offered by the plaintiff dispute both the demand for the letter and its issuance.*

---

[80] As argued, "it is incredible and totally improbable that, had the facts been as Defendants say they were, neither the Hospital executives nor the established owner/operator of health care facilities, nor their lawyers, ever even considered the applicability of the Anti-Kickback law." Adv. Pro. Dkt. 79 at 14.  This argument is not in any sense fact based; it is more of the trustee's argumentation by *surmise* in an effort to contradict what the record in this proceeding reflects.

[81] There appears to be absolutely no connection between *patient referrals* and the Pledge.  The executed formal sale documents and the lease (before it was terminated) show an awareness of and safeguard against violating Anti-Kickback Act provisions based on such referrals.  *See* Exs. P-43 at ¶ 32 and P-44 at Article 51.  The plaintiff's more extended argument beyond patient referral prohibitions (i.e., into creative would-be applications of the Act) is yet more of a detour because: (i) even if connecting the Pledge and the lease (as part of the SNF development deal) ran afoul of Anti-Kickback (a doubtful premise outside of the patient referral or service/goods supply contexts), that would not justify the trustee's surmise regarding the conduct of BMC executives; and, (ii) if a Pledge-lease connection violated the Act, *both were terminated*, and if both had not been terminated the purported violation could well become a basis for their mutual termination.  Anti-Kickback concerns are irrelevant to the Pledge, which was nonbinding from its issuance in October 2005 and properly written off in December 2006.

Regarding a then *contemplated* lease, it was simply a conceptualization when BMC targeted Eisenreich as a potential donor.  That is not to say that the notion of a leaseback was not in Eisenreich's thinking when he acceded to the solicitation.  His explanation of "back of the envelope" calculations roughing up $5 million in buildout and rental concessions at that time[82] reflects at least his view of linkage to the lease.  CEO Evans expressed more generally the same linkage in identifying Eisenreich as a contributor. Ex. P-6, R. Evans, T. 66:8-22.  C. Evans. did likewise.  Ex. P-12, C. Evans, T.87:13-88:5.  Of course, it was not until ten months after the Pledge was signed that a lease agreement was executed; and the lease was for only approximately half the space initially conceived of and reflected in the November 30, 2005 letter of intent (Ex. P-33).  Indeed, the entire deal had changed from a joint venture to a land sale/leaseback with obvious restrictions to assure development of the SNF.  And, if the trustee has a point in disputing the defendant's characterization of the lease being a formal *quid pro quo* for the Pledge *when the Pledge issued,* that argument does not dispel an overriding verity in this proceeding.  There is nothing in the record to indicate that Eisenreich was going to volunteer the Pledge or provide it out of pure charitable instincts – he was essentially a stranger to the hospital doing a business deal.  He linked the Pledge for which he was solicited, at the time of issuance, to the conceptualized, evolving and totally uncommitted deal with BMC.

In sum, whether the Pledge-SNF connection would or would not have offended Anti-Kickback notions in October 2005, that connection is undeniable.

---

[82] Ex. P-3, Eisenreich, T.62:17-63:21.

### D.    Conclusion.

This court determines, based upon the absence of any genuine dispute as to material facts, that the Pledge was not enforceable when issued, was not enforceable at any time thereafter up to the time it was canceled of record on the books of BMC, and was rendered a nullity by virtue of that cancellation (thus being unenforceable even if, *arguendo,* it had been potentially enforceable up to that point).

## III.    ALLEGATION THAT EISENREICH WAS AN "INSIDER."

This court, familiar with BMC and "insider" issues,[83] concludes that the trustee's allegations here are wholly without merit.  Moreover, the trustee's suggested loose extension of such status to business associates of enterprises that become bankruptcy debtors would tend to squelch a broad array of deals to the great detriment of struggling businesses and commerce generally.

### A.    Statutory Insidership.

The trustee contends that Eisenreich is a statutorily defined "insider" per 11 U.S.C. § 101(31)(B)(v) as a "general partner of the debtor."  This untenable position is based largely upon a *proposed* joint venture between an Eisenreich entity and BMC for the development of the SNF.  The joint development never materialized.  No binding document established the required "general partner" status, nor did such status ever exist for Eisenreich or any entity which he controlled.[84]

---

[83]*See, e.g., Pamrapo Decision*, 429 B.R. at 179-81.

[84] Application of the "general partner" statutory insider status to a co-venturer in the SNF (even if there were facts supporting such an arrangement) would be questionable.  The main business or mission of BMC, i.e., the delivery of a wide range of medical services, is distinctly different from the narrow-gauge SNF project.  To render the innumerable hospital co-venturers such as specialty medical service providers, on-site food vendors and the like "general partner[s] of the debtor," though raising issues of interpretation which are beyond the scope of this opinion, is a highly questionable thesis.

Coupled with the *proposal* of joint development, the trustee sees *statutory* insidership arising from the array purported "conspiratorial" acts of Eisenreich and, presumably, the Evanses over the October 2005 through December 2006 period.  As discussed earlier regarding the Pledge and comfort letter, the audit confirmation, the June 2006 loan, the August 2006 contracts, the termination of the leaseback, and the closing, the record here shows only the activities of a businessman *chasing a deal* and encountering a negotiating team on the other side of the transaction which had an agenda (e.g., keeping up the appearances of hospital finances) which went well beyond SNF considerations.  There is no material evidence in this proceeding to include Eisenreich as a co-conspirator with BMC executives in their efforts to enhance their bonuses or in "prettying up" the hospital's financial picture.  *See*  Point II (C)(1), *supra.*

Eisenreich was not a statutory insider of BMC.

## B.    Nonstatutory Insidership.

### 1.    <u>Overview.</u>

It is well settled that the statutory list of insiders set forth the § 101(31) of the Bankruptcy Code is not exclusive.

> Purported *nonstatutory* insiders are evaluated for preference purposes by examining: (i) factual contexts centered on analogs to Code-listed types; or (ii) influence short of control (would be "undue influence") or arm's lengthedness (or lack of it) in dealing with the debtor. Such examinations propel the inquirer toward those well-worn but softly defined terms, "undue influence" and "arm's length."

*Pamrapo Decision,* 429 B.R. at 175.

Prominent as precedential benchmarks in defining insidership are:  *In re Winstar Commc'ns, Inc.,* 554 F.3d 382 (3d Cir. 2009); *In re U.S. Medical, Inc.*, 531 F.3d 1272 (10th Cir. 2008); *In re Krehl*, 86 F.3d 737 (7th Cir. 1996); and *In re Friedman*, 126 B.R. 63 (B.A.P. 9th

Cir. 1991).[85]  This precedent was reviewed in depth by this court in *Wilen v. Pamrapo*, 429 B.R.

at 175-85.  Without repeating that review at length but incorporating it here by reference, the

nonstatutory insider standard can be summed up as follows:

> [T]he question "is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length."

*In re Winstar*, 554 F.3d at 396 (*quoting U.S. Medical*).  This two-prong test remains the

treatise-stated standard.  *See* 5 COLLIER ON BANKRUPTCY, ¶ 547.03[6] n.117 and accompanying

text (Alan N. Resnick, et als. eds. 16th ed. rev. 2010).

The following essentially undisputed factors counter the trustee's contention that

Eisenreich or an entity controlled by him was a nonstatutory insider of BMC:[86]

(i)     Eisenreich was not involved in any manner with the management

or policy-making organisms of BMC (as would be an officer or trustee in this

nonprofit entity, or a director or significant shareholder in a for-profit

corporation);

(ii)     Eisenreich was essentially a stranger to BMC prior to his response

to the SNF solicitation;

(iii)     Eisenreich was, by any objective standard and without dispute,

highly – if not uniquely – qualified for consideration by BMC as the developer of

the SNF;[87]

---

[85] "Insider" per N.J.S.A. 25:2-22(b), is consistent with the Bankruptcy Code.  *See Pamrapo Decision*, 429 B.R. at 185 n.42.

[86] The most that the trustee can marshal are the following irrelevancies and/or an otherwise factually incomplete web out of which a conspiracy and now insidership would be espoused:  an allegedly flirtatious e-mail greeting by Carrie Evans, the Pledge, the audit letter, the loan and unauthorized Brockman signature, and alleged lack of disclosure of the Pledge and the August 24 contract terms.  *See* Point II (C)(1), *supra*. None of these points establishes either the necessary closeness of relationship between Eisenreich and BMC (or its management) or that bargaining was not conducted at arm's length.

(iv)    No BMC insider significantly involved with the October 2005-December 2006 events pertaining to the SNF had any business connection with Eisenreich or any Eisenreich entity;[88]

(v)     BMC was a major Hudson County hospital and, as such, was an independent community and economic force of broad scope and significance; at the time the SNF was being considered, though important, it paled in comparison to items on the BMC agenda made known to this court in the Chapter 11 case and acknowledged in its record (including contemplation of a bi-state affiliation with a Staten Island division of St. Vincent's Hospital and the teeing up of an $80 million bond issue against which $10 million of bond anticipation funding was received in October 2006);

(vi)    When BMC ultimately contracted with an Eisenreich entity, it was through extremely comprehensive August 24, 2006 documents which were prepared in consultation with BMC's outside, independent counsel; the detailed documentary provisions were never questioned (except for pricing)[89] by the trustee for their businesslike approach to the sale of hospital real estate for a specific and restricted purpose, and the leaseback of developed space;

---

[87] *See* Ex. P-86 (BMC Board of Trustees Executive Committee Meeting Minutes of July 14, 2005).

[88] Dr. John Dedousis had been a medical director of an Eisenreich nursing home, as well as a former president of the BMC medical staff; Dedousis (who eventually became a BMC board trustee) spoke highly of Omni to Grywalski; *see* Ex. P-6, R. Evans, T.19:13-21; it is clear that no allegation is made by the trustee that Dr. Dedousis was part of the purported "conspiracy" involving Eisenreich and BMC executives nor that Dr. Dedousis played any role in the events complained of by the trustee.  The plaintiff's efforts to connect Brockman to Eisenreich in the 2005-06 period was simply a nonstarter.  *See* n.26, *supra*, and accompanying text.

[89] *See* Point II (C)(1), *supra* (as to lease rent and, among other points, its comparability to that quoted in the AON study, Ex P-8 at 19), and Point IV, *infra* (as to sale price).

(vii)    BMC's leverage and Eisenreich's bargaining limitations are plainly evidenced by the substantial change to the August 24, 2006 formalized deal affected by Brockman's extra-contract demand that the valuable leaseback be terminated – and Eisenreich's ultimate acquiescence to that demand;[90] and

(viii)    *Inter alia*, the trustee would tag as an "insider" a businessman who *responded* to the hospital SNF initiative (which was recommended by a consultant and endorsed by management before Eisenreich was on the scene, and notwithstanding the fact that the responding businessman was a logical candidate for selection as the SNF developer), *because* he *gave in* to the demands for a pledge and a loan; in fact, Eisenreich's yielding to the precontract pressuring is the antithesis of the act of an insider – it is instead the conduct of someone who, on the one hand, had bargaining "leverage" because of his strong objective qualifications as developer, while on the other hand was in the unenviable position of having to deal with more and more unstable and eroding management[91] in an institution which had its eye on much more substantial "lifeline" projects (a major merger and a mega-bond deal).

---

[90] This is strong evidence of arm's length bargaining in the SNF development process, but by no means the only evidence of the balance in the relationship.  *See* Point IV, *infra*.  However, as indicated throughout, Eisenreich maintained his own bargaining strength by virtue of the certificate of need which he (and he alone) held for Hudson County SNF beds.

[91] The record reflects that CFO Heather Aaron resigned in May 2006; CEO Rob Evans abruptly announced his resignation in October 2006 (and was rarely at the hospital thereafter until he officially departed in November 2006); and, Carrie Evans, who had been out on medical leave in the fall of 2006 was in a questionable status after her husband's departure.

## 2.    *In re Winstar Commc'ns, Inc.* – Case Distinguished.

*Winstar*, the Third Circuit's most thorough modern review of insidership issues, is cited by the trustee as support for its position.  Yet, that case presents a starkly different factual setting than the case at bar.  It serves as *contra* precedent against which to measure the trustee's allegations *sub judice*.  There, "affinity" issues and examination of the targeted transaction for arm's length negotiation appear to have converged as a factual matter.  "The Bankruptcy Court's extensive findings regarding Lucent's ability to coerce Winstar into transactions not in Windstar's interest amply demonstrate Lucent's insider status."  554 F.3d at 397.[92]

Winstar was, in effect, a captive of the much larger Lucent Technologies, Inc., who was one of Winstar's primary creditors and suppliers.  "Lucent had come to dominate the parties' relationship . . .," and, though actual control was not established,[93] that dominance justified the conclusion that Lucent was a nonstatutory insider of Winstar.  554 F.3d 399-400.

*Sub judice*, as set forth throughout this opinion, Eisenreich was by no stretch of one's imagination a person who dominated either the overall business of BMC in its broad spectrum delivery of community health services, or even the relatively incidental relationship in the development of the SNF.  *See* Point III (B)(1), *supra*.  Unlike the *Winstar* model, BMC's

---

[92] The Court of Appeals went on:

> For example, the Bankruptcy Court found that Lucent "controlled many of Winstar's decisions relating to the buildout of the network;" "forced the 'purchase' of its goods well before the equipment was needed and in many instances . . . never needed at all;" "treated Winstar as a captive buyer for Lucent's goods;" and used Winstar as "a means for Lucent to inflate its own revenue." . . . The Bankruptcy Court also found that "Lucent's ability to involve Winstar's employees in [certain improper transactions that benefitted Lucent] is further evidence of Lucent's control."

*Ibid* (citations omitted).

[93] *See* 11 U.S.C. § 101(31)(B)(iii), rendering a "person in control of the debtor" a *statutory insider* of a debtor corporation.

functioning as a medical center – an acute care major hospital – was not subject to the kind or degree of manipulation worked by Lucent against its captive buyer.

### 3. *Wilen v. Pamrapo* (the "*Pamrapo Decision*") – Case Compared.

The trustee also attempts to take some solace in this court's earlier encounters with BMC insidership issues. None is justified. The earlier adversary proceeding reflects the liquidation trustee's efforts in the BMC bankruptcy case to cast the local savings bank (Pamrapo) as an insider in two quite distinct transactions. Structurally, that adversary proceeding readily separated the affinity analysis for nonstatutory insidership from arm's lengthedness in particular transactions.

As to affinity, the many connections between the local hospital's board of trustees and the community bank's boards were undeniable[94]-- and reflect linkages which are the antithesis of relationships between Eisenreich and BMC. Eisenreich here is a newcomer, a single-project businessman, and an outsider without any hospital board or management influence other than through his pursuit of the SNF project.

The heightened scrutiny of targeted transactions that close corporate ties require is not apposite to Eisenreich's dealings with the hospital. The affinity aspect of the test for nonstatutory insidership fails *sub judice*. Nevertheless, for purposes of summary judgment the court has closely examined the "SNF deal" – from origin as a letter of intent through the revised transactions reflected in the August 24, 2006 contractual documents to the closing – for arm's lengthedness.

At the earliest stages of the SNF consideration, it was recognized that Eisenreich was a logical developer-candidate – and the one and only candidate holding the *essential* certificate of

---

[94] Among the BMC-Bank connections were BMC Board Chairman Brockman's position on the Board of Directors of Pamrapo and his ownership of stock in Pamrapo; William Campbell, Pamrapo's President, CEO and its largest shareholder being a trustee of BMC and Chair of the hospital's Finance Committee and close connections of two other BMC Board members with Pamrapo. *See* 429 B.R. at 159-60.

need to turn the nursing home concept into a reality.  With that recognition came the realization

that Eisenreich would not be easy to deal with; he held bargaining leverage.  On the BMC side of

the transactional balance, the hospital's future did not depend on the SNF project, which had

only a "value added" quality toward BMC's business goals of maintaining hospital bed census.

And, of course, BMC owned the land on its campus which was a natural site for the SNF.  But

more pressing matters of much greater dollar magnitude were on the hospital's 2005-06 agenda.

BMC could have pulled the plug on the SNF deal if it was not to BMC's liking and long-range

benefit.  And, it bears reiterating that the Board Chairman reviewed the transaction and changed

it – with the eleventh hour termination of the leaseback – notwithstanding then existing

contractual obligations.

Harking back to the *Pamrapo Decision*, the comparison of two transactions there at issue

(429 B.R. at 179-82), is unsupportive of the trustee's current position.  The transaction which

*failed* the arm's lengthedness test there (a last-minute securing of a bank line of credit with a

mortgage) bears no resemblance to the long-developing and contractually programmed SNF

project which is the current target of the trustee.  Rather, the evolving SNF project – from

conception in 2004 (before Eisenreich was in the picture), through solicitation, letter of intent,

change in deal structure, comprehensive contracting and closing – reflects businesslike

characteristics.  These characteristics, showing the give-and-take of a mutually beneficial

business deal, are comprehensively demonstrated in documents which provide benchmarks in the

SNF development process.  They are typified by the following nonexclusive list of examples:

    (i)    Eisenreich's sparse written proposal of June 21, 2005 (Ex. P-14) in

response to BMC's solicitation was ultimately answered by BMC's full-form

letters of intent of November 30, 2005 (Ex. P-33) (in which both parties preserved

rights by setting forth "non-binding understandings" as to matters of substance);

(ii)     As to the leaseback by the hospital, *there is no evidence in the record* that Eisenreich was the promoter of that concept; that the rental rate was set without due negotiation (it was expressed in the BMC-drafted letter of intent); that the rate was (as characterized by the plaintiff) "excessive";[95] or that the lease in its entirety was anything but commercially reasonable;

(iii)    In fact, the up to 40,000 square feet of BMC space to be leased as initially proposed in the November 30, 2005 letter of intent was reduced in the actual lease to 20,000 square feet (as was the lease term from 25 years to 20 years) to the apparent detriment of Eisenreich,[96] and, *of course, the entire lease, was terminated at the insistence of Mr. Brockman on the eve of closing*;

(iv)    The Purchase and Sale Agreement (Ex. P-42), besides setting a fair market price ($2 million)[97] for the SNF  site, included comprehensive and otherwise unobjected to terms; among those terms were clear restrictions placed upon Eisenreich's purchasing affiliate designed to assure the actualizing of the SNF project, including a detailed deed restriction[98] and a  "put" and "call"

---

[95]Eisenreich's view of the rate was that it "was at the top end of the market."  Ex. P-3, Eisenreich, T.62:20-22.  Ironically, an appraisal submitted by the *trustee,* prepared for this litigation, actually utilizes the *lease rental rate* as part of his valuation analysis.  *See* Ex. P-101 at 71.  And, the AON study of January 2005 uses a projected rental rate comparable to the lease rent.  *See* Ex. P-8 at 19.

[96] *See* nn.69 and 70, *supra*.

[97] *See* Point IV (A), *infra*.  *Compare and contrast* Eisenreich's earliest statement "valuing the land at $500,000," Ex. P-14 (June 21, 2005 letter), with the ultimate sale price.

[98] The Purchase and Sale Agreement (Ex. P-43) restricted the use of the property in the following manner:

> C.  It is the intent of the parties that Purchaser will construct and operate a 100,000 square foot building containing, in part, a 120-bed skilled nursing facility ("SNF") on the Real Property . . . .
> . . .

> 1.  Agreement to Sell and Purchase. . . .

provision affecting a reversion of title to the land in circumstances where the

SNF would not be developed[99] (*with a repurchase price set at the same $2 million*

*sale price*);

(v)       After the August 24, 2006 contract signing, there were further

negotiations and deal adjustments; one exchange shows Eisenreich giving *extra-*

*contract* relief relating to access easements (as to events which would "trigger"

certain related action); in that same exchange Eisenreich sought a broad "right of

first refusal" for the entirety of the BMC real estate if the hospital were to put the

property up for sale or cease operation as an acute care facility – the request was

flatly rejected ("Mr. B – said no way" on September 28, 2006, Ex. P-55); and

(vi)      The PSA's "Special Environmental Covenant" (Ex. P-43 ¶ 11-3)

underwent substantial post-contract change; originally, per the PSA, there was to

be an escrow out of closing funds and exposure for clean-up costs to BMC of up

to $500,000; a November 2, 2006 report from Environmental Waste Management

---

. . . Seller's Deed . . . will contain the following restriction on the use of
the Real Property, which restriction shall run with the land:  so long as
Seller, its successors and assigns shall own or operate a general acute
care hospital within the City of Bayonne, the Real Property shall be used
exclusively as a nursing home; skilled nursing home; intermediate care
facility; convalescent home; rehabilitation center; assisted living facility,
residence or program; residential healthcare facility; senior housing or
comprehensive personal care home licensed by the New Jersey
Department of Health and Senior Services . . . .

[99] The Purchase and Sale Agreement, Ex. P43, ¶ 29 ("Seller's Obligation to Re-Purchase Property;
Seller's Right to Re-Purchase Property"), established conditions under which the debtor must or may
repurchase the property.  The PSA, ¶ 29.1, stated that, if the purchaser were unable, within 24 months of
closing, to obtain approvals from the City of Bayonne or from Hudson County to build the SNF, or, if the
approvals contained terms which the purchaser deemed commercially unreasonable, the purchaser "may,
but shall not be required to, elect to have Seller purchase the Property from the Purchaser" for $2,000,000
("Purchaser's Put Right").  The PSA, ¶ 29.3, provided that, if the purchaser obtained land use approvals
(obviating the Seller's "put" right) and either elected not to build the SNF or could not obtain State
approvals for the SNF, then the Seller "shall have the right to purchase[ ] the Property from Purchaser"
for $2,000,000 ("Seller's Call Right").

Associates to Omni put the total cost of remediation in the range of $366,000 to

$425,000 (Adv. Pro. Dkt. 67, Supplemental Declaration of Fred R. Gruen, Esq.,

dated July 5, 2011, Ex. D);  Gruen declared that "[b]etween November 2, 2006

and the December 8, 2006 closing, the parties negotiated a straight $385,000

credit to Omni on account of the aforesaid environmental contamination" (Adv.

Pro. Dkt. 67, Gruen, ¶ 3); and, the $385,000 appeared on the HUD-1 (Ex. P-73,

line, 517) as an "escrow" but was in fact a credit.

    *Compare* the *Pamrapo Decision*, where a loan repayment of $1 million was held to be at

arm's length.[100]  429 B.R. at 181-82.  Like that transaction, the joint efforts of BMC and

Eisenreich to provide a skilled nursing home on the hospital campus satisfied "'[t]he standard

under which unrelated parties, each acting in his or her own best interest, would carry out a

particular transaction.'"  In re *U.S. Medical*, 531 F.3d at 1277 n.4, *quoting* BLACK'S LAW

DICTIONARY, 109 (6th ed. 1990), quoted with approval in *Winstar*, 554 F.3d at 399.   That is, the

BMC-Eisenreich relationship and their joint business dealings were at arm's length.  In sum,

Eisenreich, as an independent business person negotiating (ultimately successfully) for the SNF

development deal, did not exhibit characteristics of close-relationship ("affinity") necessary to

begin to be deemed a nonstatutory insider, nor did he and BMC bargain at other than arm's

length.

---

[100] Among the purported indicia of non-arm's length dealing stressed by the trustee is the fact that the June 2006 note was paid "early."  This argument ignores the ultimate bookkeeping entry by BMC that the $1 million was an advance against the real estate sale, that the $500,000 down payment required by the contract of sale was, but for $100,000, not completed, and that the note was due by its own terms on December 31, 2006, only twenty-three days after the December 8, 2006 closing.  *See* debunking of similar contention in *Pamrapo Decision*, 429 B.R. at 190 (subpoint iv).

## C.    Conclusion.

Eisenreich was neither a statutory nor a nonstatutory insider of BMC, and no genuine

issue of material fact to the contrary is raised by the record before this court.

## IV.    EVALUATION OF SALE PRICE OF BMC's REAL PROPERTY – "REASONABLY EQUIVALENT VALUE."

Ultimately, the trustee has the burden to show that BMC received "less than a reasonably

equivalent value" in the December 2006 real estate transaction, in order to establish the cause of

action under 11 U.S.C. § 548(a).  *See* § 548(a)(1)(B)(i).[101]  In addition to direct economic

benefits, indirect benefits and business synergies are to be considered in the evaluation.  *See*

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-48 (3d Cir. 1991); *see also In re*

*Fruehauf Trailer Corp.*, 444 F.3d 203, 212-14 (3d Cir. 2006); *In re R.M.L., Inc.*, 92 F.3d 139,

147-52 (3d Cir. 1996).  The business benefit to BMC in having an SNF on its campus was

evident from outset (the January 2005 AON study, Ex. P-8).  Moreover, the charitable purpose

and chartered goals of this community hospital were also to be advanced by the project.

Synergies thus were at the root of the 2005-06 BMC efforts at development.  Long-term benefits

were the focus.  This was not, even as it morphed from a joint venture to a sale, a single asset

"sell it and forget it" transaction.   And, the PSA well reflected the required use of the parcel for

SNF development.

As a threshold matter, this court notes the plain point that the $2 million sale price

provided BMC with "value."  *See generally* 11 U.S.C. § 548(d)(2)(A) and N.J.S.A. 25:2-24.

Given (i) the earlier finding that the $1 million June 2006 transfer was in exchange for a note and

not a donation, (ii) that transfer was eventually booked by BMC as an advance or deposit against

the PSA purchase price, and (iii) that the closing statement of December 8, 2006 reflected a

credit for the note principal amount plus interest, it is clear to this court that $2 million was

---

[101] *See also* N.J.S.A. 25:2-25(b) and 27(a).

"paid" – though subject to contractual adjustments[102] including a negotiated $385,000 environmental remediation credit.

But should this payment, along with other benefits and factors in the totality of circumstances,[103] be deemed "reasonably equivalent value"?  In precedential terms, the inquiry is "whether the debtor got roughly the value it gave."  *In re Freuhauf Trailer Corp.*, 444 F.3d at 213.

## A.     **"Fair Market Value."**

Both sides have submitted real estate appraisals and/or statements of value for the property conveyed for the SNF development which, not surprisingly, *appear to* vary substantially.  Bankruptcy courts are quite familiar with real estate appraisal processes and

---

[102] The trustee argues that BMC only received $188,000 in *cash proceeds* at closing and hence both the rationale to close and value are purportedly subject to question.  The argument wrongly discounts the closing adjustments reflected in the HUD-1 (Ex. P-73).

[103] Factors underlying the totality of circumstances test could include (but are not limited to) fair market value, arm's length relationship and good faith.  *In re Freuhauf Trailer Corp.*, 444 F.3d at 213 (*citing R.M.L.*, 92 F.3d at 148-49).

elements of advocacy which creep into valuations. As a general matter, actual bargained-for sale prices developed in arm's length circumstances are better evidence of the market than theoretical or hypothetically divined appraised values.  Moreover, generally appraisals which are made close in time to a questioned transaction and are not developed with an "ax to grind" (e.g., for bargaining or litigation purposes) tend to be more credible than reconstructed values developed years after a sale.  The bargained-for sale price *sub judice,* as discussed below, best reflects the special market factors involved in the sale-SNF development.  By contrast, an array of appraisals (many remote in time, overly general in approach, and reflecting one or another degree of result orientation) is less instructive.  However, given that this proceeding is at the summary judgment motion stage, submissions by the plaintiff *to the extent they value the parcel for SNF development purposes*, will be viewed in a light most favorable to the plaintiff.

Early on and during the bargaining between the parties, BMC and Eisenreich traded appraisals for the 200 ft. by 100 ft. parcel (20,000 square feet) on the BMC campus[104] that would be developed as the SNF.  The structure that would house the SNF was conceived of as a multistory building of at least 100,000 square feet.  In fact, the PSA of August 14, 2006 required that size building as the intended structure to contain a 120-bed SNF.  This meant that, in addition to considerations of environmental remediation, the two very old existing structures on the parcel would have to be demolished.[105]  *Hence, the existing structures were a liability to the*

---

[104] The PSA, paragraph 1(a) describes the parcel as "comprising approximately 20,000 square feet of land . . . and improved by one and two story attached brick and masonry buildings of approximately 25,000 square feet in the aggregate" with certain easements.  Ex. P-43.

[105] Demolition of existing structures and attendant environmental remediation of the parcel were project costs recognized from the earliest conceptualization of the SNF.  *See, e.g*., the January 2005 AON Report commissioned by BMC, Ex. P-8 at 10 (conceiving of "new construction" for the SNF); at 17 (projecting 129,000 square feet of space in a six-story structure); at 18 (reflecting a "ground floor" of 17,000 square feet and upper floors of 20,000 square feet); at 27 ("[t]he financial viability of the project could improve significantly if the costs associated with the razing [of] the existing building and the costs of a subsequent environmental cleanup could be funded through federal or state grants. . . ."); and, at 28 (identifying "the costs associated with razing the building and site clean up" as possible subjects for governmental grants or other funding).  It is significant to note that (i) the "footprint" of the SNF as a 100,000+ square-foot

*development, a fact that has all too conveniently escaped the trustee's contentions as to "value" in this proceeding.*  The sale thus had at least the following somewhat specialized characteristics which were necessitated by BMC's basic purpose in conveying its real estate to an Eisenreich entity:

      (i)     The intended use of the land to construct a large SNF was to be memorialized in a deed restriction (per PSA ¶ 1);

      (ii)     The purchaser's failure to follow through with an approved SNF gave the seller an option to "call" the property back for the $2 million purchase price (PSA ¶ 29.3);

      (iii)     The existing buildings were to be demolished and the parcel remediated environmentally, *all at the risk and cost of the purchaser except for a closing credit fixed at $385,000*; and

      (iv)     The marketplace of purchasers who could develop an SNF in Hudson County was limited by State regulation of certificates of need – and only Eisenreich had such preapproval.

---

structure would plainly cover virtually the entire 20,000 square-foot lot, and that the 80 +/- year-old existing structures (a one-story 5,000 square-foot building and a two-story 17,500 square-foot building) were obstacles covering approximately 13,750 square feet of the parcel. *See, e.g.,* plaintiff's submission, Ex. P-101 at 27 for description of existing buildings.

In sum, whether a generalized "highest and best" use of the parcel *might* have been other than an

SNF (e.g., a medical office building adjacent to the hospital or senior citizen condos), the "fair

market value" of this parcel should be evaluated in context, and the "reasonably equivalent

value" issue must be considered with BMC's goals in mind.  To the extent that appraisals

submitted for immediate motion purposes assess the parcel out of the SNF context or with

analytics inconsistent with the development of that facility, they are not relevant or probative

(even at this motion stage).  Such nonprobative appraisals would not be the basis for a genuine

issue of material fact.

The initial (October 28, 2005) BMC "number" in its bargaining was $5.3 million[106]-- a

valuation viewed as suspect even by hospital executives and its outside counsel,[107] and ultimately

rendered questionable by the deposition testimony of the appraiser, Walter, who issued the

---

[106] Appraisal of Dolph Walter, dated October 28, 2005 (Ex. P-38).

[107] *See* Ex. D-134, R. Evans, T.40:5-43:25;  Ex. DII-16, Burney, T.97:16-24 and 107:15-22 (emphasis added):

> [T]here was a general understanding or belief that for several reasons [the $5.3 million] appraisal did not reflect the appropriate value. . . [I]t didn't recognize the teardown nature of the buildings, and I don't believe it recognized the environmental issues. . . .

> [T]he October 2005 appraisal didn't adequately address the unique nature of this transaction.  *It was a simplistic appraisal, which was based upon factors that were not appropriate to this sale, like comparables of the buildings.* . . . [I]t didn't reflect what a willing buyer would do with this property with those buildings.

report.[108]  This valuation offered an income approach ($20 per square foot per year) to the

existing "80 +/- years old" brick and masonry buildings on the site (totaling 25,000 +/- gross

square feet of "rental" space), deducts some expenses and applies an eight-percent capitalization

rate.  This approach, generally applicable to an investment property, is not instructive *sub judice*,

where office rental income was not at the heart of the project, *and* the old structures had *for SNF*

*development purposes* substantial negative value (i.e., the cost of demolition and environmental

remediation).[109]  The same failings are attributable to Walter's "cost approach" – where he

speculates about the value of buildings *which are to be demolished*.  This appraisal, challenged

and otherwise showing no insight into the circumstances of the SNF development is to be

discounted.

On the other side of the bargaining see-saw, Eisenreich offered an appraisal dated

January 13, 2006 developed by National Valuation Services, Inc.  *See* Ex. P-39.  Its number was

$1.2 million, made up of a similarly unsatisfying rental income capitalization for the *existing*

*structures* (using rental rates of $12 per square foot for 17,480 square feet and $5 per square foot

for 5,000 square feet).[110]  Demolition and remediation costs were not considered.  This early

appraisal, like its counterpart above, is to be discounted.  Neither of the early appraisals is

relevant or probative in assessing real estate value based upon the business and community

---

[108] Walter acknowledged, *inter alia*, that his appraisal was not premised on demolition of the existing
buildings; his testimony otherwise put at issue the reliability of the report (*see, e.g.,* Ex. DII-21, Walter,
T.66:21-67:3; *see generally id* at 66:13-71:20).  The trustee's effort to bolster the Walter appraisal
through a colleague's letter, Ex. P-102, likewise is flawed by failing to acknowledge the necessity for
demolition and the constraints of SNF development.

[109] There is no evidence that the buildings, a one-story and a two-story structure, were at all income
generating, though BMC apparently stored equipment in one of the buildings.  *See* Ex. DII-21, Walter,
T.15:1-15.

[110] The trustee cites these rental rates in his challenge to the leaseback, which, of course, never
materialized.  In any event, the August 24, 2006 lease was for brand new space in a modern building not
to be developed for some substantial time in the future.  Rates would thus differ.  And, the BMC
bargaining position appraisal was at $20 per square foot for the 80 +/- year-old buildings, a number the
trustee prefers to ignore in advocating that the lease was overpriced.

purpose intended by BMC, i.e., the development of what had to be a new, multistory structure to house an SNF on land unburdened by old brick and masonry buildings. In fact, they do not give insight into "raw" land value so that their texts could be "molded" into meaningful data points.[111]

The next appraisal in terms of chronological development is the Cushman & Wakefield report of November 22, 2006. *See* Ex. D-111. Here, the value was reported as $2 million. It is a "land only" evaluation, solicited by BMC's outside counsel (said to have been commissioned to satisfy requirements, including bond indenture requirements, that hospital assets be sold at fair market value).[112] Under the stated category "Current Disposition," the report provides:

> It is our understanding that Bayonne Medical Center is currently under contract to sell the property to Omni Development, for a reported purchase price of $2,000,000. Omni will be demolishing the existing buildings at their expense for the redevelopment of the property with a five-story nursing home/medical office facility. We have not been provided with a copy of the contract nor have been provided with a budget fro [sic] demolition of the existing building.

Ex. D-111 at "page 3."

*Inter alia*, the $2 million value was approximately $100 per square foot for *raw land* (including a certain component for "air rights"). It bears emphasizing that the parcel was by no

---

[111] Hence, the trustee's submission, Ex. P-38 (Walter), viewed in the most favorable light for motion purposes, still does not offer *material* facts to dispute the sale price.

[112] *See* Ex. D-120, Burney, T.45:19-46:23 and 56:22-57:20. In fact, in the Cushman & Wakefield report under the stated category "Purpose and Intended Use and Users of the Appraisal," the following was set forth:

> This appraisal is intended to provide an opinion of the current market value of the fee simple interest in the property (land only) for the exclusive use of Lindabury, McCormick, Estabrook & Cooper, P.C. and their client Bayonne Medical Center in evaluating a potential disposition of the property. All other uses and users are unintended, unless specifically stated in the letter of transmittal.

Ex. D-111 at "page 3."

means deliverable in a raw land state ready for high-rise development; one or another party to a

sale transaction would have to pay directly for demolition, a factor that would impact on the

purchase price to be garnered by a seller if that direct cost were to be placed on a purchaser.

The Cushman & Wakefield  appraiser, Korch, was deposed.  As to consideration of the

"Omni" sale contract, as well as costs of demolition, the following is reflected in the deposition

transcript:

> Q.    Go to Page 18, Bates 18.  This is Page 3 of your report.
> Look at the heading, "Current Disposition" on the bottom.
> I'm reading it now, "It is our understanding that Bayonne
> Medical Center is currently under contract to sell the
> property to Omni Development for a reported purchase
> price of $2,000,000."  I'm going to stop there.  I asked you
> this question earlier.  I'm going to ask you again, now that
> you have this in front of you.  And the question is, did the
> terms of the contract between Bayonne Medical Center and
> Omni Development influence in any way the valuation that
> you reported in this document?
>
> . . .
>
> A.    It was a bit of information that we considered, but we don't
> rely on it.
>
> Q.    And how was it considered by you?
>
> A.    It's looked at as a piece of information like we would
> consider a comparable sale.
>
> Q.    Do you know whether you set this up on your grid, the
> Omni sale?
>
> . . .
>
> A.    I'd have to look and see.
>
> Q.    If it were not set up on the grid, would that lead you to
> conclude that it was not given much weight in the valuation
> process?
>
> . . .
>
> A.    Not necessarily.

Q.      As you sit here today, do you know what influence, if any, the terms of the Omni contract had on your valuation?

. . .

A.      Only that I considered it a part of data that I would normally review and analyze, along with other data.

Q.      I'm continuing to read, "Omni will be demolishing the existing buildings at their expense for the redevelopment of the property with a five-story nursing home/medical office facility.  We have not been provided with a copy of the contract, nor have been provided with a budget fro," which I assume means "for"?

A.      That's "for."

Q.      ". . . demolition of the existing buildings."  What, if at all, was the significance of the fact that you hadn't been provided with a demolition budget, as it relates to the valuation report?

. . .

A.      I think it goes back to the statements that I made, that if I don't have a cost of demolition, it's difficult for me as a nonexpert in that field to estimate it on my own.

Q.      And therefore you did not reduce your valuation conclusion based upon demolition costs.

. . .

A.      *Well, I didn't only because the value was assumed to be just for the land, assuming the property, the building was already demolished.* (Emphasis added.)

Q.      And therefore, just to complete the circle, no consideration was given in the valuation process to the cost of demolition; is that correct?

A.      That's correct.

Ex. P-104, Korch, T.56:16-59:16.  This appraisal, rendered close in time to the actual sale, would

have to be adjusted downward for demolition costs in order to determine an appropriate *sale*

*price* as of December 2006.  *Once cleared*, the land would be valued at $2 million.   *Id.* at

56:16-59:16.  As adjusted, this appraisal would provide relevant and probative evidence of

values.

For purposes of this litigation, three appraisals were prepared.  The trustee's two

submissions are each dated March 11, 2011 (Brody, Ex. P-101, at $4,645,000 and O'Donnell,

Ex. P-103 at "no less than $4,000,000").  Both of these appraisals include, to one or another

degree, *value for the existing buildings*.  Brody, e.g., at Ex. P-101, p. 71, summarizes his cost

approach (among three approaches)[113] to include $1,448,000 for the yet-to-be demolished

buildings.  O'Donnell, at Ex. P-103, p. 4, values the two-story structure (presumably including

land under it) at "between $1.9 million and $3 million" and the smaller building (again

presumably with land) at "between $860,000 and $1.24 million."  Moreover, neither makes

adequate provision for demolition and environmental remediation.  In short, they are not "raw"

land appraisals and thus have the same failing as the Walter appraisal offered by the trustee.

However, viewing them in a light most favorable to the plaintiff, certain data points can be

gleaned from each exhibit which have probative value.  Those points reflect the appraisers'

views of land value.  Brody's cost analysis readily identifies the *land value* at $2,610,000 for the

total parcel, 20,000+ square feet.  That is roughly $130 per square foot.  O'Donnell's report

values the *vacant parcels only* (i.e., excluding the improved lots) at between $580,000 and

---

[113]  The Brody appraisal (Ex. P-101) includes three formularized "approaches."  Of these three
methodologies, the "Cost Approach" and the "Market Data Sales Comparison Approach" value/compare
data for the preclosing existing structures; these analyses thus do not measure the value of the site as
cleared land ready for SNF development, or of the existing parcel subject to costs of
demolition/remediation.  They place a positive value on structures which were a liability to the SNF
development.  Brody's income approach likewise fails to value buildable land and, rather startlingly,
creates a hypothetical stream of revenue for the entire 100,000 square foot structure to be built *at the
August 24, 2006 lease rental rate*.  The plaintiff contends throughout that that rate is "excessive."  There
is no evidence of that rental rate being excessive, however, Eisenreich states frankly that it was at the high
end of the market range.  Given that, the expansion of a medical office/facility use rate from the proposed
20,000 square feet of leased space to the entire 100,000 square foot SNF (where more than 80,000 square
feet was to house a nursing home, not professional offices or treatment suites) is more than a bit
problematic.  *And,* the lease rent never saw the light of day (given the termination in December 2006).
*See* Ex. P-101 at 71.

$667,000; since those subparts of the total parcel are 5,000 square feet (see report, p.1), his per square foot land values run between $116 and $134. Extrapolating from those values, the entire 20,000 square-foot site would have a *post-demolition value* of between $2,320,000 and $2,680,000, respectively. *Neither the O'Donnell appraisal nor the cost analysis of Brody accounts for environmental costs or (as must be repeated) the necessary demolition costs,* costs largely placed upon the purchaser in December 2006.

The defense has submitted its own appraisal for litigation (American Appraisal, Ex. DII-45, dated March 11, 2011). With air rights and *before reduction* for demolition and environmental remediation costs in excess to the BMC closing credit, the value per square foot assessment is about $145. Thus, the construction-ready value of the raw land was appraised at $2,906,165. *See*, Ex. DII-45 at 31. *Actual cost* to demolish and clean up the site as reported to this appraiser was $936,804. *Id.* at 32. This amount is consistent with (indeed understates) invoices provided by Eisenreich, s*ee* Ex. DII-141, and on a per square foot basis is about $47. The reduction attendant to it resulted in an appraised value by American Appraisal *as of closing* of $1,970,000. *Id.* at 32. As of August 2006 when the PSA was signed, the value was said to be $1,910,000. *Id.* at 33.

In sum (discounting the two earliest appraisals), there is reasonable consistency in the three litigation-solicited reports (Exs. 101 and 103 submitted by the trustee, and Ex. DII-45 for the defense) as to *cleared* land. The costs of demolition and remediation left to the purchaser must thus be deducted from the site-ready raw land measure in order to determine the "fair market value" of the SNF parcel for that purpose at the time of sale. That net measure of a transaction price would most conform to the business and community purpose which BMC was trying to achieve with the real estate sale. To recap, the two trustee submissions (Exs. P-101 as to cost analysis and 103), respectively, set the land value (*not* reduced for demolition costs) at

$2,610,000[114] and (using land value figure as extended) between $2,320,000 and $2,680,000.

Using *only* the $936,804 demolition/remediation cost accounted for in the American Appraisal

defense report (DII-45), these values net down to $1,673,000 and between $1,383,000 and

$1,743,000.   The defense report from American Appraisal (Ex. DII-45) set the value at

$2,906,165 less demolition costs of $936,804, or $1,970,000.   In effect each of these appraisal

amounts for raw land value *only,* as reduced for a certain stated amount of demolition costs,[115]

would be comparable to or less than the actual price paid for the BMC parcel.[116]   And, ironically,

the last *defense* submission would reflect the *highest* such hypothetical net sale "price."

---

[114] Brody's appraisal (Ex. P-101 at 29) suggests a value-added factor for "synergism" based upon potential BMC-purchaser interaction; *see id* at 50 for fifteen percent "Synergism Factor."   This highly subjective and overgeneralized factor fails to account for the very specific expectations of BMC in increasing *its* "bed count" and acute care facility utilization; that is, arguably, the price could be *reduced* by such a factor in order to promote the SNF, or the factor could otherwise be neutralized by the synergistic *benefit to the hospital*.   And, as with all valuations of a hypothetical nature, "the economics of supply and demand" – i.e., the marketplace – is assumed.   *See id* at 28.   However, the availability of purchasers able to meet the BMC goal to develop the SNF was limited by the certificate of need requirement; Brody is seemingly unaware of or unconcerned with this vital sale factor when he generalizes about "synergy."   *In any event, a fifteen percent add-on to the $2,610,000 would not affect the numbers appreciably nor the conclusion which follows*.

[115] With or without accounting for demolition costs (including environmental remediation costs above the sale credit), the array of appraisal values in Exs. P-101 and 103, and Ex. DII-45 reflects "*equivalency*" in land values, a term which belies any notion of exactitude in making comparisons.

[116] Chairman Brockman weighed in with his confirming view of market value, as follows:

> Q     And so your understanding was that the $2,000,000 purchase price was the fair market value of the Bell Building at the time of the sale?

> A     Yes.   In fact, the city had just bought the piece right across the street.   In proportion it was fair market value, too.

> Q     Do you know what the city bought the property across the street for?

> A     I think they told me half a million dollars.

> Q     They paid $500,000.   So how is that comparable to 2,000,000?   I'm just trying to understand your theory there.

> A     Well, it was, like, one-quarter of the block they bought for $500,000 right across the street.

Cushman & Wakefield (Ex. DII-111), providing the only sale-*contemporaneous* appraisal, set the site-ready value (without considering demolition costs) at $2 million. Reducing this value by the same $937,000 demolition/remediation amount would result in a yet-to-be-cleared land value of $1,063,000 – a figure lower than all three "for-litigation" submissions.

This court is well aware that the defense has submitted invoices for demolition and remediation which could be read as being in the $1.3 million range (Ex. D-141).[117] However, for summary judgment purposes only the *lesser* cost reflected in Ex. DII-45 is used in the court's analysis.

The best evidence of market value is usually reflected in the actuality of a bargained-for contract price. This is especially the case where special circumstances or sale characteristics are involved --- as with the BMC-SNF development effort. Of course, at the summary judgment stage *genuine* disputes of *material* facts require trial; *sub judice* there is no genuine dispute as to the value of land in its ready state for SNF construction, nor as to the *least* invoiced cost of readying the land. This court thus finds that the $2 million sale was at a fair market price in

---

Q    Was it an improved lot? Did it have a building on it? It was a
     vacant lot?

A    Was it vacant? I don't recall. They did the improvements, the
     city did.

Ex. P-127 (Brockman) at 44:2-19.

[117] Defendants submitted amended answers to interrogatories (with backup documentation) reflecting a total of $936,803.74 in demolition costs (as of October 26, 2010) and environmental remediation costs of $764,804.34 (as of that date). The court has assumed (against the defense) that the *remediation costs* include the $385,000 credit taken by Omni at closing. Moreover, the court has discounted (again, against the defense) the excess of claimed remediation costs above the closing credit. Since the *demolition costs* are unchallenged by the plaintiff (*see* July 1, 2011 hearing transcript, Adv. Pro. Dkt. 68 at 58), *only* actual demolition costs, i.e., $936,803.74, are applied in the court's analysis of fair market value of the parcel.

December, 2006.[118]  Of course, this finding amply supports a summary judgment conclusion of "reasonably equivalent value," especially where (as set forth immediately hereinafter) the sale price is set in an arm's length relationship.

## B.      Arm's Length Relationship.

It has already been found (i) that neither Eisenreich nor any entity controlled by him were "insiders" of BMC, and (ii) that the sale price paid for the BMC parcel was at "fair market value."  Concluding arm's lengthedness in the BMC-Eisenreich relationship would flow from these building block findings.  *See, in particular*, Point III (B)(3), *supra*, detailing the characteristics of the SNF transaction and the give-and-take of that mutually beneficial business deal.

Leverage in the bargaining process has already been analyzed.  In most general terms, Eisenreich was holding the vitally important certificate of need for beds in a Hudson County SNF, while the hospital was a major health delivery enterprise with developable land at its disposal.  And, as a fundamental in the facts of this proceeding, BMC had an unimpeachably proper business and service objective in the development of an SNF on its campus; the directly corresponding point is that Eisenreich was an objectively qualified developer and operator of nursing homes.  The BMC-Eisenreich dealing thus reflects an arm's length relationship, a factor supporting the conclusion that BMC received "reasonably equivalent value" in the December 8, 2006 sale of real estate.

## C.      Good Faith.

The trustee attacks Eisenreich as one who has conspired with officers of BMC.  How does that conspiracy theory relate to the sale transaction of December 8, 2006?  The web woven by the trustee to impugn Eisenreich is cast in terms of the origin and life of the Pledge.  More

---

[118] The "put" and "call" provisions of the PSA at ¶ 29 (Ex. P-43) reflect the fairness of the sale price, given that a repurchase (if the SNF project should not be feasible or if feasible should not be appropriately advanced) was to be at the $2 million amount.

specifically, it is argued (mostly by inference) (i) that the Pledge was somehow a "favor"

provided by Eisenreich for BMC *considering and ultimately selecting* Eisenreich as a developer

candidate for the SNF; (ii) that coziness between the Evanses and Eisenreich was evidenced by

the audit letter episode and the loan with its aberrations; and (iii) that BMC suffered in the

process (presumably through the undeserved Pledge-related bonus to R. Evans and H. Aaron, the

CFO), and a bargain sale price for Eisenreich which included an above-market leaseback by

BMC.

     The actual transaction at issue and other clear evidence in the record belie the trustee's

argument.  As to the transaction:

     (i)      It was a sale determined by this court to be at a fair market value price;

     (ii)     It was directly in furtherance of a proper business and community purpose

of BMC;

     (iii)    It was made to someone who was highly (if not uniquely) qualified to

actually deliver the SNF; and

     (iv)    Any and all concerns for the pricing of a would-be leaseback by BMC

were mooted when the leaseback agreement was terminated.

     As to the Pledge, it was nonbinding at outset (again, as determined earlier), and nullified

of record when the leaseback was terminated.  Any losses occasioned by events surrounding the

audit letter (including personal bonuses) are not pled against Eisenreich.  The June 2006 transfer

by Eisenreich's entity to BMC has been determined to be a loan (as documented) and, as such, is

not the basis for a claim against Eisenreich, a noninsider who advanced $1 million to the hospital

and was given a resulting credit at the closing of December 2006.  Purported malfeasance by

officers, trustees, and auditors of BMC was the subject of earlier, now concluded, litigation and

did not involve Eisenreich or his entities as a party.  Those claims of malfeasance cannot be laid

at the feet of Eisenreich now, either directly or through some theory of conspiracy incorporated

into the here-pled causes of action.

There is simply no *factual basis* in the record before this court to impugn Eisenreich's

good faith in the development and conclusion of the sale transaction of December 2006.

### D.      Conclusion – "Reasonably Equivalent Value."

Both a fair market value analysis and the totality of circumstances (i.e., arm's

lengthedness and good faith) support the conclusion that BMC received reasonably equivalent

value in the sale at issue.  This conclusion is based upon material facts which are not in genuine

dispute.

## V.      VALIDITY OF NOTE AND SALE.

The trustee, at Count VII of the Complaint, asserts that the June 2006 loan was "never

authorized" by the Board of Trustees of BMC and hence is "invalid and unenforceable."

Similarly, at Count XII the assertion of such invalidity is raised as to the December 2006 sale.

The trustee's position, on the undisputed facts of this proceeding and the applicable law, is

without merit.

### A.      The Note.

The court will assume for purposes of summary judgment that the Board (including

Brockman) was unaware of the June 2006 note *when that note issued*, and that Brockman did not

in fact countersign it.  Nevertheless, the following points are undisputed:

(i)      CEO R. Evans executed the note for BMC;

(ii)      C. Evans advised Eisenreich as to Chairman Brockman, "I got his

signature yesterday" (Ex. P-60);

(iii)      The $1 million was actually transferred by an Eisenreich entity to BMC in

June 2006;

(iv)    Recording of the receipt of these funds, initially booked by BMC as payment of the first installment on the Pledge, *was later corrected at the direction of C. Evans* to be recorded as an advance on the sale;[119]

(v)    The PSA deposit requirement for the purchaser, "Bayonne/Omni Development L.L.C.," was apparently satisfied (indeed "super satisfied" since the $1 million loan far exceeded the $400,000 otherwise unpaid on the deposit amount due);

(vi)    Chairman Brockman, upon learning of the note for the first time shortly before the December 2006 closing, investigated the matter (particularly to get assurance that the $1 million had been received by BMC);[120]

(vi)    Brockman reported the existence of the note to the Board of Trustee, as reflected in the meeting minutes of December 7, 2006;[121] and

(viii)    Brockman approved the credit for the note as reflected on the HUD-1 Settlement Statement (Ex. P-73) which he signed on behalf of BMC at the closing.

It is thus clear that BMC received the benefit of the $1 million loan, and that though not initially disclosed to the Board, before the loan was repaid/credited it was investigated and disclosed to the Board.  That process of ratification would seem to put to rest the trustee's purported cause of action.  However, even if it were only established that there was the $1 million payment to BMC,[122] the concept that the loan was unauthorized and thus unenforceable as *ultra vires* is contrary to applicable law.

---

[119] *See* Ex. P-13, Mohrle, T. 85:12-93:25.

[120] Ex. P-125, Brockman, T.68:13-72:23; 79:9-81:10; 83:14-84:12.

[121] Ex. P-76.  "Mr. Brockman reported that the closing with Omni Asset Management for the on-site Skilled Nursing Facility is scheduled to take place tomorrow.  He was successful in renegotiating and releasing BMC from being obligated to lease back 20,000 sq. ft.  Aspects surrounding a promissory note were related and it was commented that this is an important project for the community that we must move forward with."

[122] The trustee would revert to the argument that the Pledge was binding, that it was the basis for the June

N.J.S.A. 15A:3-2 validates the loan transaction.  That statutory section for nonprofit

corporations is based upon N.J.S.A. 14A:3-2 of the New Jersey Business Corporation Act.

Commissioners' Comment to that section advises as follows:

> In precluding the defense of *ultra vires* to the parties, this
> section changes present New Jersey case law with respect
> to a contract which is wholly executory on both sides.  In
> such a situation, the *ultra vires* defense is now
> available. . . . In other respects, this section largely codifies
> New Jersey case law, *which precludes the defense of ultra
> vires to the parties in the case of a partially executory
> contract fully performed by either party in reliance upon
> the agreement in such a manner as to benefit the other
> party.*  [Citations omitted, emphasis added.]

Given that the loan transaction was fully performed (by both parties) as of the closing, and

partially performed by Eisenreich's entity as of the June 2006 payment, the *ultra vires* defense is

precluded.  Similarly, the benefit conveyed to BMC estops the trustee from disputing

authorization under the circumstances of this case.  *See, e.g., Ross v. Realty Abstract Co.*, 50 N.J.

Super. 147 (App. Div. 1958).

The prior conclusion should dispose of the trustee's narrow gauge summary judgment

motion pertaining to the note.  The trustee asserts in his motion two related formalisms

associated with the note.  The point is stressed that the Eisenreich entity named as payee on the

instrument was "ATE Consulting Co.," not "Bayonne/Omni Development, L.L.C.," the

purchaser of the BMC real estate.  Moreover, the note was said to have never been presented for

payment at closing (endorsed for cancellation).  As the argument goes (building on these two

sticking points), from BMC's creditors' vantage point the hospital did not receive "reasonably

equivalent value" for the $1 million (plus) closing credit of December 8, 2006.  However, as has

already been detailed, the loan proceeds were "booked" by BMC as an advance against the real

---

2006 payment, and that there was thus no "benefit" to BMC.  Documentary evidence, i.e., principally the
comfort letter and the note, along with other material evidence set forth throughout the Opinion, amply
rebut the trustee.

estate sale, and they "super satisfied" the balance due on the contract deposit amount.  Hence, the link between the credit at closing and the loan is clear, notwithstanding the fact that the named payee on the note was an Eisenreich entity different from the purchasing Eisenreich entity.  *As the plaintiff stresses most emphatically,* this specific fact (i.e., the payee-purchaser variance) "conclusively establishes that Eisenreich failed to observe the proper corporate forms, and treated the entities he created (or purported to create) as extensions of himself *and each other*." Plaintiff's Brief, Dkt. 51 at 45 (emphasis added).

*Transfer* of either the note or its underlying obligation, as in this instance from the note payee to the related purchasing entity, does not offend any principle of law nor generate rights in the trustee, *provided* the trustee is not exposed to a "double payment" of the obligation.  *See, generally*, U.C.C. Article 3; *consider* N.J.S.A. 12A:3-203 and 301 as to transfer and enforcement; *see also* N.J.S.A. 12A:3-309 as to lost instruments.  While the maker of a note said to be lost by a person seeking enforcement might be entitled to adequate protection against a second claimant presenting the note in the future, here *years* have passed since the December 31, 2006 note due date *and* the Chapter 11 case bar date to claims[123] is likewise long since passed. Neither BMC nor the trustee is in any jeopardy from the theoretical note holder now coming out of the woodwork.  BMC had received a loan, represented by the note obligation, the obligation was satisfied by the closing credit, and no claim persists with respect to any "outstanding" instrument.

---

[123] The six-year statute of limitations to enforce the obligation to pay the note will not run until after December 31, 2012.  *See* N.J.S.A. 12A:3-118(a).  However, the applicable Chapter 11 claims bar date expired on *May 30, 2008*.  *See* main case Dkt. 1298.  Moreover, given that the note is an "overdue instrument" per N.J.S.A. 12A:3-304 and has been such from and after January 1, 2007, there can be no "holder in due course" status for a hypothetical current claimant taking the note after that date.  N.J.S.A. 12A:3-302(a)(2).

The trustee's motion for summary judgment based upon these formalistic contentions (where no damage was suffered nor is conceivable), is to be denied.

**B.      The Sale.**

The trustee's contention that the sale was unauthorized and should be reversed fails *a fortiori*.  Like the effort to invalidate the note and payment against it, the New Jersey statutory law precluding *ultra vires* attack is applicable.  Moreover, factually the sale transaction has stronger underpinnings than the loan in terms of disclosure, early Board approval, preclosing investigation, price verification, and ultimate Board and Chairman review.[124]  Specifically, the following facts convincingly rebut the trustee's position:

> (i)      The Board generally approved the concept of the sale (at market value) at its June 8, 2006 meeting;[125]

---

[124] *See* Point II (A)(1)(2) and (3), *supra*.

[125] The minutes (Ex. P-40)  reflect the following:

> **Skilled Nursing Facility** – By way of background, Mr. Brockman advised that initially we were seeking to structure the SNF project as a land lease arrangement with Omni Asset Management.  It has recently come to light that this will not be an acceptable arrangement given Bayonne Medical Center's not-for-profit status.
>
> In order for Raymond James to proceed with the bond financing and to move forward with the SNF project, Mr. Brockman stated it may be necessary to sell the land at the current market rate. He explained further details of this proposal and added that all necessary covenants will be included to protect and ensure the best interests of Bayonne Medical Center.
>
> **FOR ACTION:**  The Board of Trustees of Bayonne Medical Center approves and authorizes Administration to proceed in this matter and, if deemed necessary, arrange for the sale of the land at market value.

(ii)     BMC's outside counsel fully participated in the development of comprehensive sale transaction documents;

(iii)    Chairman Brockman reviewed the entire transaction in the week before closing[126] and ultimately changed the deal by eliminating the leaseback;

(iv)     BMC's outside counsel commissioned an appraisal by Cushman & Wakefield to verify the sale price;[127]

(v)      Meeting minutes of the Board reflect discussion of the impending closing;[128] and

(vi)     The Chairman of the Board attended the closing, was represented by BMC counsel there, and "signed off" on the closing documents.

---

Eventually, a thorough and complete form of resolution was prepared and signed by the BMC Board secretary (Ex. P-79); this resolution included the $2 million sale price.  The court will assume for summary judgment purposes that the sale price was not made available to the Board at the June meeting (though Brockman's statement about this could be taken to the contrary, Ex. P-125, Brockman, T.51:6-19).

[126] *See* Ex. P-65 (November 30, 2006, 12:08 PM responding e-mail from outside counsel Burney, referring to his partner "D.B.") as follows:

> Mr. Brockman advised D.B. within the last few minutes that there will be no closing until Mr. Brockman has reviewed the terms of the transaction.  I am advising Fred Gruen accordingly.
>
> D.B. and I are supposed to meet with Mr. Brockman tomorrow morning.

[127] *See* Ex. D-120, Burney, T.45:19-46:23 and 56:22-57:20 ("The purpose [of this appraisal] was to provide evidence that the purchase price was a reasonable one." [*id.* at 57:19-20]).  *See also* Ex. P-65 indicating on November 30, 2006 that BMC executive Apsel "has the appraisal information he was waiting for."

[128] *See* Ex. P-76.

The sale was thus authorized and cannot be invalidated after-the-fact.

## C.    Conclusion.

Both the satisfaction of the note and the closing of the real estate sale were valid

transactions under the applicable law, neither being subject to rescission after the fact of their

completion.

## VI.    "ACTUAL FRAUD" CAUSES OF ACTION.

The plaintiff has pled actual fraud in Complaint Counts III (concerning repayment of the

note per 11 U.S.C. § 548(a)(1)(A)), V  (as to the same repayment per N.J.S.A. 25:2-25(a)) and X

(as to the sale of the real estate per N.J.S.A. 25:2-25(a)).

The applicable statutory sections to such actual fraud causes of action are premised on the

*debtor's* conduct.  Nowhere in this proceeding's record is there any evidence of *BMC* conduct in

repaying the note or selling the parcel as effecting a transfer "with actual intent to hinder, delay,

or defraud" any creditor.  Again, allegations of "cooking" the books, excesses as to bonuses, or

loose practices in authorizing and executing documented transactions (accusations against BMC

officers and trustees), are simply not connected to the repayment of a loan of $1 million and sale

of land for $2 million at fair value.

It is true that BMC was insolvent in December 2006.   BMC's transfers while in such

economic status should thus be scrutinized.  However, the transfers in question have

characteristics ("factors") which dispose of "actual intent" to defraud.  More specifically, the

tranfers were *not* to "insiders," BMC did *not* retain possession or control of the property after the

transfers, the note repayment and the sale were disclosed to the Board before the closing, the

transfers were only incidental in terms of the overall asset picture and business of BMC, and,

*most significantly*, the transfers were both for "reasonably equivalent value."  *See* N.J.S.A.

25:2-26(a)(b)(c)(e) and (h).  This court concludes that the note repayment and the sale were not

acts of actual fraud attributable to BMC.  No genuine issue of material fact persists which would

put this conclusion in question.

In addition, *even if BMC had committed "actual fraud,"* the defendants would have

irrebutable defenses to any remedy which the trustee would seek against them.  The value given

for the note and parcel and the good faith of Eisenreich as a persistent businessman operating in

the ordinary course of his business and toward the realization of an appropriate hospital goal,

provide those statutory defenses.  *See* 11 U.S.C. § 548(c) and N.J.S.A. 25:2-30(a) and (d).

Actual fraud causes of Counts III, V and X, being unsupportable in fact and in law, are to

be dismissed.

## VII.    SUMMARY AND EFFECT OF CONCLUSIONS.

There is no genuine issue of material fact in dispute in this proceeding, even when

viewing the facts in the light most favorable to the plaintiff.  Therefore, this court finds and

concludes as a matter of law pursuant to *Fed. R. Civ. P.* 56, made applicable here through *Fed.

R. Bankr. P.* 7056,  as follows (with the hereinafter stated effects on the Complaint):

A.    The Pledge was nonbinding when made and, whether or not nonbinding when

made, was written-off, canceled and terminated in or around December 2006; hence, the Pledge

is not enforceable.  *See, in particular*, Point II, *supra*, along with the totality of findings and

conclusions throughout this Opinion.  Count I of the Complaint ("Claim for Enforcement of

Pledge") shall therefore be dismissed.

B.      Defendant Eisenreich (and the entity defendants he controlled) were neither statutory nor nonstatutory "insiders" of BMC.  *See, in particular*, Point III, *supra*, along with the totality of findings and conclusions throughout this Opinion.  It is uncontested that the note repayment date occurred more than ninety days before the filing of BMC's Chapter 11 petition. Hence, the time requirements of 11 U.S.C. § 547(b)(4)(A) and (B) for the avoidance of a preferential transfer per § 547  have not been satisfied.  Count II of the Complaint ("Claim for Avoidance of Preferential Transfer as to Repayment of Alleged Promissory Note") shall therefore be dismissed.  Count VI ("Claim for Fraudulent Transfer as to Repayment of Alleged Promissory Note – N.J.S.A. 25:2-27"), to the extent implicating N.J.S.A. 25:2-27(b) ("transfer . . . to an insider") and Count XI (Claim for Fraudulent Transfer as to Sale of Bell Building – N.J.S.A. 25:2-27), to the extent implicating N.J.S.A. 25:2-27(b) ("transfer . . . to an insider"), shall both likewise be dismissed.

C.      BMC received "reasonably equivalent value" in the real estate sale which closed on December 8, 2006.  *See, in particular*, Point IV, *supra,* along with the totality of findings and conclusions throughout this Opinion.   Count IV ("Claim for Fraudulent Transfer as to Repayment of Alleged Promissory Note – Constructive Fraud"), relying on 11 U.S.C. § 548(a)(1)(B) for relief (relief only available where "less than reasonably equivalent value" was received in exchange for the note), shall therefore be dismissed.  In addition, Count V ("Claim for Fraudulent Transfer as to Repayment of Alleged Promissory Note – N.J.S.A. 25:2-25) to the extent implicating N.J.S.A. 25:2-25(b) (applicable to transfers not "receiving reasonably

equivalent value") and Count VI ("Claim for Fraudulent Transfer as to Repayment of Alleged

Promissory Note – N.J.S.A. 25:2-27), to the extent implicating N.J.S.A. 25:2-27(a) (providing a

remedy if "reasonably equivalent value" is not received in the exchange), shall both likewise be

dismissed.   Count IX ("Claim for Fraudulent Transfer as to Sale of Bell Building – Constructive

Fraud"), relying on 11 U.S.C. § 548(a)(1)(B) for relief (relief only available where "less than

reasonably equivalent value" was received in exchange for the sale of the BMC real estate), shall

therefore be dismissed.  In addition, Count X ("Claim for Fraudulent Transfer as to Sale of Bell

Building – N.J.S.A. 25:2 -25"), to the extent implicating N.J.S.A. 25:2-25(b) (applicable to

transfers not "receiving reasonably equivalent value") and Count XI ("Claim for Fraudulent

Transfer as to Bell Building – N.J.S.A. 25:2-27"), to the extent implicating N.J.S.A. 25:2-27(a)

(providing a remedy if "reasonably equivalent value" is not received in the exchange), shall both

likewise be dismissed.

     D.     "Actual fraud" allegations of Complaint are without basis in fact or legal merit.

*See, in particular,* Point VI, *supra*, along with the totality of findings and conclusions throughout

this Opinion.  Therefore Count III ("Claim of Fraudulent Transfer as to Repayment of the

Alleged Promissory Note – Actual Fraud"), relying on 11 U.S.C. § 548(a)(1)(A) for relief, shall

be dismissed.  In addition, Count V ("Claim for Fraudulent Transfer as to Repayment of Alleged

Promissory Note – N.J.S.A. 25:2-25") and Count X ("Claim for Fraudulent Transfer as to Sale of

Bell Building – N.J.S.A. 25:2-25"), to the extent implicating the actual fraud aspects of N.J.S.A.

25:2-25(a), shall both likewise be dismissed.

     E.     Both the repayment of the June 2006 note and the December 2006 sale of real

estate were authorized and valid transactions of BMC, and are not subject to rescission.  *See, in*

*particular*, Point VI, *supra*, along with the totality of findings and conclusions throughout this

Opinion.  Count VII ("Declaratory Judgment of Invalidity and/or Unenforceability as to Alleged Promissory Note"), Count VIII ("Claim for Unjust Enrichment as to Alleged Promissory Note"), Count XII ("Declaratory Judgment of Invalidity and/or Unenforceability as to Transfer of Bell Building Property"), and Count XIII ("Claim for Unjust Enrichment as to Transfer of Bell Building Property"), shall all be dismissed.

F.      The plaintiff's motion for summary judgment on Counts I and II and certain claims under Counts IV, V and VI is denied, given the court's findings and conclusions for the defendants as to these Counts and causes.  Count XIV of the Complaint, for Attorneys' Fees and Costs, is dismissed.

_____

The court will enter its order implementing the findings and conclusions of this Point VII.


Dated:  November 1, 2011                    ____/s/ Morris Stern _____
                                            MORRIS STERN
                                            United States Bankruptcy Judge